IN THE
UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

**TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD., CANADIAN SOLAR INTERNATIONAL LIMITED, CANADIAN SOLAR MANUFACTURING (THAILAND) CO., LTD.,**

*Plaintiffs-Appellants*,

**NEXTERA ENERGY CONSTRUCTORS, LLC,**
*Plaintiff*

v.

**UNITED STATES,**

*Defendants-Appellees*,

**AUXIN SOLAR INC.**

*Defendant.*

---

Appeals from the United States Court of International Trade in
Case Nos. 1:23-CV-00227-MMB, 1:23-cv-00222-MMB, Judge M. Miller Baker

---

**NON-CONFIDENTIAL BRIEF FOR PLAINTIFFS-APPELLANTS
CANADIAN SOLAR INTERNATIONAL LIMITED AND CANADIAN
SOLAR MANUFACTURING (THAILAND) CO., LTD.**

---

Jonathan T. Stoel
Michael G. Jacobson
Nicholas R. Sparks

HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel.: (202) 637-5600

*Counsel for Plaintiffs-Appellants
Canadian Solar International Limited
and Canadian Solar Manufacturing
(Thailand) Co., Ltd.*

October 15, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2025-1940, 2025-1941 |
| **Short Case Caption** | Trina Solar Science & Technology (Thailand) Ltd. v. US |
| **Filing Party/Entity** | Canadian Solar International Limited; Canadian Solar Manufacturing (Thailand) Co., Ltd. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/15/2025

Signature: /s/ Jonathan T. Stoel

Name: Jonathan T. Stoel

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Canadian Solar International Limited | | CSI Solar Co., Ltd.; Canadian Solar Inc. |
| Canadian Solar Manufacturing (Thailand) Co., Ltd. | | CSI Solar Co., Ltd.; Canadian Solar Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Gregory M.A. Hawkins (Hogan Lovells US LLP) | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

I, Nicholas R. Sparks, have entered an appearance as counsel to Canadian Solar International Limited and Canadian Solar Manufacturing (Thailand) Co., Ltd. in this proceeding and certify that I have authority to file this document.
/s/ Nicholas R. Sparks
Nicholas R. Sparks
10/15/2025

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.........................................................................iii

TABLE OF AUTHORITIES ...................................................................v

STATEMENT OF RELATED CASES ................................................. xii

JURISDICTIONAL STATEMENT ........................................................1

INTRODUCTION ..................................................................................3

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........5

STATEMENT OF THE CASE................................................................5

    A.    Solar I Orders ..........................................................6

    B.    Solar II Orders .........................................................8

    C.    Circumvention Inquiries..........................................9

    D.    Preliminary Determination....................................11

    E.    Final Determination...............................................16

SUMMARY OF THE ARGUMENT .....................................................18

ARGUMENT ........................................................................................21

    I.    STANDARD OF REVIEW ....................................21

    II.    COMMERCE UNLAWFULLY INTERPRETED THE STATUTORY LANGUAGE "MINOR OR INSIGNIFICANT" TO REQUIRE A LARGE PORTION OF THE VALUE AND OPERATIONS TO COME FROM THIRD-COUNTRY MANUFACTURING...............24

    III.    COMMERCE UNLAWFULLY ELEVATED R&D TO BE THE SINGLE CONTROLLING FACTOR IN ITS CIRCUMVENTION ANALYSIS ................................32

IV.   COMMERCE'S DETERMINATION WITH RESPECT TO THE VALUE OF PROCESSING ADDED IN THAILAND WAS UNLAWFUL..........................................................................48

    A.   One Third Is Not a "Small Proportion" ...................................49

    B.   Commerce Failed to Conduct the Required Qualitative Value-Added Analysis .......................................................................51

    C.   Commerce's Assessment of the Value Added in Thailand Is Inconsistent with the Department's Precedent .........................54

V.   COMMERCE FAILED TO RENDER A DETERMINATION THAT WAS SUPPORTED BY SUBSTANTIAL EVIDENCE....................55

CONCLUSION .........................................................................................59

**CONFIDENTIAL MATERIAL DELETED**

The confidential material deleted in pages 10, 12–15, 17–18, 33, 48, 50, and 56–57 consists of business proprietary information submitted to, or released by, the U.S. Department of Commerce under administrative protective order, **Appx1–4,** the disclosure of which is protected by statute, 19 U.S.C. § 1677f.

# TABLE OF AUTHORITIES

**Cases**

*Al Ghurair Iron & Steel LLC v. United States*,
   65 F. 4th 1351 (Fed. Cir. 2023) ..........................................................40

*Anhydrides & Chemicals, Inc. v. United States*,
   130 F. 3d 1481 (Fed. Cir. 1997) ..........................................................22

*Best Power Tech. Sales Corp. v. Austin*,
   984 F. 2d 1172 (Fed. Cir. 1993) ..........................................................25

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962) ................................................................. 23, 46

*Canadian Solar Int'l Ltd. v. United States*,
   No. 23-00222, 2025 WL 1420317 (Ct. Int'l Trade May 16, 2025) ............ passim

*Chevron, U.S.A., Inc. v. N.R.D.C, Inc*,
   467 U.S. 837 (1984) ........................................................... 21, 22, 25

*Consol. Edison Co. v. N.L.R.B.*,
   305 U.S. 197 (1938) ..........................................................................23

*Daewoo Elecs. Co. v. Int'l Union of Electronic Elec., Technical, Salaried & Mach. Workers, AFL-CIO*,
   6 F. 3d 1511 (Fed. Cir. 1993) ..............................................................23

*Downhole Pipe & Equip., L.P. v. United States*,
   776 F. 3d 1369 (Fed. Cir. 2015) ..........................................................21

*Gallant Ocean (Thailand) Co. v. United States*,
   602 F. 3d 1319 (Fed. Cir. 2010) ..........................................................23

*Hlds (B) Steel Sdn Bhd v. United States*,
   No. 21-00638, 2024 WL 244937 (Ct. Int'l Trade Jan. 23, 2024).......................29

*Int'l Bus. Machs. Corp. v. United States*,
   201 F. 3d 1367 (Fed. Cir. 2000) ..........................................................25

*Kisor v. Wilkie*,
588 U.S. 558 (2019) ............................................................41

*Liberty Frozen Foods Pvt., Ltd. v. United States*,
791 F. Supp. 2d 1249 (Ct. Int'l Trade 2011) ......................41

*Long Island Care at Home, Ltd. v. Coke*,
551 U.S. 158 (2007) ............................................................41

*Loper Bright Enterprises et al. v. Raimondo*,
144 S. Ct. 2244 (2024) ................................................ passim

*Micron Tech., Inc. v. United States*,
243 F. 3d 1301 (Fed. Cir. 2001) .........................................34

*Mittal Steel Point Lisas Ltd. v. United States*,
548 F. 3d 1375 (Fed. Cir. 2008) .........................................21

*N.L.R.B. v. Columbian Enameling & Stamping Co.*,
306 U.S. 292 (1939).............................................................23

*Pesquera Mares Australes v. United States*,
266 F. 3d 1372 (Fed. Cir. 2001) ................................. 22, 25

*SKF USA Inc. v. United States*,
263 F. 3d 1369 (Fed. Cir. 2001) .........................................41

*Sunpreme Inc. v. United States*,
946 F. 3d 1300 (Fed. Cir. 2020) ...........................................8

*Timex V.I., Inc. v. United States*,
157 F. 3d 879 (Fed. Cir. 1998) ...........................................22

*Universal Camera Corp. v. N.L.R.B.*,

71 S. Ct. 456 (1951) ............................................................23

**Statutes**

19 U.S.C. § 1516a(a)(2)(B)(vi) ...........................................1

19 U.S.C. § 1516a(b)(1)(B)(i) ...........................................21

19 U.S.C. § 1671 ...............................................................31

19 U.S.C. § 1673 ...............................................................31

19 U.S.C. § 1677j(b) ................................................... 18, 34

19 U.S.C. § 1677j(b)(1) ..................................................9, 24

19 U.S.C. § 1677j(b)(2) ............................................... passim

19 U.S.C. § 1677j(b)(2)(B) ................................................56

19 U.S.C. § 1677j(b)(2)(E) ..................................................5

19 U.S.C. § 1677j(b)(3) ........................................... 20, 37, 56

19 U.S.C. § 1677j(b)(3)(B) ................................................33

19 U.S.C. § 1677j(b)(E) .....................................................49

19 U.S.C. § 1677j(b)(1)(C) ...................................... 11, 24, 28

19 U.S.C. § 3512(d) ..........................................................29

28 U.S.C. § 1581(c) ............................................................2

**Administrative Materials**

*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 87 Fed. Reg. 75221 (Dep't Commerce Dec. 8, 2022) ..............................11

*Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention with Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57419 (Dep't Commerce Aug. 23, 2023).............................................2

*Certain Aluminum Foil from the People's Republic of China*, 88 Fed. Reg. 17177 (Dep't Commerce Mar. 22, 2023)........................................................................45

*Certain Corrosion-Resistant Steel Products from Taiwan*, 84 Fed. Reg. 32864 (Dep't Commerce July 10, 2019) (affirmative preliminary determination of anti-circumvention inquiry on the antidumping duty order)......................................52

*Certain Crystalline Silicon Photovoltaic Products From Taiwan*, 80 Fed. Reg. 8596 (Dep't Commerce Feb. 18, 2015) (antidumping duty order)................................9

*Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 79 Fed. Reg. 76970 (Dep't Commerce Dec. 23, 2014) (final determination of sales at less than fair value) .............................................................................8

*Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 80 Fed. Reg. 8592 (Dep't Commerce Feb. 18, 2015) (antidumping duty order; and amended final affirmative countervailing duty determination and countervailing duty order)......................................................................................9

*Certain Tissue Paper Products from the People's Republic of China*, 73 Fed. Reg. 21580 (Dep't Commerce Apr. 22, 2008) (affirmative preliminary determination

of circumvention of the antidumping duty order and extension of final determination) ....................................................................................................55

*Certain Welded Carbon Steel Standard Pipes and Tubes from India,* 87 Fed. Reg. 52507 (Dep't Commerce Aug. 26, 2022) (preliminary negative determinations of circumvention of the antidumping order) ............................................................44

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 Fed. Reg. 73018 (Dep't Commerce Dec. 7, 2012) ......................................................................................6

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China,* 88 Fed. Reg. 57419 (Dep't Commerce Aug. 23, 2023) ..........................................................................................................43

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Countervailing Duty Order,* 77 Fed. Reg. 73017 (Dep't Commerce Dec. 7, 2012)...............................................................6

*Ferrovanadium and Nitrided Vanadium From the Russian Federation,* 77 Fed. Reg. 6537 (Dep't Commerce Feb. 8, 2012) (preliminary negative determination and extension of time limit for final determination of circumvention of the antidumping duty order) ....................................................................................54

*Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the United Kingdom,* 64 Fed. Reg. 40336 (Dep't Commerce July 26, 1999) (negative final determinations of circumvention of antidumping and countervailing duty orders) ................................................................................................................ 52, 54

*Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan,* 88 Fed. Reg. 21980 (Dep't Commerce Apr. 12, 2023) (preliminary affirmative determination of circumvention of the antidumping duty order)................................................45

*Notice of Scope Rulings,* 86 Fed. Reg. 47476 (Dep't Commerce Aug. 25, 2021)….32

*Small Diameter Graphite Electrodes from the People's Republic of China,* 77 Fed. Reg. 33405, 33413 (Dep't Commerce June 6, 2012) (affirmative preliminary determination of circumvention of the antidumping duty order and extension of final determination)............................................................................................53

**Other Authorities**

CDC, *About Smallpox*, https://www.cdc.gov/smallpox/about/index.html (last accessed Oct. 15, 2025) .......................................................................................51

Gallup, *Party Affiliation*, https://news.gallup.com/poll/15370/party-affiliation.aspx (last accessed Oct. 15, 2025)................................................................................50

*Insignificant*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/insignificant (last visited Oct. 15, 2025)........................................................................................................26

*Insignificant*, Merriam-Webster Dictionary, https://www.merriamwebster.com/dictionary/insignificant (last visited Oct. 15, 2025) ....................................................................................................26

*Insignificant*, Oxford English Dictionary, https://www.oed.com/dictionary/ insignificant_adj?tab=meaning_and_use #351290 (last visited Oct. 15 2025) 26

*Minor*, Brittanica Dictionary, https://www.britannica.com/dictionary/minor (last visited Oct. 15, 2025)........................................................................................26

*Minor*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/ minor (last visited Oct. 15, 2024) .......................................................................................26

*Minor*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/minor (last visited Oct. 15, 2024) ..................................26

**TABLE OF AUTHORITIES—Continued**

*Small*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/small (last accessed Oct. 15, 2025)...............................50

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316 (1994).................................................................. passim

## STATEMENT OF RELATED CASES

This action is the consolidation of two appeals that were decided simultaneously by the lower court. Case Nos. 1:23-CV-00222-MMB (*Canadian Solar International Limited v. US*); 1:23-cv-00227-MMB (*Trina Solar Science & Technology (Thailand) Ltd. v. US*). This Court consolidated the action on July 29, 2025. ECF No. 3. These actions have not previously been before this or any other appellate court.

This action challenges the U.S. Commerce Department's solar products from China circumvention determination with respect to Thailand. A separate action before the U.S. Court of Appeals for the Federal Circuit, Ct. No. 25-1937 (*BYD (H.K.) Co., Ltd. v. US*), challenges the U.S. Commerce Department's solar products from China circumvention determination with respect to Cambodia. While that action arises from a separate factual record with distinct interested parties, that appeal and this appeal do have certain issues in common. That action could, therefore, indirectly impact this appeal.

Nos. 2025-1940, 2025-1941

IN THE
UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

———————————

**TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD.,
CANADIAN SOLAR INTERNATIONAL LIMITED, CANADIAN SOLAR
MANUFACTURING (THAILAND) CO., LTD.,**
*Plaintiffs-Appellants*,

**NEXTERA ENERGY CONSTRUCTORS, LLC,**
*Plaintiff*

v.

**UNITED STATES,**

*Defendants-Appellees*,

**AUXIN SOLAR INC.**
*Defendant.*

———————————

Appeals from the United States Court of International Trade in
Case Nos. 1:23-CV-00227-MMB, 1:23-CV-00222-MMB, Judge M. Miller Baker

———————————

**NON-CONFIDENTIAL BRIEF FOR PLAINTIFFS-APPELLANTS
CANADIAN SOLAR INTERNATIONAL LIMITED AND CANADIAN
SOLAR MANUFACTURING (THAILAND) CO., LTD.**

———————————

**JURISDICTIONAL STATEMENT**

Plaintiffs-Appellants Canadian Solar International Limited ("CSIL") and

Canadian Solar Manufacturing (Thailand) Co., Ltd. ("THSM") (collectively,

"Canadian Solar") brought this action, pursuant to 19 U.S.C. § 1516a(a)(2)(B)(vi)

and 28 U.S.C. § 1581(c), to challenge the final affirmative circumvention determination of the U.S. Department of Commerce ("Commerce" or "the Department"), notice of which was published as *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention with Respect to Cambodia, Malaysia, Thailand, and Vietnam*, 88 Fed. Reg. 57419 (Dep't Commerce Aug. 23, 2023), Appx10728–10742 ("Final Determination") and Memorandum from James Maeder to Lisa Wang, *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Issues and Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Thailand*, Case Nos. A 570-979, C-570-980 (Circumvention Injury Thailand 2022) (Aug. 17, 2023) ("Decision Memo"), Appx10559–10727.

This Court has jurisdiction over Canadian Solar's appeal of the U.S. Court of International Trade's (the "CIT") decision under 28 U.S.C. § 1295(a)(5), which grants plaintiffs the right to appeal from the final judgment of the CIT. Canadian Solar timely brought this appeal by filing a notice of appeal at the CIT on July 14, 2025, within 60 days of the CIT's May 16, 2025 challenged order and judgment.

Appx49. This appeal is from a final order and judgment that disposes of all parties' claims.

## INTRODUCTION

Canadian Solar is a global solar producer that manufactures solar cells and modules in the United States, Thailand, and other countries. Many of Canadian Solar's Thai modules and U.S.-manufactured modules containing Thai cells have been installed in solar projects in the United States and now power thousands of U.S. businesses and communities. Canadian Solar has invested hundreds of millions of dollars in Thailand to build sophisticated manufacturing facilities and train thousands of workers there.

Despite Canadian Solar's deep and rich investments in Thailand, Commerce concluded that the company circumvented the relevant antidumping duty and countervailing duty ("AD/CVD") orders on solar cells and modules from China. That is wrong as both a legal and factual matter. For many years, Canadian Solar has operated transparently in Thailand, consistent with the rules iterated by Commerce and other government agencies. Commerce's circumvention proceeding resulted in a sudden change of course that—unlawfully—found that Canadian Solar's longstanding supply chain was circumventing the China orders. Specifically, considering more than a decade of consistent U.S. Government determinations and guidance assuring the industry that solar cells made in Thailand were Thai cells,

3

Canadian Solar intentionally oriented its supply chain to comply with Commerce's instructions regarding the scope and interpretation of the AD/CVD orders. Relying on the agency's guidance, Canadian Solar invested hundreds of millions of dollars, built complex, extensive manufacturing facilities, and hired thousands of solar professionals *in Thailand*. But now, according to Commerce, solar cells and modules made in Thailand are Chinese.

This case should be remanded so that Commerce can correct its faulty findings of circumvention with respect to Canadian Solar. The Final Determination was not supported by substantial evidence or in accordance with law because Commerce: (1) unlawfully warped the definition of "minor or insignificant" beyond this statutory text's plain meaning, to require the majority of production to occur in the third country to avoid a circumvention finding; (2) unlawfully made one single factor, research and development ("R&D"), controlling in its "minor or insignificant" analysis, contrary to the governing statute and agency precedent; (3) unlawfully misapplied the statute's direction to assess whether the value of processing performed in Thailand by Canadian Solar was "a small proportion" of the total value; and (4) found the level of R&D investments made in Thailand to weigh in favor of a circumvention finding in the face of substantial evidence disproving such a conclusion.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      Whether Commerce's conclusion that a process can be transformative and critical but nevertheless "minor or insignificant," 19 U.S.C. § 1677j(b)(2), was made in accordance with law.

2.      Whether Commerce's decision to make one single factor, R&D, controlling in its "minor insignificant" analysis pursuant to 19 U.S.C. § 1677j(b)(2) was made in accordance with law.

3.      Whether Commerce's conclusion that a value of approximately one third of the value of the merchandise imported into the United States constitutes a "small proportion" weighing in favor of circumvention, 19 U.S.C. § 1677j(b)(2)(E), was made in accordance with law.

4.      Whether Commerce's determination that Canadian Solar's R&D in Thailand supported an affirmative circumvention finding, notwithstanding record evidence of significant R&D activities in Thailand, was supported by substantial evidence.

## STATEMENT OF THE CASE

Crystalline silicon photovoltaic ("CSPV") cells and modules have been the subject of multiple AD and CVD proceedings over the last thirteen years.  These proceedings, including scope clarifications, oriented the global solar supply chain in a manner that gives rise to the key issues presented in the instant appeal.

## A.    Solar I Orders

Commerce published the AD/CVD orders on CSPV cells from China and modules possessing CSPV cells from China in December 2012 (the "Solar I Orders").[1] Commerce established critical country-of-origin language through the Solar I proceedings, consistently instructing that the country of formation of the positive-negative ("p/n") junction (wherein a wafer[2] becomes a CSPV cell capable of converting sunlight into electricity) determines the origin of the CSPV cell for AD/CVD scope purposes.[3] The p/n junction is formed "once the wafer is doped and

---

[1]    *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 Fed. Reg. 73018 (Dep't Commerce Dec. 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Countervailing Duty Order*, 77 Fed. Reg. 73017 (Dep't Commerce Dec. 7, 2012) (collectively, "Solar I Orders").

[2]    To form a CSPV cell, polysilicon is added with boron and heated to form monocrystalline silicon. Decision Memo, at 49, Appx10607. After being further crystallized and cooled, the ingot is formed, which is subsequently sliced into thin "wafers." *Id.* The sliced wafers then undergo phosphorus diffusion, which gives the surface of the wafer its negative potential electrical orientation. *Id.* The phosphorus layer and a boron-doped layer together create the p/n junction of the cell. *Id.* The cell then undergoes additional chemical processes to enhance sunlight absorption before silver paste is soldered onto the cell to form electrical conduits. *Id.*

[3]    *See NextEra Comments on Auxin's Circumvention Ruling Request* (May 2, 2022), at Att. 13 (citing Commerce Memorandum, "Scope Clarification: Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China," (Mar. 19, 2012) ("*Scope Clarification Memo*")), Appx2289, Appx2587–2597.

an opposite electrical orientation is imparted on the surface…When sunlight strikes the cell, the positive and negative charge carriers are released, causing electrical current to flow. It is at this point that the cell is capable of generating electricity from sunlight." Decision Memo at 52, Appx10610.

In determining that the p/n junction formation was the significant turning point for origin purposes, rather than an earlier process in production, such as ingot slicing or wafer formation, Commerce expressly rejected the Solar I petitioner's attempt to enlarge the scope of the Orders to include CSPV cells manufactured in third countries using Chinese wafers. *NextEra Comments on Auxin's Circumvention Ruling Request* (May 2, 2022), at Attachment 13 (citing Scope Clarification Memo), at 6–8, Appx2592–2594. Commerce determined that solar cells produced in third countries using Chinese wafers (i.e., prior to the formation of the p/n junction) would be outside the scope of the investigation. *Id*. at 8–9, Appx2594–2595. Further, in addressing country-of-origin issues, Commerce instructed the Solar I petitioner that wholly separate AD/CVD petitions would need to be prosecuted to "address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country." *Id*. at 9, Appx2595. Entire global supply chains were oriented to comply with the Government's directive in reliance on this bright line.

Commerce was not alone in its approach. The U.S. International Trade Commission ("ITC") and U.S. Customs and Border Protection also consistently

relied on Commerce's determination that the p/n junction formation serves as the key origin turning point when enforcing and weighing scope and origin issues.[4]

## B.    Solar II Orders

On December 31, 2013, one year after the Solar I Orders were published, the same petitioner brought AD/CVD petitions against certain CSPV products from China and an AD petition against certain CSPV products from Taiwan.[5]  In this second solar case, the petitioner sought a remedy against solar module exports by CSPV module producers in China that had switched from using Chinese cells to using third-country cells, including from Taiwan, as such goods were outside the scope of the Solar I Orders.  Commerce subsequently issued AD/CVD orders on

---

[4]    *See, e.g.*, *Sunspark Technology Inc. Scope Ruling*, (Oct. 23, 2020), Appx5073; Commerce Memorandum, *Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China: ET Solar Inc.*, Case Nos. A-570-979, C-570-980 (June 15, 2021), Appx2647; U.S. Customs and Border Protection, Ruling H301813 (May 24, 2019), Appx5064; U.S. Customs and Border Protection, Ruling H301201 (Oct. 18, 2019), Appx5060; *Crystalline Silicon Photovoltaic Cells and Modules From China*, Inv. Nos. 701-TA-481 and 731-TA-1190, USITC Pub. 4360 (Nov. 2012) (Final) at I-18, Appx3479; *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled Into Other Products*, Inv. No. TA-201-75, USITC Pub. 5266 (Dec. 2021) (Extension) at I-58, I-82, Appx3704 (Attachment 37-B); *Sunpreme Inc. v. United States*, 946 F. 3d 1300 (Fed. Cir. 2020) (en banc).

[5]    *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 79 Fed. Reg. 76970 (Dep't Commerce Dec. 23, 2014) (final determination of sales at less than fair value) and accompanying Issues and Decision Memo, at 6.

February 18, 2015 (the "Solar II" Orders).[6]  These orders cover CSPV solar modules produced in China using cells produced outside of China and CSPV solar cells from Taiwan, wherever assembled into modules.

### C.    Circumvention Inquiries

On February 8, 2022, nearly a full decade after the Solar I Orders came into force, Auxin Solar Inc. ("Auxin"), a very small U.S. producer of solar modules containing imported solar cells, requested that Commerce initiate country-wide circumvention inquiries pursuant to 19 U.S.C. § 1677j(b)(1) to determine whether CSPV cells and modules completed in Cambodia, Malaysia, Thailand, or Vietnam using parts and components manufactured in China were circumventing the Solar I Orders.  *See* Auxin Circ. Req., Appx78, Appx96.  The circumvention allegation affected more than $5 billion annually of solar imports into the United States, covering over 80 percent of imported CSPV products.  *Id*. at Ex. 1, Appx169.  Commerce initiated country-wide anti-circumvention inquiries on the Solar I Orders on April 1, 2022. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Initiation of Circumvention*

---

[6]      *See Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 80 Fed. Reg. 8592 (Dep't Commerce Feb. 18, 2015) (antidumping duty order; and amended final affirmative countervailing duty determination and countervailing duty order); *Certain Crystalline Silicon Photovoltaic Products From Taiwan*, 80 Fed. Reg. 8596 (Dep't Commerce Feb. 18, 2015) (antidumping duty order).

*Inquiry on the Antidumping Duty and Countervailing Duty Orders*, 87 Fed. Reg. 19071 (Dep't Commerce Apr. 1, 2022), Appx2281–2288.

On May 12, 2022, Commerce selected two respondents for the Thailand segment of the circumvention inquiries—Trina Solar Science & Technology (Thailand) Ltd. ("TTL") and CSIL. *Circumvention Inquiry With Respect to Thailand: Respondent Selection* (May 12, 2022), Appx5356. CSIL is a Hong Kong-based trading company that exports CSPV products, including CSPV solar cells and modules produced by its Canadian Solar affiliate THSM, in Chonburi, Thailand. *See Verification of the Information Reported by Canadian Solar International Limited* (Apr. 19, 2023), Appx10360, Appx10364. THSM began manufacturing operations in Thailand in 2016. Appx10364. At the time of Commerce's inquiries, its major, significant manufacturing facilities measured [ number ] square meters, with an average production capacity of [ number ] megawatts, and the company employed [ number ] workers. Memorandum from Paola Aleman Ordaz and Jeffery Pedersen to The File, *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic from China – Circumvention Inquiry with Respect to Thailand*: *Preliminary Analysis Memorandum for Canadian Solar International Limited,* Case Nos. A-570-979, C-570-980 (Circumvention Inquiry Thailand 2022) (Dec 1. 2022) ("CSIL Prelim. Analysis Memo"), Appx8507.

Commerce issued initial questionnaires to CSIL and TTL on May 13, 2022. *Circumvention Inquiry Questionnaire* (May 13, 2022), Appx4722. CSIL timely submitted fulsome questionnaire responses from May 2022 through November 2022. Appx8460–8463.

### D.    Preliminary Determination

On December 1, 2022, Commerce preliminarily determined that imports of CSPV cells and modules exported from Cambodia, Malaysia, Thailand, and Vietnam using parts and components from China had circumvented the Solar I Orders. *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 87 Fed. Reg. 75221 (Dep't Commerce Dec. 8, 2022) ("Prelim. Determination"), Appx8486–8496.

As part of its preliminary determination and as required by the governing statute, Commerce analyzed based on the statutory requirement for a circumvention finding whether "the process of assembly or completion" in Thailand was "minor or insignificant." *See* 19 U.S.C. §§ 1677j(b)(1)(C), 1677j(b)(2). Commerce addressed the five statutory factors under 19 U.S.C. § 1677j(b)(2): (A) the level of investment in the foreign country; (B) the level of research and development in the foreign country; (C) the nature of the production process in the foreign country; (D) the extent of production facilities in the foreign country; and (E) whether the value of

the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States (the "minor or insignificant" factors). In applying this required analysis, Commerce compared the production of CSPV cells and modules by the Thai respondents to their affiliated producers in China. Prelim. Memo at 15, Appx8473.

For TTL, Commerce found that four out of the five statutory factors under 19 U.S.C. § 1677j(b)(2) weighed *against* a finding of circumvention. *Id*. at 16–20, Appx8473–8479. For CSIL, Commerce found that three out of the five statutory facts weighed *against* a finding of circumvention. *Id*. Yet, Commerce concluded that both respondents were circumventing the Solar I Orders. *Id*. at 24, Appx8482. Walking through the factors enumerated at 19 U.S.C. § 1677j(b)(2), Commerce made the following preliminary findings:

**Level of Investment.** Commerce determined that the level of investment of both CSIL and TTL in Thailand was significant – even finding Canadian Solar's investment in Thailand to be [ adjective ] than its relevant investments in China. CSIL Prelim. Analysis Memo at 2, Appx8506. For CSIL, Commerce compared THSM's investment of [ # ] million in Thai cell and module manufacturing against the [ # ] million required to construct and start up wafer production in China by its affiliates. *Id.* Based on this comparison, Commerce correctly determined that the level of investment in Thailand to produce solar cells and modules was not minor or

insignificant for either respondent, and this level of investment weighed against a finding of circumvention. Prelim. Memo at 16, Appx8474.

**Extent of Production Facilities.** Commerce compared the size, production capacity, and number of workers at THSM's cell and module facilities in Thailand with affiliated [ materials ] producing facilities in China. For CSIL, Commerce found that the size of THSM's cell and module production facilities was [ adjective ] to that of its affiliated production facilities in China, and that THSM employed [ number ] the number of workers in Thailand as compared to the workers in Chinese affiliates, concluding that this factor weighed against a finding of circumvention. CSIL Prelim. Analysis Memo, Appx8507.

**Nature of Production Process.** Commerce made a broad, "all-inclusive" finding as to the significant nature of cell and module production in Thailand when compared to ingot and wafer production in China. The agency found cell and module production, compared to ingot and wafer production, to be much more technologically sophisticated, complex, and physically transformative. Commerce acknowledged, for instance: "While {upstream} ingot and wafer production require large amounts of upfront capital and technical capabilities, the ITC {has} found solar cell production to be the 'most capital intensive part of the manufacturing process,' and 'a highly automated, capital intensive, and technologically sophisticated process, requiring skilled technicians and employees with advanced degrees.'"

Prelim. Memo at 18–20, Appx8476–8478; Decision Memo, Appx10607–10611. The Department then explained that "cell production is where the essence of a solar module is realized." *Id*. Commerce thus concluded that "the nature of the production performed by the respondents in the third country is not minor or insignificant compared to either processing polysilicon into wafers, or ingots into wafers, in China, which does not weigh in favor of finding circumvention." *Id.*

**Level of R&D.** Commerce found that neither TTL's nor CSIL's R&D expenditures in Thailand was significant when compared to the R&D expenditures in ingot and wafer production made by each company's affiliates in China. Appx8473. For CSIL, Commerce compared THSM's R&D costs incurred from 2019 through 2021 related to cell and module production (nearly $[ # ] million) against those incurred by affiliated ingot and wafer producers (approximately $[ # ] million). CSIL Prelim. Analysis Memo, Appx8506. Commerce's consideration of the expenditures of CSIL's and TTL's affiliates in China was determinative in this analysis. That is, Commerce did not consider whether the sum of investment was significant in Thailand or great for operations involving the production of cells and modules.

Nor did Commerce assess the relative amount of total R&D, in Thailand or globally, against total processing expenditures, in Thailand or globally, to assess the relative importance of R&D to this sector and industry. Rather, the agency solely

considered how THSM's R&D costs in Thailand compared to those of certain affiliated companies in China making entirely different products.

**Value of Processing.**  Commerce analyzed whether the value of the processing performed in Thailand represents a small proportion of the value of the merchandise imported into the United States.  Commerce summed the per-unit costs incurred in the third country for non-Chinese material inputs, labor, fixed and variable overhead, selling, general, and administrative items, and interest, and divided the sum by the per-unit weighted-average value of the respondents' U.S. sales of inquiry merchandise during 2021.  Based on Commerce's calculations, the value of processing performed by TTL in Thailand was **[ # ]** percent of the value of inquiry merchandise imported into the United States in 2021.  Preliminary Analysis Memorandum for TTL (Dec. 1, 2022), Appx8499.  Commerce determined that TTL's figure was a significant percentage of value, weighing against finding circumvention.  *Id*.

For CSIL, Commerce conducted a similar analysis, finding the value of processing performed by CSIL in Thailand to be **[ # ]** percent of the value of the inquiry merchandise imported into the United States in 2021.  CSIL Prelim. Analysis Memo, Appx8507.  Commerce found this value to weigh in favor of circumvention for CSIL.  Commerce offered no analysis or explanation supporting these disparate conclusions with respect to CSIL and TTL on this factor.

### E.    Final Determination

On August 23, 2023, following extensive briefing, Commerce published its Final Determination in the *Federal Register*.  Commerce did not change its preliminary circumvention analysis as to TTL or CSIL.  Decision Memo at 1, Appx10559.  TTL and CSIL both timely raised arguments concerning, among other issues, Commerce's purported analysis of the level of R&D, nature of the production process, and value of processing under 19 U.S.C. § 1677j(b)(2).

CSIL demonstrated in its case brief that Commerce had improperly elevated the importance of the single R&D factor above all others, contrary to the agency's own precedent.  Appx10490–10491.  CSIL further explained that Commerce failed to address the nature of THSM's R&D activities in Thailand, the number of employees involved in THSM's R&D activities, and the relative weight of R&D activities compared to the size of total operations.  CSIL's Second Tranche Case Brief, Appx10478.  Notwithstanding CSIL's demonstration of the significant R&D undertaken by THSM in Thailand, Commerce continued to find that this factor weighed in favor of a finding of circumvention.  Decision Memo at 44, Appx10602.

CSIL similarly explained that the record demonstrated that the value of processing performed by THSM in Thailand was significant.  In particular, CSIL explained that Commerce had erroneously focused solely on a quantitative, value-added analysis, without a broader view of the production process.  CSIL's Second

Tranche Case Brief at 21, Appx10495. Moreover, [ # ] percent of the value manufactured in Thailand does not constitute a "small proportion." *Id*. Notwithstanding CSIL's explanation, Commerce continued to find this factor to weigh in favor of circumvention with respect to CSIL. Decision Memo at 57–60, Appx10615–10618. Commerce ultimately found the value of processing performed in Thailand by CSIL to be [ # ] percent. CSIL Final Analysis Memo, Appx10745.

Commerce continued to find that four out of five (for TTL) and three out of five (for CSIL) of the minor or insignificant factors weighed against a finding of circumvention. Commerce did not change its erroneous determination that CSPV cells and modules produced in Thailand using parts and components manufactured in China and exported to the United States were circumventing the Solar I Orders. Decision Memo, Appx10559.

### F.    CIT Slip Op. 25-59

Canadian Solar and TTL timely appealed Commerce's circumvention determination before the CIT in October 2023. The CIT upheld the Thailand circumvention determinations. Even as it did, however, the CIT faulted certain errors in the agency's reasoning. The CIT found that Commerce "erred as a matter of law" in weighing the "minor or insignificant" factors, because Commerce let the issue of affiliation, a separate and subsequent consideration under the statute, "bleed over" into the weighing of the "minor or insignificant factors." Slip Op. 25-59 at 16,

Appx20. The CIT erroneously reasoned that this was "harmless error" because (1) "the majority of processing is still done in China," and (2) the R&D factor would have been dispositive and compelled the same result even if Commerce had properly excluded affiliation in weighing the minor or insignificant factors. *Id*. at 17. The CIT also erroneously concluded that Commerce's decision to elevate the R&D factor to be controlling was lawful and that Commerce's conclusion that a [ # ] percent value-add is a "small proportion" was made in accordance with law.

On July 13, 2025, Canadian Solar timely filed a notice of appeal of the CIT's order and judgment.

## SUMMARY OF THE ARGUMENT

Canadian Solar seeks judgment on the agency record with respect to the following issues:

### 1. Whether Commerce's Application of the "Minor or Insignificant" Analysis Was Rendered in Accordance with Law

The plain text of 19 U.S.C. § 1677j(b), the architecture of the statute, and accompanying Congressional instructions make clear that Commerce may extend AD/CVD orders to cover third-country merchandise pursuant to this authority only when the third-country processes are truly "minor or insignificant." In its narrow discussions of the 19 U.S.C. § 1677j(b)(2) subfactors, Commerce failed to recognize that the plain meanings of the terms "minor" and "insignificant" do not encompass processing in Thailand – fueled by hundreds of millions of dollars of investment,

18

billions of dollars of annual production value, a workforce of thousands of professionals – and which includes the key element of solar panel production—formation of the p/n junction. Congress has directed in the Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ("SAA") that the circumvention statute may only target "screwdriver operations." 1994 U.S.C.C.A.N. 4040, 4216. Canadian Solar's Thailand operations are undoubtedly not "minor or insignificant" screwdriver operations, whether measured quantitatively or qualitatively.

### 2. Whether Commerce's Decision to Elevate R&D to Be Controlling Was in Accordance with Law

Commerce's decision to make one single "minor or insignificant" factor controlling was unlawful because Congress has expressly directed that "no single factor will be controlling." Commerce's decision was particularly unlawful and untethered from the governing statute because R&D is the factor least associated with "processing" in the third country, the overarching question in a circumvention analysis as required by statute. Moreover, Commerce's decision with respect to R&D was unlawfully infected by affiliation considerations, which are a separate statutory issue. Commerce also contradicted years of its own precedent confirming that at least a majority of the "minor or insignificant" factors must favor circumvention to support an affirmative finding.

### 3. Whether Commerce's Decision with Respect to the Value of Processing in Thailand Was in Accordance with Law

Commerce's conclusion that approximately one third of the merchandise's value constitutes a "small proportion" is not in accordance with law. One third is not a "small proportion" under any reasonable definition. Moreover, Commerce's decision was unlawful because it ignored qualitative value-added considerations and contradicted agency precedent recognizing similar figures to not constitute a "small proportion."

### 4. Whether Commerce's Final Determination Was Supported by Substantial Evidence

Commerce failed to engage with substantial evidence showing Canadian Solar's significant R&D activities in Thailand. Rather, the agency focused on the R&D activities of affiliated parties in China, which is a wholly separate statutory consideration in 19 U.S.C. § 1677j(b)(3), as acknowledged by the CIT. The agency additionally failed to show how this one subfactor demonstrated circumvention when expenditures on other considerations, such as facility construction, are many multiples higher than R&D expenses in the solar industry. Commerce's decision with respect to the critical R&D factor is thus not supported by substantial evidence and should be remanded.

**ARGUMENT**

## I. STANDARD OF REVIEW

The Federal Circuit reviews decisions of the CIT de novo, applying the same standard used by the CIT. *Downhole Pipe & Equip., L.P. v. United States*, 776 F. 3d 1369, 1373 (Fed. Cir. 2015) (citing *Mittal Steel Point Lisas Ltd. v. United States*, 548 F. 3d 1375, 1380 (Fed. Cir. 2008)). In appeals of final AD/CVD determinations, this Court shall hold unlawful and remand any determination by Commerce that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Commerce's determinations must in all cases be consistent with the governing statute and the agency's regulations. Following the Supreme Court's decision in *Loper Bright Enterprises et al. v. Raimondo*, 144 S. Ct. 2244 (2024), in which the Court overruled *Chevron, U.S.A., Inc. v. N.R.D.C, Inc*, 467 U.S. 837 (1984), Commerce's interpretations of statutory provisions are not entitled to deference by this Court. Instead, "{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright*, 144 S. Ct. at 2247. In other words, this Court must determine not whether an agency's "reading {is} 'permissible' in such a case," *id.* at 2251, as *Chevron* directed, *Chevron*, 467 U.S. at 843, but rather whether the agency's interpretation reflects "the best reading of the statute. . . ." *Loper Bright*, 144 S. Ct.

at 2251 ("{W}hen courts confront statutory ambiguities in cases that do not involve agency interpretations or delegations of authority, they are not somehow relieved of their obligation to independently interpret the statutes."). *Id.* In so doing, "{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires . . . {and} need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* at 2273.

Even before the Supreme Court's decision in *Loper Bright*, no deference was owed to Commerce when the intent of Congress is judicially ascertainable. *Timex V.I., Inc. v. United States*, 157 F. 3d 879, 881–82 (Fed. Cir. 1998). This analysis requires this Court to "first carefully investigate the matter to {discern} Congress's purpose and intent on the question at issue." *Id*. at 881. In determining the plain meaning of statutory language, this Court employs the traditional tools of statutory construction (e.g., dictionary definitions, grammatical structure). *See*, *e.g.*, *Pesquera Mares Australes v. United States*, 266 F. 3d 1372, 1382–83 (Fed. Cir. 2001) (relying on the dictionary definition of a key phrase in a statute); *Anhydrides & Chemicals, Inc. v. United States*, 130 F. 3d 1481, 1483 (Fed. Cir. 1997) ("The rules of grammar apply in statutory construction."). If appropriate, this Court must also consider the legislative history to determine congressional intent. *Timex*, 157 F. 3d at 882 (citing *Chevron*, 467 U.S. at 843 n.9).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. N.L.R.B.*, 71 S. Ct. 456, 459 (1951) quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). It must be "more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." *N.L.R.B. v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In making its judgment, this Court "reviews the record as a whole, including any evidence that fairly detracts from the substantiality of the evidence," *Gallant Ocean (Thailand) Co. v. United States*, 602 F. 3d 1319, 1323 (Fed. Cir. 2010) (internal quotation marks and citation omitted), and determines "whether the evidence and reasonable inferences from the record support {the agency's} finding." *Daewoo Elecs. Co. v. Int'l Union of Electronic Elec., Technical, Salaried & Mach. Workers*, *AFL-CIO*, 6 F. 3d 1511, 1520 (Fed. Cir. 1993) (internal quotation marks and citation omitted). Commerce must provide a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

## II. COMMERCE UNLAWFULLY INTERPRETED THE STATUTORY LANGUAGE "MINOR OR INSIGNIFICANT" TO REQUIRE A LARGE PORTION OF THE VALUE AND OPERATIONS TO COME FROM THIRD-COUNTRY MANUFACTURING

The circumvention statute lists five requirements that all must be met for Commerce to find circumvention and to impose duties on imports from a third country. 19 U.S.C. § 1677j(b)(1). To render an affirmative determination, Commerce had to find affirmatively for each of these questions:

(A) Whether the merchandise imported into the United States from Thailand is the same class or kind as merchandise that is subject to the Solar I Orders;

(B) Whether before importation into the United States, such merchandise is completed or assembled in Thailand from merchandise that is subject to the Solar I Orders or produced with inputs from the country under the Solar I Orders;

(C) Whether the process of assembly or completion in Thailand is minor or insignificant;

(D) Whether the value of the merchandise produced in the country subject to the Solar I Orders is a significant portion of the total value of the merchandise exported to the United States; and

(E) Whether the action is appropriate to prevent evasion of the Solar I Orders.

Here, Commerce made affirmative findings on all five issues. The main element at issue before Commerce in this circumvention inquiry, and thus the core legal question before this Court, is the third of the five factors: "whether the process of assembly or completion in the foreign country . . . is minor or insignificant." 19 U.S.C. § 1677j(b)(1)(C). The threshold, key inquiry before this Court in this case is

whether CSIL and THSM's "assembly or completion" of CSPV cells and modules in Thailand is actually "minor or insignificant" under the statute. Absent such a legal finding, Commerce is prohibited from extending existing AD/CVD orders to production in the inquiry country.

"The best reading of the statute" does not allow Commerce to conclude that hundreds of millions of dollars in investment to undertake the key, transformative stage of a manufacturing process, producing billions of dollars of annual value, constitutes "minor or insignificant" processing. *Loper Bright*, 144 S. Ct. at 2251 (explaining that the "best reading" is " 'the reading the court would have reached' if no agency were involved.") (quoting *Chevron*, 467 U.S. at 843). Commerce's contrary conclusion conflicts with the plain meaning of the statutory text, the architecture of the Tariff Act of 1930, as amended, and Congress's accompanying instructions and is thus unlawful.

This Court must use "all relevant interpretive tools" in interpreting the statute, *Loper Bright*, 144 S. Ct. at 2251, starting with the provision's plain meaning. "In order to ascertain the 'established meaning,' {of a statutory term} it is {generally} appropriate to consult dictionaries." *Pesquera*, 266 F. 3d at 1382 (*citing Int'l Bus. Machs. Corp. v. United States*, 201 F. 3d 1367, 1372 (Fed. Cir. 2000); *Best Power Tech. Sales Corp. v. Austin*, 984 F. 2d 1172, 1177 (Fed. Cir. 1993).

"Minor" and "insignificant" both have well-accepted meanings. "Insignificant" is defined as "lacking meaning or import," "small in size, quantity, or number," "not worth considering," "not noticeable," and "not important or thought to be valuable." *Insignificant*, Merriam-Webster Dictionary, https://www.merriamwebster.com/dictionary/insignificant (last visited Oct. 15, 2025); *Insignificant*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/insignificant (last visited Oct. 15, 2025). "Insignificant" means "{d}evoid of significance, weight, or force; {o}f no importance or moment; immaterial; trivial, trifling; mean, contemptible." *Insignificant*, Oxford English Dictionary, https://www.oed.com/dictionary/ insignificant_adj?tab=meaning_and_use #351290 (last visited Oct. 15 2025). "Minor" is similar: It means "having little importance, influence, or effect, especially when compared with other things of the same type," "comparatively unimportant," and "not very important or valuable." *Minor*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/ minor (last visited Oct. 15, 2024); *Minor*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/minor (last visited Oct. 15, 2024); *Minor*, Brittanica Dictionary, https://www.britannica.com/dictionary/minor (last visited Oct. 15, 2025).

Together, the phrase "minor or insignificant" clearly evinces Congress's intent to expand the application of AD/CVD orders outside their existing scope *only* where third-country processing is *truly immaterial*—i.e., involving "immaterial, trivial, trifling" activities performed outside of the country subject to an AD/CVD order prior to importation to the United States.  Under the governing standard of review, it stands to reason that this Court should not defer to an application of this standard by Commerce that results in major and significant processing that is being treated as "minor or insignificant." *Loper Bright*, 144 S. Ct. at 2251.

The massive, state-of-the-art, and highly valuable manufacturing operations of THSM in Thailand, which required hundreds of millions of dollars to bring to life, are anything but "trivial" or "unimportant."  *See* Appx10484–10486 (reviewing Canadian Solar's large investments in Thai production).  These Thailand operations include hundreds of millions of dollars of investment and production, as Commerce readily acknowledged in the investigation.  These operations are better described as *significant* and *major*—the antonyms of the statutory terms at issue here.

Moreover, the p/n junction in the Thai solar cell exported to the U.S. market is formed in Thailand.  This is critical because multiple Government agencies have long agreed that this step is the crux of solar cell and module manufacturing.  *See, e.g.*, *SunSpark Technology Inc. Scope Ruling* (Jan. 23, 2020), Appx5073 (Commerce explaining, "Put simply, wafers are not cells.").  The manufacturing

processes of CSIL and THSM in Thailand completely change the relevant merchandise: a wafer cannot produce electricity until it is transformed into a solar cell, and a cell is of relatively little use until it is turned into a module. In fact, Commerce itself found those "significant" activities to be "multi-stage," "technologically sophisticated," and "capital intensive" processes, requiring "highly-skilled workers" and "skilled technicians and employees with advanced degrees". Decision Memo, Appx8476–8477. They are thus ***not*** "minor or insignificant" processes.

The contrary conclusions of Commerce and the CIT are untenable. The CIT did not attempt to ascertain the best reading of "minor or insignificant," as required by *Loper Bright*. In fact, the CIT largely ignored Canadian Solar's broader arguments regarding the interpretation of "minor or insignificant," focusing instead narrowly on the five subfactors informing this analysis. *See generally* Slip Op. 25-59, Appx5–36. The factors set forth in § 1677j(b)(2) are intended to guide the agency's investigation as to what is "minor or insignificant" under § 1677j(b)(1)(C), and so the legal analysis must start and end with what amounts to "minor or insignificant" processing. Moreover, the CIT's conclusion is untethered from the administration of the AD/CVD law more generally, which has consistently recognized that the p/n junction formation is the critical stage in the manufacturing process.

On top of that, the statute commands that Commerce's "minor or insignificant" analysis focus on the "process of assembly or completion" of the good in the inquiry country. The CIT has characterized "completion or assembly" as synonymous with "manufacturing" or with "production process." *Hlds (B) Steel Sdn Bhd v. United States*, No. 21-00638, 2024 WL 244937, at *4 (Ct. Int'l Trade Jan. 23, 2024). Commerce's conclusion that such substantial manufacturing operations in Thailand are "minor or insignificant" is thus plainly not in accordance with law—particularly when, as discussed in greater detail below, that Commerce centered its findings on the R&D prong of the statute, which has the least of all prongs to do with the "process of assembly or completion."

Additional direction from Congress confirms that this circumvention statute may only cover truly "minor or insignificant" processes. The SAA, by law, "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d). The SAA states that the circumvention law is intended to address "screwdriver operation{s}." SAA at 4216–17. Manufacturing plants requiring investments in the hundreds of millions of dollars and utilizing complex chemical manufacturing processes, robotics, and thousands of employees (such as Canadian Solar's facility in Thailand) are per se not within the bounds of

the circumvention statute and certainly may not be characterized as a "screwdriver operation."

Per the SAA, Congress did not intend to grant Commerce with the authority to enforce the circumvention remedy whenever the level of processing in the third country is less than the level of processing in the country under order.  Congress intended instead for Commerce to assess the nature of the production process and find circumvention only in cases where the operations were truly "minor or insignificant"—i.e., "immaterial, trivial, trifling."  In fact, Congress addressed the limitations on the circumvention provisions for this exact reason.  The SAA states that the circumvention provisions are intended to be "fair to all parties" and that "{b}ecause Commerce will find circumvention only where assembly or completion operations in the United States or in third countries are minor, the proposed amendments will not deter legitimate investment." SAA at 4217.  These statements illustrate that Congress understood that the circumvention provisions would be used only when the assembly process was akin to an easily-established "screwdriver operation."  Commerce's capacious interpretation of this standard throws this carefully calibrated balance out the window.  The agency's interpretation cannot be squared with the statute's unambiguous requirement that the operations in the third country must be "minor or insignificant" for third-country-produced goods to be lawfully included in the scope of an existing order on another country.

Furthermore, viewed in the context of the broader trade remedy statutory schema, this proper, narrower view of the circumvention standard focused on "screwdriver" operations makes perfect sense. The circumvention statute is an extraordinary exception to the general statutory scheme for the application of trade remedy measures. Where applied, the circumvention authority enables Commerce to expand the scope of existing orders without following the more rigorous and involved procedures associated with new AD/CVD investigations (including the requirement that the ITC conduct a separate investigation and render a separate affirmative injury finding). 19 U.S.C. §§ 1671, 1673. The circumvention statute enables Commerce to do this, however, only where the processing in a third country is so "minor or insignificant" that the merchandise being exported from that third country can reasonably be considered as having been manufactured in the country on which the AD/CVD orders have already been imposed (in this case, China). Conversely, using this statute to expand orders to cover goods substantially made in third countries where the processes undertaken to make those goods are "sophisticated," "complex," and "transformative" upends the carefully designed statutory framework and allows the circumvention statute to encroach on the role of the separate AD/CVD investigation statute.

Commerce's affirmative circumvention determination has massively expanded the scope of the Solar I Orders to include solar cells and modules

manufactured in Thailand that previously were unquestionably outside the scope of the orders. This scope expansion was made in the absence of any ITC finding that imports from these countries materially injured or threatened the domestic industry. And Commerce expanded the scope notwithstanding its own repeated determinations that any solar cells on which the p/n junction was formed outside of China were excluded from the scope of the Solar I Orders. *See*, *e.g.*, *Notice of Scope Rulings*, 86 Fed. Reg. 47476 (Dep't Commerce Aug. 25, 2021).

Again, the CIT largely dismissed these concerns, primarily focusing on the balancing of § 1677j(b)(2) factors rather than the overarching consideration of whether the processing is "minor or insignificant." The CIT did not examine the legislative or other interpretive guidance in order to assess and understand what "minor or insignificant" processing properly entails. This finding thus constitutes clear legal error.

## III. COMMERCE UNLAWFULLY ELEVATED R&D TO BE THE SINGLE CONTROLLING FACTOR IN ITS CIRCUMVENTION ANALYSIS

Both Commerce and the CIT point to R&D activities as the decisive issue in this proceeding. *See* Slip Op. 25-59 at 24, Appx28 ("{T}he Department's emphasis on R&D was so great that it still found {TTL's} process of assembly or completion in Thailand to be minor or insignificant, despite its negative determination about that company's value of processing. If such a finding didn't save Trina, a similar finding

wouldn't have made a difference for Canadian Solar."). That is, notwithstanding that Canadian Solar invested hundreds of millions of dollars in building manufacturing facilities and a skilled workforce in Thailand, Commerce found that Canadian Solar must have circumvented the orders because its ingot- and wafer-manufacturing affiliates in China spent a [ number ] dollars more on R&D expenses over a given period than did THSM for cell and module R&D in Thailand.

Commerce's (1) elevation of R&D to the single controlling factor in the "minor or insignificant" analysis, and (2) finding that R&D weighed in favor of circumvention were both unlawful. Congress made clear that "no single factor" in the "minor or insignificant" analysis may be controlling, which is precisely what Commerce and the CIT have proposed here. Commerce's R&D finding is also unlawful because its foundation is a preoccupation with Canadian Solar's affiliates in China, a factor that even the CIT conceded is not relevant for the R&D determination. Slip Op. 25-59 at 16. The CIT was correct as affiliation is an entirely separate statutory consideration under 19 U.S.C. § 1677j(b)(3)(B). Moreover, Commerce's R&D finding is internally inconsistent, focusing on ingot and wafer R&D expenditures in China despite also recognizing the complexity of cell and module production in Thailand. And, the finding contradicts years of Commerce precedent, which shows that a majority of the "minor or insignificant" factors should demonstrate circumvention for Commerce to make an affirmative finding.

## A. Commerce's Decision to Make the R&D Factor Alone Controlling Plainly Contradicts the SAA

For Commerce to render an affirmative determination of circumvention pursuant to 19 U.S.C. § 1677j(b), the agency must determine that "the process of assembly or completion in the foreign country {subject to AD/CVD orders} is minor or insignificant." Providing specific direction to Commerce in making its minor or insignificant determination, the statute instructs that Commerce "shall take into account" five specified factors. 19 U.S.C. § 1677j(b)(2).

The Federal Circuit has explained that "{t}he SAA, of course, is more than mere legislative history. Congress has instructed that '{the SAA} shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.' 19 U.S.C. § 3512(d)." *Micron Tech., Inc. v. United States*, 243 F. 3d 1301, 1309 (Fed. Cir. 2001). The relevant portion of the SAA here directs: "Commerce will evaluate each of these factors as they exist either in the United States or a third country, depending on the particular circumvention scenario. *No single factor will be controlling*." SAA at 4216 (emphasis added).

Despite the SAA's plain text, Commerce—and the CIT—made R&D controlling. For TTL, the only minor or insignificant factor that weighed in favor of circumvention was R&D. As for Canadian Solar, based on Commerce's analysis,

the CIT made clear that Commerce's affirmative determination on the value-added prong was irrelevant because R&D would have been controlling regardless. Slip Op. 25-59 at 24, Appx28. In the CIT's words: "'Commerce effectively placed dispositive weight on the R&D factor.' Even if the Department had not erroneously considered the Chinese parents' control over decision making and investment in Thailand, the result would have been the same." *Id*. (internal citations omitted). But, elevating one minor or insignificant factor above all is exactly what the SAA forbids.

The CIT misunderstood this analysis to be a substantial evidence question, finding: "As the Department reasonably explained why R&D outweighed the other factors, including the nature of the production process, Plaintiffs' argument that it should have reached a different result is unavailing." Slip Op. 25-59 at 18, Appx22. But that just restates the issue—if "R&D outweighed the other factors," that one factor was "controlling." And on questions of statutory interpretation, courts owe no deference to the "agency's decision to favor one conclusion over the other," *id*., and must instead determine the "best reading" of the statute. *Loper Bright*, 144 S. Ct. at 2251.

Commerce's elevation of R&D as controlling is particularly troubling, because these findings are focused on the one "minor or insignificant" factor, i.e., R&D, that is not directly connected with the manufacturing process. This focus stands in contrast to the other four "minor or insignificant" statutory factors, which

directly address the manufacturing process in the inquiry country, by using the language "manufacturing", "production", and "processing": (1) the level of investment in *manufacturing*; (2) the nature of the *production process*; (3) the extent of the *production process*; and (4) the value of *processing performed*. Commerce cannot lawfully hang its entire case on one factor, particularly when that factor is the one furthest from the controlling statutory language.

The SAA likewise focuses on manufacturing processes, explaining that "{b}ecause Commerce will find circumvention only where *assembly or completion operations* . . . are minor, the proposed amendments will not deter *legitimate investment, characterized by the addition of substantial value*." 1994 U.S.C.C.A.N. 4040, 4217 (emphases added).

R&D is not an aspect of the "process of assembly or completion" of solar products to sell to consumers. R&D is also a readily transferrable cross-border asset, so its demonstrative value is relatively minor in terms of the *Thailand* production process. It is unlawful to rely on a single factor at all—and even more egregious that the one factor relied upon here is R&D.

**B.    Even the CIT Admits that Commerce's R&D Analysis Was Unlawfully Infected with Affiliation Considerations**

Commerce's R&D analysis also relies on an unlawful preoccupation with THSM's affiliates in China that is contrary to the statutory construction. The Final Determination seeks to justify elevating R&D to preeminence by rationalizing:

"Nearly all of the technology, financial arrangements, decision making, and all the key inputs can ultimately be traced back to their affiliates in China." Decision Memo at 67, Appx10625. The statute, however, directs Commerce to consider affiliation only *after* it has made a "minor or insignificant" determination. Commerce must first use the 19 U.S.C. § 1677j(b)(2) factors to determine whether the process is "minor or insignificant"—only if so, must Commerce *then* look to the 19 U.S.C. § 1677j(b)(3) factors (pattern of trade, affiliation, and import increases) to determine whether to include such merchandise within the scope of the AD/CVD orders.

The CIT recognized that Commerce erred as a matter of law by focusing on THSM's Chinese affiliates to determine whether THSM's Thailand activities were "minor or insignificant":

> The statute requires Commerce to undertake an "if/then" analysis. Only if it finds the conditions in § 1677j(b)(1)(A)–(E) satisfied does it then decide whether to expand an order to cover a third country. In doing so, it must then consider the § 1677j(b)(3) factors. By letting one of them—affiliation—bleed over into its weighing of the § 1677j(b)(2) elements that bear on § 1677j(b)(1)(C), the Department erred as a matter of law.

Slip. Op. 25-59 at 16, Appx20. The CIT is correct—Commerce acted unlawfully. Only *after* Commerce made its "minor or insignificant" processing determination was Commerce lawfully permitted to consider THSM's affiliates.

This legal error permeates all of Commerce's circumvention finding as to CSIL. This is because Commerce's *entire* assessment of R&D rests on a comparison

between THSM and its Chinese affiliates and Commerce's assumption that THSM relies on its affiliates' R&D expenditures. CSIL Prelim. Analysis Memo, Appx8506, Decision Memo, Appx10600–10602 ("{T}he R&D of one company is not necessarily compartmentalized when it comes to its affiliates. Affiliated companies may share R&D."). In justifying its over-reliance on the R&D factor, for instance, Commerce directly contradicts its prior findings on the other four "minor and insignificant" factors:

> While four out of the five factors in the case of TTL and three of the five factors in the case of THSM do not support circumvention, *these factors are still a function of the activities of TTL and THSM's affiliates in China*. The financial statements of both respondents indicate that their major or ultimate decisions are made in their headquarters location in China. Further, for both CSIL and TTL we find that nearly all or all of the investment necessary to operate the factories was arranged by and was a function of actions by their affiliates in China. While many of the parts included in the value of processing done in the inquiry countries were sourced locally, as noted above, all or nearly all of the key high tech inputs of wafers and the other six most important inputs were produced in China.

Decision Memo at 66–67, Appx10624–10625 (emphasis added).

Commerce's reasoning is circular. First, the agency assessed each "minor or insignificant" factor by comparing activities of the THSM in Thailand to that of its affiliates based in China. For example, the level of investment in Thailand was found to be significant when compared to the level of investment by the respective

affiliates. Decision Memo at 41–42, Appx10599–10600. Yet, in explaining why these factors should not be as important as the R&D factor, Commerce entirely disregarded its prior findings that THSM's level of investment, extent of production facilities, and nature of processing **compared to that of its affiliates** is significant. CSIL Prelim. Analysis Memo, Appx8506, Decision Memo, Appx10600–10602. The mere fact that THSM has affiliates in China cannot be used as a basis to unravel Commerce's findings that THSM's process of assembly or completion in Thailand was significant. In other words, the statute does not allow Commerce to adopt an affiliate-centric analysis for weighing the "minor and insignificant" factors and then rely on the existence of affiliates as the underlying reason to find circumvention.

Commerce's focus on the location of "major or ultimate decisions" is also notable because this is **not** one of the five "minor or insignificant" factors and instead is indicative of affiliation, a separate consideration under the statute. Appx10624. The statute requires Commerce to assess "the process of assembly or completion" in Thailand, not the individuals or affiliates involved in making business decisions.

The CIT correctly recognized that Commerce's preoccupation with Canadian Solar's Chinese affiliates "erred as a matter of law". Slip Op. 25-59 at 16, Appx20. It then erroneously concluded, however, that the Department's unlawful analysis was "harmless error" because "key high tech inputs" and "production machinery" were produced in China and, in any event, "Commerce effectively placed dispositive

39

weigh on the R&D factor." *Id.* at 17, Appx21. The CIT thus failed to appreciate the substantial consequences of the Department's confused framework. Commerce's *entire* R&D analysis rests on its comparison of THSM's expenditures against those of its affiliates. Commerce's *entire* "minor or insignificant" finding and, by extension, its affirmative circumvention finding against CSIL rest on its R&D finding. This error is anything but harmless. Because R&D was determinative, Commerce's error could not have been harmless, unlike if multiple other factors had weighed in favor of circumvention. *Al Ghurair Iron & Steel LLC v. United States*, 65 F. 4th 1351, 1363 (Fed. Cir. 2023) ("We conclude that Commerce's error was harmless. Commerce's finding of circumvention involved a multi-factor test and was *supported by many findings* other than its calculation of {the respondent's} value added.") (emphasis added). The Department's error invalidates the entire foundation of Commerce's affirmative circumvention determination – how THSM's R&D expenditures compared to those of its affiliates making different products – and must thus be remanded for correction.

## C. Commerce's Decision to Elevate One Single Factor, R&D, to Preeminence Contradicts Clear Agency Precedent

Moreover, Commerce's analysis with respect to R&D is unlawful because it contradicts established agency precedent confirming that (a) a majority of the factors should weigh in favor of circumvention to find circumvention, and (b) R&D is relatively less informative than the other factors for evaluating third-country

processing. It is a bedrock principle of administrative law that an agency interpretation should be viewed skeptically by a court when that agency interpretation conflicts with a prior interpretation and "creates 'unfair surprise' to regulated parties." *Kisor v. Wilkie*, 588 U.S. 558, 579 (2019) (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007)). Such agency actions do not reflect the "fair and considered judgment" of the agency. *Id.* Courts have explained that an unexplained inconsistency in the application of an agency's methodology in the context of an adjudication is unlawful agency action. *SKF USA Inc. v. United States*, 263 F. 3d 1369, 1382 (Fed. Cir. 2001), *aff'd*, 332 F. 3d 1370 (Fed. Cir. 2003) ("{I}t is well-established that an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently.") (internal citation and quotation marks omitted); *Liberty Frozen Foods Pvt., Ltd. v. United States*, 791 F. Supp. 2d 1249, 1256 (Ct. Int'l Trade 2011) (internal citation omitted). And the Supreme Court made clear in *Loper Bright* that courts owe no deference to Commerce's interpretation and must determine the best reading of the statute.

Canadian Solar and TTL provided Commerce with a summary of its decisions since 2012 where Commerce determined that circumvention was occurring by minor processing either for merchandise completed in the United States or merchandise completed in a third country. *See* TTL's Second Tranche Case Brief, Appx10461–10464. Plaintiffs identified eighteen decisions and summarized Commerce's

findings with regard to each of the five factors considered. *Id.*; *Second Tranche Rebuttal Case Brief of CSIL*, Case No. A-570-979 (Anti-Circumvention Inquiry Thailand-2022) (May 9, 2023) at 27–28, Appx10543–10544 (surveying five recent "minor or insignificant" findings). In fifteen of those eighteen decisions, Commerce found that all five factors weighed in favor of finding the process to be minor or insignificant. For the remaining three decisions, Commerce found that four of the five factors weighed in favor of finding the process to be minor or insignificant. Thus, those decisions demonstrated that Commerce had never found a process to be minor or insignificant when a minority of the five factors weighed in favor of finding the process to be minor or insignificant. In sum, prior to the inquiry at the center of this appeal, Commerce had *always* justified affirmative circumvention determinations with a finding that the majority of the five factors weigh in favor of circumvention.

Inexplicably, Commerce changed course entirely here and found that one factor alone could outweigh the rest. The CIT accepted Commerce's formulation, explaining "were the agency to adopt such a wooden {majority-rule} policy, it would conflict with the statute, which affords the Department maneuvering room to weigh the relevant factors based on the circumstances." Slip Op. 25-59 at 11, Appx15. This was wrong. Rather, as explained above, Congress instructed Commerce to make factual determinations in circumvention inquiries but did not grant it unlimited

"maneuvering room" to develop bespoke statutory tests. Congress developed a five-factor test and then said: "No single factor will be controlling." SAA at 4216. Commerce's "maneuvering room" does not allow the agency to ignore Congress's clear limits or the agency's own precedent. The CIT's concern that Commerce should not be boxed in by a "wooden policy" is misplaced and is an issue with the statute's limits—Plaintiffs have not attempted to circumscribe Commerce's flexibility by inventing a wooden test. Slip Op. 25-59 at 11, Appx15. They have directed the agency to Congress's instructions written in stone.

Moreover, Commerce's conclusions are also inconsistent with the agency's findings in other segments of the circumvention inquiry—notably, Commerce's *negative* circumvention determination with respect to Jinko Solar Technology Sdn. Bhd. and Jinko Solar (Malaysia) Sdn. Bhd. (collectively, "Jinko") that was made on the basis of the agency's finding that *four* out of the five factors under 19 U.S.C. § 1677j(b)(2) weighed against a finding of circumvention. *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China*, 88 Fed. Reg. 57419 (Dep't Commerce Aug. 23, 2023) and accompanying Issues and Decision Memorandum (Malaysia) at 50 (". . . we continue to find the extent of Jinko's Malaysian production facilities to be minor or insignificant. . . ."). For Jinko, Commerce rendered a negative determination because a majority of the factors weighed against a finding of circumvention—

inexplicably the opposite outcome of what Commerce reached with respect to CSIL. This inconsistency makes clear that Commerce's determination was contrary to law.

Agency precedent also confirms that R&D in particular should not be considered a determinative factor in Commerce's "minor or insignificant" analysis. The Department has previously explained that limited R&D alone is an insufficient basis for an affirmative circumvention determination. In fact, Commerce has explained that typically R&D should be given less weight than the other statutory factors. For instance, Commerce has explained:

> *"The lack of research and development expenses . . . provides no information as an informative factor in determining whether the Order is being circumvented."* Certain Welded Carbon Steel Standard Pipes and Tubes from India, 87 Fed. Reg. 52507 (Dep't Commerce Aug. 26, 2022) (preliminary negative determinations of circumvention of the antidumping order) and accompanying Issues and Decision Memorandum at 16. (emphasis added), and

> *"Based on this record . . . , a lack of significant R&D expenses with respect to . . . tubing products does not necessarily mean that the processing in Vietnam is minor or insignificant. Accordingly, we find that the lack of significant R&D expenses for the production of . . . tubing in Vietnam is not informative in determining whether the processing . . . is minor or insignificant."* Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan, 88 Fed. Reg. 21980 (Dep't Commerce Apr. 12, 2023) (preliminary affirmative determination of circumvention of the antidumping duty order) and accompanying Issues and Decision Memorandum at 14.

Moreover, Commerce has repeatedly asserted that the level of R&D is *less* informative in determining whether third-country processing is "minor or insignificant" than the other statutory factors under section 781(b)(2). For example, in *Certain Aluminum Foil from the People's Republic of China*, Commerce explained:

> The factors involving the level of investment, ***the level of R&D***, and the extent of the production facilities in {the third country} ***weigh less heavily in our determination*** than the factors involving the nature of the production process and the value added in {the third country} ***because the former relate more broadly to the companies and their facilities, whereas the latter relate more to the production of the inquiry merchandise itself***.

88 Fed. Reg. 17177 (Dep't Commerce Mar. 22, 2023) (preliminary affirmative determinations of circumvention with respect to the Republic of Korea and the Kingdom of Thailand) and accompanying Issues and Decision Memorandum (Korea) at 15 (emphases added).

Notwithstanding its contrary precedent, Commerce here elevated R&D above all over factors and made it determinative. This determination contradicted agency precedent establishing that – (1) circumvention does not exist if a majority of the factors weigh against a finding of circumvention, and (2) R&D is a comparatively less important "minor or significant" factor. As such, Commerce's analysis was unlawful.

**D. Commerce's R&D Conclusion Contradicts Itself by Emphasizing the Complexity of Cell and Module Manufacturing Even While Relying on R&D Expenses Associated with Ingot and Wafer Manufacturing**

Commerce's R&D analysis is also unlawful because it is internally inconsistent. Commerce must provide a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). Commerce focuses on wafer and ingot R&D expenses incurred by THSM's affiliates but recognizes the sophisticated processes required to build cells and modules in Thailand. That is, Commerce fails to link logically the relevance of wafer and ingot R&D expenses from affiliates to the complex manufacture of downstream cells and modules by THSM in Thailand. Commerce states that R&D has "preeminent importance in the solar industry," and that this is "the main reason R&D weighs heavily in the overall decision pursuant to {19 U.S.C. §1677j(b)(1)(C)}." Decision Memo at 65, Appx10623. In purported support, Commerce cites the R&D expenses reported by solar producers and their need to upgrade *cell* technology for efficiency—not wafer and ingot R&D, which serves as the basis for Commerce's comparison in this circumvention inquiry. *Id*. Commerce never explains how R&D is unusual or unique to the solar industry, as many

manufacturing industries invest in R&D in order to improve technologically over time.

Next, Commerce contradicts its findings regarding the significant nature of the solar cell and module production process by claiming that R&D expenses in solar cells and modules are not as important or significant when compared to R&D expenditures for wafer and polysilicon production. *Id.* Commerce offers no logic for this conclusion. At their core, Commerce's findings as to the significance of R&D expenditures directly contravene its findings as to the significant nature of the solar cell and module production process. Commerce observes that "wafer factories require high upfront capital expenditure and bear many technical hurdles. . . {and} {c}ell manufacturing is more versatile compared to wafers and polysilicon and has lower technical {h}urdles." *Id.* at 65–66, Appx10623–10624. This was wrong. Commerce contradicts its own findings as follows:

> Record evidence indicates that there are significant technical requirements that must be met for, and changing technologies with respect to, producing solar cells. *Id.* at 50, Appx10608.
>
> ***The equipment and technology, as well as the number of processing steps required to produce a {solar} cell are far more technically sophisticated than those of the polysilicon or wafer manufacturing operations***. . . Cell manufacturing alone requires a fully integrated, multi-step manufacturing line with equipment to perform {multiple} processes. . . Each of these processes requires one or more uniquely designed and calibrated machines to advance the

wafer from a commodity product to a finished cell.  *Id.* at 51, Appx10609 (emphasis added).

Moreover, ***while the technology required to produce ingots has not significantly changed since it was created, the same is not true for solar cells***.  Technology improvements in the wafer-to-cell process are responsible for most of the performance improvements of solar panels.  *Id.* (emphasis added, internal quotation omitted).

In short, Commerce's focus on wafer and ingot R&D expenditures was unlawful under the statute.  The agency wrongly focused on affiliate activities and contradicted the agency's own findings with respect to the transformative significance of cell and module production.

## IV.  COMMERCE'S DETERMINATION WITH RESPECT TO THE VALUE OF PROCESSING ADDED IN THAILAND WAS UNLAWFUL

In its Final Determination, Commerce determined that the percentage of the value of imported inquiry merchandise represented by THSM's processing in Thailand was a "small proportion of the value of the merchandise imported into the United States" and thus "minor or insignificant."  Decision Memo at Appx10615, CSIL Final Analysis Memo at Appx10745.  But the Final Determination acknowledges that the value of processing performed by CSIL in Thailand amounted to **[ # ]** percent of the value of the inquiry merchandise imported into the United

States. CSIL Final Analysis Memo, Appx10745.[7] Commerce's finding that this figure constituted a "small proportion" was not lawful due to the following: (1) approximately one third of the value is not "a small proportion" under a plain reading of the statute; (2) the finding contradicts agency precedent confirming that one third is not a "small proportion"; and (3) the agency ignored qualitative factors demonstrating that the production process undertaken in Thailand is transformative and constitutes the key manufacturing step in the creation of a solar product.

### A. One Third Is Not a "Small Proportion"

Commerce's decision is not lawful because one third is not a "small proportion" under the best reading of the term (or, indeed, any normal meaning). The statute directs: "In determining whether the process of assembly or completion is minor or insignificant . . . ,{Commerce} shall take into account—. . . (E) whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States." 19 U.S.C. § 1677j(b)(E). The CIT was unbothered by Commerce's vast expansion of the term "small proportion," noting "***the majority of processing is still done in China***," and that, in any event, the decisive R&D factor outweighed any value-added finding. Slip Op. 25-59 at 17–18, Appx21–22 ("{E}ven if Commerce erred in that

---

[7] Slip Op. 25-59, n.8, indicates that THSM's value of processing in Thailand was approximately one third (33 percent)—between 26 and 34 percent. Slip Op 25-59 at 22, n. 8, Appx26.

finding, it made no difference in the outcome and thus was harmless error.")
(emphasis added).  The statutory question, though, is not whether a majority of the
product's value is added in Thailand.  The question is whether **[ # ]** percent value
added in Thailand is "small proportion."

The answer is no.  "Small" means "little or close to zero in an objectively
measurable aspect (such as quantity)," "of little consequence," and "limited in
degree."  *Small*, Merriam-Webster Dictionary, https://www.merriam-
webster.com/dictionary/small (last accessed Oct. 15, 2025).  One third of anything
is clearly not "close to zero."  Nor can one third of a particular category be "of little
consequence."  For example, one third of a product's value is not a "small
proportion" under the best reading of that term.  Nor would a company that lost one
third of its value agree that this decline is only a "small proportion" of the company's
value.  If a city had 120 days of rain per year, it would not be correct to say that only
"a small proportion" of its days were rainy.  In 2024, approximately 28% of
American voters were registered with the Democratic Party and 28% with the
Republican Party (less than one third).  It would not be correct to say that registrants
of either party represent only a "small proportion" of registered U.S. voters.  Gallup,
*Party Affiliation*, https://news.gallup.com/poll/15370/party-affiliation.aspx  (last
accessed Oct. 15, 2025).  Smallpox has a mortality rate of approximately 30 percent.
CDC, *About Smallpox*, https://www.cdc.gov/smallpox/about/index.html  (last

accessed Oct. 15, 2025).  It would not be correct to say that only a "small proportion" of those afflicted with smallpox do not survive the disease.

In short, a figure can be substantially less than *a majority* without being a small proportion.  The purported justification by Commerce and the CIT observation that "a majority" of the value is added in China is baffling—the legal test is "small proportion," not "minority share."

Accordingly, Commerce's finding that one third constitutes a "small proportion" of the whole is not a lawful reading of that term.  This Court owes no deference to Commerce's poor and erroneous interpretation of the governing statute.

## B.  Commerce Failed to Conduct the Required Qualitative Value-Added Analysis

Commerce's value-added analysis is additionally unlawful because it ignores the transformative and qualitative value added by THSM in Thailand.  The Department itself has explained that "Congress has directed {Commerce} to focus more on the nature of the production process and less on the difference in value between the subject merchandise and the parts and components imported into the processing country.  *See* CSIL's Second Tranche Case Brief at Appx10496, Decision Memo at Appx10614.  Congress has instructed Commerce to adopt "a more qualitative focus on the nature of the production process," not "a rigid numerical calculation of value-added."  SAA at 4217.  Moreover, in past circumvention cases and consistent with this Congressional intent, circumvention inquiries "focus more

on the nature of the production process and less on the difference in value between the subject merchandise and the imported parts or components." *Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the United Kingdom*, 64 Fed. Reg. 40336, 40347 (Dep't Commerce July 26, 1999) (negative final determinations of circumvention of antidumping and countervailing duty orders) (explaining, "we believe that any attempt to establish a numerical standard would be contrary to the intentions of Congress."); *see also Certain Corrosion-Resistant Steel Products from Taiwan*, 84 Fed. Reg. 32864 (Dep't Commerce July 10, 2019) (affirmative preliminary determination of anti-circumvention inquiry on the antidumping duty order) and accompanying Issues and Decision Memorandum at 17 ("In prior anti-circumvention inquiries, Commerce has explained that Congress directed the agency to focus more on the nature of the production process and less on the difference between the value of the subject merchandise and the value of the parts and components imported into the processing country. Additionally, Commerce has explained that, following the URAA, Congress redirected the agency's focus to the nature of the production process."). Specifically, under the governing statute, the Department has explained that Congress has redirected Commerce's focus to the ***nature*** of the production process. *See Small Diameter Graphite Electrodes from the People's Republic of China,* 77 Fed. Reg. 33405, 33413 (Dep't Commerce June 6, 2012) (affirmative preliminary determination of circumvention of the antidumping

duty order and extension of final determination) and accompanying Issues and Decision Memorandum at 9–10 (explaining that Commerce was "keeping away from a rigid numerical calculation of value-added in favor of a more qualitative focus on the nature of the production process").

The essential nature of CSIL's CSPV production processes is conducted in Thailand. Decision Memo at 49–53, Appx10607–10611. Commerce conclusively found that the nature of THSM's production process in Thailand is extensive and significant, showing that, qualitatively, the value added through cell and module production in Thailand is certainly significant. *Id*. The manufacturing processes that occur in Thailand completely change the relevant merchandise: a wafer cannot produce electricity until it is transformed into a cell, and a cell is of relatively little use until it is turned into a module. As the original petitioner explained in the underlying Solar I AD/CVD investigations, "{A} wafer is no more capable of producing electricity than a sliver of river-rock." *NextEra Comments on Auxin's Circumvention Ruling Request* (May 2, 2022) at Att. 18, Appx2632. Commerce examined the third-country production processes in this case and plainly and repeatedly found those "significant" activities to be "multi-stage," "technologically sophisticated," "capital intensive," processes, requiring "highly-skilled workers" and "skilled technicians and employees with advanced degrees"—and thus ***not***

"minor or insignificant" processes.  Prelim. Memo, Appx8476–8477; Decision Memo, Appx10607–10611.

## C. Commerce's Assessment of the Value Added in Thailand Is Inconsistent with the Department's Precedent

The Final Determination offers no explanation of what Commerce considers to be a "small proportion" and why the agency broke from precedent in reaching this conclusion here.  There are several other circumvention cases in which Commerce determined that *significantly lower* levels of value added did not support an affirmative circumvention finding.  For example, Commerce has reached *negative* circumvention determinations where the value of processing performed in the exporting country was lower than one third, ranging from 12 to 26 percent, and from 10 to 29 percent.  *Ferrovanadium and Nitrided Vanadium From the Russian Federation*, 77 Fed. Reg. 6537, 6539 (Dep't Commerce Feb. 8, 2012) (preliminary negative determination and extension of time limit for final determination of circumvention of the antidumping duty order) (unchanged in Final Determ.); *Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the United Kingdom*, 64 Fed. Reg. 40336, 40340 (Dep't Commerce July 26, 1999).

These prior decisions undermine Commerce's conclusion here that creating approximately one third of the value of the exported product in Thailand was somehow "small," "minor" or "insignificant." Commerce wrongly found in the Final Determination that this significant value-added in Thailand "represents a small

proportion of the value of the merchandise imported into the United States." *Certain Tissue Paper Products from the People's Republic of China*, 73 Fed. Reg. 21580, 21585–86 (Dep't Commerce Apr. 22, 2008) (affirmative preliminary determination of circumvention of the antidumping duty order and extension of final determination) (unchanged in Final Determ.) ("The value added to the finished merchandise by {respondent's third-country} processing is an average value of ***approximately 34 percent***. Based on our analysis of the value added, we find that the value of the processing performed by {respondent} to convert the . . . jumbo rolls to cut-to-length tissue paper does not represent a small proportion of the value of the finished merchandise sold in the United States.") (emphasis added). Instead, THSM has provided significant, major, and meaningful value-added to the final solar module products in Thailand.

## V.  COMMERCE FAILED TO RENDER A DETERMINATION THAT WAS SUPPORTED BY SUBSTANTIAL EVIDENCE

Commerce's finding that THSM's R&D expenses are "minor or insignificant" additionally fails because it is not supported by substantial evidence. Specifically, Commerce failed to account for record evidence detailing THSM's R&D activities, including that THSM employs skilled engineers who innovate on a daily basis to improve product and manufacturing efficiency. *CSIL Response to Circumvention Inquiry Questionnaire*, Case No. A-570-979 (Anti-Circumvention Inquiry

Thailand–2022) (June 3, 2022) at Ex. 20, Appx8192–8193. In its analysis, Commerce compared THSM's R&D costs incurred from 2019 through 2021 related to cell and module production (nearly $[ # ] million) against those incurred by affiliated ingot and wafer producers (approximately $[ # ] million). CSIL Prelim. Analysis Memo, Appx8506. Commerce confirmed R&D activities and initiatives at verification, including that THSM dedicated [ number ] Thai Baht ("THB") specifically to R&D projects in 2019, [ number ] THB in 2020, and [ number ] THB in 2021. CSIL's Second Tranche Case Brief, Appx9405–9442, Appx10492–10493. Commerce also reviewed information regarding products developed specifically by THSM for solar cell and module production in Thailand. *CSIL Verification Report*, (Apr. 19, 2023) at 14, Appx10373. Rather than engage with this substantial evidence of THSM's R&D expenses, Commerce obfuscated by focusing unlawfully on the R&D activities of THSM's ingot and wafer manufacturing affiliates in China. But, as the CIT acknowledged, affiliation considerations are only relevant for the 19 U.S.C. § 1677j(b)(3) analysis, which is wholly distinct from the § 1677j(b)(2)(B) R&D assessment and cannot be applied until *after* Commerce completes the "minor or insignificant" portion of the analysis. Slip Op. 25-59 at 16, Appx20.

Commerce's analysis is not supported by substantial evidence because the agency failed to address the nature of THSM's R&D activities in Thailand. The record evidence demonstrates that THSM's technology team and process team each

conduct R&D and develop new technologies to optimize THSM's own production and improve product quality in Thailand. *CSIL Response to Circumvention Inquiry Questionnaire* at 7–8, Appx6138–6139. These efforts include, for example, the development in Thailand of new products and improvements on its existing cell technology. *Id.* at Ex. 20, Appx8192–8193. Commerce verified these initiatives, confirming that THSM had undertaken in Thailand several "recent R&D projects." CSIL Verification Report, Appx10373.

THSM demonstrated that it maintains **[ # ]** employees across its Thailand cell and modules operations who work in R&D—a significant proportion of the total Canadian Solar workforce involved in R&D in Canadian Solar's global operations. *CSIL Response to Circumvention Inquiry Questionnaire*, Part I at Ex. 20, Appx8192–8193; *see also*, *id.* at Ex. 1-A (2021 Form 20-F) at 96 (listing 156 full-time R&D employees across the subsidiaries of Canadian Solar Inc.), Appx6259.

Put simply, THSM provided information demonstrating its significant R&D activities. Commerce simply refused to engage with this information in the Final Determination, merely asserting: "CSIL never compared the level of importance of the Thai R&D activities to the level of importance of the R&D activities of its affiliates in China to support it{s} position." Decision Memo at 44, Appx10602. This is not reasonable decision-making, particularly because, as the CIT

acknowledged, affiliation considerations are a separate statutory issue from the R&D analysis. Slip Op. 25-59 at 16, Appx20.

Rather, Commerce simply sidesteps the substantial evidence of THSM's R&D, including its activities and the number of employees. Moreover, even if R&D expenses in China are greater than in Thailand, Thai R&D expenses are still relevant to how much in favor that factor supports a finding of circumvention and how Commerce considers the totality of the circumstances under its "minor or insignificant" analysis. To provide an extreme example, one trillion dollars of R&D expenses in Thailand would undoubtedly not be "minor or insignificant" even if there was two trillion dollars of R&D expenses by Chinese affiliates. Commerce fails to explain this weighing and thus falls short of the statute's directive. Commerce's decision should be remanded so that, consistent with the statute, the agency may properly focus on THSM's R&D activities undertaken in Thailand rather than the R&D initiatives of other companies in another country making different products than THSM.

## CONCLUSION

For the foregoing reasons, the CIT's order and judgment below should be reversed and remanded. Commerce should be ordered to render a Final Determination that is supported by substantial evidence and consistent with the governing statute.

Respectfully submitted,

/s/ Jonathan T. Stoel
Jonathan T. Stoel
Michael G. Jacobson
Nicholas R. Sparks

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone: +1.202.637.5600
Fax: +1.202.637.5910
E-mail: jonathan.stoel@hoganlovells.com

*Counsel to Canadian Solar International Limited, and Canadian Solar Manufacturing (Thailand) Co., Ltd.*

Dated: October 15, 2025

# Addendum

**Slip Op. 25-59**

## UNITED STATES
## COURT OF INTERNATIONAL TRADE

| Court No. 23-00222 | Court No. 23-00227 |
|---|---|
| CANADIAN SOLAR INTERNATIONAL LIMITED and CANADIAN SOLAR MANUFACTURING (THAILAND) CO., LTD., | TRINA SOLAR SCIENCE & TECHNOLOGY (THAILAND) LTD., |
| *Plaintiffs*, | *Plaintiff*, |
| and | and |
| NEXTERA ENERGY CONSTRUCTORS, LLC, | NEXTERA ENERGY CONSTRUCTORS, LLC, |
| *Plaintiff-Intervenor*, | *Plaintiff-Intervenor*, |
| v. | v. |
| UNITED STATES, | UNITED STATES, |
| *Defendant*, | *Defendant*, |
| and | and |
| AUXIN SOLAR INC., | AUXIN SOLAR INC., |
| *Defendant-Intervenor*. | *Defendant-Intervenor*. |

Before: M. Miller Baker, Judge

## OPINION

[Sustaining the Department of Commerce's circumvention determination.]

Dated: May 16, 2025

*Jonathan T. Stoel*, *Michael G. Jacobson*, and *Nicholas R. Sparks*, Hogan Lovells US LLP, Washington, DC, on the briefs for the Canadian Solar companies, Plaintiffs in Case 23-222.

*Jonathan M. Freed* and *MacKensie R. Sugama*, Trade Pacific PLLC, Washington, DC, on the briefs for Trina Solar Science & Technology (Thailand) Ltd., Plaintiff in Case 23-227.

*Matthew R. Nicely*, *Daniel M. Witkowski*, and *Julia K. Eppard*, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, on the briefs for NextEra Energy Constructors, LLC, Plaintiff-Intervenor in both cases.

*Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director; *Reginald T. Blades, Jr.*, Assistant Director; and *Stephen C. Tosini*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, on the brief for the United States, Defendant in both cases.

    *Baker*, Judge: Plaintiffs in these cases challenge the Department of Commerce's finding that solar cell imports from Thailand circumvent antidumping and countervailing duty orders on such equipment made in China. As explained below, the court sustains the agency's determination.

<p style="text-align:center">I</p>

    The Tariff Act of 1930, as amended, allows Commerce to impose antidumping or countervailing duties on a "class or kind" of imported merchandise if it "finds

that the merchandise reflects unfair pricing or unfair subsidization and the [International Trade] Commission finds material injury to the domestic industry." *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 917 (Fed. Cir. 2019) (citing 19 U.S.C. §§ 1671(a)(1), 1673(1)). In imposing such duties, the Department must "include 'a description of the subject merchandise, in such detail as [it] deems necessary.'" *Id.* (emphasis removed) (quoting 19 U.S.C. §§ 1671e(a)(2), 1673e(a)(2)). The statute "defines 'subject merchandise' as 'the class or kind of merchandise that is within the scope of an investigation [or] an order under this subtitle.'" *Id.* (quoting 19 U.S.C. § 1677(25)). In practice, Commerce describes the product "within the scope of the order[ ]" by reference to its "technical characteristics" and "country of origin" (sometimes referred to in this opinion as the "source country"). *Id.* at 913.

The Department "typically determines country of origin based on the country where the merchandise is processed or manufactured." *Id.* But in trade, as in war, the antagonist gets a vote. To avoid duties, a producer may "finish[ ] or assemble[ ]" its products "in a different country" using components manufactured in the source country. *Bell Supply Co. v. United States*, 888 F.3d 1222, 1228 (Fed. Cir. 2018). Whether the final product as exported from the third country is deemed to originate from the source country depends on whether it was "substantial[ly] transform[ed]" in the former. *Id.*

"A substantial transformation occurs where, as a result of manufacturing or processing steps, the

product loses its identity and is transformed into a new product having a new name, character and use." *Id*. (cleaned up) (quoting *Bestfoods v. United States*, 165 F.3d 1371, 1373 (Fed. Cir. 1999)). If such a transformation occurs, the third country becomes the country of origin, and the product is out-of-scope. *Id.* at 1230. Otherwise, such goods are deemed to originate from the source country, meaning they're in-scope. *Id.*

Even if substantially transformed in a third country, the products finished or assembled there from source-country components are not necessarily home free, as it were. As relevant here, the statute's anticircumvention provision, 19 U.S.C. § 1677j, authorizes—but does not require—Commerce to extend antidumping and countervailing duty orders to such articles when certain other conditions are satisfied. *See id.* § 1677j(b)(1); *see also Bell Supply*, 888 F.3d at 1230 (explaining that if the Department "applies the substantial transformation test and concludes that the imported article has a country of origin different from the country identified in an AD or CVD order, then [it] can include such merchandise within the scope of [such an] order only if it finds circumvention under § 1677j").

For there to be circumvention, imports "completed or assembled" in a third country from source-country components must be "of the same class or kind" as goods subject to the duty order. 19 U.S.C. § 1677j(b)(1)(A), (B). The "process of assembly or completion" has to be "minor or insignificant." *Id.* § 1677j(b)(1)(C). The value of the parts made in the source country must also be "a significant portion of

the total value" of the product as finally exported to this nation. *Id*. § 1677j(b)(1)(D). Finally, "action [must be] appropriate . . . to prevent" avoidance of duty orders. *Id*. § 1677j(b)(1)(E).

If Commerce finds those conditions satisfied, it must then determine whether to extend the orders to the third-country goods. In doing so, it must "take into account" certain considerations. *Id*. § 1677j(b)(3). As relevant here, they include any "affiliat[ion]" between the company doing the "assembl[y] or complet[ion]" and the manufacturer or exporter of source-country parts or components. *Id*. § 1677j(b)(3)(B).

In many anticircumvention cases, including these, the crux of the controversy is the "minor or insignificant" condition under § 1677j(b)(1)(C). As to that question, Commerce must "take into account" certain factors regarding operations in the third country. They are "(A) the level of investment"; "(B) the level of research and development"; "(C) the nature of the production process"; "(D) the extent of production facilities"; and "(E) whether the value of the processing performed" there "represents a small proportion of the value of the merchandise imported into the United States." *Id*. § 1677j(b)(2). "Commerce will evaluate each of these factors . . . , depending on the particular circumvention scenario. No single [one] will be controlling." *Statement of Administrative Action Accompanying the Uruguay Round Agreements Act* (SAA), H.R.

Doc. 103–316, vol. 1, at 893, 1994 U.S.C.C.A.N. 4040, 4216.[1]

## II

In 2012, Commerce issued orders imposing anti-dumping and countervailing duty orders on solar cells made in China.[2] *See* 77 Fed. Reg. 73,018; 77 Fed. Reg. 73,017. A decade later, domestic producer Auxin Solar Inc. asked the Department to investigate whether such merchandise imported from Thailand, Cambodia,

---

[1] The SAA is an "authoritative expression" of the statute's meaning. 19 U.S.C. § 3512(d).

[2] In technical jargon, the orders cover "crystalline silicon photovoltaic cells, . . . whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials." Appx1004. According to the Energy Department, a solar cell "is a nonmechanical device that converts sunlight directly into electricity." https://www.eia.gov/energyexplained/solar/photovoltaics-and-electricity.php. "Individual cells can vary from 0.5 inches to about 4.0 inches across." *Id*. One such cell "can only produce 1 or 2 Watts, which is only enough electricity for small uses, such as powering calculators or wristwatches." *Id*. Cells can be "electrically connected in a packaged, weather-tight . . . *panel* (sometimes called a *module*)." *Id*. (emphasis in original). In plain English, a solar panel is an assembly of linked solar cells.

A solar cell, in turn, is created by "the addition of a p/n junction" to a solar wafer. Appx1062. For purposes of the orders, that is the key manufacturing step that determines the country of origin. *Id*.; *see also* Appx1108 ("[T]he essential nature of the final product is imparted and realized through production in the inquiry country when the p/n junction is formed in the wafer.").

Vietnam, and Malaysia circumvented those orders. *See* Appx1255.

The agency did so. In its investigation as to Thailand, it selected two mandatory respondents—Trina Solar Science & Technology (Thailand) Ltd., a Chinese-owned Thai entity, and Canadian Solar International Limited, a (despite its name) Chinese company with a Thai manufacturing affiliate, Canadian Solar Manufacturing (Thailand) Co., Ltd. (collectively Canadian Solar). Appx1001; Appx19720.

Commerce preliminarily concluded that only one of the five § 1677j(b)(2) factors (R&D) indicated that Trina's operations in Thailand were "minor or insignificant" for purposes of § 1677j(b)(1)(C), and only two (R&D and processing value) did so as to Canadian Solar. Appx1015–1022. Nevertheless, after balancing those considerations, the agency found that both companies' Thai activities were minor or insignificant under the "totality" of the circumstances. Appx1014. As all the other § 1677j(b)(1) conditions were satisfied, and after accounting for the § 1677j(b)(3) factors, the Department determined that action was necessary to prevent circumvention. Appx1023.

After receiving comments from Canadian Solar and Trina, the Department reaffirmed its finding of circumvention in its final determination. *See* Appx1056. As to its conclusion that "the process of assembly or completion" in Thailand was "minor or insignificant," *see* § 1677j(b)(1)(C), it explained that it weighed R&D heavily because of "its preeminent importance in the solar industry." Appx1120. The "stages of production

less demanding of R&D [were] those that the respond-
ents . . . opened overseas." *Id.* The "most [R&D-]de-
manding" manufacturing of solar cell components was
"undertaken in China." *Id.*

The agency acknowledged that it "viewed R&D less
importantly in other circumvention inquiries than" it
did here. *Id.* It explained that the relative significance
of that factor "depends on the industry and product un-
der investigation." *Id.* It also noted that "the im-
portance of any one of [the § 1677j(b)(2)] criteria can
vary from case to case depending on the particular cir-
cumstances unique to each circumvention inquiry." *Id.*

Although four of the § 1677j(b)(2) factors pointed
*against* finding that Trina's operations in Thailand
were "minor or insignificant," and three did so as to
Canadian Solar, Commerce explained that in its bal-
ancing it gave those considerations less weight for sev-
eral reasons. First, the Chinese corporate parents
made the "major or ultimate decisions." Appx1121.
Second, the parents also provided most or all of the
Thai investment. *Id.* Third, "nearly all of the key high
tech inputs . . . were produced in China," and thus
stemmed from R&D in that country. Appx1122.
Fourth, "[w]ith regard to the nature and extent of pro-
duction," the machinery that Trina and Canadian So-
lar used in Thailand was of Chinese origin. *Id.* Finally,
in the latter company's case, the "majority of the pro-
cessing is still done in China." *Id.*

### III

Invoking jurisdiction conferred by 28 U.S.C. § 1581(c), Canadian Solar and Trina (collectively Plaintiffs) brought these suits under 19 U.S.C. §§ 1516a(a)(2)(A)(ii) and (a)(2)(B)(vi) challenging the Department's final determination.[3] NextEra Energy Constructors, LLC, an importer of Thai solar cells, intervened in both cases as a plaintiff, while Auxin did likewise as a defendant. The parties have fully briefed Plaintiffs' and NextEra's motions for judgment on the agency record, which are ripe for disposition.

In § 1516a(a)(2) actions such as these, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The question is not whether the court would have reached the same decision on the same record. Rather, it is whether the administrative record as a whole permits Commerce's conclusion.

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well

---

[3] ECF citations in this opinion refer to Case 23-222 unless otherwise specified.

as evidence that fairly detracts from the sub-
stantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373,
1379 (Fed. Cir. 2003) (cleaned up); *see also SSIH
Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365,
382 (Fed. Cir. 1983) (if Commerce makes a choice be-
tween "two fairly conflicting views," the court may not
substitute its judgment even if its view would have
been different "had the matter been before it *de novo*")
(quoting *Universal Camera Corp. v. NLRB*, 340 U.S.
474, 488 (1951)).

## IV

Plaintiffs and NextEra attack Commerce's finding
that "the process of assembly or completion" in Thai-
land "is minor or insignificant." *See* ECF 40, at 30–62
(Plaintiffs); ECF 43, at 6–28 (NextEra); *see also*
19 U.S.C. § 1677j(b)(1)(C). Plaintiffs also assert that
the agency erred in determining that "action is appro-
priate" to prevent circumvention. *See* ECF 40, at 62–
67; *see also* 19 U.S.C. § 1677j(b)(1)(E). The court con-
siders these issues in turn.

### A

#### 1

Plaintiffs observe that until the determination
challenged here, Commerce never previously "found a
process to be minor or insignificant when less than a
majority of the five factors" in 19 U.S.C. § 1677j(b)(2)
"weighed in favor" of such a determination. ECF 40,
at 34–35. They point to 18 agency decisions finding

circumvention based on affirmative findings on at least three (and usually more) of the five statutory factors. *See id*. at 36–37. According to Plaintiffs, this shows that Commerce "*always* justif[ies] affirmative circumvention determinations with a finding that the majority of the five factors weigh in favor of circumvention." *Id*. at 37 (emphasis in original).

The government correctly responds that Plaintiffs "identify no instance when Commerce has articulated a 'majority rule'" for assessing the § 1677j(b)(2) factors. ECF 44, at 33. Each of the 18 cited determinations turned on its facts. Thus, the Department's decision here is not inconsistent with past practice because it has never adopted the mechanical test advocated by Plaintiffs.[4]

And were the agency to adopt such a wooden policy, it would conflict with the statute, which affords the Department maneuvering room to weigh the relevant factors based on the circumstances. *See* 19 U.S.C. § 1677j(b)(2) (directing Commerce to "take [them] into

---

[4] Nor is it, as Plaintiffs contend, inconsistent with the Department's negative determination in the Malaysian segment of this inquiry. *See* ECF 40, at 38. There, the agency concluded that four of the five § 1677j(b)(2) factors did not indicate circumvention. *Id*. Critically, Commerce found—unlike in this segment involving Thailand—that respondent Jinko's R&D in Malaysia was *significant*. Case 23-224, ECF 36-2, at 49. Given the "preeminent importance" the agency attaches to that factor in the context of solar cell production, *see* Appx1120, it predictably determined that Jinko's process of assembly or completion in Malaysia was not minor or insignificant.

account"). The SAA confirms this understanding, explaining that the agency evaluates the factors "depending on the particular circumvention scenario." SAA at 893, 1994 U.S.C.C.A.N. at 4216. The government correctly observes the majority rule advocated by Plaintiffs "would effectively reduce Commerce's [role] to a counting exercise that would frustrate [its] ability to ascribe weight to the factors" in any given case. ECF 44, at 33. Balancing the § 1677j(b)(2) factors is an art, not a science.

Here, the Department did what the statute and the SAA charged it with doing: consider each of the five factors, weigh them according to the facts, and render its finding "on the totality of [the] evidence." Appx1120; *see also* Appx1121–1122. Plaintiffs' majority-rule argument fails because the agency never adopted such a policy and the statute precludes it.

<center>2</center>

Plaintiffs challenge Commerce's assignment of "dispositive weight [to] the R&D factor," even though "the majority of the factors weighed against circumvention." ECF 40, at 39–40. They assail this balancing on several grounds.

They first assert that the Department "failed to provide any explanation for why the [other four] factors should not be accorded their due weight." *Id*. But that's not true. The Department discussed at length why—in this solar industry context—R&D outweighed them. *See* Appx1120–1121. And it then identified

several reasons why it discounted them on their own terms. Appx1121–1122.

Plaintiffs also contend that the centrality of R&D is not "unusual or unique to" the solar power industry because "many other manufacturing industries invest in R&D in order to become more efficient." ECF 40, at 40 (citing Appx1120). They cite no authority—record or otherwise—for this proposition, nor do they explain its relevance in any event.

Plaintiffs next argue that the Department contradicted itself in concluding that R&D for solar cells assembled in Thailand is "not as important or significant" compared to such expenditures for production of precursor components in China. *Id.* (citing Appx1120). They point to the agency's determination that the "nature of the production process" (§ 1677j(b)(2)(C)) in Thailand *is* consequential. *See* Appx1104–1108. Essentially, Plaintiffs contend that it follows from that finding that the relevant R&D must be as well.

Commerce, however, reasonably explained that solar cell production in Thailand was "less demanding of R&D" than manufacturing of the precursor wafer, which "is undertaken in China." Appx1120. "[C]*ompared with*" producing the precursor components, "building a new module factory has low technical hurdles." Appx1121 (emphasis added). "[N]ot only is R&D of preeminent importance to solar makers, but R&D is most important to wafer production that is exclusively performed by the Chinese affiliates of the respondents and not performed in [Thailand]." *Id*. This China-based R&D implicated "the most important stage[ ] of

production," *id.*, which is "the driver of the solar industry," Appx1122.

The Department, then, did not contradict itself. It explained that although the production of solar cells and modules is important in absolute terms, relatively speaking the R&D associated with that stage is less important than that linked to the manufacturing of precursor components in China. *Id.* Thus, on balance, the R&D factor indicated circumvention.

Plaintiffs next assert that Commerce's reliance on R&D conflicts with its own precedent. They characterize previous agency decisions as holding that this factor receives less weight than the other four and that "*limited* R&D alone is an insufficient basis" for finding circumvention. ECF 40, at 42 (emphasis added). There are two problems with this argument.

To begin with, the Department found that in this context, the R&D for precursor wafers is anything *but* "limited." Instead, it's "the driver of the solar industry." Appx1122. That's precisely why the agency attached outsized importance to it.

Moreover, the cited sources do not support Plaintiffs' assertions. *Certain Welded Carbon Steel Standard Pipes and Tubes from India* stated that "[a] lack of research and development expenses *does not necessarily mean* that circumvention exists." Preliminary I&D Memo at 16 (Aug. 22, 2022) (emphasis added), accompanying 87 Fed. Reg. 52,507. That principle, of course, is a truism. A lack of R&D *might* indicate circumvention, depending on the Department's weighing

of the § 1677j(b)(2) factors based on the relevant record evidence.

Similarly, Plaintiffs quote *Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan* as follows: "A 'lack of significant R&D expenses . . . is not informative in determining whether processing in [the third country] is minor or insignificant.'" ECF 40, at 42 (quoting Preliminary I&D Memo at 14 (Apr. 6, 2023), accompanying 88 Fed. Reg. 21,980). But the full context belies their selective excerpts:

> *Based on this record* . . . , a lack of significant R&D expenses with respect to . . . tubing products *does not necessarily mean* that the processing in Vietnam is minor or insignificant. Accordingly, we find that the lack of significant R&D expenses for the production of . . . tubing in Vietnam is not informative in determining whether the processing . . . is minor or insignificant.

*Tubing from Taiwan* Preliminary I&D Memo at 14 (emphasis added). The Department thus based its decision on the record before it and did not articulate a bright-line rule about the relative weight of R&D in all cases.[5]

---

[5] The same is true of *Aluminum Foil from China*, which found, "*for this product*, that the factors involving the level of investment, the level of R&D, and the extent of the production facilities in Thailand weigh less heavily in our determination . . . ." Preliminary I&D Memo at 15 (Mar. 15,

Finally, recall that Commerce attached less weight to its negative § 1677j(b)(2) findings because Chinese affiliates controlled Canadian Solar and Trina's "major or ultimate decisions" and arranged "nearly all or all" of the necessary investment in Thailand. Appx1121. Plaintiffs point out that the locus of decision making is "not one of the five 'minor or insignificant factors.'" ECF 40, at 45 (emphasis removed). NextEra zeroes in on the source of the problem, observing that "affiliation" is identified as a factor for the Department "to consider under 19 U.S.C. § 1677j(b)(3) . . . , but that is a separate statutory provision that is relevant only *after* Commerce has separately found that the 'mandatory' prerequisites" under § 1677j(b)(1) "are met, including that the process of assembly or completion is minor or insignificant." ECF 43, at 21–22 (emphasis in original and citation omitted).

The court agrees with Plaintiffs and NextEra. The statute requires Commerce to undertake an "if/then" analysis. Only *if* it finds the conditions in § 1677j(b)(1)(A)–(E) satisfied does it *then* decide whether to expand an order to cover a third country. In doing so, it must then consider the § 1677j(b)(3) factors. By letting one of them—affiliation—bleed over into its weighing of the § 1677j(b)(2) elements that bear on § 1677j(b)(1)(C), the Department erred as a matter of law.

---

2023) (emphasis added), accompanying 88 Fed. Reg. 17,177.

That said, this was harmless error for two separate and independent reasons. First, Commerce didn't just rely on affiliation to assign less weight to its negative § 1677j(b)(2) findings. It gave additional reasons that Plaintiffs do not challenge,[6] including that "all or nearly all of the key high tech inputs" and the Thai-based production machinery "were produced in China." Appx1122. And in the case of Canadian Solar, "the majority of processing is still done in China." *Id.*; *cf. Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351, 1363 (Fed. Cir. 2023) ("Commerce's finding . . . was supported by many findings other than its [erroneous] calculation of [the plaintiff's] value added.").

Second, as Plaintiffs acknowledge, "Commerce effectively placed dispositive weight on the R&D factor." ECF 40, at 39. Even if the Department had not erroneously considered the Chinese parents' control over decision making and investment in Thailand, the result would have been the same. A remand would be wasteful. *Oracle Am., Inc. v. United States*, 975 F.3d 1279, 1290–91 (Fed. Cir. 2020) ("[P]rinciples of harmless error apply to judicial review of agency action generally. A remand is unnecessary when . . . there is no reason to believe that the decision would have been different" even without the error.).

Finally, Plaintiffs assert that Commerce's finding that "the nature of the production process" in Thailand

---

[6] The court therefore assumes, without deciding, that the Department permissibly took these considerations into account.

is consequential is "incongruent with [its] overall con-
clusion that the process of assembly or completion
[there] is minor or insignificant." ECF 40, at 57–58.
They contend that these findings "cannot be recon-
ciled" because cell and module production "is a major,
complex manufacturing process that does not amount
to minor or insignificant processing." *Id.* at 57. Trina's
reply amplifies this point and asserts that "[o]verall,
Commerce's findings with regard to the
§ 1677j(b)(2)(C) nature of processing factor logically
compelled a negative determination as to circumven-
tion." Case 23-227, ECF 49, at 4.

The court disagrees. Although the record might
have permitted the Department to reach such a con-
clusion, it did not *compel* such a result. "Where two
different, inconsistent conclusions may reasonably be
drawn from the evidence in [the] record, an agency's
decision to favor one conclusion over the other is the
epitome of a decision that must be sustained upon re-
view for substantial evidence." *In re Morsa*, 713 F.3d
104, 109 (Fed. Cir. 2013) (brackets omitted) (quoting
*In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002)). As
the Department reasonably explained why R&D out-
weighed the other factors, including the nature of the
production process, Plaintiffs' argument that it should
have reached a different result is unavailing.

3

Plaintiffs argue that substantial evidence does not
support the agency's determination that Canadian So-
lar's R&D indicated circumvention. *See* ECF 40, at 46–
49. They point to "record evidence" of the company's

activities, including its hiring of "skilled engineers who innovate on a daily basis," *id*. at 46 (citing Appx10734–10735), and its spending, *id*. (citing Appx18669–18706, Appx19729). They contend that Canadian Solar devotes a "significant proportion" of its global R&D to its Thai operations. *Id*. at 47 (citing Appx10734–10735). Finally, they say the agency failed to explain how it weighed the company's Thai R&D expenses against amounts spent in China or otherwise "engage with" this information. *Id*. at 48.

Contrary to the company's argument, the agency did engage with the relevant record evidence. It found that Canadian Solar's R&D expenditures in China were more than four times greater than such costs in Thailand. Appx1048. Based on that disparity, it concluded that the company's R&D activities in the latter country were "minor or insignificant." *Id*. It explained that spending is "an important gauge of the level of R&D" and outweighed "the nature of the Thai R&D activities or the number of employees engaged in" them. Appx1099. It added that although the company claimed its Thai R&D was "important in nature, Commerce normally compares the level of R&D in the inquiry country to that in the order country." *Id*. Canadian Solar does not dispute that it never provided such a comparison. *Id*.

Given that failure, it can hardly now complain that Commerce attached too much weight to the spending disparity. The court thus concludes the agency's finding that the company's Thai R&D was inconsequential is supported by substantial evidence.

4

Plaintiffs and NextEra contest Commerce's finding, *see* Appx1115, that the value of Canadian Solar's processing in Thailand is "a small proportion of the value of" its solar cell exports to the U.S. for purposes of 19 U.S.C. § 1677j(b)(2)(E). *See* ECF 40, at 49–56 (Plaintiffs); ECF 43, at 24–28 (NextEra).

Plaintiffs first complain that the Department relied exclusively on monetary values and did not also consider the qualitative aspects of the company's Thai operations. ECF 40, at 49–50. They assert that prior agency decisions look to both considerations. *Id.* at 49–51. NextEra makes a similar argument. *See* ECF 43, at 26.

The government responds by noting that the statute distinguishes "the nature of the production process" from the "value of processing." ECF 44, at 20 (citing 19 U.S.C. § 1677j(b)(2)(C)). It contends that it would be "illogical" to require the Department to evaluate the former twice and that doing so would violate the interpretive canon against surplusage. ECF 44, at 20. Under that canon, no word in a statute "should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012). And the government observes that "so long as Commerce explains itself," which it argues the agency did here, "it is not bound by its prior determinations." ECF 44, at 22 (citing *Al Ghurair*, 65 F.4th at 1360).

Neither Plaintiffs nor NextEra argue that the Department erred in interpreting the statute. In any event, the court agrees with the agency's reading. As the government contends, the "nature of the production process" factor in § 1677j(b)(2)(C) encompasses a qualitative assessment. *Id.* at 20. Plaintiffs' and NextEra's approach would render § 1677j(b)(2)(C) surplusage.

The relevant regulation also requires assessing the "value of processing" based on "the cost of producing the part or component." Appx1112 (quoting 19 C.F.R. § 351.226(i)).[7] Commerce observed that "[c]osts are measured numerically, as is the value of merchandise." *Id.* It discussed its prior decisions and explained that they referred to "the overall decision of whether processing is minor or insignificant or the overall determination of whether circumvention is occurring," rather than the specific § 1677j(b)(2)(E) factor. Appx1113–1114. Accordingly, the court finds that the agency sufficiently explained its conclusion that "value of processing" means monetary worth rather than qualitative considerations.

Plaintiffs alternatively argue that even if the Department properly limited its analysis to monetary worth, it failed to articulate a benchmark in concluding that Canadian Solar's value of processing in Thailand—somewhere between 26 and 34 percent of U.S.

---

[7] The agency issued § 351.226 in September 2021. The decisions Plaintiffs cite all antedate the regulation.

import value[8]—was a "small proportion" of the value of its exports to the United States. ECF 40, at 54. They call the omission "striking" in view of other cases in which the agency found that smaller value-added percentages than those here were not "minor or insignificant." *Id.* at 54–55.

The court disagrees. Commerce's final determination explained that it "has found processing percentages consistent with [Canadian Solar's] to be small," Appx1115—a point that Plaintiffs do not dispute. The agency reasonably explained—although tersely—that Canadian Solar's percentage was within the range it had previously recognized as small. *Cf. Al Ghurair*, 65 F.4th at 1361 n.4 (sustaining the Department's finding that "the value added" in the third country "was insignificant *in view of prior [agency] cases making similar findings*") (emphasis added); *see also id.* (noting with approval the company's concession that "Commerce should not be held to a numerical or

---

[8] The agency treated the actual percentages as confidential. In *Ferrovanadium and Nitrated Vanadium from Russia*, discussed below, the value of processing ranged from about 12 to 26 percent. 77 Fed. Reg. 6537, 6539, 6542. The government says that range is *lower* than Canadian Solar's. ECF 44, at 24. It also cites a decision involving tissue paper from China in which the value of processing averaged 34 percent, which it states is *higher* than Canadian Solar's. *Id.* (citing 73 Fed. Reg. 21,580, 21,585).

'bright-line' test in considering the value added in third-country processing").[9]

The Department further distinguished its previous decision in *Vanadium from Russia*—where it had found 12 to 26 percent *not* to be small—"based on the extensive and substantial processing that occurred." *Id*. It reasonably explained why it reached a different outcome here—"we find it is appropriate to consider the nature of processing in the overall circumvention decision rather than in assessing the percentage calculated under" the value of processing factor. *Id*.[10] The court therefore sustains the agency's finding about the value of Canadian Solar's processing in Thailand.

Finally, even if Commerce erred in that finding, it made no difference in the outcome and thus was harm-

---

[9] Plaintiffs also argue that Commerce's affirmative value-added finding for Canadian Solar cannot be reconciled with its corresponding negative determination for Trina. *See* ECF 40, at 56. But the Department explained—and Plaintiffs do not dispute—that the former's percentage is within the range that it had previously determined to be minor. Appx1115. The implication is that Trina's percentage, which is more than just a few percentage points higher than Canadian Solar's, is outside that range.

[10] Plaintiffs also cite two other previous decisions in which Commerce found percentages comparable to Canadian Solar's not to be small. ECF 40, at 55–56 (discussing *Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the United Kingdom*, 64 Fed. Reg. 40,336, 40,340, and *Tissue Paper from China*, 73 Fed. Reg. at 21,585–86). It's not clear that Plaintiffs brought these to the Department's attention, and in any event they do not argue that it erred in failing to address them.

less error. This is obvious because the Department's emphasis on R&D was so great that it still found Trina's process of assembly or completion in Thailand to be minor or insignificant, despite its negative determination about that company's value of processing. If such a finding didn't save Trina, a similar finding wouldn't have made a difference for Canadian Solar.

\* \* \*

The court sustains Commerce's balancing of the § 1677j(b)(2) factors and thus its conclusion that "the process of assembly or completion" of solar cells in Thailand was "minor or insignificant" under § 1677j(b)(1)(C).

## B

In a last-ditch attempt to force a remand, Plaintiffs contend that "Commerce failed to demonstrate that an affirmative circumvention determination was 'appropriate' under" § 1677j(b)(1)(E). ECF 40, at 62. They claim the Department "may only issue an affirmative circumvention determination if it finds that it is 'appropriate' to do so" under that provision. *Id.*

Plaintiffs misread the statute. It does not require the agency to "demonstrate" that an "affirmative finding" is appropriate, save that it must address the statutory conditions and factors. Rather, it directs Commerce to "determine[ ] that *action is appropriate* under this paragraph [i.e., § 1677j(b)(1)] *to prevent evasion* of such order or finding." 19 U.S.C. § 1677j(b)(1)(E) (emphasis added). The Department did just that: It found action appropriate because circumvention would not

stop unless the agency included the Thai solar cells and modules within the scope of the orders on such merchandise from China. Appx1131. Nothing more was required.

Plaintiffs then pivot from their textual argument and contend action was inappropriate. They correctly observe that Commerce's administration of the orders "has centered on the location of the formation of the p/n junction[11] as the critical production step to determine whether solar cells or modules were within" the scope of the duty orders applying to China. ECF 40, at 65. "Notwithstanding . . . this history," the Department "instead erroneously focuse[d] on the production of wafers as a critical stage for determining circumvention." *Id*. Thus, the agency's "appropriateness determination was faulty because it failed to explain why [it] could suddenly reverse course and determine the wafer origin to be determinative rather than the situs of p/n junction formation." *Id*. at 66.

Commerce, however, confronted this issue head-on. It acknowledged that "it is the addition of a p/n junction that transforms a silicon wafer into a solar cell." Appx1062. Here, that occurred in Thailand, which meant that it—not China—was the country of origin.[12]

---

[11] The junction's creation is the critical step that transforms a wafer into a solar cell. *See* note 2.

[12] It also contributed to the agency's finding that the "nature of the production process" in the former country *was* significant. *See* Appx1108.

The Department also explained that "[w]hile products with a country-of-origin other than the country subject to the order are not normally covered by the order, the Act expressly provides an exception to this rule under [its] circumvention provisions . . . ." Appx1062. They "only require that the merchandise imported into the United States be of the same class or kind as the [goods] produced in the country that is the subject of the order." *Id*. Such merchandise need not "have the same country-of-origin." *Id*.

Indeed, "circumvention can only occur if the articles are from a country *not* covered by the relevant AD or CVD orders." *Id*. (brackets removed, emphasis added, and quoting *Bell Supply*, 888 F.3d at 1229). To read 19 U.S.C. § 1677j(b) as Plaintiffs do—"as applying to a class or kind of merchandise that is covered by an AD and/or CVD order only when the country of origin of the merchandise is the order country"—would disable that provision. *Id*.

Commerce was exactly right. As to this issue, Plaintiffs' quarrel is not with its analysis, but rather with *Bell Supply*, which the agency faithfully applied. That decision forecloses their argument.

*    *    *

The court denies the motions for judgment on the agency record filed by Canadian Solar (ECF 40) and NextEra (ECF 43) in Case 23-222 and similarly denies the motions for judgment on the agency record filed by Trina (ECF 44) and NextEra (ECF 47) in Case 23-227. It therefore sustains Commerce's determination.

**Ct. Nos. 23-00222, 23-00227**                                    **Page 27**

Judgment will enter in both actions. *See* USCIT R. 58(a).

Dated:  May 16, 2025               <u>/s/ *M. Miller Baker*</u>
          New York, NY               Judge

# Web page cited in the opinion

 **U.S. Energy Information Administration**



## Solar explained
# *Photovoltaics and electricity*

---

**BASICS**

## Photovoltaic cells convert sunlight into electricity

A photovoltaic (PV) cell, commonly called a solar cell, is a nonmechanical device that converts sunlight directly into electricity. Some PV cells can convert artificial light into electricity.

Sunlight is composed of *photons*, or particles of solar energy. These photons contain varying amounts of energy that correspond to the different wavelengths of the solar spectrum.

A PV cell is made of semiconductor material. When photons strike a PV cell, they will reflect off the cell, pass through the cell, or be absorbed by the semiconductor material. Only the photons that are absorbed provide energy to generate electricity. When the semiconductor material absorbs enough sunlight (solar energy), electrons are dislodged from the material's atoms. Special treatment of the PV cell's surface during manufacturing makes the front surface of the cell more receptive to the dislodged, or *free*, electrons so that the electrons naturally migrate to the surface of the cell.

## The flow of electricity in a solar cell

The movement of electrons, which all carry a negative charge, toward the front surface of the PV cell creates an imbalance of electrical charge between the cell's front and back surfaces. This imbalance, in turn, creates a voltage potential similar to the negative and positive terminals of a battery. Electrical conductors on the PV cell absorb the electrons. When the conductors are connected in an electrical circuit to an external load, such as a battery, electricity flows through the circuit.

**Inside a photovoltaic cell**



Source: U.S. Energy Information Administration

# PV cells, panels, and arrays

The PV cell is the basic building block of a PV system. Individual cells can vary from 0.5 inches to about 4.0 inches across. However, one PV cell can only produce 1 or 2 Watts, which is only enough electricity for small uses, such as powering calculators or wristwatches.

PV cells are electrically connected in a packaged, weather-tight PV *panel* (sometimes called a *module*). PV panels vary in size and in the amount of electricity they can produce. Electricity-generating capacity for PV panels increases with the number of cells in the panel or in the surface area of the panel. PV panels can be connected in groups to form a PV *array*. A PV array can be composed of as few as two PV panels to hundreds of PV panels. The number of PV panels connected in a PV array determines the amount of electricity the array can generate.

PV cells generate direct current (DC) electricity. DC electricity can be used to charge batteries that power devices that use DC electricity. Nearly all electricity is supplied as alternating current (AC) in electricity transmission and distribution systems. Devices called *inverters* are used on PV panels or in PV arrays to convert the DC electricity to AC electricity.

PV cells and panels produce the most electricity when they are directly facing the sun. PV panels and arrays can use tracking systems to keep the panels facing the sun, but these systems are expensive. Most PV systems have panels in a fixed position that are usually facing directly south in the northern hemisphere—or directly north in the southern hemisphere—at an angle that optimizes the physical and economic performance of the system.



## did you know **?**

Solar photovoltaic cells are grouped in panels, and panels can be grouped into arrays of different sizes to power water pumps, power individual homes, or provide utility-scale electricity generation.



Source: National Renewable Energy Laboratory (copyrighted)

## PV system efficiency

The efficiency that PV cells convert sunlight to electricity varies by the type of semiconductor material and PV cell technology. The efficiency of commercially available PV panels averaged less than 10% in the mid-1980s, increased to around 15% by 2015, and is now approaching 25% for state-of-the art modules. Experimental PV cells and PV cells for niche markets, such as space satellites, have achieved nearly 50% efficiency.

## PV system applications

When the sun is shining, PV systems can generate electricity to directly power devices such as water pumps or supply electric power grids. PV systems can also charge a battery to provide electricity when the sun is not shining for individual devices, single homes, or electric power grids.

Some advantages of PV systems are:

- PV systems can supply electricity in locations where electricity distribution systems (power lines) do not exist, and they can also supply electricity to electric power grids.
- PV arrays can be installed quickly.
- The environmental effects of PV systems located on buildings are minimal.

**Appx35**



Source: National Renewable Energy Laboratory (copyrighted)



Source: National Renewable Energy Laboratory (copyrighted)

## History of PV systems

The first practical PV cell was developed in 1954 by Bell Telephone researchers. Beginning in the late 1950s, PV cells were used to power U.S. space satellites. By the late 1970s, PV panels were providing electricity in remote, or *off-grid*, locations that did not have electric power lines. Since 2004, most PV systems in the United States are *grid-connected*—they are connected to an electric power grid. These PV systems are installed on or near homes and buildings and at *utility-scale* power plants that have at least 1 megawatt of electric-generation capacity. Technological advances, lower costs for PV systems, and various financial incentives and government policies, especially tax credits and net metering, have helped to greatly expand PV use since the mid-1990s. Millions of grid-connected PV systems are now installed in the United States.

Electricity generation at utility-scale PV power plants increased from 6 million kilowatthours (kWh) (or 6,000 megawatthours [MWh]) in 2004 to about 162 billion kWh (or 161,651,000 MWh) in 2023. About 74 billion kWh (or 73,619,000 MWh) were generated by *small-scale*, grid-connected PV systems in 2023, up from 11 billion kWh (or 11,233,000 MWh) in 2014. *Small-scale PV systems* have less than 1,000 kilowatts of electricity-generation capacity. Most small-scale PV systems are located on buildings and are sometimes called *rooftop PV* systems.

*Last updated: May 24, 2024, with preliminary data for 2023 from the Electric Power Monthly, February 2024.*

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-570-979/C-570-980
Circumvention Inquiry
Thailand 2022
**Public Document**
E&C/OIV: JDP/PAO

August 17, 2023

| | |
|---|---|
| **MEMORANDUM TO:** | Lisa W. Wang<br>Assistant Secretary<br> for Enforcement and Compliance |
| **FROM:** | James Maeder<br>Deputy Assistant Secretary<br> for Antidumping and Countervailing Duty Operations |
| **SUBJECT:** | Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Issues and Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Thailand |

---

## I.    SUMMARY

We have analyzed the case and rebuttal briefs of the interested parties in the circumvention inquiries of the *Orders*.[1]  As a result of our analysis, we continue to find, consistent with the *Preliminary Determination*, that solar cells and modules completed in Thailand from parts and components manufactured in China, are circumventing the *Orders*.  With regard to CSIL and TTL, as well as for the eight companies that failed to timely respond to the Q&V questionnaire, we continue to find that they are circumventing the *Orders* and that a country-wide determination is most appropriate to prevent further circumvention of the *Orders* by non-examined producers of inquiry merchandise in Thailand.  We recommend that you approve the positions described in the "Discussion of the Issues" section of this memorandum.  Based on our analysis of the comments received, we made certain changes to the language in the certification. Below is the complete list of issues for which we received comments and rebuttal comments from interested parties:

## A.    Methodological Issues

| | |
|---|---|
| Comment 1. | Whether Solar Cells With a p/n Junction Formed Outside of China Should Be Subject to Circumvention Inquiries |
| Comment 2. | Whether a Wafer Should Be Considered a Chinese Input Where Either the Wafer or the Polysilicon in the Wafer was Produced Outside of China. |

---

[1] Appendices I, II, and III attached to this memorandum identify the naming conventions, acronyms and abbreviations (Appendix I), court and case citations (Appendix II), and documents on record (Appendix III)

Comment 3.   Whether Commerce Should Analyze Investment Data on a Per-Unit Basis
Comment 4.   Whether to Depart from the Section 781(b)(2) "Minor or Insignificant" Methodology Applied in the *Preliminary Determination*s
Comment 5.   How to Value U.S. Imports of Solar Cells and Modules for Purposes of Section 781(b)(2)(E) of the Act
Comment 6.   Whether Material Costs Should Be Included in the Value of Third-Country Processing
Comment 7.   Whether Commerce Should Rely on Surrogates to Value Chinese Inputs Consumed in the Inquiry Country

**B.     Country-Specific Issues**

Comment 8.   Whether Third Country Processing was Minor-General

**C.     Overall Determinations**

Comment 9.   Whether the Factors Under 781(b)(3) of the Act Justify an Affirmative Final Determination
Comment 10.  Affirmative Circumvention Determinations Would not Be Appropriate Under Section 781(b)(1)(E) of the Act

**D.     Certification Issues**

Comment 11.  Whether Commerce Should Allow AFA Companies to Certify
Comment 12.  Certification Requirements and Corrections
Comment 13.  Whether Commerce Can Require Certifications for U.S. Entries of Merchandise Not Covered by the *Orders*
Comment 14.  Whether Exporters and Importers Should Be Permitted to Submit Multiple Certifications, as Applicable
Comment 15.  Whether or Not Companies Found Not to Be Circumventing Should Be Required to Certify and to Identify Their Wafer Suppliers
Comment 16.  Whether Commerce Should Reconsider Certification Eligibility in Changed Circumstances Reviews
Comment 17.  Whether Cadmium Telluride Thin Film Solar Products are Covered by Affirmative Final Determinations or Related Certification Requirements
Comment 18.  Clarification and Enforcement of the Utilization Requirement
Comment 19.  Whether the "Wafer-Plus-Three" Requirement is Appropriate

**E.     Other Issues**

Comment 20.  Whether Commerce Properly Placed Ex Parte Memoranda on the Record That Concerned the Circumvention Inquiries
Comment 21.  Whether Commerce's Determination to Apply *Presidential Proclamation 10414* Retroactively is Contrary to Law
Comment 22.  Whether Third-Country Exporters Without an AD Rate Should Receive the Separate Rate

2

## II.    BACKGROUND

On December 8, 2022, Commerce published the *Preliminary Determination*.  Between February 6 and 15, 2023, we conducted verification in Thailand.[2]  Pursuant to section 781(e) of the Act, on May 30, 2023, we notified the ITC of our affirmative preliminary determination of circumvention and informed the ITC of its ability to request consultations with Commerce regarding the possible inclusion of the products in question within the *Orders* pursuant to section 781(e)(2) of the Act.[3]  The ITC did not request consultations with Commerce.

In accordance with 19 CFR 351.309, we invited parties to comment on the *Preliminary Determination* and our verification findings.[4]  Between March 6 and May 9, 2023, parties submitted case and rebuttal briefs.[5]  Additionally, numerous parties requested a hearing.[6]  On July 18, 2023, Commerce held a public hearing.[7]

## III.   SCOPE OF THE *ORDERS*

The merchandise covered by the *Orders* is crystalline silicon photovoltaic cells, and modules, laminates, and panels, consisting of crystalline silicon photovoltaic cells, whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials.

The *Orders* cover crystalline silicon photovoltaic cells of thickness equal to or greater than 20 micrometers, having a p/n junction formed by any means, whether or not the cell has undergone other processing, including, but not limited to, cleaning, etching, coating, and/or addition of materials (including, but not limited to, metallization and conductor patterns) to collect and forward the electricity that is generated by the cell.

---

[2] *See* CSIL's Verification Report; and TTL's Verification Report.
[3] *See* ITC Notification Letter.
[4] *See* First Tranche Briefing Schedule and Second Tranche Briefing Schedule – Thailand.
[5] *See* Auxin's March 6, 2023 Case Brief; BYD HK's March 6, 2023 Case Brief; CSIL's March 6, 2023 Case Brief; First Solar Malaysia's March 6, 2023 Case Brief; First Solar Vietnam's March 6, 2023 Case Brief; Hanwha's March 6, 2023 Case Brief; Jinko's March 6, 2023 Case Brief; Maxeon's March 6, 2023 Case Brief; New East's March 6, 2023 Case Brief; NextEra's March 6, 2023 Case Brief; Risen's March 6, 2023 Case Brief; Silfab's March 6, 2023 Case Brief; TTL's March 6, 2023 Case Brief; Vina's March 6, 2023 Case Brief; VSUN's March 6, 2023 Case Brief; Auxin's March 17, 2023 Rebuttal Brief; Boviet's March 17, 2023 Rebuttal Brief; BYD HK's March 17, 2023 Rebuttal Case Brief; CSIL's March 17, 2023 Rebuttal Brief; First Solar Malaysia's March 17, 2023 Rebuttal Brief; First Solar Vietnam's March 17, 2023 Rebuttal Brief; JA Solar, LONGi, Vina and VSUN's March 17, 2023 Rebuttal Brief; Hanwha's March 17, 2023 Rebuttal Brief; Jinko's March 17, 2023 Rebuttal Brief; Maxeon's March 17, 2023 Rebuttal Brief; Next Era's March 17, 2023 Rebuttal Brief; Risen's March 17, 2023 Rebuttal Brief; Silfab's March 17, 2023 Rebuttal Brief; TTL's March 17, 2023 Rebuttal Brief; CSIL's April 26, 2023 Thailand Case Brief; Silfab's April 26, 2023 Thailand Case Brief; Auxin's April 26, 2023 Thailand Case Brief; TTL's April 26, 2023 Thailand Case Brief; TTL's April 26, 2023 Thailand Rebuttal Brief; Auxin's May 9, 2023 Thailand Rebuttal Brief; CSIL's May 9, 2023 Thailand Rebuttal Brief; NextEra's May 9, 2023 Thailand Rebuttal Brief; and TTL's May 9, 2023 Thailand Rebuttal Brief.
[6] *See* TTL's Hearing Request; CSIL's Hearing Request; Silfab's Hearing Request; and Auxin's Hearing Request.
[7] *See* Hearing Transcript.

3

Merchandise under consideration may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, modules, laminates, panels, building-integrated modules, building-integrated panels, or other finished goods kits.  Such parts that otherwise meet the definition of merchandise under consideration are included in the scope of the *Orders*.

Excluded from the scope of the *Orders* are thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide (CIGS). Also excluded from the scope of the *Orders* are crystalline silicon photovoltaic cells, not exceeding 10,000mm$^2$ in surface area, that are permanently integrated into a consumer good whose function is other than power generation and that consumes the electricity generated by the integrated crystalline silicon photovoltaic cell.  Where more than one cell is permanently integrated into a consumer good, the surface area for purposes of this exclusion shall be the total combined surface area of all cells that are integrated into the consumer good.

Additionally, excluded from the scope of the *Orders* are panels with surface area from 3,450 mm$^2$ to 33,782 mm$^2$ with one black wire and one red wire (each of type 22 AWG or 24 AWG not more than 206 mm in length when measured from panel extrusion), and not exceeding 2.9 volts, 1.1 amps, and 3.19 watts.  For the purposes of this exclusion, no panel shall contain an internal battery or external computer peripheral ports.

Also excluded from the scope of the *Orders* are:

1)      Off grid crystalline silicon photovoltaic cells (CSPV) panels in rigid form with a glass cover, with the following characteristics:

   (A) A total power output of 100 watts or less per panel;
   (B) a maximum surface area of 8,000 cm2 per panel;
   (C) do not include a built-in inverter;
   (D) must include a permanently connected wire that terminates in either an 8mm male barrel connector, or a two-port rectangular connector with two pins in square housings of different colors;
   (E) must include visible parallel grid collector metallic wire lines every 1–4 millimeters across each solar cell; and
   (F) must be in individual retail packaging (for purposes of this provision, retail packaging typically includes graphics, the product name, its description and/or features, and foam for transport); and

2)      Off grid CSPV panels without a glass cover, with the following characteristics:

   (A) A total power output of 100 watts or less per panel;
   (B) a maximum surface area of 8,000 cm2 per panel;
   (C) do not include a built-in inverter;
   (D) must include visible parallel grid collector metallic wire lines every 1–4 millimeters across each solar cell; and
   (E) each panel is

4

1. permanently integrated into a consumer good;
2. encased in a laminated material without stitching, or
3. has all of the following characteristics:  (i) the panel is encased in sewn fabric with visible stitching, (ii) includes a mesh zippered storage pocket, and (iii) includes a permanently attached wire that terminates in a female USB–A connector.

In addition, the following CSPV panels are excluded from the scope of the *Orders*:

1)      Off-grid CSPV panels in rigid form with a glass cover, with each of the following physical characteristics, whether or not assembled into a fully completed off-grid hydropanel whose function is conversion of water vapor into liquid water:
(A) A total power output of no more than 80 watts per panel;
(B) A surface area of less than 5,000 square centimeters (cm2) per panel;
(C) Do not include a built-in inverter;
(D) Do not have a frame around the edges of the panel;
(E) Include a clear glass back panel; and
(F) Must include a permanently connected wire that terminates in a two-port rectangular connector.

Additionally excluded from the scope of the Orders are off-grid small portable crystalline silicon photovoltaic panels, with or without a glass cover, with the following characteristics: (1) a total power output of 200 watts or less per panel; (2) a maximum surface area of 16,000 cm2 per panel; (3) no built-in inverter; (4) an integrated handle or a handle attached to the package for ease of carry; (5) one or more integrated kickstands for easy installation or angle adjustment; and (6) a wire of not less than 3 meters either permanently connected or attached to the package that terminates in an 8mm diameter male barrel connector.

Modules, laminates, and panels produced in a third country from cells produced in China are covered by the *Orders*; however, modules, laminates, and panels produced in China from cells produced in a third country are not covered by the *Orders*.

Merchandise covered by the *Orders* is currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 8501.71.0000, 8501.72.1000, 8501.72.2000, 8501.72.3000, 8501.72.9000, 8501.80.1000, 8501.80.2000, 8501.80.3000, 8501.80.9000, 8507.20.8010, 8507.20.8031, 8507.20.8041, 8507.20.8061, 8507.20.8091, 8541.42.0010, and 8541.43.0010.  These HTSUS subheadings are provided for convenience and customs purposes; the written description of the scope of the *Orders* is dispositive.[8]

## IV.    SCOPE OF THE CIRCUMVENTION INQUIRY

This circumvention inquiry covers:  (A) crystalline silicon photovoltaic cells that meet the physical description of crystalline silicon photovoltaic cells in the scope of the *Orders*, subject to the exclusions therein, whether or not partially or fully assembled into other products, that were produced in Thailand from wafers produced in China; and (B) modules, laminates, and panels consisting of crystalline silicon photovoltaic cells, subject to the exclusions for certain panels in

---

[8] *See Orders*; *see also Solar CCR Excluding Certain Off-Grid Solar Products*.

5

the scope of the *Orders*, whether or not partially or fully assembled into other products, that were produced in Thailand from wafers produced in China and where more than two of the following components in the module/laminate/panel were produced in China:  (1) silver paste; (2) aluminum frames (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6) junction boxes.  If modules, laminates, and panels consisting of crystalline silicon photovoltaic cells do not meet both of the conditions in item (B) above, then this circumvention inquiry does not cover the modules, laminates, and panels, or the crystalline silicon photovoltaic cells within the modules, laminates, and panels, even if those crystalline silicon photovoltaic cells were produced in Thailand from wafers produced in China.  Wafers produced outside of China with polysilicon sourced from China are not considered to be wafers produced in China for purposes of this circumvention inquiry.

## V.     PERIOD OF THE CIRCUMVENTION INQUIRY

The period of the inquiry is January 1, 2008, through December 31, 2021.

## VI.     CHANGES SINCE THE *PRELIMINARY DETERMINATION*

As detailed below, none of the minor changes to calculations had an impact on our *Preliminary Determination*.  For a complete description of our analysis, *see* the *Preliminary Determination* and for a complete description of the change to this analysis, *see* the Final Analysis Memoranda.[9]

## VII.     DISCUSSION OF THE ISSUES

**Methodological Issues**

**Comment 1.   Whether Solar Cells With a p/n Junction Formed Outside of China Should be Subject to the Circumvention Inquiries**

*CSIL*[10]
- Because Commerce has long held that solar cells and modules with a p/n junction formed outside of China are not subject to the *Orders*,[11] solar cells and modules with p/n junctions formed in the four inquiry countries should not be subject to these circumvention inquiries.

*Auxin*[12]
- Commerce's practice with respect to the p/n junction does not prevent it from issuing an affirmative circumvention finding that solar cells and modules with a country of origin other than China are covered by the scope of the *Orders*.[13]  Thus, solar cells and modules with a p/n junction formed outside of China should be subject to the circumvention inquiries.

---

[9] *See* CSIL Final Analysis Memorandum; and TTL Final Analysis Memorandum.
[10] *See* CSIL's March 6, 2023 Case Brief at 2-3.
[11] *Id.* at 2 (citing the *Orders*).
[12] *Id.* at 9-13; *see also* Auxin's March 17, 2023 Rebuttal Brief at 30-31.
[13] *See* Auxin's March 17, 2023 Rebuttal Brief at 30-31 (citing *Bell Supply CAFC*, 888 F.3d at 1229-31).

6

**Commerce's Position:**  We disagree with CSIL.  Commerce previously determined that it is the addition of a p/n junction that transforms a silicon wafer into a solar cell.[14]  Thus, the country where the p/n junction is formed is the country-of-origin of the solar cell.  While products with a country-of-origin other than the country subject to the order are not normally covered by the order, the Act expressly provides an exception to this rule under the circumvention provisions in section 781 of the Act.  Circumvention inquiries under section 781(b) of the Act can bring within the discipline of an order merchandise that would not be subject to the order under a country-of-origin analysis.[15]

The circumvention provisions in section 781(b)(1)(A) of the Act, only require that the merchandise imported into the United States be of the same class or kind as the merchandise produced in the country that is the subject of the order.  It does not require the merchandise to have the same country-of-origin as the merchandise that is the subject of the order.

In fact, "{c}ircumvention can only occur if the articles are from a country not covered by the relevant AD or CVD orders."[16]  To read section 781(b) of the Act as applying to a class or kind of merchandise that is covered by an AD and/or CVD order only when the country of origin of the merchandise is the order country would render section 781(b) of the Act moot.  Hence, there is no basis for not examining the solar cells and solar modules at issue (*i.e.*, solar cells and solar modules where the country-of-origin is Cambodia, Malaysia, Thailand, or Vietnam) in these circumvention inquiries.

### Comment 2.  Whether a Wafer Should be Considered a Chinese Input Where Either the Wafer or the Polysilicon in the Wafer was Produced Outside of China

*Whether Wafers Sliced from Chinese Polysilicon Outside of China Should be Considered a Chinese Input*

Commerce preliminarily defined inquiry merchandise as solar cells produced in Cambodia, Malaysia, Thailand, or Vietnam, from wafers produced in China, and solar modules produced in Cambodia, Malaysia, Thailand, or Vietnam that contain such solar cells where three or more of the following components in the module/laminate/panel were produced in China:  (1) silver paste; (2) aluminum frames (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6) junction boxes.  Commerce also preliminarily determined that wafers produced outside of China using polysilicon sourced from China are not Chinese wafers for purposes of the circumvention inquiries.

*Auxin*[17]
- Commerce should determine that wafers sliced from Chinese-origin polysilicon ingots outside of China are Chinese wafers for purposes of defining inquiry merchandise.

---

[14] *See* Solaria Scope Ruling.
[15] *See 2021 Regulations Final Rule*, 86 FR at 52342.
[16] *See Bell Supply CAFC*, 888 F.3d at 1229.
[17] *See* Auxin's March 6, 2023 Case Brief at 4-9; *see also* Auxin's March 17, 2023 Rebuttal Brief at 5-13.

- Commerce's decision to the contrary is arbitrary, inconsistent with record evidence, and undermines its affirmative findings of circumvention.
- Slicing Chinese-origin polysilicon ingots into wafers outside of China does not constitute substantial transformation of the ingot; thus, the wafers remain of Chinese-origin. Significant processing is required to produce polysilicon ingots used to make wafers (*i.e.,* several stages of melting and doping polysilicon, crystal growth, use of 70 percent of the total energy consumed in producing a wafer); whereas slicing the ingots into wafers is minor (*i.e.,* cutting the ingot, submerging it in a chemical bath, cleaning, and inspecting).[18]
- Commerce's decision allows parties to continue to exclusively rely on Chinese-origin materials to produce solar cells and modules and evade AD and CVDs by simply slicing polysilicon ingots into wafers outside of China.  Commerce should not permit this.
- The CAFC held that Commerce has discretion to fashion a remedy in its proceedings that will prevent simple avoidance of AD/CVDs and that it should do so.[19]

*BYD HK,*[20] *CSIL,*[21] *Jinko,*[22] *NextEra,*[23] *TTL,*[24] *Silfab*[25]
- Granting Auxin's request would inappropriately expand the coverage of the circumvention inquiries which were initiated to examine cell and module assembly outside of China only where "all of the manufacturing process up through the production of wafers takes place in China."[26]  Commerce should reject Auxin's *post hoc* attempts to expand the circumvention inquiries.
- Auxin's argument that the country of origin of the wafer should be based on the location of the polysilicon ingot production because of the significance of that production is undermined by its separate argument that Commerce should determine that any wafer produced from Chinese-origin polysilicon—regardless of where the ingot is produced, is a Chinese wafer for purposes of the circumvention inquiries.[27]
- Auxin's arguments about the polysilicon and wafer-making processes and substantial transformation are irrelevant because polysilicon and wafers are not subject merchandise.[28]
- Commerce should not examine whether a product is circumventing an AD/CVD order simply because an input into an input in that product comes from the order country.  To do so here essentially means that solar cells produced anywhere in the world from Chinese polysilicon would be subject to the *Orders*, which would render the original scope of the *Orders*, *i.e.*, solar cells from China, meaningless.[29]

---

[18] *See* Auxin's March 6, 2023 Case Brief at 4-6 (citing Circumvention Request at 18-19; and the *NREL Report* in Exhibit 97).
[19] *Id.* at 7 (citing *Canadian Solar CAFC*, 918 F.3d at 919.
[20] *See* BYD HK's March 17, 2023 Rebuttal Brief at 3-7.
[21] *See* CSIL's March 6, 2023 Rebuttal Brief at 6-10.
[22] *See* Jinko's March 17, 2023 Rebuttal Brief at 1-5.
[23] *See* NextEra's March 17, 2023 Rebuttal Brief at 3-6.
[24] *See* TTL's March 17, 2023 Rebuttal Brief at 3-6.
[25] *See* Silfab's March 17, 2023 Rebuttal Brief at 7-8.
[26] *See* NextEra's March 6, 2023 Case Brief at 5 (citing Circumvention Request at 67).
[27] *See* NextEra's March 17, 2023 Rebuttal Brief at 5 (citing Auxin's March 6, 2023 Case Brief at 5-6).
[28] *See* Jinko's March 17, 2023 Rebuttal Brief at 3.
[29] *Id.* at 2.

8

- Auxin failed to demonstrate how domestic producers of solar cells and modules are harmed by Commerce's decision that wafers produced outside of China using polysilicon sourced from China are not Chinese wafers for purposes of the circumvention inquiries.[30]
- Commerce should exercise its "substantial discretion in interpreting" the circumvention provisions in the Act and continue to find that solar cells made from wafers produced outside of China are not inquiry merchandise. [31]

*Whether Wafers Sliced from Non-Chinese Polysilicon Inside China Should be Considered a Chinese Input*

*TTL,*[32] *NextEra,*[33] *Maxeon,*[34] *Risen,*[35] *Jinko*[36]
- Inquiry merchandise should not include solar cells and modules assembled in an inquiry country using Chinese wafers made from non-Chinese polysilicon because Auxin did not request circumvention inquiries with respect to such merchandise. Rather, Auxin requested circumvention inquiries with respect to solar cells and modules produced in an inquiry country where, "all of the manufacturing process up through the production of wafers takes place in China."[37]
- Auxin explained that the examples of circumvention described in its request for circumvention inquiries "involve exporters {in Cambodia, Malaysia, Thailand, and Vietnam} that do not produce polysilicon ingots or wafers — the key upstream inputs in CSPV cells and modules — in those countries, but instead sourced these and other necessary materials and inputs *from China*" (emphasis added).[38] Thus, it is clear that Chinese-origin polysilicon is a key factor in the circumvention inquiries. As such, wafers produced from non-Chinese origin polysilicon should be excluded from the circumvention inquiries.[39]
- Commerce incongruently considers solar cells/modules made in the inquiry countries from non-Chinese wafers containing Chinese polysilicon to be outside the scope of these inquiries, while it considers solar cells/modules made in the inquiry countries from Chinese wafers containing non-Chinese polysilicon to be inquiry merchandise even though those cells and module contain much less Chinese content than the former solar cells/modules. Commerce should correct this inconsistency and find solar cells/modules made in the inquiry countries from Chinese wafers containing non-Chinese polysilicon are not inquiry merchandise.[40]
- It neither makes sense, nor comports with the law, to find solar cells that are assembled in the inquiry countries from non-Chinese polysilicon to be circumventing the *Orders* when

---

[30] *Id.* at 4.
[31] *Id.* at 3.
[32] *See* TTL's March 6, 2023 Case Brief at 3-7. *see also* TTL's March 17, 2023 Rebuttal Brief at 5-6.
[33] *See* NextEra's March 6, 2023 Case Brief at 2-4.
[34] *See* Maxeon's March 6, 2023 Case Brief at 2-3; *see also* Maxeon's March 17, 2023 Rebuttal Brief at 2-3.
[35] *See* Risen's March 6, 2023 Case Brief at 1-5; *see also* Risen's March 17, 2023 Rebuttal Brief at 1-2.
[36] *See* Jinko's March 17, 2023 Rebuttal Brief at 1-5.
[37] *See, e.g.*, NextEra's March 6, 2023 Case Brief at 3 (citing Circumvention Request at 67).
[38] *See* Risen's March 6, 2023 Case Brief at 3.
[39] *Id.*
[40] *See* TTL's March 6, 2023 Case Brief at 6-7 (citing TTL's May 19, 2022, and JA Solar's May 2, 2022 Comments at Exhibit 2).

9

the value added in China for such solar cells may be less than 33 percent of the total value of the solar cell.[41]  A circumvention determination that is not properly targeted to provide relief only for cell assembly in a third country that is truly circumventing the *Orders* will exacerbate the solar cell shortages faced by module assemblers in the United States.[42]

- Moreover, because the value of the polysilicon in solar cells/modules is a significant portion of the total value of the solar cells/modules, if the wafers in those products were made from non-Chinese polysilicon it is less likely that the solar cells and modules would meet the criterion for finding circumvention under section 781(b)(1)(D) of the Act (*i.e.*, the value of the merchandise produced in the order country is a significant portion of the total value of the merchandise exported to the United States).[43]

- Under certain existing measures, CBP already requires U.S. importers to identify the origin of the polysilicon in imported solar modules.[44]  Thus, administration of a decision that solar cells/modules with wafers containing non-Chinese polysilicon are not inquiry merchandise would not be burdensome.

*Auxin*[45]

- Auxin's request for circumvention inquiries was not limited to solar cells and modules that contain Chinese-origin polysilicon; rather Auxin requested that Commerce initiate circumvention inquiries with respect to solar cells and modules assembled in the inquiry countries where "the vast majority of the materials and equipment … {were} sourced from China."[46]

- Auxin's description of inquiry merchandise as solar cells and modules produced in an inquiry country where, "all of the manufacturing process up through the production of wafers takes place in China," was simply a factual description of the nature of the circumvention that was occurring.[47]

- In order to find circumvention, the Act requires, among other things, that the merchandise imported into the United States be assembled in a foreign country from merchandise produced in the order country and that the value of the merchandise produced in the order country be a significant portion of the total value of the imported merchandise.  The Act does not require that every component assembled in the foreign country be sourced from the order country.

- Polysilicon accounts for less than 10 percent of the cost of a solar module.[48]  It makes no sense to exclude solar modules made with non-Chinese polysilicon from inquiry merchandise when all the other module components, representing over 90 percent of the value of the module, may have been sourced from China.

---

[41] *See* Maxeon's March 6, 2023 Case Brief at 2-3 (citing *NREL Report* included in NextEra May 2, 2022 Comments at Attachment 24; and *Thailand* PDM at 19-20).
[42] *Id.* at 3.
[43] *See* NextEra's March 6, 2023 Case Brief at 3 (citing the *NREL Report* in NextEra's May 2, 2022 Comments at Attachment 24).
[44] *See* Risen's March 6, 2023 Case Brief at 3; *see also* TTL's March 6, 2023 Case Brief at 7 (citing *DHS Order Re: Forced Labor in Xinjiang*; *see also* the Uyghur Forced Labor Prevention Act).
[45] *See* Auxin's March 17, 2023 Rebuttal Brief at 6-13.
[46] *Id.* at 11.
[47] *Id.* at 9.
[48] *Id.* at 12 (citing the *NREL Report* in NextEra's May 2, 2022 Comments at PDF 496).

10

**Commerce's Position:** For purposes of this inquiry, we have continued to find that a wafer is produced in China if the ingot was sliced to form the wafer in China. The circumvention provisions under section 781(b) of the Act involve merchandise imported into the United States that was completed or assembled in a foreign country from merchandise that was produced in the order country. The phrase "produced in" is not further explained or defined in the Act. We find the Senate Report concerning the Omnibus and Trade Competitiveness Act of 1988, and other sections of the circumvention provisions in the Act provide insights into how to properly apply the phrase "produced in" to the present facts.

When Congress passed the Omnibus and Trade Competitiveness Act in 1988, it explained that section 781 of the Act "addresses situations where 'parts and components … are *sent* from the country subject to the order to the third country for assembly and completion"[49] (emphasis added). Additionally, section 781(b)(1)(c) of the Act provides that when determining whether an AD or CVD order should cover merchandise assembled or completed in a third-country, Commerce should examine whether third-country imports of the merchandise that was produced in the order country and assembled or completed in that third country increased after initiation of the investigation that led to the order. These provisions, which indicate that the focus is on the part or component exported (sent) from the order country in the form ultimately used in the finished product in the third country, taken together with the "produced in" requirement, lead us to conclude that the "production" that must occur in the order country involves those production steps that transform the raw materials into the part or component that is sent to the third country for assembly into the finished product. In other words, we have considered merchandise to be "produced in" the order country for purposes of section 781(b)(1)(B)(ii) of the Act if the final manufacturing step occurs there.

Auxin identified three stages of wafer production: (1) refining polysilicon; (2) forming the refined polysilicon into an ingot; and (3) processing the ingot into wafers.[50] Only the last stage of production results in the merchandise that was shipped from China to the inquiry countries for assembly and completion into solar cells and solar modules. Neither of the intermediate products produced in this process (refined polysilicon and polysilicon ingots) is the merchandise that was shipped/exported to the third country for assembly into the final product. Hence, wafers processed outside of China from ingots made of Chinese polysilicon do not satisfy the "produced in" the order country requirement of section 781(b)(1)(B)(ii) of the Act (the production step that resulted in the part or component that is used in completion or assembly in the third country (the wafer) did not occur in China). Similarly, wafers processed in China from ingots made of non-Chinese polysilicon do satisfy the "produced in" the order country requirement of section 781(b)(1)(B)(ii) of the Act (the production step that resulted in the part or component (the wafer) that is used in completion or assembly in the third country occurred in China).

Auxin contends that Commerce should conduct a substantial transformation analysis and find that wafers processed outside of China from ingots made of Chinese polysilicon are "produced in" China for purposes of section 781(b)(1)(B)(ii) of the Act because minimal processing is

---

[49] *See Senate Report 100-71* at 101.
[50] *See, e.g.*, Circumvention Request at 15.

required to process an ingot into wafers. However, we do not find that a substantial transformation analysis is the appropriate analysis here.

Commerce typically conducts a substantial transformation analysis to determine whether the country of origin of a product that is within the class or kind of merchandise covered by an AD/CVD order, is the country covered that order. First, wafers are not in a class or kind of merchandise covered by any AD/CVD order. Second, the only requirement in section 781(b)(1)(B)(ii) of the Act is that the merchandise be "produced in the foreign country with respect to which such order or finding applies" not that its country of origin is the country to which such order or finding applies. Thus, we need only identify the country where the raw materials were transformed into the part or component that was used in assembly in the inquiry country. There is no need to consider the substantial transformation criteria (*e.g.*, the class or kind of the upstream and downstream products, where the essential component of the product is substantially transformed, and the extent and value of the processing) to identify the country where the ingots are sliced into wafers, thus, forming the product that was used as an input. Consequently, we have not used a substantial transformation analysis to determine whether wafers were "produced in" China for purposes of section 781(b)(1)(B)(ii) of the Act where the relevant production steps occurred in multiple countries.

While Auxin contends that Commerce's focus on the country where the ingot was sliced into wafers allows parties to evade AD and CVDs by simply slicing Chinese polysilicon ingots into wafers outside of China, Auxin did not point to anything in the Act or Commerce's practice in circumvention cases that compels Commerce to determine that a component was "produced in" the order country for purposes of section 781(b)(1)(B)(ii) of the Act based on where an input into that component was produced. There is no mention in section 781(b)(1)(B)(ii) of the Act of inputs into components. Rather, section 781(b)(1)(B)(ii) of the Act requires that the component that was assembled in the third country be produced in the order country. Moreover, in prior circumvention inquiries involving merchandise completed or assembled in third countries, Commerce focused its analysis on where the component that was assembled into the finished product in the third country was produced, not where the materials that were used to produce the component were produced. For example, in *CORE from China (UAE)*[51] which typically involved processing hot-rolled steel made in China into CORE in the UAE, Commerce did not consider where the iron ore or billets that were used to make the hot-rolled steel were sourced, but rather it considered where the hot-rolled steel was produced.

We find that the country in which the ingot is sliced to form the wafer is, pursuant to the language in section 781(b)(1)(B)(ii) of the Act, the most reasonable interpretation of where the wafer is produced. To the extent that this raises evasion concerns, we do not find that such concerns are sufficient to warrant a deviation from our interpretation of the statute. Indeed, Auxin's proposed alternative would potentially require Commerce to find circumvention based on wafers that, in our interpretation, are not "produced in" China. While this alternative may address evasion concerns, it is contrary to the statute, and therefore, impermissible.

We also disagree with interested parties' arguments that Auxin's request for these circumvention inquiries established that inquiry merchandise must contain wafers made from Chinese-origin

---

[51] *See CORE from China (UAE) Final*, 85 FR at 41957.

polysilicon. Although Auxin noted in its request that all the manufacturing processes for the merchandise subject to the inquiries, up through the production of wafers, takes place in China, Auxin appears to have been describing the existing situation that it viewed as constituting circumvention. In fact, Auxin explained in its request that "{r}easonably available evidence establishes that certain companies may complete the production process through polysilicon refinement, ingot formation, and the production of the wafers in China, after which the wafers are converted to CSPV cells in the third country using additional and substantial Chinese-origin components."[52] However, the circumvention inquiries that Auxin specifically requested, and on which Commerce initiated, cover solar cells and modules assembled and completed in Cambodia, Malaysia, Thailand, or Vietnam using Chinese-produced inputs, not necessarily Chinese-produced inputs where all the materials that were used to produce the input in China were also produced in China.

Interested parties that oppose finding circumvention also argued that it makes no sense to find solar cells and solar modules containing wafers made from non-Chinese polysilicon to be circumventing the *Orders*, because the wafers in those solar cells and modules have very little Chinese content. However, those parties did not provide a basis in the Act, Commerce's regulations, or its practice, for interpreting the "produced in" the order country requirement in section 781(b)(1)(B)(ii) of the Act as a content percentage requirement. Rather, the plain meaning of "produced" is to make from components or raw materials. Thus, "produced in" the order country means the production steps that transformed the raw materials into the part or component that is sent to the third country for assembly into the finished product occurred in the order country.

Therefore, based on the foregoing, we consider wafers to be a product of China if the ingot was sliced to form the wafer in China. As a result, we have not defined inquiry merchandise as solar cells and solar modules assembled in an inquiry country from wafers produced outside of China using Chinese polysilicon (as advocated by Auxin), and we have not excluded from our definition of inquiry merchandise solar cells and solar modules assembled in an inquiry country from wafers produced inside China using polysilicon produced outside of China (as advocated by parties opposed to finding circumvention).

Lastly, certain interested parties argued that determining whether wafers were produced in China based on the country-of-origin of the polysilicon in the wafer would not be administratively burdensome because under certain existing measures, CBP already requires U.S. importers to identify the origin of the polysilicon in imported solar modules. Because we deem the country of origin of polysilicon to be irrelevant to the question of whether a wafer is produced in China, this argument is moot. In any case, it is not clear that it is administratively feasible to uniformly apply "percentage-of-Chinese-content" or "source-of-component-inputs" definitions of the phrase "produced in" in section 781(b)(1)(B)(ii) of the Act to all the components that could be exported from China to the inquiry countries for assembly into solar cells and solar modules (such as aluminum frames, junction boxes, etc.). Such a rule appears to be complicated and administratively burdensome given that there could be as many as 100 different inputs used to produce a solar module.

---

[52] *See* Circumvention Request at 27.

**Comment 3.   Whether Commerce Should Analyze Investment Data on a Per-Unit Basis**

*NextEra*[53]
- Commerce must consider the large upstream industry in China that supplies virtually all of the world's demand for wafers.  Failing to do so results in an overly simplistic and distortive comparison that does not properly account for differences in scale and market structure.
- Consistent with legislative history, Commerce's past practice, and congressional intent, an alternative approach is warranted in this case. Commerce has also acknowledged that there is no one-size-fits-all approach and that it may determine an appropriate analysis. Thus, Commerce should analyze investment on a per-unit basis for these final determinations.
- Commerce has the data needed to calculate the investment of mandatory respondents on a per-megawatt basis, which allows Commerce to account for differences in scale, market size, and demand, and thus more accurately compare the size of investments in the two countries.

*Auxin*[54]
- NextEra argues that a per-MW analysis is more appropriate because it accounts for differences in scale, market size, and demand, and thus more accurately compares the size of investments in the two countries.[55]
- However, it has been Commerce's practice under section 781(b)(2) of the Act to evaluate the absolute level of investment, as opposed to the per-unit level of investment, because it is a proper and relevant analysis for identifying the level of investment in the third country.[56]
- Commerce's practice is grounded in the recognition that per-unit levels of investment can be distortive, fail to reflect initial threshold levels of investment, and thus fail to capture circumventing activity.
- CSPV production facilities in China require significant threshold levels of investment to capitalize on economies of scale.  Commerce should therefore follow its practice and compare the absolute level of investment rather than the per-unit level of investment.
- In *CORE from China (Vietnam)*, Commerce rejected per-unit comparisons because comparing per-unit investment overlooks the relative requirements for establishing integrated production facilities in China, as compared with processing facilities in the third country, as they dilute the large necessary initial investments required by the volume of the facilities.[57]
- If Commerce were to utilize a per-unit comparison, it would delay closing the circumvention loophole because only when the circumventing company achieved scale would it achieve a per-unit investment figure that approaches the per-unit investment figure of a fully scaled production facility in the original country.

---

[53] *See* NextEra's March 24, 2023 Case Brief at 20-22.
[54] *See* Auxin's April 3, 2023 Rebuttal Brief at 36-41.
[55] *Id.* (citing NextEra's March 24, 2023 Case Brief at 20-22).
[56] *Id.* (citing *CORE from China (Vietnam)*; *CORE from China (UAE)*; and *CRS from China (Vietnam)*).
[57] *Id.* (citing *CORE from China (Vietnam)*).

- Benefiting from economies of scale is crucial to realize lower per-megawatt investment costs for polysilicon, ingot and wafer manufacturing.
- NextEra fails to recognize that Chinese over-investment in its CSPV production process has decimated the industry in the United States and allowed Chinese producers to realize lower per-unit costs.
- Commerce should continue to evaluate the level of investment on an absolute basis because such an analysis is consistent with Commerce's practice and ensures that China's industrial policy, heavy subsidies to its PV industry, and other non-market practices do not distort Commerce's overall analysis by failing to capture initial threshold levels of investment in China.

**Commerce's Position:** We agree with Auxin that Commerce should evaluate investment on an absolute basis as opposed to a per-unit basis. For these final determinations, we continue to find that the absolute level of investment is a proper and relevant analysis for evaluating the level of investment in Thailand under section 781(b)(2)(A) of the Act.

The statute does not instruct Commerce to employ a particular analysis when evaluating the level of investment in the foreign country for purposes of section 781(b)(2)(A) of the Act. Given the statute's silence on the issue, Commerce may determine an appropriate analysis to apply. We find that a comparison between the level of investment in the third country and the level of investment of respondents' Chinese affiliates, on an absolute as opposed to a per-megawatt basis, is a proper and relevant analysis for identifying "the level of investment in the third country" under the Act. We disagree with NextEra's argument that we should compare the levels of investment on a per-unit basis because we find the proposed alternative of adjusting for per-unit production capacity to be inappropriate in this case. Comparing per-unit investment overlooks the relative requirements of establishing ingot and wafer production facilities in China, as compared with the cell and module production facilities in Thailand, as this would dilute the large necessary initial investments required by the production volume of the facilities.

Accounting for the threshold level of investment in the Chinese facilities, therefore, captures the investment in the production process that would otherwise be ignored if we were to compare per-unit investment or that would otherwise not be representative if we adjusted for capacity. Thus, the absolute level of investment of the finishing process relative to the production process of the respondents' affiliates is the appropriate comparison.

In addition to the high levels of investments and large manufacturing facilities required for ingot and wafer manufacturing, the size of China's solar industry can also have a direct impact on the economies of scale that can be realized, allowing ingot and wafer manufacturers to realize lower per-unit investment costs, and thus distorting our analysis. China's dominance in the global ingot and wafer manufacturing capacity means Chinese ingot and wafer producers are able to benefit from economies of scale in order to achieve lower per-unit investment costs. China currently accounts for 97 percent of global wafer manufacturing capacity, a feat achieved thanks to economies of scale, supply chain integration, and government support.[58] China has a lower global manufacturing capacity for cells and modules, accounting for 80 percent and 70 percent of

---

[58] *See* Auxin's July 29, 2022 Comments at Exhibit 1 (citing IEA Report at 24).

the world's production capacity, respectively.[59]  China's ingot and wafer manufacturing industries have therefore been able to benefit heavily from economies of scale, they have been able to achieve steep drops in manufacturing costs at every step of the production process, thus diluting investment amounts in a per-unit figures analysis.[60]

As explained above, the much larger threshold levels of investment required to establish ingot and wafer manufacturing facilities and the resulting economies of scale distort the investment figures for a per-unit analysis.  Therefore, with respect to section 781(b)(2)(A) of the Act, we have continued to compare the investments of the cell and module production process in Thailand to investments of the ingot and wafer production process in China on an absolute basis.

**Comment 4.   Whether to Depart from the Section 781(b)(2) "Minor or Insignificant" Methodology Applied in the *Preliminary Determination*s**

*Auxin*[61]

*Commerce Arbitrarily Broke with its Longstanding Practice Without Explanation*
- Commerce departed from its longstanding merchandise-centric comparative methodology when conducting its "minor or insignificant" analysis under section 781(b)(1)(C) of the Act in favor of a new affiliate-centric approach without explanation.  Commerce is required to explain the reasons for a departure from its practice.  Its failure to do so here is arbitrary and unlawful.[62]
- Since 2012, Commerce has applied a consistent merchandise-centric comparative methodology, which follows the flow of goods, when conducting its "minor or insignificant" analysis under sections 781(b)(1)(C) and (b)(2) of the Act.  This approach has been applied by Commerce in circumvention cases involving a broad range of merchandise and industries.[63]

---

[59] *Id.* (citing IEA Report at 24-27).

[60] *Id.* (citing IEA Report at 17); *see also* Auxin's April 3, 2023 Rebuttal Brief at 39-41.

[61] *See* Auxin's April 26, 2023 Case Brief at 6-28, 31-33, and 53-61; and Auxin's May 9, 2023 Rebuttal Brief at 6-11.

[62] *See* Auxin's April 26, 2023 Case Brief (citing *Save Domestic Oil*, 357 F.3d at 1283; and *Encino Motorcars*, 579 U.S. at 212).

[63] In all of the following cases cited in Auxin's April 26, 2023 Case Brief, Commerce compares operations, R&D and investment in the third country to the order country with identifying affiliation as a consideration:  In *SDGE from China (UK),* Commerce explained that "the purpose of the analysis set out in sections 781(b)(1)(C) and (b)(2)(E) of the Act is to evaluate whether a process is minor or insignificant within the context of the totality of the production of subject merchandise.  That is, {Commerce's} analysis addresses the relative size and significance of the processing provided by {the respondent} in comparison to the processing necessary to produce the overall finished product."  *See SDGE from China (UK)*, 77 FR at 47599.  In *PET Film from the UAE (Bahrain),* Commerce repeated that under its 781(b) analysis, "{i}t is appropriate to compare the cost of the process and completion in the third-country facilities with the cost of the process and completion of the facilities needed to produce the subject merchandise in the home country."  *See PET Film from the UAE (Bahrain)* IDM at Issue 2; In *CORE from China (Vietnam),* Commerce again reiterated that its practice has been to "compare the total investment required (as well as, separately, the R&D, production process, and facilities) from the beginning of the production process in the country subject to an antidumping or countervailing duty order to the investment required (as well as, separately, the R&D, production process, and facilities) to finish the final product in a third country, rather than to compare the investments (as well as, separately, the R&D production process, and facilities) required to perform the same finishing steps in each country."  *See CRS from China (Vietnam)* IDM at Comment 5; *CORE from Taiwan*

16

- Commerce's approach has been affirmed by the CIT as a reasonable interpretation of the circumvention statue and consistent with its past practice in 781(b) cases. Specifically, the CIT explained that "a determination of the third country's portion of the total sum of investment is useful to gauge the level of investment in a third country. Comparative analysis helps also to ensure that larger companies with much smaller operations in a third country – operations that may appear significant in absolute terms given the size of the firm, but that comprise a small share of total operations – will not be able to elude an AD/CVD order simply on account of the firm's large overall size. Accordingly, a comparative analysis was reasonable."[64]

- The CIT affirmed Commerce's analysis, in part, because it was consistent with Commerce's longstanding practice. The CIT noted that Commerce had a longstanding practice of "us{ing} a similar type of comparative analysis and arrived at similar conclusions" and therefore Commerce's merchandise-centric comparative methodology "aligns with its past practice."[65]

- In recent cases Commerce has continued to apply its merchandise-centric comparative framework comparing the production steps taken by the mandatory respondents in those cases to the entire production process in the order country.[66]

- In *SDGE from China (UK)*, *CORE from China (Vietnam)*, *CRS from China (Vietnam),* and *HFC from China (India)*, Commerce found the process of completion in the third country to be minor or insignificant even when the respondents were not affiliated with producers or exporters in the country subject to the order.[67]

- Commerce's affiliate-centric methodology is inconsistent with the language and purpose of the statute as it raises affiliation to a mandatory criterion for finding circumvention.

- Sections 781(b)(1)(C) and 781(b)(2) of the Act do not instruct Commerce to consider affiliation when determining whether the process of assembly or completion is minor or insignificant. Under section 781(b) of the Act, only sub-paragraph (3) specifies affiliation as a consideration.

- Commerce's affiliate-centric methodology allows unaffiliated entities to circumvent AD/CVD orders with impunity, such that, many of Commerce's previous affirmative findings of circumvention since 2012 would now require a negative finding of circumvention under this framework. Not only is this requirement unnecessary, but it contradicts frequent Commerce determinations that affiliation is not a necessary condition for circumvention.[68]

---

(Malaysia) IDM at Comment 1; *OCTG from China* (*Brunei and the Philippines)* IDM at Comment 1; and *HFCs from China (India)* IDM at Comment 3.
[64] *See* Auxin's April 26, 2023 Case Brief (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368).
[65] *Id.*
[66] *Id.* (citing *SSSS from China (Vietnam) Preliminary* PDM at 20; *see also Pipe and Tube from India (UAE and Oman)* IDM at Comment 6).
[67] *Id.* (citing *SDGE from China (UK)* at 47600; *CORE from China (Vietnam)* at Comment 12; *CRS from China (Vietnam)* at Comment 12; *HFC from China (India) Preliminary* PDM at 22, unchanged in *HFC from China (India)*.
[68] *See* Auxin's April 26, 2023 Case Brief (citing *Butt-Weld Pipe Fittings from China (Thailand)* IDM at Comment 3, where Commerce explained that "a relationship between the Chinese manufacturer and Thai converter/exporter is not a necessary condition for finding circumvention" and "{i}t is possible for circumvention to occur between unrelated companies."; In *Brass Sheet and Strip from Canada* IDM at Comment 5 Commerce mentioned "{w}hile we have noted that it is 'more likely' for related parties to engage in circumvention activity, a relationship between

17

- Commerce's condition that it will only consider affiliated operations in the order country as a basis for comparison would allow a party to easily evade detection of circumvention by selling inputs through an unaffiliated trading company in the order country.

- When amending the circumvention statute as part of the implementation of the URAA, Congress codified the "minor or insignificant" standard Commerce had already been using, thereby endorsing the overall production process (*i.e.*, merchandise-centric) comparative framework.[69]

- In post-URAA cases, Commerce continued to adopt a merchandise-centric comparative framework to analyze third country assembly operations in the context of the totality of the production of subject merchandise.[70]

- In *Diamond Sawblades from China (Thailand)* and *Aluminum Extrusions from China (Vietnam)*, Commerce again described its practice of analyzing the significance of the assembly and completion process in the third country relative to the full production process for the subject merchandise, noting that it is consistent with prior practice.[71]

- In *Plywood from China (Vietnam) Preliminary,* Commerce compared third country assembly operations to the full production process of subject merchandise in the country subject to the order.[72]

- Commerce has continued up until this case to follow its practice of comparing third country assembly operations to the full production process of subject merchandise in the country subject to the order.[73]

- It is rare that Commerce has not conducted a minor or insignificant comparative analysis, and only when the record of a proceeding lacked sufficient data for such an analysis or when the third country operations being evaluated pre-dated the issuance of the relevant order.[74]

- In departing from its established practice in the *Preliminary Determinations*, Commerce did not conclude that the record lacked sufficient data or that the respondents' operations pre-dated the issuance of the order.

- In *Hot-Rolled Lead and Bismuth,* Commerce acknowledged that it was departing from comparing to a fully integrated producer explaining that "rolling mills which

---

the exporter and importer is not a necessary condition for finding circumvention.  While circumvention may be more likely to occur between related parties, it is also possible for circumvention to occur between unrelated companies;"; In *CORE from China (Vietnam)* IDM at Comment 12; and *CRS from China (Vietnam)* at Comment 12 Commerce once again reiterated recently that the "lack of affiliation does not constitute evidence that circumvention is not occurring.").

[69] *Id.* (citing *Granular PTFE Resin from Italy*).

[70] *Id.* (citing *Tissue Paper from China (Vietnam) Preliminary Determination*, 73 FR at 21584, unchanged in *Tissue Paper from China (Vietnam) Final Determination* IDM).

[71] *Id.* (citing *Diamond Sawblades (Thailand)* IDM at Comment 3; and *Aluminum Extrusions from China (Vietnam)* IDM at 9).

[72] *Id.* (citing *Plywood from China (Vietnam) Preliminary*, 87 FR at 45753).

[73] *Id.* (citing *LWR from China (Vietnam) Preliminary* PDM at 20; *LWR from Taiwan (Vietnam) Preliminary* PDM at 13; and *Circular Welded Carbon-Quality Steel Pipe from China (Vietnam) Preliminary* PDM at 18).

[74] *Id.* (citing *Uncovered Innerspring Units from China (Malaysia) Preliminary Determination,* 80 FR at 64393. ("Because Goldon failed to respond to the questionnaire, the record does not contain complete information regarding the factors set forth in section 781(b)"), unchanged in *Uncovered Innerspring Units from China (Malaysia) Final Determination*, 80 FR at 74758; *Tissue Paper from China (Thailand) Final Determination*, 74 FR at 29172 (applying AFA to the respondent for "refus{ing} to respond to the {Commerce's} questionnaire").

18

subsequently roll lead billets into hot-rolled lead bar predate the order and have always been considered a distinct part of the industry."[75]

- In *Ferrovanadium from Russia Final Determination*, Commerce rejected petitioner's "argument that {Commerce} should compare the U.S. vanadium pentoxide process to the overall ferrovanadium process" finding that such an analysis was "misplaced in this case."[76]  Commerce acknowledged the standard practice and explained that "{w}here the company completing the processing is unaffiliated to foreign producers/exporters and the processing activity … existed prior to the antidumping order, {Commerce} finds the analysis which it employed for the Preliminary Results of U.S. processing activity without comparison to overall production activities is the appropriate analysis."[77]

- For CSIL and TTL, there is no record evidence demonstrating that the company was established before the imposition of the *Order* and both companies are affiliated with Chinese producers and exporters of solar cells and modules, and other solar components.

*Commerce's Approach Results in It Ignoring the Most Important Stage of Production*

- Commerce's affiliate-centric approach results in its analysis ignoring the first stage of the production process:  the mining and refining of solar-grade polysilicon.[78]  As noted by the ITC, polysilicon is the "main underlying raw material input" for solar cells.[79]  Commerce has previously recognized that "{b}y any reasonable measurement, polysilicon is the most important input used in solar modules."[80]

- Producing and achieving the requisite level of purity for solar-grade polysilicon "requires large capital investments to build a plant, large corporate investment to learn and refine the production process, highly skilled labor to operate the plant, and low electricity costs due to the large amount of energy needed to produce polysilicon."[81]

- Auxin's circumvention request explicitly identified production of solar-grade polysilicon in China as the first stage of solar cell/module production.[82]

- The statute requires Commerce to "determine whether the difference between the value of the merchandise imported into a third country {for further processing} and the value of the completed merchandise exported to the United States is small."[83]  Consistent with the statutory language, Commerce began assessing third-country production "within the context of the overall production process."[84]  Commerce consistently adopted this approach in its pre- URAA circumvention inquiries.[85]

- Auxin uploaded information on the record showing that the average investment required to produce subject merchandise in China is $4.7 billion.  Should Commerce change its

---

[75] *Id.* (citing *Hot-Rolled Lead and Bismuth* IDM at Comment 5)

[76] *Id.* (citing *Ferrovanadium from Russia Final Determination* IDM at Comment 1; *see also Ferrovanadium from Russia Preliminary Determination*, 77 FR at 6537.

[77] *Id.* (citing *Ferrovanadium from Russia Final Determination* IDM at Comment 1).

[78] *Id.* (citing *Thailand* PDM at 17).

[79] *Id.* (citing *ITC Solar Monitoring* at I-60 and VI-1).

[80] *Id.* (citing *Solar Cells from China 2017-2018 AR* IDM at Comment 4).

[81] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5).

[82] *Id.* (citing Circumvention Request at 27).

[83] *Id.* (citing SAA at 893).

[84] *Id.* (citing *Granular PTFE Resin from Italy*, 58 FR at 26102).

[85] *Id.* (citing *Butt-Weld Pipe Fittings from China (Thailand)*, 59 FR at 15156; and *Brass Sheet and Strip from Canada* IDM at Comment 2).

analysis for the final to a "merchandise-centric approach" it should compare third country operations to the $4.7 billion.[86]

- IEA and DOE reports placed on the record by Auxin note that polysilicon, ingots, and wafers require a higher level of investment compared to solar cell and module production.[87]

*NextEra*,[88] *CSIL*,[89] and *TTL*[90]

*The Act Does Not Mandate a Specific Methodology Under Section 781(b)(2)*

- Commerce's analysis must "vary from case to case depending on the particular circumstances unique to each circumvention inquiry."[91]
- While section 781(b)(2) of the Act does not instruct Commerce to consider affiliation when determining whether the process of assembly or completion in a third country is minor or insignificant, the statute does not preclude Commerce from considering affiliation. Commerce has stated that it has the discretion under the circumvention statute to determine the appropriate minor or insignificant analysis under section 781(b)(2) "depending on the totality of the circumstances of the particular anti-circumvention inquiry."[92]  Thus, Auxin reads a limitation into the statute where one does not exist.
- Although the CAFC may have upheld Commerce's merchandise-centric approach in *Al Ghurair CAFC 2023*, the CAFC noted in that case that "Commerce is not bound by its prior determinations" if there is reason to deviate from past practice.[93]
- In the CIT *Al Ghurair* determination that the CAFC affirmed in *Al Ghurair CAFC 2023*, the CIT prefaced its decision by stating that "the statute does not outline a specific methodology for Commerce to follow to determine the level of investment."[94]  The CIT further explained that when there is an absence of a designated methodology, Commerce has the discretion on its own method of analysis.[95]
- The SAA explains that "Commerce will evaluate each of {the statutory} factors as they exist either in the United States or a third country, depending on the particular circumvention scenario."[96]  This guidance has been adopted in various circumvention cases cited by Auxin, including *Pet Film from the UAE (Bahrain)*, *CORE from Taiwan (Malaysia), HFCs from China (India)*, *OCTG from China (Philippines and Brunei)*.[97]

---

[86] *Id.* (citing Auxin's July 29, 2022 Investment and R&D Information at Excel Attachment).

[87] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5; and Auxin's July 29, 2022 Investment and R&D submission at Exhibit 1).

[88] *See* NextEra's May 9, 2023 Rebuttal Brief at 4-18.

[89] *See* CSIL's May 9, 2023 Rebuttal Brief at 6-25.

[90] *See* TTL's May 9, 2023 Rebuttal Brief at 6-21.

[91] *Id.* (citing *PET Film from the UAE (Bahrain) Preliminary Determination* IDM at 5).

[92] *See* NextEra's May 9, 2023 Rebuttal Brief (citing *CORE from China (Vietnam)* IDM at 7).

[93] *Id.* (citing *Al Ghurair CAFC 2023*, 65 F.4th at 1351*).*

[94] *Id.* (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368*)*

[95] *Id.* (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1368 (citing *Timken Co.*, 968 F. Supp. 2d at 1286 n.7, *aff'd* 589 F. App'x 995 (Fed. Cir. 2015))).

[96] *Id.* (citing SAA at 893)

[97] *Id.* (citing *PET Film from the UAE (Bahrain) Preliminary* PDM at 5; *CRS from China (Vietnam)* IDM at Comment 5; *CORE from Taiwan (Malaysia)* IDM at 19-20; *HFCs from China (India) Preliminary* PDM at 17; and *OCTG from China (Philippines and Brunei) Preliminary* PDM at 9).

- In *SSSS from China (Vietnam), Pipe and Tube from India (UAE and Oman), CORE from China (UAE),* Commerce compared upstream production in the order country to downstream production in the third country.[98]
- Commerce has repeatedly stated that its analysis must be tailored to the particular facts of the case,[99] based on the "factors as they exist in the third country, depending on the totality of the circumstances of the particular anti-circumvention inquiry."[100]
- As such, Auxin is incorrect that its "merchandise-centric" analysis is appropriate because it is product and industry neutral. Instead, Commerce's analysis must be tailored to the specific facts of the circumvention inquiries.

*Commerce's Reliance on Affiliation Accurately Represents Auxin's Request*

- Commerce's affiliate-centric approach is consistent with Auxin's original request for circumvention and record evidence. Auxin's circumvention request defined the alleged circumventing activity as "assemblers of CSPV cells and modules … that use affiliated Chinese input suppliers and a fully integrated Chinese supply chain to circumvent the existing Orders."[101] Moreover, Auxin clarified that its allegations "rely heavily upon the relationships between certain Chinese input suppliers and their affiliates in the targeted third countries," and claimed that the affiliation relationships " narrow{} the alleged circumvention activity in this petition to major Chinese companies that use other countries as export platforms."[102] Auxin specifically framed its circumvention request around assemblers in the third countries "that use affiliated Chinese input suppliers and a fully integrated Chinese supply chain to circumvent the existing Orders."[103]

*Chinese Solar Producers Are Not Integrated with Polysilicon Producers*

- Information on the record, such as a report from the DOE placed on the record by Auxin, confirms that any integration in the solar industry occurs at the later stages of the solar cell and module production process (*i.e.*, from wafers through module production).[104] This demonstrates that solar cell and module production is not fully integrated in China back to the polysilicon refinement stage of production.
- Auxin identified only one company in China with investments in progress for production of polysilicon, ingot, wafers, cells, and modules; and most companies Auxin identified produce at only one or two of these production stages.[105]

---

[98] *See* CSIL's May 9, 2023 Rebuttal Brief (citing *CORE from China (UAE)* at Comment 1; *SSSS from China (Vietnam)* at 18-19 "where Commerce compared the R&D activities of the upstream hot-rolling of stainless steel in China to the R&D activities of the further processor in the third country;" *Pipe and Tube from India (UAE and Oman)* at Comment 6; and *OCTG from China (Brunei and the Philippines) Preliminary* at 10, unchanged in *OCTG from China (Brunei and the Philippines)* at Comment 1.

[99] *See* NextEra's May 9, 2023 Rebuttal Brief (citing *PET Film from the UAE (Bahrain) Preliminary* PDM at 5; *CORE from China (Vietnam)* IDM at 7).

[100] *Id.* (citing *CORE from China (Vietnam)* IDM at 7; *CRS from China (Vietnam)* IDM at Comment 5; *HFCs from China (India) Preliminary* PDM at 11-12, 17; *CORE from Taiwan (Malaysia)* IDM at 8; *OCTG from China (Philippines and Brunei) Preliminary* PDM at 6; *SSSS from China (Vietnam)* IDM at 15; and *Pipe and Tube from India (UAE and Oman)* IDM at 8, 12).

[101] *Id.* (citing Circumvention Request at 1-2).

[102] *Id.* (citing Circumvention Request at 87).

[103] *Id.* (citing Circumvention Request at 1-2).

[104] *Id.* (citing Auxin's May 16, 2022 Comments at Exhibit 5).

[105] *Id.* (citing Auxin's Investment and R&D Information at Excel Attachment).

21

- In steel cases Commerce used the facts on the record to compare final processing steps in the third country to the operations of integrated steel mills in the country subject to the order.[106]  However, there is no such facts regarding integration in the solar industry.
- As Commerce does not include iron ore production/investment/facilities in its steel circumvention analysis, it should not include polysilicon production in its solar circumvention analysis.[107]
- Thus, including the polysilicon stage as part of Commerce's consideration of the Chinese solar industry would unfairly distort the analysis and ignore the reality of the industry subject to the inquiry.

*Auxin's Suggested Remedies are Unreasonable*

- In the numerous cases cited by Auxin, it never provides a case, as it argues Commerce should do here, where Commerce calculated an absolute investment figure by averaging the investments of various producers at different stages of the supply chain and summing them to create an estimate of the cost of a hypothetical fully integrated facility.  For the solar industry, doing so would not represent the actual structure of the industry and, thus, would be an inappropriate basis for Commerce's comparison.
- The investment data that Auxin argues should be relied upon under a merchandise-specific approach conflates projected investments with actual investments, often citing companies' announcements of long-term investment plans with projected capacity over the next five to ten years.[108]  Many of the investment and capacity figures used by Auxin do not represent the initial start-up investment required to construct a facility in China, and the figures also include anticipated investments that have not yet been made in China.
- In proposing these vague, estimated figures, Auxin omits any rationale for why Commerce should discard concrete data that was certified by company officials and counsel and verified by U.S. Government officials.[109]  This approach would run counter to Commerce's mission of fair and accurate administration of the trade laws.[110]
- A direct comparison between Auxin's investment data and the mandatory respondents' investment data would lead to inaccurate and misleading results by comparing projected investments in China to third country investments.

*Commerce has Considered Affiliation in Performing Its Analysis under 782(b)(2)*

- Contrary to Auxin's claims, Commerce has focused on comparisons with affiliates in prior circumvention inquiries.  In *PET Film from the UAE (Bahrain),* Commerce collected data from a third-country manufacturer in Bahrain and its affiliate in the UAE to conduct its comparative analysis, making the same comparison between affiliates' investments and operation that Auxin asserts is not appropriate here.[111]  In *CRS from*

---

[106] *Id.* (citing *CORE from China (Vietnam)*; *CRS from China (Vietnam)*; and *SSSS from China (Vietnam)*).

[107] *See* TTL's May 9, 2023 Rebuttal Brief (citing *Pipe and Tube from India (Oman and UAE)* IDM at Comment 6).

[108] *See* NextEra's May 5, 2023 Rebuttal Brief (citing Auxin's Investment and R&D Submission at Excel Attachment and Exhibit P-7b).

[109] *See* CSIL's May 9, 2023 Rebuttal Brief (citing *Yangzhou CAFC* at 1379; and *Gallant Ocean (Thai.) Co.* at 1323).

[110] *Id.* (citing *Albemarle Corp.*, 821 F.3d at 1355, 1357)

[111] *See* NextEra's May 9, 2023 Rebuttal Brief (citing *PET Film from the UAE Preliminary Determination* PDM at 5-6, unchanged in *PET Film from the UAE (Bahrain)*).

*Korea (Vietnam)* and *Diamond Sawblades Thailand*, Commerce had data on the record from affiliated parties and opted to make a direct comparison between the respondents' investments and the operations of its affiliate in the country subject to the order.[112]

- Auxin ignores the significant portion of Commerce's analysis that did not consider affiliation at all.  When analyzing the factors under section 781(b)(2) of the Act, Commerce did not consider affiliation when evaluating section 781(b)(2)(C) and 781(b)(2)(E) of the Act.

**Commerce's Position:**  We disagree with Auxin that Commerce should revise its application of the "minor or insignificant" factors, as enumerated in section 781(b)(2) of the Act.[113]  The statute and the SAA grant Commerce discretion in evaluating the five minor or insignificant factors. The statute only provides that Commerce "shall take into account" the five factors, without further instruction.  According to the SAA, Commerce will evaluate the five factors under section 781(b)(2) of the Act "as they exist either in the United States or a third country, depending on the *particular circumvention scenario*," and that "{n}o single factor will be controlling."[114]  Thus Commerce must tailor its analysis to the facts on the record.  Here, we place particular emphasis on affiliation, aided by the circumvention request itself, because the 'circumvention scenario' alleged by Auxin is unique and distinguishable from most of those examined in our previous circumvention inquiries.

In this circumvention inquiry, the particular circumvention scenario, per Auxin's request, is centered around third country companies using "affiliated Chinese input suppliers and a fully integrated supply chain to circumvent the existing *Orders*."[115]  Auxin notes that "{t}he circumvention allegations contained herein rely heavily upon the relationships between certain Chinese input suppliers and their affiliates in the targeted third countries, a factor that Commerce must consider."[116]  Again, Auxin describes that the "fact pattern significantly narrows the alleged circumventing activity in this petition to major Chinese companies that use other countries as export platforms to continue selling cheap CSPV cells and modules to the United States."[117]  In accordance with the SAA's language instructing Commerce to "evaluate the factors … depending on the particular circumvention scenario," we applied our minor and insignificant analysis, with respect to the respondents' level of investment, level of research and development, and extent of production facilities, using a comparative approach that accounts for the production activities of the upstream affiliates of the third country producers, mirroring Auxin's request.

Auxin's circumvention request is why we also disagree with Auxin's arguments that we should adopt a "merchandise-centric" comparative approach for the final determination and include solar-grade polysilicon in our 781(b)(2) analysis.  Auxin focuses on the language in *SDGE from*

---

[112] *Id.* (citing *CRS from Korea (Vietnam) Preliminary* PDM at 14-17, unchanged in *CRS from Korea (Vietnam)*; and *Diamond Sawblades (Thailand) Preliminary* PDM at 12, unchanged in *Diamond Sawblades (Thailand)*).

[113] The five factors listed under section 781(b)(2) of the Act:  (A) level of investment in the foreign country; (B) level of research and development in the foreign country; (C) nature of the production process in the foreign country; (D) extent of production facilities in the foreign country; and (E) value of processing performed in the foreign country.

[114] *See* SAA at 893 (emphasis added).

[115] *See* Circumvention Request at 1-2.

[116] *Id.* at 87.

[117] *Id.*

23

*China (UK)* stating that the purpose of the analysis under section 781(b)(1)(C) of the Act is to "evaluate whether a process is minor or insignificant within the context of the totality of the production of subject merchandise" such that Commerce's analysis addresses "the relative size and significance of the processing provided by {the respondent} in comparison to the processing necessary to produce the overall finished product."[118] Again, Congress and our past practice require us to consider the unique facts and circumstances of each specific case. In *Al Ghurair CAFC 2023*, the CAFC noted that Commerce "is not bound by its prior determinations" and should there be a reason to deviate from its past practice, Commerce may explain why it is appropriate to do so.[119] In the underlying CIT decision, the CIT noted that Commerce has the discretion to decide its own analysis to determine the level of investment as section 781(b)(2) of the Act does not outline a specific methodology."[120] In accordance with *Timken Co.,* the CIT provided Commerce the discretion "to adapt to different factual circumstances to address circumvention."[121] In *CRS from China (Vietnam),* Commerce applied a similar logic where it stated that the statute does not instruct Commerce to apply a particular analysis, and therefore, "Commerce may determine an appropriate analysis to apply."[122] Again, Congress and our past practice require us to consider the unique facts and circumstances of each specific case. In accordance with the recognized discretion granted to Commerce in circumvention inquiries, for this inquiry, Commerce utilized an approach which is specific to the upstream affiliates of each respondent. Because none of the respondents to this inquiry were affiliated with upstream producers of polysilicon, we did not consider Chinese polysilicon production as part of our comparative analysis of the 'minor or insignificant' factors.

Auxin's circumvention request alleges a circumvention fact pattern that involves integrated Chinese solar producers spinning off the last steps of production (*i.e.*, solar cell and solar module production) to the inquiry countries to undermine the existing *Orders* and avoid AD/CVD duties. With that fact pattern in mind, after selecting the largest producers/exporters of solar cells and/or solar modules in the third countries, we requested a litany of information related to the corporate structure and operations of the respondents, examining any affiliation links to producers involved in the production of solar cells and modules in China. After examining the information placed on the record by the respondents, the facts indicated that: (1) none of our respondents' affiliates in China had fully integrated production back to the mining and refining of solar-grade polysilicon during the period of inquiry; and (2) there is no substantial record evidence of fully integrated production in China during the period of inquiry.[123] CSIL provided information showcasing that its upstream affiliates in China started at the ingot stage of production, thus we decided it was appropriate to directly compare CSIL's Thai facilities to that of its upstream affiliates in China, starting from the ingot stage of production when examining sections 781(b)(2)(A), (B), and (D) of the Act.[124] Whereas in TTL's case, it provided information showcasing that its upstream affiliates in China started at the wafer stage of production, thus, we

---

[118] *See SDGE from China (UK)*, 77 FR at 47599.
[119] *See Al Ghurair CAFC 2023*, 65 F.4th at 1360 (citing *Hyundai Electricity CAFC*, 15 F.4th at 1089.
[120] *See Al Ghurair CIT 2021* at 1368 (citing *Timken Co.*, 968 F. Supp. 2d at 1286 n.7, *aff'd* 589 F. App'x 995 (Fed. Cir. 2015)).
[121] *Id.*
[122] *See CRS from China (Vietnam) Final* IDM at Comment 5; *CORE from China (Vietnam) Final* IDM at 34; and *OCTG from China (Brunei and the Philippines) Final* IDM at 7.
[123] *See* CSIL Preliminary Analysis Memorandum at 2; *see also* TTL Preliminary Analysis Memorandum at 2.
[124] *See Thailand* PDM at 16.

24

decided it was appropriate to directly compare TTL's Thai facilities to that of its upstream affiliates in China, starting from the wafer stage of production when examining sections 781(b)(2)(A), (B), and (D) of the Act.[125]  Such facts, on the respondent-specific level, were subsequently authenticated by us when conducting the verifications of CSIL and TTL.

Based on the facts above, we disagree with Auxin's insistence that Commerce include in its comparison to the order country the first stage of production of solar cells and modules, the mining and refining of solar-grade polysilicon.  The pre-URAA cases Auxin relies on in support of starting the comparative analysis at the first stage of the production process, *Granular PTFE Resin from Italy* and *Brass Sheet and Strip from Canada,* are cases where Commerce compared third country operations to fully integrated producers in the country subject to the order.[126] Moreover, other post-URAA cases cited by Auxin, *CORE from China (Vietnam)*, *CRS from China (Vietnam)*, and *SSSS from China (Vietnam)*, are cases where Commerce used the facts on the record to compare fully integrated steel producers in China to the operations conducted in the third country.  These cases are not comparable to the present circumvention proceeding as our record demonstrates that fully integrated production (*i.e.*, production facilities that manufacture polysilicon, wafers, ingots, solar cells, and solar modules) is not typical of the solar industry in China.  Auxin's argument that Commerce should compare the level of production in the third country to a fully integrated producer in China, as it did in prior circumvention inquiries, is therefore inapposite.  Even if Commerce were to determine that such an approach was appropriate to evaluate the circumvention scenario alleged by Auxin, the record lacks evidence of a 'fully integrated' solar cell and module producer comparable to the fully integrated steel mills which has been used as a basis for comparison in other cases.

The solar industry is distinguishable from the industries involved in the cases cited by Auxin, and therefore warrants a different methodological approach, when considering the 'minor or insignificant' factors, to that applied in past cases.  In the steel industry, producers in the order country typically are fully integrated starting at the first stage of production.[127]  We do not have a similar fact pattern on this record.  Prior to the *Preliminary Determination,* we provided all parties, including Auxin, an opportunity to place investment and R&D information on the record of the proceeding.  However, no party provided substantial record evidence of fully integrated production in China during the period of inquiry.  Regarding the Chinese solar industry as a whole, Auxin, in its July 29, 2022 Investment and R&D submission, identified only one company in China with in-progress investments in all stages of production, *i.e.*, solar-grade polysilicon, ingot, wafers, solar cells, and solar modules.[128]  An interested party, NextEra, placed information on the record indicating that the solar industry is not composed of fully integrated producers starting with mining or refining solar-grade polysilicon.[129]  In fact, a report Auxin

---

[125] *Id.* at 16.
[126] *See Granular PTFE Resin from Italy* IDM at 12-13 n.16 (citing *Brass Sheet and Strip from Canada*, 58 FR at 33613 ("compar{ing} {respondents' rerolling} activities to that of *vertically integrated producers*, such as brass mills, which cast, roll, and finish the product") (emphasis added)).
[127] *See CORE from China (Vietnam) Preliminary* PDM at 18, n. 82.
[128] *See* Auxin's Investment and R&D Information at Excel Attachment.  Auxin did not provide information establishing that this company had actually commenced production of solar cells and modules.
[129] *See* NextEra's May 2, 2022 Comments at Att. 2 and at 9 ("Of the leading global polysilicon producers by capacity in 2021, only two, the Chinese companies GCL and Tongwei, participate in supply chain stages other than

itself placed on the record, and cited in its April 26, 2023 Case Brief, confirms that integration in the Chinese solar industry does not begin at the mining and refining of solar-grade polysilicon stage of production, and instead involves the later stages of the solar cell and module production process (*i.e.*, wafer through module production).[130]  Auxin argues that we should use its July 29, 2022 Investment and R&D submission to extrapolate an estimate of the investment and R&D needed for one fully integrated solar cell and module producer in China from a number of different companies that operate in different stages of the production process and use those estimates as the basis for our comparison to the order country.  Given the fragmented nature of the solar industry in China, we find a comparison to a fully integrated producer in China, in accordance with Auxin's proposed "merchandise-centric" approach to be inappropriate.

The solar industry is also unique in other respects.  First, solar cell production is more technically complex and dependent on skilled labor to a greater degree than most other products that Commerce has examined in prior circumvention inquiries.[131]  For this reason, we placed particular emphasis on the "level of research and development" factor when evaluating whether the production in the third country was minor or insignificant.  *See* Comment 8.  However, the nature of research and development is such that, once carried out, it is easily transmissible across national borders.  Further, solar cells and modules are unique products insofar as one country, here China, accounts for almost one hundred percent of the global production of a primary upstream input, *i.e.*, solar wafers.[132]  These factors, when taken into consideration together, contribute to a circumvention scenario in which large solar conglomerates are incentivized to 'spin off' production of solar cells into third countries, and in which third country producers are left with little choice but to source solar wafers from China.  Our comparative analysis of the 'minor or insignificant' factors, in which we compare respondents' level of investment, level of research and development, and extent of production facilities to those of their affiliated Chinese input suppliers, is the most appropriate manner in which to account for *these particular facts*, which again are unique to the solar industry.

Further, contrary to the language Auxin cites from *SDGE from China (UK)*, there is precedent for Commerce to not examine whether the process of assembly in the third country is minor or insignificant in comparison to the entirety of the production process in the order country.  This was the case in *PET Film from the UAE Preliminary Determination*, where Commerce found it appropriate to compare PET film facilities in the third country, Bahrain, to PET Film facilities in the order country, and did not include all production stages in the comparative analysis.[133]  This was also the case in *SSSS from China (Vietnam)*, *Pipe and Tube from India (UAE and Oman)*, *CORE from China (UAE)*, and *OCTG from China (Brunei and the Philippines)* where similar to this circumvention inquiry, for the factors under section 781(b)(2) of the Act, Commerce

---

polysilicon. Of these two companies, GCL is a significant wafer producer, and Tongwei is a leading CSPV cell producer. All other polysilicon producers … operate exclusively in the polysilicon stage of the CSPV manufacturing supply chain.").

[130] *See* Auxin's May 16, 2022 Comments at Exhibit 5.

[131] *See ITC Solar Final* at I-15 (solar cell production is "a highly automated, capital intensive, and technologically sophisticated process, requiring skilled technicians and employees with advanced degrees.").

[132] *See* Circumvention Request at 28-30 (citing Bloomberg NEF Report at 1, 9).

[133] *See PET Film from the UAE Preliminary Determination* IDM at 5.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

compared upstream production in the order country to downstream production in the third country.[134]

Citing *Ferrovanadium from Russia Final Determination* and *Hot-Rolled Lead and Bismuth*, cases where Commerce decided against conducting a comparative analysis under section 781(a)(2) of the Act, Auxin argues that the absence of a comparative analysis under 781(a)(2) is only appropriate where there is "no affiliation between the relevant parties **and** third country (or U.S.) operations pre-existed the relevant order."[135]  Although these two cases were circumvention inquiries conducted under section 781(a) of the Act, similar statutory language applies to sections 781(a)(2) and 781(b)(2).  While we agree with Auxin that these are two important aspects to consider, in this specific case, we also consider Auxin's circumvention request, which focused heavily on upstream solar input producers working in tandem with affiliated third country solar cell and solar module producers to circumvent the existing *Orders,* an important distinction that must be considered.  Auxin's proposed standard, which aims to compare third country producers to the entire solar cell and module production process in the order country, fails to account for the rapid growth of the solar cell industry in the years following the issuance of the *Orders*, and may inappropriately target certain third country producers with no upstream affiliates in the order country.[136]  Therefore, for third country solar cell and module producers with no upstream input affiliates in the order country, we find a comparative analysis in the manner requested by Auxin for sections 781(b)(2)(A), (B), and (D) of the Act to be inappropriate.

Auxin also argues that we have gone against our practice by elevating affiliation to a mandatory criterion under section 781(b)(2) of the Act, therefore, making affiliation a prerequisite for finding circumvention.  However, this point by Auxin is a misrepresentation of our minor or insignificant analysis applied in the *Preliminary Determination.*  Although Auxin is correct that, in this specific case, for our evaluation of the level of investment, the level of research and development, and the extent of the production process, we centered our analysis around upstream input affiliates, Auxin incorrectly conflates our analysis with respect to sections 781(b)(2)(A), (B), and (D) to the entire determination made under section 781(b)(1)(C) of the Act and our circumvention finding writ-large.  In evaluating whether the process of assembly in the third country was minor, for the criterion under section 781(b)(2)(C) of the Act, nature of production process, we compared third country operations to the production of a silicon wafer in China, starting from the solar-grade polysilicon stage of production, regardless of affiliation. Specifically, in the *Preliminary Determination*, we found that the nature of the production process, as examined under section 781(b)(2)(C) of the Act, is "not minor or insignificant compared to either **processing polysilicon into wafers**, or ingots into wafers, in China, which does not weigh in favor of finding circumvention."[137]  Similarly, when examining the criteria

---

[134] *See CORE from China (UAE)* IDM at Comment 1; *SSSS from China (Vietnam)* IDM at 18-19 "where Commerce compared the R&D activities of the upstream hot-rolling of stainless steel in China to the R&D activities of the further processor in the third country"; *Pipe and Tube from India (UAE and Oman)* IDM at Comment 6; and *OCTG from China (Brunei and the Philippines) Preliminary* PDM at 10, unchanged in *OCTG from China (Brunei and the Philippines)* IDM at Comment 1.
[135] *See* Auxin's April 26, 2023 Case Brief at 23-26.
[136] *See* Circumvention Request at 57-58, n. 231.
[137] *See Thailand* PDM at 20.  Our approach with respect to 781(b)(2)(C), nature of the production process in the foreign country, remains unchanged in this final determination.

27

under section 781(b)(2)(E) of the Act, value of processing, in the *Preliminary Determination* we again did not factor in affiliation and note that the silicon wafer is naturally inclusive of the polysilicon that went into it.[138]  As such, Auxin's reliance on *Butt-Weld Pipe Fittings from China (Thailand)* and *CORE from China (Vietnam*), cases where Commerce noted that affiliation does not have to be present for circumvention to occur, is misplaced as we did not, in this case, elevate affiliation to a mandatory criterion under section 781(b)(2) of the Act or consider affiliation a prerequisite to finding circumvention.  For similar reasons, Auxin's dependence on *SDGE from China (UK),* affirmed in *U.K. Carbon & Graphite*, *CORE from Vietnam (China)*, *Retail Carrier Bags from Taiwan Final Determination*, *CRS from China (Vietnam)*, *Tissue Paper from China (India)*, *SDGE from China (UK),* and *HFC from China (India), i.e.*, prior circumvention cases where the process of assembly was found minor even for respondents that did not have affiliates in the order country, adds no value within the context of this proceeding as the methodology applied in the *Preliminary Determination* does not preclude a company with no affiliates in the order country from being found to be circumventing an order.

We note that Commerce, in the cases cited by Auxin, has opted to conduct a direct comparison under section 781(b)(2) of the Act between a respondent's third country operations and the operations of its affiliate in the country subject to an AD/CVD order.  For example, *PET Film from the UAE (Bahrain)*, *CORE from Taiwan (Malaysia)*, *CRS from Korea (Vietnam)*, and *Diamond Saw Blades from China (Thailand)* are examples of prior circumvention cases where Commerce conducted a direct comparison between the respondents and their affiliates in the country subject to the order when examining the criteria under 781(b)(2)(A), level of investment, 781(b)(2)(B), R&D, 781(b)(2)(C), nature of production process, and 781(b)(2)(D), extent of production facilities.[139]  In line with *PET Film from the UAE (Bahrain)*, *CORE from Taiwan (Malaysia)*, *CRS from Korea (Vietnam)*, and *Diamond Saw Blades from China (Thailand)*, when examining 781(b)(2)(A), level of investment, 781(b)(2)(B), R&D, and 781(b)(2)(D), extent of production facilities, we reasonably opted to make a direct comparison between a respondent's operations in the third country and its upstream affiliates in the country subject to an AD/CVD order.

Therefore, the assumption by Auxin that unaffiliated suppliers will get a free path to circumvent the existing *Orders* is false.  Rather, in accordance with the SAA, our finding as to whether the extent of processing was minor or insignificant was supported by our evaluation of all five factors listed in section 781(b)(2) of the Act, including the nature of the production process and the value added in the third country, which Commerce evaluated without comparison to respondents' upstream affiliates.

Therefore, our minor or insignificant determination, under section 781(b)(1)(C) of the Act was a "multi-factor"[140] analysis and did not rely merely on affiliation or the exclusion of a stage of production as the linchpins of our circumvention findings.  For these reasons, for the final

---

[138] *Id*.  Our approach with respect to section 781(b)(2)(E) of the Act, value of processing in the foreign country, remains unchanged in this final determination.
[139] *See PET Film from the UAE (Bahrain) Preliminary* PDM at 5-6, unchanged in *PET Film from the UAE (Bahrain)*; *CORE from Taiwan Preliminary Determination* PDM at 14-17, unchanged in *CORE from Taiwan Final*; and *Diamond Sawblades (Thailand) Preliminary* PDM at 12, unchanged in *Diamond Sawblades (Thailand)*.
[140] *See Al Ghurair CAFC 2023*, 65 F.4th at 1363.

determination, we will not depart from the minor or insignificant analysis applied in the *Preliminary Determination*.

**Comment 5.    How to Value U.S. Imports of Solar Cells and Modules for Purposes of Section 781(b)(2)(E) of the Act**

*Auxin*[141]
- Section 781(b)(2)(E) of the Act requires Commerce to determine "whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States."
- Commerce should base the value of the merchandise that is imported into the United States on the COM of that merchandise rather than U.S. sales price because U.S. sales prices could be transfer prices, prices that reflect dumping or subsidization, or prices below costs.
- Commerce has acknowledged that section 781 of the Act does not define "value," and it explained that in determining value under that section of the Act it considers the items that are being valued and the "availability and reliability of reported prices and costs."[142]
- In *Plywood from China (Vietnam) Preliminary*, Commerce valued the merchandise imported into the United States using COM where it noted that " … the U.S. price is insufficient to cover even the Chinese veneer content of the finished hardwood plywood."[143]
- This same logic should be applied in these circumvention inquiries where Commerce finds a similar fact pattern when comparing the cost of Chinese inputs used in the inquiry merchandise (based on surrogate values) to the sales value of the merchandise imported into the United States.

*NextEra*[144]
- Using COM to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act directly conflicts with Commerce's statutory mandate and is inconsistent with its practice.
- In *Glycine from China (India)*, Commerce explained that "although the statute does not specify a method for determining value {under section 781(b)(2)(E) of the Act}, it does clearly specify that this is a *value-based test, and not a cost-based test*."[145]
- In *PET Film from the UAE (Bahrain)*, Commerce confirmed that it must use "the value of the merchandise exported to the United States," not costs, in its calculations under section 781(b)(2)(E) of the Act, "consistent with use of the phrase 'value of processing performed'" in that section of the Act.[146]
- In *Plywood from China (Vietnam)*, Commerce was forced to base its calculations under section 781(b)(2)(E) of the Act on whatever facts were available since there were no

---

[141] *See* Auxin's April 26, 2023 Case Brief at 75-78.
[142] *Id.* (citing *SDGE from China (UK)* IDM at Comment 3).
[143] *Id.* (citing *Plywood from China (Vietnam) Preliminary*).
[144] *See* NextEra's May 9, 2023 Rebuttal Brief at 39-40.
[145] *Id.* (citing *Glycine from China (India)* IDM at 18).
[146] *Id.* (citing *PET Film, Sheet, and Strip from the UAE (Bahrain)* IDM at 5).

usable data from respondents on the record (Commerce applied total AFA).  The unique methodology used in that case is not relevant here.[147]

*TTL*[148]

- Under section 781(b)(2)(E) of the Act, Commerce is clearly directed to compare the value of processing in the third country to the "value of the merchandise imported into the United States."  Thus, Commerce should continue to use the value, not the cost, of merchandise imported into the United States in its calculations under section 781(b)(2)(E) of the Act.
- In *Glycine from China (India)*, Commerce explained that section 781(b)(2)(E) of the Act "does clearly specify that this is a *value-based test* and *not a cost-based test*."[149]
- *SDGE from China (UK)* does not support Auxin's proposal to use costs to value the merchandise imported into the United States, which is the denominator in the ratio of "value of processing to the value of the merchandise," because the issue in that case involved the numerator of the ratio.  Moreover, in *SDGE from China (UK)* Commerce based the value of the imported merchandise on sales value, not costs.[150]
- Auxin did not show that the U.S. sales prices reported by respondents are unreliable.  At verification Commerce found no discrepancies with respect to the U.S. sales prices reported by TTL.
- Auxin based its claim that TTL's U.S. sales prices are unreliable on a comparison between material costs, based on surrogate values, and U.S. sales prices.  However, this comparison is not relevant in circumvention inquiries.  Any claim that a company is selling solar cells or solar modules at less than fair value should be made in a antidumping duty petition.

**Commerce's Position:**  We disagree with Auxin's position that Commerce should use COM to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act.  Although the word "value" is not defined in section 781(b)(2)(E) of the Act, Congress described this section of the Act as determining "whether the value of the processing performed in … the third country represents a small portion of the value of the merchandise sold in, or imported into, the United States."[151]  The phrase "value of the merchandise sold" indicates a sales value that generally reflects all costs incurred, not just the cost of materials, labor, and factory overhead (COM), as well as a profit.

Commerce has taken this position in other cases.  In *Glycine from China (India)* Commerce explained that "although the statute does not specify a method for determining value {in section 781(b)(2)(E) of the Act,} it does clearly specify that this is a value-based test, and not a cost-

---

[147] *Id.* (citing *Plywood from China (Vietnam) Preliminary* PDM at 15, 24).
[148] *See* TTL's May 9, 2023 Rebuttal Brief at 35 and 36.
[149] *Id.* (citing *Glycine from China (India)* IDM at 18).
[150] *Id.* (citing *SDGE from China (UK)* IDM at Comment 3).
[151] *See* S. Rep. No. 103-412 (1994), at 82.

30

based test."[152]  This plain reading of the statute is also consistent with Commerce's calculations in other circumvention inquiries.[153]

Neither *SDGE from China (UK)* nor *Plywood from China (Vietnam)* supports Auxin's position. The issue in *SDGE from China (UK)* involved how to value third-country processing (the numerator in the ratio of third-country processing divided by the value of the merchandise imported into the United States), not how to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act.[154]

In *Plywood from China (Vietnam)*, Commerce did not have any usable data from Vietnamese producers or exporters of hardwood plywood to determine the relative value of the processing performed in Vietnam.  Consequently, Commerce used data that were provided by the requester of the circumvention inquiry and submitted in the Vietnam Finewood Scope Inquiry.  The requester in *Plywood from China (Vietnam)* argued that most of the production costs for hardwood plywood were incurred in China and, thus, Vietnamese processing is relatively minor. In the absence of data from Vietnamese producers or exporters of hardwood plywood, Commerce attempted to confirm the requester's allegation by examining the percentage of COM represented by core veneers from China and Vietnamese processing (*i.e.*, Commerce sought to confirm whether most costs were incurred in China).  Although Commerce applied AFA in its determination, it noted that it based its analysis on "the value associated with completing hardwood plywood using Chinese-origin core veneers (and potentially Chinese face and back veneers) in Vietnam is relatively insignificant in comparison to the primary stages of production that are completed in China."[155]  Thus, Commerce's cost-based approach in *Plywood from China (Vietnam)*, was unique to the facts of that case and should not necessarily stand as precedent for all circumvention inquiries.  In fact, in the final determination in *Plywood from China (Vietnam)*, Commerce explained that:

> Although the U.S. Importers and {Vietnamese} Exporters assert that the methodology relied on in other circumvention inquiries to calculate the value added in a third country differs from the methodology Commerce used in the Preliminary Determination, we continue to find that our determination relied on the best available information on our record. … Given the limited information available on the record, we have continued to apply our quantitative analysis from the Preliminary Determination.[156]

Lastly, we do not find Auxin's arguments that the reported U.S. prices are distorted to be persuasive.  Auxin based its arguments on a comparison of the total value, based on surrogate values, of Chinese inputs in a solar module, to the U.S. sales value of the module.  However,

---

[152] *See Glycine from China (India)* IDM at 18.
[153] *See, e.g.*, *CORE from China (UAE) Preliminary* PDM at 21, unchanged in *CORE from China (UAE)*; *Pipe and Tube from India (Oman and UAE)* IDM at 37; and *OCTG from China (Brunei and Philippines) Preliminary* PDM at 13, unchanged in *OCTG from China (Brunei and Philippines)*.
[154] *See SDGE from China (UK)* IDM at Comment 3 ("… UKCG requests that {Commerce} reconsider the methodology used to determine the numerator of the quantitative portion of the analysis of further processing … As discussed below, {Commerce} has indeed reconsidered its calculation of the value included in the numerator").
[155] *See Plywood from China (Vietnam) Preliminary* PDM at 10, 23, and 24.
[156] *See Plywood from China (Vietnam) Final* IDM at Comment 2.

31

Commerce calculated the total value of Chinese inputs in a solar cell or solar module that Auxin used in its comparison for purposes of section 781(b)(1)(D) of the Act, not section 781(b)(2)(E) of the Act. Auxin never explains why it would be distortive to compare the cost of processing solar cells and modules in, for example, Cambodia, Malaysia, or Thailand, to the U.S. sales value of those solar cells and modules when presumably, the sales value would reflect the processing costs incurred in those countries. Moreover, it is not appropriate to find that inquiry merchandise is being dumped or unfairly subsidized in the context of a circumvention proceeding.

For the foregoing reasons, we have continued to use U.S. sales prices to value the merchandise that was imported into the United States for purposes of section 781(b)(2)(E) of the Act.

**Comment 6.   Whether Material Costs Should be Included in the Value of Third-Country Processing**

*Auxin*[157]
- When applying section 781(b)(2)(E) of the Act (*i.e.*, determining whether the value of the processing performed in the third country represents a small proportion of the value of the merchandise imported into the United States), Commerce must exclude the value of material inputs in the value of the processing. By using the phrase "processing performed," the Act focused on the processing operations in the third country, not the value of the material inputs used in those processing operations.
- This interpretation is consistent with *HFCs from China (India)* where Commerce determined that "when the Act is referring to the value of the processing, it is referring to the process of completion or assembly of the parts or components, not the process to manufacture the parts or components."[158]
- In *HFCs from China (India)*, Commerce noted that "Congress acknowledged in {certain} passages of the SAA that, under the previous statutory criteria, the inclusion of the parts or components from a third country proved to be problematic. Therefore, Congress enacted the revisions to section 781(b) of the Act, which allowed Commerce to focus on whether the process of assembly or completion is minor or insignificant pursuant to section 781(b)(2) of the Act." [159]
- Rather, material inputs used in third-country processing should be considered when determining the total value of the exported merchandise under section 781(b)(1)(D) of the Act (where Commerce must determine whether the portion of the product produced in the order country is a significant portion of the total value of the product exported to the United States) and sections 781(b)(2)(A) (level of investment in the third country), (C) (nature of the production process in the third country), and (D) (extent of the production facilities in the third country) of the Act.[160]

---

[157] *See* Auxin's April 26, 2023 Thailand Case Brief at 71-75.
[158] *Id.* (citing *HFCs from China (India)* IDM at 17).
[159] *Id.*
[160] *Id.*

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

*TTL*[161] and *NextEra*[162]

- The direct materials are an integral part of processing, and the exclusion of the non-Chinese material values would leave a gap in the assessment of the value of the processing in Thailand.
- Commerce has a longstanding practice of including the value of material inputs used in third-country processing in the value of that processing under section 781(b)(2)(E) of the Act and should not depart from that practice here.[163]
- Auxin did not explain why here Commerce should depart from its overwhelming prior practice based on a single instance (*HFCs from China (India)*), where it excluded the value of material inputs used in third-country processing from the value of that processing.[164]

**Commerce's Position:**  We disagree with Auxin's position that in this circumvention inquiry, Commerce should exclude material costs from the value of processing for purposes of section 781(b)(2)(E) of the Act.

Section 781(b)(2)(E) of the Act directs Commerce to determine "whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States." Although Auxin claims that the phrase "the value of the processing performed" means the value of the processing operations performed in the third country, not the value of the material inputs used in those processing operations, the phrase "processing operations" is not further defined in the Act, and the individual items to be included in, or excluded from, the value of processing are not identified in the Act.  Moreover, Auxin did not cite any accounting authority or other authority showing that a manufacturer's processing costs do not include material costs.

Processing generally entails subjecting something to a series of actions in order to achieve a particular result or the act of taking something through a set of prescribed procedures.  For example, the Executive Summary and portions of the narrative in the *Bloomberg Report*, which is a report that Auxin relied on in its Circumvention Request, indicate that processing refers to the entire manufacturing activity[165] and processing costs refer to the total cost of a certain stage of production.[166]  In contrast, a graph in the *Bloomberg Report* indicates that processing costs include depreciation and fixed overhead costs.[167]  Therefore, it appears that the word "processing" is not consistently used to refer to the same types of costs.  Thus, the plain meaning of "processing," as used in section 781(b)(2)(E) of the Act, does not answer the question of whether the value of processing includes material costs.

---

[161] *See* TTL's May 9, 2023 Rebuttal Brief at 31-34.

[162] *See* NextEra's May 9, 2023 Rebuttal Brief at 37-39.

[163] *See CORE from China (UAE)* IDM at 20; *CRS from Korea (Vietnam) Preliminary* PDM at 17, unchanged in *CRS from Korea (Vietnam)*; and *Diamond Sawblades (Thailand) Preliminary* PDM at 12, unchanged in *Diamond Sawblades (Thailand)*.

[164] *See* NextEra's April 28, 2023 Vietnam Rebuttal Brief at 36-37

[165] *See Bloomberg Report* at the Executive Summary at PDF page 5, item 5.

[166] *Id.* at PDF page 15.

[167] *Id.* at Figure 9.

33

Auxin primarily rests its argument on Commerce's decision in *HFCs from China (India)* and Commerce's discussion of the SAA in that case.  When Commerce calculated the value of processing for purposes of section 781(b)(2)(E) of the Act in *HFCs from China (India)*, it did not include the processing and material costs that the respondent incurred in the third country to produce the HFC component (R-125) that the respondent blended with the Chinese HFC component (R-32) to form the HFC blend (R-410A) sold in the United States.  Commerce explained that "when the Act is referring to the value of the processing, it is referring to the process of completion or assembly of the parts or components, *not the process to manufacture the parts or components*.  This interpretation of the language in the Act is consistent with Congress' intent towards this portion of the statute" (emphasis added).[168]

Thus, the issue in *HFCs from China (India)* involved the material costs that the respondent incurred to self-produce a product that it used to "complete" the Chinese product, and not the question of whether the cost of materials and supplies used when assembling and completing the Chinese product in the third-country should be included in the value of processing for purposes of section 781(b)(2)(E) of the Act.  In fact, in *HFCs from China (India)*, the respondent did not use any materials in its "completion" of the Chinese R-32, it merely blended the self-produced R-125 with the Chinese R-32 to form the HFC blend (R-410A) sold in the United States.[169]  Hence, we do not find Commerce's decision in *HFCs from China (India)*, to be directly applicable in this case.

Moreover, the decision in *HFCs from China (India)*, which Commerce described as "consistent with Congress' intent towards this portion of the statute,"[170] was to focus on the process of completing the Chinese components in the third country, as opposed to the process of manufacturing parts that were used to finish the Chinese components in the third country.  Commerce's decision in *HFCs from China (India)* was to not focus on the processing that had nothing to do with the assembly or completion of the merchandise imported from the order country (China).  Thus, this decision was entirely consistent with Congress' revisions to Section 781(b) which directed "Commerce to focus on whether the process of assembly or completion {in the third-country} is minor or insignificant pursuant to section 781(b)(2) of the Act."[171]  Additionally, Commerce's decision in *HFCs from China (India)* was fact specific and did not necessarily establish a broader practice regarding which costs should be included in the value of processing being performed in the foreign country for purposes of section 781(b)(2)(E) of the Act.

Auxin's argument is based, in part, on Commerce's citation in *HFCs from China (India)* to the SAA's discussion of a "third-country parts" problem that existed in the pre-URAA version of the Act, which required that the difference between the value of the order country product that was processed in the third country and the final product imported into the United States be small to find circumvention.  Congress found this provision was ineffective in identifying circumvention

---

[168] *See HFCs from China (India)* PDM at Comment 3.
[169] *Id*. ("… we valued only the respondents' direct labor, manufacturing overhead, SG&A expenses, and net interest expenses in valuing the production process as these are the *only* expenses incurred by GFL … in performing the processing on the components to make HFC blends" (emphasis added).
[170] *Id*.
[171] *Id*.

because in some cases only minor assembly was performed in the third country, yet the difference in value was not small (*e.g.*, a "screwdriver" operation in the third country where high value third-country electronic components were simply connected together with electronic components from the order country into a finished product). Therefore, Congress revised the Act by removing the "difference in value" provision and adding, among other things, section 781(b)(2)(E) of the Act (whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States).[172]

However, after discussing the third-country parts problem, the SAA simply explains that new section 781(b)(2)(E) of the Act requires that Commerce determine whether the value of the third-country processing is small and notes that this requirement is consistent with the overall focus of revisions to the Act, which is to determine whether the process of assembly or completion in the third country is minor or insignificant. The SAA never indicated that the cost of all the materials used in third country processing should be excluded from the value of that processing for purposes of section 781(b)(2)(E) of the Act, and Commerce has not taken that position in numerous prior circumvention cases.[173]

A discussion of this matter is in Commerce's summary of the comments that it received on its revisions to the regulations that it proposed pursuant to the Uruguay Round Agreements Act. Specifically, one party "argued that because the emphasis in anticircumvention inquiries concerning completion or assembly in … a third country is now on whether that process is minor or insignificant, any parts or components sourced from third countries should not be included in making that judgement."[174] Commerce replied to that comment by stating that "we have not adopted this suggestion."[175] While Commerce went on to explain that third-country parts and components must still be considered under section 781(b)(1)(D) of the Act, the issue raised by the commenter was clearly focused on the issue at hand here, namely how third-country parts should be treated in determining whether completion or assembly in a third country was minor.[176] Yet, Commerce did not indicate, at that time, that its policy would be to exclude the cost of materials from the value of the processing in all circumvention inquiries, as suggested by Auxin.

Moreover, Commerce's regulations under 19 CFR 351.226(i) specify that "{i}n determining the value of … processing performed … under section 781(b)(2)(E) of the Act, the Secretary may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(e) of the Act—or, in the case of nonmarket economies, on the basis of section 773(c) of the Act." Thus, Commerce's regulations discuss valuing parts or components when determining the value of processing under section 781(b)(2)(E) of the Act.

Similarly, we do not find it appropriate to exclude the cost of processing materials from the value of third-country processing in this circumvention inquiry. Here, we are not facing the situation described in the SAA, where a few high value third-country components are being connected

---

[172] *See* SAA at 892-94.
[173] *Id.*
[174] *See Antidumping Duties; Countervailing Duties*, 62 FR at 27329.
[175] *Id.*
[176] *Id.*

35

together with components from the order country into a finished product.  Auxin itself claimed that "{t}he total cost components from China represent a significant portion of the total value of the merchandise ultimately exported to the United States."[177]  Moreover, the process of completing some of the Chinese components in the third country involves more than simply attaching Chinese and third-country components together.  Some third-country materials are applied to, or infused into, the Chinese components to modify their properties (*e.g.*, phosphorus is diffused into wafers to effect a molecular-level impregnation that changes the electrical properties of the wafer).[178]  As a result, the processing involves more than just the activities performed on the components; it includes third-county materials interacting with the Chinese components to change the properties of the component.  It is not clear, in this case, that all third-country materials should be excluded from the value of third-country processing, even the materials that form the nature of the processing.

Moreover, we do not find it reasonable to apply Auxin's interpretation of the SAA in this case, given the cost structure of solar cells and solar modules.  Record evidence indicates that non-material costs account for significantly less than half the price for solar modules.  The ITC noted that "{r}aw material costs for the production of solar modules (much of which are the cost of the cells) accounted for 81.5 percent of U.S. producers' total cost of goods sold."[179]  The *Bloomberg Report* (2021), indicates that material inputs account for 67 percent of the cost of converting a solar cell into a solar module while other processing costs account for 13 percent and labor and electricity costs accounted for 20 percent of total costs.[180]  Given that the total non-material costs incurred to produce solar cells and solar modules, even in China, are limited, we do not find that Auxin's proposal to only consider non-material costs when calculating the value of third-country processing would provide a meaningful measure of the significance of the assembly or completion in the third-country.  Therefore, in order to calculate a meaningful measure of third-country processing of solar cells and solar modules under section 781(b)(2)(E) of the Act, and for the other reasons explained above, we have continued to include material costs in the value of processing performed in the foreign country for purposes of section 781(b)(2)(E) of the Act.

**Comment 7.   Whether Commerce Should Rely on Surrogates to Value Chinese Inputs Consumed in the Inquiry Country**

*CSIL*[181]
- Commerce should not value any inputs that were used to assemble modules in Thailand using surrogate values (which are used for NME countries) because Thailand is a market economy country.[182]  Where the producer purchased the input from a Thai supplier in Thailand and paid for the input in a market economy currency, the fact that the input was produced in China is irrelevant since the purchase occurred in a market economy.
- If Commerce continues to use surrogate values it should:  (1) apply the same surrogate value to the same type of input in each of the circumvention inquiries; and (2) value the

---

[177] *See* Circumvention Request at 78.
[178] *Id.* at 20.
[179] *See USITC Solar Investigation Final* at V-1.
[180] *See Bloomberg Report* at PDF page 18 and Figure 12 and PDF page 22 and Figure 18.
[181] *See* CSIL's April 26, 2023 Case Brief at 26-27.
[182] *Id.* at 26 (citing section 771(18) of the Act).

input using its purchase price, not a surrogate value, where a significant quantity of the input was not of Chinese origin.[183]

*Auxin*[184]

- Commerce should value the Chinese inputs that were used to assemble modules in Thailand based on surrogate values because assembly in a market-economy country does not undermine Commerce's authority to use surrogates to value inputs that were produced in an NME country (in this case China)[185] and the *Orders* under consideration are on an NME country.[186]

- Instead of applying the same surrogate value to the same type of input in each of the circumvention inquiries, Commerce should follow its practice and select surrogate values in each circumvention inquiry based on, among other factors, the quality, specificity, and contemporaneity of the available surrogate value data.[187]

- CSIL's suggestion to use purchase prices to value certain inputs where some of the input came from outside of China should be rejected because it is inconsistent with Commerce's NME methodology and a misapplication of 19 CFR 351.408(c)(1), which pertains to purchases of inputs from market economy countries, not the composition of those inputs.

**Commerce's Position:**  We continue to find that it is appropriate to value Chinese-produced inputs that were used to produce solar cells and modules in the inquiry country based on surrogate values.  When determining whether circumvention occurred, section 781(b)(1)(D) of the Act instructs Commerce to determine whether "the value of the merchandise produced in the foreign country to which the antidumping duty order applies is a significant portion of the value of the merchandise that was exported to the United States."  Neither the Act nor Commerce's regulations describe how it is to determine "value."  In this case we have interpreted "value" to mean the cost of the input.  While we are not determining the cost of production or constructed value here, we find section 773(f)(1) of the Act instructive in considering the issue before us.  When calculating cost of production and constructed value, section 773(f)(1) notes that:

> {c}osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and reasonably reflect the costs associated with the production and sale of the merchandise.

Use of the word "normally" indicates that there may be circumstances where it is inappropriate to use the respondent's records to determine costs.  In such cases, Commerce has the discretion to determine costs by some other reasonable means.

---

[183] *Id.* at 27 (citing 19 CFR 351.408(c)(1)).
[184] *See* Auxin's May 9, 2023 Rebuttal Brief at 75-77.
[185] *Id.* (citing *U.K. Carbon and Graphite*, 931 F. Supp. 2d at 1322; *see also Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1377-78).
[186] *Id.* (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1376, 1377).
[187] Id. (citing *Off-the-Road Tires from China* IDM at Comment 9).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

Under the Act, the prices of goods produced in NME countries cannot generally be relied upon. The presence of government controls on various aspects of NMEs renders calculation of costs based on actual prices paid for NME inputs invalid under Commerce's normal methodologies. Because the respondent assembled solar modules in the inquiry country using inputs that were produced in China, and China is an NME country, we believe the prices paid by the respondent could be distorted by controls in the NME country.  Given these facts, we find it would be inappropriate to use the respondent's records to determine the cost of the Chinese-produced inputs.

In such situations, Commerce must determine costs by some other reasonable means. Commerce's longstanding practice is to use surrogates to value inputs in an NME country. While the inquiry country is not an NME country, this inquiry concerns *Orders* on an NME country, China, and the inputs in question were produced in China.  Thus, for the reasons noted above, and consistent with Commerce's practice of using surrogate values in circumvention inquiries involving NME countries,[188] we find it appropriate to use surrogates, rather than the respondent's purchase prices, to value Chinese-produced inputs that were used to produce solar cells and modules in the inquiry country.

We disagree with the respondent's position that purchase prices should be used to value the Chinese produced inputs because the inquiry country is a market economy country.  We find the current situation similar to the one described in Policy Bulletin 94.1, where Commerce noted that "{i}n view of the economic distortion created by state control in NMEs, and the absence of market directed decisions on price and output, it is unrealistic to expect the prices of NME produced goods sold to third {country} resellers to be unaffected by that distortion."[189] Moreover, the CIT "has sustained Commerce's use of surrogate values in previous circumvention inquiries involving merchandise assembled in {a market economy} country, because the decision to do so reflects Commerce's reasonable construction of the statute.[190]

We assigned the same surrogate value to the same type of input in each of the circumvention inquiries, as suggested by CSIL, only where the facts supported doing so.  Section 773(c)(1)(B) of the Act instructs Commerce to "use the best available information" on the record when selecting surrogate values.  It is Commerce's practice to select surrogate values from a single market economy country that represent broad market average prices that are specific to the input being valued, net of taxes and import duties, contemporaneous with the period under consideration, publicly-available, and not aberrational.[191] Commerce must weigh the available surrogate value information on the record with respect to each input and make a product-specific and case-specific decision as to what the "best" available surrogate value is for each input.[192]  We followed Commerce's methodology for selecting surrogate values in NME cases by using the best available information on the record of each circumvention inquiry to value the Chinese inputs used by the respondent(s) in that inquiry, rather than follow the rule proposed by CSIL.

---

[188] *See, e.g.*, *SDGE from China (UK)* IDM at Comment 2; *see also CORE from China (UAE)* IDM at Comment 2; *CORE from China (Vietnam)*; and *Hangers from China (Vietnam)*.
[189] *See* Policy Bulletin 94.1.
[190] *See Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1378 (citing *U.K. Carbon and Graphite*, 931 F. Supp. 2d at 1336).
[191] *See CVP 23 from China,* and accompanying IDM at Comment 4; *see also* 19 CFR 351.408(c)(2).
[192] *See, e.g.*, *Preserved Mushrooms from China* IDM at Comment 1.

38

While CSIL argued that Commerce should value an input using its market economy purchase price, not a surrogate value, where a significant quantity of the input was not of Chinese origin, 19 CFR 351.408(c)(1) establishes that Commerce will use a surrogate value unless "substantially all" of the input has been purchased from a market economy supplier, and provides that "substantially all" means that 85 percent or more of the total quantity of the input purchased must have been purchased from market economy suppliers.  While the inquiry country is not an NME country, this inquiry concerns *Orders* on an NME country, China; thus, we followed our NME methodology of using the market economy purchase price when 85 percent or more of the total quantity of the input was purchased from market economy suppliers.  Moreover, where a respondent purchased an input from China and one or more market economy countries, we accounted for the market prices paid for the input under section 781(b)(2)(E) of the Act, and only used surrogate values to value the Chinese portion of the input for purposes of section 781(b)(1)(D) of the Act.

**Country-Specific Issues**

**Comment 8.   Whether Third Country Processing was Minor-General**

**The Level of Investment in Thailand**

*Auxin*[193]
- The record contains information demonstrating that Chinese polysilicon producers' average absolute investment is $1,479,630,963,[194] or $0.07/watt, representing 31 percent of the total investment in solar facilities.[195]  Chinese ingot producers' average absolute investment is $694,448,090,[196] or $0.05/watt, and 15 percent of the total investment in solar facilities.[197]  Chinese wafer producers' average absolute investment is $1,198,355,500,[198] or $0.06/watt, representing 25 percent of the total investment in solar facilities.[199]  Chinese cell producers' average absolute investment is $ 776,898,051,[200] or $0.09/watt, representing 16 percent of the total investment in solar facilities.[201]  Chinese module producers' average absolute investment is $566,410,256,[202] or $0.07/watt, representing 12 percent of the total investment in solar facilities.[203]  This overall average Chinese investment in all five stages of solar module production of $4.7bn dwarfs THSM and TTL's investment in its Thai solar cell and module production facilities.[204]

---

[193] *See* Auxin's Tranche 1 Rebuttal Brief at 28-31; Auxin's April 26, 2023 Case Brief at 30-47; and Auxin's April 26, 2023 Case Brief at 12, 41.

[194] *See* Auxin's April 26, 2023 Case Brief at 31 (citing Auxin's July 29, 2022 Comments at the Investment & R&D Excel Attachment, "Poly" tab).

[195] *Id.* (citing Auxin's July 29, 2022 Comments at the Investment & R&D Excel Attachment, "Poly" tab).

[196] *Id.* (citing Auxin's July 29, 2022 Comments at the Investment & R&D Excel Attachment, "Ingots" tab).

[197] *Id*.

[198] *Id.* (citing Auxin's July 29, 2022 Comments at the Investment & R&D Excel Attachment, "Wafers" tab).

[199] *Id*.

[200] *Id.* (citing Auxin's July 29, 2022 Comments at the Investment & R&D Excel Attachment, "Cells" tab).

[201] *Id.*

[202] *Id.* (citing Auxin's July 29, 2022 Comments at the Investment & R&D Excel Attachment, "Modules" tab).

[203] *Id.*

[204] *See* Auxin's April 26, 2023 Case Brief at 39 (citing Boviet Preliminary Analysis Memorandum at 2).

- Auxin's estimate of the average absolute investment for the fully integrated solar production process in China is consistent with the announcement by the China-based East Hope Group of its establishment of a fully integrated (*i.e.*, polysilicon production through module assembly) base in the Inner Mongolia Region of China for $4.6 billion.[205]

- In the *Preliminary Determination*, Commerce compared THSM and TTL's investments in their respective Thai solar cell and module facilities to their Chinese affiliates' ingot and/or wafer facilities.[206] This approach failed to follow its longstanding practice of comparing third country assembly operations to production of subject merchandise in the country subject to the order as a way to evaluate the relative significance of the third country assembly operation.[207] Based on the Chinese investment placed on the record cited above, THSM and TTL's investments in the solar cell and module factories are a small fraction of the overall Chinese investments.

- Commerce only compared the Thai investment to one of THSM or TTL's affiliate's solar wafer and/or one ingot producers, rather than to THSM and TTL's affiliate's ingot or wafer through solar module producers. If Commerce had conducted its comparison based on the full production performed by THSM and TTL's affiliates, the result would indicate the overall investments in the Thai facilities are less than that in China.[208] Such a comparison is conservative because it ignores the necessary investment in polysilicon production. Thus, THSM and TTL's investments in cell fabrication and module assembly in Thailand are minor or insignificant under both a merchandise-centric and affiliate-centric analysis.

- Record information indicates that TTL's Chinese affiliates have recently realized ingot[209] and polysilicon production.[210] Thus, Commerce should have compared the investment in TTL's Thai facilities to that in its affiliates' polysilicon through solar module production.

*CSIL*[211] and *NextEra*[212]

- Based on CSIL's submissions,[213] Commerce correctly found and verified[214] that the level of investment for THSM was not minor or insignificant. Commerce cannot find that solar cell production is a major, capital-intensive process, while at the same time determine that some producers have an insignificant level of investment for cell and module production or that the manufacturing facilities in the targeted countries are "minor and insignificant."

---

[205] *Id.* at 33 (citing Auxin's July 29, 2022 Comments at Exhibit PI-6).

[206] *See* Auxin's April 26, 2023 Case Brief at 34 (citing CSIL Preliminary Analysis Memorandum at 2; and TTL Preliminary Analysis Memorandum at 2).

[207] *Id.* at 34 (citing *Al Ghurair CIT 2021*, 536 F. Supp. 3d at 1362 ("Commerce determined that the initial investment of approximately $272 million for facilities in the UAE was minor compared to the average investment of $3.6 billion for construction of integrated steel mills in China.")

[208] *Id.* Case Brief at 34 (citing CSIL Preliminary Analysis Memorandum at Excel Attachment II (Investment); and TTL Preliminary Analysis Memorandum at Excel Attachment II (Investment).

[209] *Id.* 3 (citing TTL's IQR Part I at 1).

[210] *Id.* (citing TTL's IQR Part I at Exhibit 9 (PDF pages 269, 319-20, and 345)).

[211] *See* CSIL's May 9, 2023 Rebuttal Brief at 39-40.

[212] *See* Next Era's May 9, 2023 Rebuttal Brief at 31-33.

[213] *See* CSIL's May 9, 2023 Rebuttal Brief at 40 (citing CSIL's IQR, Part I at Exhibit 15; *see also* CSIL's SQR1 at Exhibit S1-2).

[214] *Id.* (citing CSIL's Verification Exhibits at Exhibit VE-8).

40

- Auxin's reference to "Chinese companies, with the support of the Government of China"[215] in discussing investments is inapposite because CSIL and THSM's ultimate parent, Canadian Solar Inc., is a globally integrated solar company legally domiciled and incorporated in Canada.
- Auxin argues that based on its calculations any investment less than $4.7 billion amounts to circumvention.[216] Auxin's figures are, again, unverified estimates. Even if they were accurate, they would be inappropriate because they purport to represent the entirety of the production process, from the mining of silicon to solar module assembly.

*TTL*[217] and *NextEra*[218]

- Commerce correctly found that the level of investment for TTL was not minor or insignificant.
- Commerce's practice is to compare the investments in third country downstream operations to the upstream operations in the country of the AD/CVD order to determine whether third country assembly operations are "minor or insignificant.[219] Thus, a comparison of investments in downstream cell and module production in China, which Auxin argues to do, are both an irrelevant and inaccurate consideration for determining whether TTL's same downstream cell and module investments in Thailand are minor or insignificant.
- TTL's Chinese affiliate's investments in ingot and polysilicon facilities in China were not operational during 2021 and the Trina Group is only a minority shareholder in these ventures.[220] Further, Auxin itself admits that both facilities take years to construct.[221]
- While the investment estimates in future polysilicon and ingot joint venture operations are not a relevant comparison to TTL's inquiry period cell and module production, if Commerce is to use these estimates for a comparison, Commerce must use a per megawatt comparison due to the significant scale of Trina's domestic market that these future investments are servicing and the distinct nature of each of these production stages.
- When comparing the investment per megawatt for the different stages for investments made within the similar time periods, the cell stage shows higher investment per watt than the polysilicon, ingot, and wafer stages.[222]
- TTL's wafer consumption in 2021 included substantial amounts of non-Chinese wafers and the share of non-Chinese wafers increased substantially in 2022.[223]

**Commerce's Position:** We disagree with Auxin. With regard to arguments concerning Commerce's comparison methodology, as stated in Comment 4, we have continued to compare the investment in the inquiry countries to that of the cell/module producers' affiliates in China,

---

[215] *Id.* at 39 (citing Auxin's April 26, 2023 Case Brief at 34).
[216] *Id.* (citing Auxin's April 26, 2023 Case Brief at 34).
[217] *See* TTL's May 9, 2023 Rebuttal Brief at 18-25.
[218] *See* Next Era's May 9, 2023 Rebuttal Brief at 31-33.
[219] *See* TTL's May 9, 2023 Rebuttal Brief at 20 (citing, *e.g.*, *CORE from China (UAE)* IDM at Comment 1; *see also SSSS from China (Vietnam) Preliminary* PDM at 18-19 (where Commerce compared the R&D activities of the upstream hot-rolling of stainless steel in China to the R&D activities of the further processor in the third country).
[220] *Id.* at 23 (citing TTL's Verification Report at Exhibit V-5).
[221] *Id.* (citing Auxin's April 26, 2023 Case Brief at 61).
[222] *Id.* at 24 (citing TTL's 4th SQR at 3 and Exhibit 5).
[223] *See* TTL's May 9, 2023 Rebuttal Brief at 25 (citing TTL's IQR Part 2 at 35-36).

41

and so we have not considered Auxin's investment figures concerning companies unaffiliated with CSIL and TTL.  Additionally, as stated in Comment 3, we have not compared investment on a per-unit basis.  We further disagree with Auxin that we should compare the investment in the inquiry country to the investments in multiple factories producing the same output.  Doing so would prevent us from determining whether the investment in the inquiry country to produce a solar cell or module represents a minor or insignificant share of the overall investment undertaken in China to produce a solar cell or module, because it would overstate the investment in China required to do so.

With regard to Auxin's argument that we should compare the investment in the inquiry countries to the investment in the full production in China, rather than to only the stages of production not done in the inquiry countries, regardless of the approach, the result would be the same.  As we noted in the *Preliminary Determination*, a simple comparison of the investment in the THSM and TTL facilities to that of the factories performing the stages of production only done by their affiliates in China, demonstrates that both respondents' investments in Thailand are not minor or insignificant.[224]  However, even if we compared the investment by CSIL and TTL's Chinese affiliates' in all stages of solar production in China to the investment by THSM and TTL in Thailand, the investments in the THSM and TTL facilities represent a significant share of the investments by their affiliates in China.[225]

With regard to Auxin's argument that we should have compared TTL's investment to the investments in the Trina Group's investments in polysilicon and ingot production in China, there is no evidence on the record that investments by TTL's Chinese affiliates in ingot and polysilicon production have resulted in any production or even that they have broken ground in the planned facilities.[226]  Thus, we have not compared TTL's investments in Thailand to these unrealized investments by its affiliates.

**The Level of R&D in Thailand**

*CSIL*[227]
- Commerce's comparison of THSM's R&D expenses in Thailand to those of its affiliated Chinese ingot and wafer producers is flawed for three reasons.
- First, Commerce did not consider the important nature of THSM's R&D activities in Thailand which involve developing new technologies to optimize its production and improve product quality.[228]
- Second, Commerce did not consider that the number of THSM employees conducting R&D is a significant proportion of the total Canadian Solar workforce involved in R&D.
- Third, Commerce inappropriately compared total R&D expenses incurred by companies of radically different sizes which distorted its analysis.

---

[224] *See* the CSIL and TTL Preliminary Analysis Memoranda.
[225] *See* the CSIL and TTL Final Analysis Memoranda.
[226] *See* TTL's Verification Report at Exhibit V-5; *see also* Auxin's April 26, 2023 Case Brief at 61, noting the lengthy time required to realize polysilicon production.
[227] *See* CSIL's April 26, 2023 Case Brief at 16-21
[228] *Id.* at 19 (citing CSIL'S IQR Part I at 7-8).

42

*Auxin*[229]

- While Commerce correctly found that CSIL's R&D expenses were minor or insignificant, it used an incorrect comparison to reach that conclusion.
- Instead of comparing THSM's R&D expenses in Thailand to those of its affiliated Chinese ingot and wafer producers (an affiliate-centric approach),[230] Commerce should have compared THSM's R&D expenses in Thailand to those of companies engaged in the stages required to produce the merchandise under consideration in the order country, China (a merchandise-centric approach). R&D expenses for every stage of solar cell and solar module production in China are substantial and confirm Commerce's conclusion.[231]
- Alternatively, Commerce should have compared THSM's R&D expenses in Thailand to those of all its affiliated Chinese solar producers, rather than comparing the Thai R&D expenses to the R&D expenses of only CSIL's affiliated Chinese ingot and wafer producers.
- In either case, THSM's R&D expenses for cell fabrication and module assembly in Thailand are minor or insignificant under both a merchandise-centric and an affiliate-centric analysis.

**Commerce's Position:** We disagree with Auxin, in part, and CSIL.[232] First, for the reasons explained in Comment 4, in this particular inquiry, we do not find it appropriate to compare CSIL's R&D expenses incurred in Thailand to those of unaffiliated Chinese producers engaged in the various stages required to produce the merchandise under consideration (a merchandise-centric approach). Hence, we do not find Auxin's comparisons of CSIL's Thai R&D expenses to those of unaffiliated Chinese producers engaged in various stages of solar related production to be persuasive.

Auxin contends that the R&D expenses of all CSIL's affiliated solar producers in China should have been considered in the affiliate-centric R&D expense comparison. In contrast, we compared the level of R&D expenses incurred in Thailand only to the R&D expenses incurred by CSIL's Chinese affiliates that performed the initial production steps related to the products assembled or completed in Thailand. Using that comparison, we believe we properly focused on the significance of the Thai R&D expenses in relation to all the R&D expenses incurred by entities engaged in manufacturing the product imported into the United States.

However, because R&D may be shared among affiliates such that the R&D of one company can benefit another affiliated company and save that company from needing to conduct its own R&D, we also compared the level of R&D expenses incurred in Thailand to the R&D expenses incurred by CSIL's other Chinese affiliates that were not directly involved in the production of the product imported into the United States. This comparison continues to show that THSM's

---

[229] *See* Auxin's April 26, 2023 Case Brief at 40-43; *see also* Auxin's May 9, 2023 Rebuttal Brief at 22-26.

[230] *See* CSIL Preliminary Analysis Memorandum.

[231] *See* Auxin's April 26, 2023 Case Brief at 40 (citing Auxin's July 29, 2022 Comments at Exhibits RD-1, RD-2, and RD-4 and the Excel Attachment at "R&D").

[232] Except for its comments regarding verification (*see* TTL's April 26, 2023 Case Brief at 10-12), TTL did not dispute Commerce's preliminary determination that the level of its R&D in Thailand was minor and insignificant relative to that of its affiliates in China.

43

R&D expenses are not comparable to those of its affiliates in China and supports our preliminary decision.[233]

While Auxin believes that Commerce erred by not considering the important nature of THSM's R&D activities in Thailand and the number of employees engaged in those R&D activities, section 781(b)(2)(B) of the Act instructs Commerce to consider the "level of research and development in the {inquiry country}."  We believe that an important gauge of the level of R&D is the amount spent on R&D.  Based on the difference in R&D expenses that we observed in our comparison, we do not find that the nature of the Thai R&D activities or the number of employees engaged in those R&D activities outweigh the difference that we observed such that Commerce should reverse its decision.[234]  Moreover, while CSIL claimed that THSM's Thai R&D activities were important in nature, Commerce normally compares the level of R&D in the inquiry country to that in the order country.  CSIL never compared the level of importance of the Thai R&D activities to the level of importance of the R&D activities of its affiliates in China to support it position.

Lastly, we disagree with CSIL's claim that our R&D expense analysis is distorted because we compared aggregate, rather than per-unit, R&D expenses of two companies "without regard to production scale and capacity …"[235]  R&D expenses are expenditures that generally relate to a company's efforts to develop and improve products.  R&D expenses are typically considered to be fixed expenses which do not vary, at least in the short term, based on the level of production. Therefore, larger production volumes and capacity do not necessarily translate into more R&D expenses.  Hence, it is not clear that comparing R&D expenses of companies with different production capacities necessarily distorts the comparison.

Furthermore, the R&D of one company is not necessarily compartmentalized when it comes to its affiliates.  Affiliated companies may share R&D.  Therefore, calculating per-unit R&D expenses for each affiliated company based on that company's production volume or capacity, as CSIL suggests, may not be meaningful when one company's R&D may benefit the production of not only that company but other affiliated companies.  We believe the more meaningful metric in this situation is the total R&D expense incurred by the company.  This figure represents the total level of R&D that the company has contributed compared to the total level of R&D that other companies in its group of affiliates has contributed.  We find this is a better gauge of the level of R&D provided in Thailand and in China by CSIL affiliated companies.

**Nature of Production**

*Auxin*[236]

- Commerce's incorrectly determined, based on the nature of third-country processing, that the processing is not minor or insignificant[237]  In making that decision, Commerce failed to properly weigh:  (1) capital requirements; (2) costs associated with building; (3) the

---

[233] *See* CSIL Preliminary Analysis Memorandum.
[234] *Id*.
[235] *See* CSIL's May 9, 2023 Rebuttal Brief at 37; *see also* CSIL's April 26, 2023 Case Brief at 20.
[236] *See* Auxin's April 26, 2023 Case Brief at 53, 57-71.
[237] *See* Auxin's April 26, 2023 Case Brief (citing *Thailand* PDM at 20).

44

time required to build, the manufacturing facility; (4) technical hurdles associated with starting up operations; (5) energy to require to produce the product; (6) labor demands; (7) number of stages of production; and (8) number of inputs used to produce the product.[238]  Each of these items are addressed below.

- Commerce based its finding that solar cell production is the most capital intensive part of the manufacturing process on outdated data from 2009 to 2012.[239]  Recent data from IEA's 2021 report, show that "polysilicon and ingots/wafers together account for almost 70% of all investment in solar PV manufacturing due to their high capital requirements"[240] and "polysilicon plants and ingot and wafer factories are significantly more CAPEX-heavy than cell- and module-manufacturing facilities."[241]

- The IEA reported that "… polysilicon and ingots/wafers together account for almost 70% of all investment in solar PV manufacturing …" while cells and modules have low minimum investment requirements.[242]

- The BloombergNEF Report indicated that polysilicon and wafer facilities "take the longest to construct"[243] (12-40 months for polysilicon plants but only 3-12 months for cell and module facilities according to IEA; 3-4 years for polysilicon plants but only 1-3 years for ingot, wafer, solar cell and module facilities according to DOE).[244]

- The BloombergNEF Report concluded that "{t}echnical hurdles are highest for plants that make polysilicon and wafers;"[245] thus, "{g}iven low technical and financial barriers, it is also easier for module companies to open shop in other countries in response to tariffs or other policy developments."[246]  The DOE noted that "the module production process … does not require the same level of technical skill …"[247]

- According to the IEA, "{p}olysilicon production accounts for 40% of all energy consumed to manufacture solar PV modules, the largest {energy consumption} of all supply chain segments" followed by ingot and wafer production."[248]  Less than one-third of energy consumption is for the production of solar cells and solar modules.

---

[238] *See* Auxin's April 26, 2023 Case Brief (citing *Preliminary Determination* PDM at 17-20).

[239] *See* Auxin's April 26, 2023 Case Brief (citing *Preliminary Determination* PDM at 20).

[240] *See* Auxin's April 26, 2023 Case Brief (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 47)).

[241] *See* Auxin's April 26, 2023 Case Brief (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 85)).

[242] *See* Auxin's April 26, 2023 Case Brief (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 47 and 86)).

[243] *See* Auxin's April 26, 2023 Case Brief (citing Circumvention Request at Exhibit 4 (citing *Bloomberg Report* at 1)).

[244] *See* Auxin's April 26, 2023 Case Brief (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 65; Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 12)).

[245] *See* Auxin's April 26, 2023 Case Brief (citing Circumvention Request at Exhibit 4 (citing *Bloomberg Report* at 1)).

[246] *See* Auxin's April 26, 2023 Case Brief (citing Circumvention Request at Exhibit 4 (citing *Bloomberg Report* at 3.4)).

[247] *See* Auxin's April 26, 2023 Case Brief (citing Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 45)).

[248] *See* Auxin's April 26, 2023 Case Brief (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 36-37)).

- The DOE found ingot and wafer production to be the most labor-intensive stages of solar cell production.  Although there are lower labor requirements for polysilicon production, it "requires highly skilled labor to operate a plant."[249]
- Based on information from the ITC and the DOE, there are 21-24 discrete steps to produce polysilicon, ingots, and wafers (seven steps to produce polysilicon and 14 to 17 steps to produce wafers depending on the type of wafer produced) but only 17-19 steps to produce solar cells and modules.
- Although more inputs are used to produce solar cells and modules than polysilicon, ingots, and wafers, the greater time and costs to start up, the significant energy required to run, and the higher technical hurdles associated with, polysilicon, ingot, and wafer facilities compared to solar cells and module facilities, and the fact that most inputs used to the produce solar cells and modules in the inquiry country are sourced from China, support finding solar cell and module production in the inquiry country to be minor or insignificant.

*NextEra*[250]

- Record evidence indicates that the nature of production in the inquiry country is not minor, but is a multi-step process that involves sophisticated machinery and is labor intensive compared to the production of polysilicon, ingots, and wafers in China.
- FTI Consulting, Inc. and the ITC described solar cell production as a multi-step process requiring uniquely designed and calibrated machines and a skilled force.[251]
- Auxin stated that "the production of cells and modules requires capital, technological sophistication, and R&D and Auxin does not dispute this unmarkable point."[252]
- Auxin certified before the ITC that "{m}anufacturing CSPV products is capital intensive and technologically sophisticated"[253] and that "CSPV manufacturers also must invest in cutting edge equipment and continued R&D."[254]  In contrast, record evidence shows that the technology used to produce wafers has stayed the same since it was originally created.[255]
- The *IEA Report* indicates that producing solar cells and modules requires more sophisticated equipment and is more labor-intensive than producing polysilicon, ingots, and wafers.[256]

---

[249] *See* Auxin's April 26, 2023 Case Brief (citing Auxin's May 16, 2022 Comments at Exhibit 5 (citing *DOE Solar Deep Dive* at 25)).

[250] *See* NextEra's May 9, 2023 Rebuttal Brief at 20-29.

[251] *See* NextEra's May 9, 2023 Rebuttal Brief (citing NextEra's May 2, 2022 Submission at Attachment 3 (citing *FTI Report* at 11) and Attachment 37-A (citing *ITC Solar Safeguard Proceeding 2017* at I-22 – I-23).

[252] *See* NextEra's May 9, 2023 Rebuttal Brief (citing Auxin March 7, 2022 Comments at 10).

[253] *See* NextEra's May 9, 2023 Rebuttal Brief (citing NextEra's May 2, 2022 Submission at Attachment 4 (citing *Auxin's ITC Posthearing Brief* at II-24)).

[254] *See* NextEra's May 9, 2023 Rebuttal Brief (citing NextEra's May 2, 2022 Submission at Attachment 19 (citing *Auxin's ITC Prehearing Brief* at 20)).

[255] *See* NextEra's May 9, 2023 Rebuttal Brief (citing NextEra's May 2, 2022 Submission at Attachment 3 (citing *FTI Report* at 11) and Attachment 19 (citing *Auxin's ITC Prehearing Brief* at 20)).

[256] *See* NextEra's May 9, 2023 Rebuttal Brief (citing Auxin's July 29, 2022 Comments at Exhibit 1 (citing *IEA Report* at 35-36, 45)).

- The CEA report indicates that cell production is the most capital-intensive part of the production process and requires the highest capital expenditure of any of the CSPV production stages.[257]
- Processing in the inquiry country creates the p/n junction which forms the solar cell and it is "where the essence of a solar module is realized."[258]  As the petitioner in the underlying investigation noted, a wafer's " … only notable characteristics are its crystal structure and positive potential orientation."[259]  Thus, transformation of the wafer into a solar cell and module is clearly "significant."
- According to the *FTI Report*, *Denis De Ceuster Report*, *Auxin's ITC Posthearing Brief,* and *Auxin's ITC Prehearing Brief*, producing wafers from polysilicon is less extensive than producing solar modules from wafers.[260]  Auxin failed to address record information about the transformative nature of production in the inquiry country, ignored information regarding the production equipment used, and relied on irrelevant facts regarding energy consumption and lead times in its analysis.
- Although Auxin claimed that the ITC's findings on which Commerce relied are outdated, the ITC has reaffirmed its earlier findings that "CSPV cell production is capital intensive and requires a skilled workforce."[261]
- In sum, solar cell and solar module production in the inquiry country requires substantial initial and ongoing investments, extensive production facilities, sophisticated and highly technical equipment, and skilled laborers with specialized training.

*TTL*[262]

- Commerce should reject Auxin's eight-part framework for evaluating the nature of production, which overlaps with other circumvention criterion, (*e.g.*, level of investment and extent of production facilities) and has no bearing on a nature of production analysis, and continue to find that solar cell and solar module production in Thailand is not minor or insignificant.
- Commerce relied on detailed qualitative and quantitative information from reputable sources to evaluate the nature of production.  Auxin failed to explain how Commerce's analysis is deficient.
- The *IEA Report* indicates that "{t}he sophistication, precision and advanced automation entailed in manufacturing solar cells imply more expensive equipment" while " … polysilicon and ingot production processes use simpler, more conventional equipment …"[263]

---

[257] *See* NextEra's May 9, 2023 Rebuttal Brief (citing NextEra's May 2, 2022 Submission at Attachment 2 (citing *CEA Report* at 11-12)).
[258] *See* NextEra's May 9, 2023 Rebuttal Brief (citing *Preliminary Determination* PDM at 20).
[259] *See* NextEra's May 9, 2023 Rebuttal Brief (citing NextEra's May 2, 2022 Submission at Attachment 18).
[260] *See* NextEra's May 9, 2023 Rebuttal Brief (citing NextEra's May 2, 2022 Submission at Attachment 1 (*Denis De Ceuster Report* at 8), Attachment 3 (citing *FTI Report* at 12), Attachment 4 (citing *Auxin's ITC Posthearing Brief* at 20), and Attachment 19 (citing *Auxin's ITC Prehearing Brief* at 20)).
[261] *See* NextEra's May 9, 2023 Rebuttal Brief (citing NextEra's May 2, 2022 Submission at Attachment 37-C (citing *ITC Solar Safeguard Proceeding 2017* at I-22)).
[262] *See* TTL's May 9, 2023 Rebuttal Brief at 28-31.
[263] *Id.* at 30 (citing Auxin's July 29, 2021 Comments at Exhibit 1 (citing *IEA Report* at 35-36)).

47

- Solar cell and solar module production in the inquiry country cannot be minor or insignificant when the p/n junction, which imparts the essential character of solar cells, is formed in that production.
- Even if Commerce inappropriately includes polysilicon mining and refining in its nature of production analysis, as advocated by Auxin, it does not undermine Commerce's finding that solar cell and module production involves a greater number of stages, requires a high level of technological sophistication, is expensive, and requires high-technological machinery and workers with strong technological knowledge.
- Auxin ignored the ITC's extensive analysis on solar cell and module production and instead claimed that the ITC's report is outdated based on selected vague statements about general costs. Auxin's claim is not supported by a detailed quantitative and qualitative examination of the production process.

*CSIL*[264]

- Commerce correctly determined, based on the nature of the production process undertaken in Thailand, that the production is neither minor nor insignificant.
- Commerce has consistently determined that formation of the p/n junction, which occurred in Thailand, is a critical, transformative, complicated, and technical step that creates a solar cell and is the most significant aspect of overall production. Commerce, the ITC, and CBP have recognized that the p/n junction imparts the "essential" character of the solar cell.
- It would be nonsensical for Commerce to conclude that formation of the p/n junction results in "substantial transformation," which it has determined in the past,[265] but also determine that it is insignificant in its nature.
- The ITC reaffirmed its findings that "CSPV cell production is capital intensive and requires a skilled workforce."[266]
- Auxin's multi-factor nature of production analysis[267] is not grounded in the governing statute, Commerce's regulations, or Commerce's prior practice. In its analysis, Auxin illogically compares the number of steps required to produce polysilicon, ingots, and wafers to the number of steps required to produce solar cells and modules instead of examining the *nature* of these steps (*e.g.*, complexity and significance).
- Auxin's claim that the solar industry now prioritizes costs associated with polysilicon, ingots, and wafers, rather than the p/n junction, and that the ITC's findings regarding the solar industry are outdated, does not overcome record information demonstrating the significance of solar cell and module production.[268]
- Auxin failed to demonstrate that the nature of producing solar cells and modules is minor.

---

[264] *See* CSIL's May 9, 2023 Rebuttal Brief at 28-35.

[265] *Id.* at 29-30 (citing TTL's May 2, 2022 Comments at Attachment 8 (citing Solar Investigation Scope Clarification Memorandum at 9)).

[266] *Id.* at 34 (citing Circumvention Request at Exhibit 5 (citing *ITC Solar Safeguard Proceeding 2019* at I-47)).

[267] (1) capital intensity; (2) time to build the production facilities; (3) cost to build the facilities; (4) technical hurdles associated with startup; (5) energy required for production; (6) number of production stages; (7) labor demand; (8) significance of the p/n junction versus significance of solar-grade polysilicon; and (9) number of inputs used for production.

[268] *See* CSIL's May 9, 2023 Rebuttal Brief at 32-33 (citing CSIL's October 20, 2022 Pre-Preliminary Comments at 9).

**Commerce's Position:**  We continue to find that the nature of the production process in the inquiry country is not minor or insignificant.

As an initial matter, it is useful to repeat here our description of the production process from the *Preliminary Determination,* which is not specific to any one respondent but encompasses the essence of the manufacturing performed by all the respondents.  As described in the *Preliminary Determination*:

> According to the ITC, to produce ingots, polysilicon rocks are placed into a quartz crucible along with a small amount of boron, which is used to provide a positive electric orientation.  The crucible is then heated in a furnace to approximately 2,500 degrees Fahrenheit to produce monocrystalline silicon, currently the most common form of polysilicon used in producing solar cells.  Once the polysilicon is melted, a seed crystal is lowered into the material and rotated, with the crucible rotated in the opposite direction.  The melt starts to solidify on the seed and the seed is slowly raised out of the melt—creating a single long crystal.  The crystal is then cooled before it is moved onto the next step.  The process of growing the crystal takes approximately 2.5 days.[269]

> To produce wafers, the top and tail of the ingot are cut off and the remaining portion is cut into equal length pieces and then squared.  A wire saw is used to slice the ingots into wafers.  Typically, diamond wire saws are used for monocrystalline wafer slicing.  The wafers are then cleaned, dried, and inspected.[270]

> Solar cell production typically involves phosphorus being diffused into a thin layer on the wafer surface at high heat, which gives the surface of the wafer its negative potential electrical orientation.  The combination of that layer, and a boron-doped layer below, creates the positive-negative (p/n), junction.  A thin layer of silicon is removed from the edge of the solar cell to separate the positive and negative layers.  A silicon nitride antireflective coating is then added to the solar cell to increase the absorption of sunlight and metals are printed on the solar cell to collect electricity.  Aluminum and silver layers are applied, and then the solar cell is placed in a furnace, where the high temperature causes the silver paste to become imbedded in the surface of the silicon layer, forming a reliable electrical contact.  The final step in the process is testing and sorting the solar cells based on their characteristics and efficiency.[271]

> To assemble solar cells into solar modules, a piece of glass is placed on the production line, and EVA or another encapsulant is placed on top of the glass.  Then a group of solar cells is placed in a line and soldered together, creating a string.  The strings are then placed on top of the encapsulant, and the string interconnections are soldered together.  After this, another layer of EVA and a

---

[269] *See Thailand* PDM at 17 (citing *ITC Solar Monitoring* at I-62).
[270] *Id.* at 17 (citing *ITC Solar Monitoring* at I-64).
[271] *Id.* at 17 (citing *ITC Solar Monitoring* at I-65 to I-66).

49

backsheet are added, and the product is laminated and cured.  Usually a frame is added, and a junction box is attached to the back of the module.[272]

As explained in Comment 4, we did not consider the production of polysilicon in our analysis because none of the respondents' affiliates in China produced polysilicon, and there is no substantial evidence on the record to support finding that the Chinese solar industry is vertically integrated from the production of polysilicon to the production of solar modules.

We examined the nature of the production process by comparing the production of solar cells and solar modules in the inquiry country to the production of ingots and/or wafers in China, depending on whether the respondents' affiliates in China produced ingots and/or wafers.

Because Auxin claims that Commerce failed to properly weigh certain factors in its analysis of the nature of third-country processing (*i.e.*, capital requirements, building costs and time, technical hurdles, energy consumed in production, labor demands, number of production stages, and number of inputs used) we have addressed each of Auxin's factors below.  While we have addressed each of the factors relied upon by Auxin, it is important to note that Commerce has not established these factors as criteria for analyzing the nature of the production process in the foreign country, but examines the nature of that production process on a case-by-case basis.

For the final determination, we have not considered capital expenditures/requirements or the cost associated with building production facilities in our analysis of the nature of production because we analyzed the level of investment in the production facilities under section 781(b)(2)(A) of the Act.  Thus, Auxin's comments regarding capital requirements and the cost to build manufacturing facilities are moot.

With respect to the time required to construct each type of production facility, according to the *DOE Solar Deep Dive*, ingot and wafer facilities, solar cell facilities, and solar module facilities require one to three years to build.[273]  Thus, this factor does not indicate that the nature of solar cell and solar module production in the inquiry country differs from the production of ingots and wafers in China.

With respect to technical hurdles, the *Bloomberg Report* notes that wafer factories "bear many technical hurdles, which makes it difficult for new factories to be built outside of China,"[274] whereas "{c}ell manufacturing … compared to wafers and polysilicon … has lower technical hurdles"[275]  and "{b}uilding a new module factory has low technical hurdles compared with wafer and polysilicon."[276] Nonetheless, record evidence indicates that there are significant technical requirements that must be met for, and changing technologies with respect to, producing solar cells.

---

[272] *Id.* at 17 (citing *ITC Solar Monitoring* at I-67).
[273] *See DOE Solar Deep Dive* at 12.
[274] *See Bloomberg Report* at 3.2.
[275] *Id.* at 3.3.
[276] *Id.* at 3.4.

50

According to the *FTI report*, "the equipment and technology, as well as the number of processing steps required to produce a {solar} cell are far more technically sophisticated than those of the polysilicon or wafer manufacturing operations. … Cell manufacturing alone requires a fully integrated, multi-step manufacturing line with equipment to perform {multiple} processes … . Each of these processes requires one or more uniquely designed and calibrated machines to advance the wafer from a commodity product to a finished cell …"[277]

Moreover, while the technology required to produce ingots has not significantly changed since it was created,[278] the same is not true for solar cells. "Technology improvements in the wafer-to-cell process are responsible for most of the performance improvements of solar panels."[279] Because of technological improvements to solar cells, module makers must regularly upgrade their production lines to avoid becoming obsolete.[280] Hence, there are also meaningful technological requirements that must be met before producing solar cells.

Regarding energy, according to the *IEA Report* ingot and wafer production consumes higher amounts of energy when compared to the solar cell and solar module production, which "require less heat and lower temperatures for drying and cooling, and most of the electricity is used for automated mechanical work."[281] However, it is not clear that energy consumption is necessarily informative when examining whether the nature of the production process is minor or insignificant. Energy consumption may have more to do with the type of processing required than the scale or extent of the processing. Therefore, the record does not support a finding that the lower energy consumption required to produce solar cells and modules contributes in a meaningful way to our evaluation of the nature of the production process.

With respect to labor, according to the *DOE Solar Report* 0.40 - 0.80 direct employees are required per MW of ingot and wafer production, while 0.15-0.45 and 0.50-0.70 direct employees are required per MW of solar cell and solar module production, respectively.[282] This means that a one GW ingot and wafer production facility requires 400-800 direct manufacturing workers, while one GW solar cell and solar module production facilities require 150-450 direct manufacturing workers and 500-700 direct manufacturing workers, respectively.[283] Based on this information, the labor requirements for a solar cell and solar module facility are greater than the labor requirements for an ingot and wafer production facility.

With respect to the skill level, the ITC reported that processing wafers into solar cells involves sophisticated machinery, which requires "skilled technicians and employees with advanced degrees."[284] There is no information on the record that indicates that the production of ingots and wafers require skilled workers.

---

[277] *See FTI Report* at 11.
[278] *See Denis De Ceuster Report* at 9.
[279] *Id.* at 1.
[280] *See Bloomberg Report* at 3.4.
[281] *See IEA Report* at 37.
[282] *See DOE Solar Report* at 11.
[283] *Id.* at 11.
[284] *See ITC Solar Final* at I-18; *see also ITC Solar Safeguard Proceeding 2017* at I-22 to I-23.

51

According to the *DOE Solar Deep Dive,* producing ingots and wafers requires 14 or 17 steps (depending on the type of wafer produced, *i.e.*, monocrystalline or multicrystalline), producing solar cells requires seven or 11 steps (depending on whether a full-area AI-BSF cell or full-area PERC cell is being produced), and producing solar modules requires nine steps.[285]  Thus, it requires fewer steps to produce ingots and wafers in China, than to produce solar cells and solar modules in the inquiry country.

More significant, however, is the nature of the production performed in each production step. The *IEA Report* specifies that while each segment of the manufacturing processes require various types of special equipment, solar cell production requires sophisticated, precise and advanced automation equipment, and solar module production requires "highly automated machinery and accurate quality-testing equipment at multiple stages."[286]  Meanwhile, the *IEA Report* indicates that ingot production uses "simpler, more conventional equipment…"[287]  Therefore, producing solar cells and solar modules in the inquiry country involves a multi-step production process that requires more precise and sophisticated equipment at multiple stages compared to producing ingots and wafers in China.

Regarding inputs, solar cell and solar module production requires approximately 100 different inputs, whereas converting polysilicon into wafers only involves a handful of inputs.[288]

More importantly, producing wafers from polysilicon in China is less extensive of a transformation of the input than producing solar cells and solar modules from wafers in the inquiry country.  The essence of the solar module is realized in solar cell production.  In the *Preliminary Determination,* we noted that:

> once a wafer is doped and an opposite electrical orientation is imparted on the surface, it results in the creation of a p/n junction.  When sunlight strikes the cell, the positive and negative charge carriers are released, causing electrical current to flow.  It is at this point that the cell is capable of generating electricity from sunlight.[289]

> Therefore, Commerce has determined that it is only when the p/n junction is created that a wafer is no longer just a wafer, but is a solar cell that is subject to *the Orders*.[290]

In sum, the production of solar cells and solar modules in the inquiry countries has greater labor demands, more steps, and requires more inputs than ingot and wafer production in China. Moreover, the multi-step solar cell and solar module production process requires sophisticated, precise, and technologically advanced equipment, and a skilled workforce.  Production of solar cells and wafers involves more than attaching Chinese components together.  Solar cell and solar

---

[285] *See DOE Solar Deep Dive* at 30-31, 35-36, and 44.
[286] *See IEA Report* at 35.
[287] *Id.* at 3.
[288] *See Thailand* PDM at 19.
[289] *Id.* at 19 (citing Solaria Scope Ruling at 10-11).
[290] *Id.* (citing SunSpark Scope Ruling at 6).

modules production involve exacting processes (*e.g.*, molecular-level impregnation of phosphorus into the wafer at a high heat,[291] printing solar cells (metals, such as silver paste, are printed onto the solar cell to collect electricity[292])) and treatments to, and preparation of, inputs used in production (such as lamination and curing of EVA, solar cells, and the backsheet).[293]

Importantly, the essential nature of the final product is imparted and realized through production in the inquiry country when the p/n junction is formed in the wafer.  The p/n junction "… results in the creation of solar cells—albeit unfished solar cells—capable of converting sunlight into electricity via the photovoltaic effect."[294]  Moreover, other components in the solar cell and solar module are important to its ability to function because they channel the electricity out of the cell so that the product can be used as intended.  We do not believe that the technical hurdles associated with ingot and wafer production outweigh the above facts when comparing the nature of producing ingots and wafers to the nature of producing solar cells and solar modules.

Based on the foregoing, we continue to find that the nature of the production process in the inquiry country performed by the mandatory respondent(s) does not support finding the process of assembly or completion in the inquiry country to be minor or insignificant.

**Extent of the Production**

*Auxin*[295]
- Commerce's analysis of the extent of production facilities in the inquiry country is flawed.
- Commerce failed to follow its longstanding practice of comparing assembly facilities in the inquiry country to facilities for all the stages required to produce the merchandise under consideration (a merchandise-centric approach).  Instead, Commerce compared assembly facilities in the inquiry country to facilities of the respondents' affiliates in China that only performed some of the steps required to produce the merchandise under consideration (an affiliate-centric approach).
- Record evidence demonstrates that the production facilities of companies in China that perform all the steps required to produce subject merchandise are more extensive in terms of square footage and capacity than CSIL and TTL's production facilities in Thailand.[296]
- Even under Commerce's affiliate-centric approach, and using the subset of CSIL's affiliated Chinese solar producers that Commerce used in its comparison, the evidence shows that CSIL's assembly facilities in Thailand are smaller in terms of size and capacity than its affiliates' solar production facilities in China.[297]  If all of CSIL's affiliated solar producers in China are considered in the affiliate-centric comparison,

---

[291] *See* Circumvention Request at 20.
[292] *Id.*
[293] *Id.* at 21.
[294] *See* ET Solar Scope Ruling at 7.
[295] *See* Auxin's April 26, 2023 Case Brief at 44-52.
[296] *Id.* (citing Auxin's July 29, 2022 Comments at Exhibits 1 (*IEA Report* at 27 and 85) and P-2; and Circumvention Request at 69-70 and Exhibits 14 and 96).
[297] *See* Auxin's April 26, 2023 Case Brief at 49-50.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

which Commerce should have done, CSIL's assembly facilities in Thailand are even smaller than indicated in Commerce's comparison.[298]

- Similarly, Commerce inexplicably limited its affiliate-centric facility comparison for TTL to a small subset of its affiliated Chinese solar producers. If additional Chinese solar producers that are affiliated with TTL are considered in the comparison, TTL's inquiry country assembly facilities are minor or insignificant by any reasonable metric.[299]

*TTL*[300]

- Commerce's facility comparisons are reasonable and consistent with its practice of comparing the third-country facilities used to produce the downstream product to the order country facilities used to produce the upstream product.[301]
- Auxin's proposed comparisons are unclear, not supported by the facts, and inconsistent with Commerce's practice.
- While Auxin cites figures to demonstrate the "enormous" size of certain Chinese solar production facilities and the Chinese solar industry, it is not clear that the overall size of the solar industry in China is relevant, nor is it clear what specific comparison Auxin is proposing.
- The facts do not support including the size and capacity figures that Auxin used in its comparison because TTL does not have affiliates in China with integrated facilities for production prior to the wafer stage.
- Auxin also inappropriately included Chinese facilities that are used to produce solar cells and solar modules in its comparison which conflicts with Commerce's practice.[302]

*CSIL*[303]

- In its analysis, Auxin inappropriately compared the extend of CSIL's affiliated producer's (THSM) facilities in Thailand to production facilities for the entire, upstream supply chain.
- In contrast to Auxin's comparison, Commerce officials verified and reviewed extensive documentation, including payroll records and land purchase agreements, that confirmed the extensive production facilities managed by THSM in Thailand.

*NextEra*[304]

- Commerce correctly compared production facilities in Thailand to upstream production facilities in China.
- Based on this comparison, record evidence shows that TTL's facilities in Thailand are significant in terms of size and number of workers compared to the facility of its affiliated upstream Chinese producer.

---

[298] *Id.* at 49-50.
[299] *Id.* at 50-52.
[300] *See* TTL's May 9, 2023 Rebuttal Brief at 26-28.
[301] *Id.* (citing *Pipe and Tube from India (Oman and UAE)* IDM at Comment 6).
[302] *Id.* (citing *CORE from China (UAE)* IDM at Comment 1; *SSSS from China (Vietnam) Preliminary* PDM at 18-19).
[303] *See* CSIL's May 9, 2023 Rebuttal Brief at 40-41.
[304] *See* NextEra's May 9, 2023 Rebuttal Brief at 33-36.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

- Commerce correctly excluded from its comparison the data on Chinese production facilities reported by TTL that Auxin used in its comparison. For a number of reasons, which involve business proprietary information, these data were not relevant to the inquiry period.
- While Auxin argued that THSM's Thai facilities are smaller than its affiliates' solar production facilities in China, the determination that Commerce must make is not whether the facilities in the inquiry country are smaller, but whether the extent of those facilities indicates that assembly and completion in the inquiry country is minor or insignificant. Here, the extent of THSM's Thai facilities do not indicate that assembly and completion in the inquiry country is minor or insignificant.
- Moreover, Auxin's capacity analysis of THSM's Thai facilities, which suggests that the extent of the production facilities indicates minor or insignificant production, is contradicted by a comparison of the size of the facilities and the number of workers at the facilities.
- Commerce's determination that CSIL's and TTL's production facilities in Thailand are not minor or insignificant is thus fully supported by record evidence.

**Commerce's Position:** We disagree with Auxin. First, for the reasons explained in Comment 4, in this particular inquiry, we do not find it appropriate to compare the extent of CSIL and TTL's production facilities in Thailand to facilities of unaffiliated Chinese producers for each stage required to produce the merchandise under consideration. Additionally, as explained in Comment 4, we do not find it appropriate to consider facilities for the production of polysilicon in our facilities analysis. We have not done so because none of the mandatory respondents have affiliates that produce polysilicon, and there is no substantial evidence on the record that the Chinese solar industry is vertically integrated from polysilicon production to solar module production. Hence, we do not find Auxin's square footage and capacity comparisons between the respondents and unaffiliated Chinese solar producers to be persuasive.

Auxin also argues that CSIL's assembly facilities in Thailand are smaller in terms of size and capacity than its affiliates' solar production facilities in China. However, Commerce's analysis of the extent of production facilities is not necessarily a binary question of whether the facility is smaller or larger than another facility but an examination of the degree of size differences. When we considered the size and capacity differences in our analysis of CSIL's facilities (which is business proprietary information), in addition to the number of workers employed in those facilities, we found that the majority of the metrics weighed in favor of finding the Thai facilities were not minor or insignificant.[305]

In addition, while Auxin contends that the production facilities of all CSIL's affiliated solar producers in China should have been considered in the affiliate-centric facility comparison, we find it is appropriate to measure the extent of the Thai production facilities by comparing them only to the facilities of CSIL's Chinese affiliates that performed the initial production steps related to the products assembled and completed in Thailand. Using that comparison, we can gauge the significance of the Thai production facilities in relation to all the CSIL's production

---

[305] *See Thailand* PDM at 20. Due to the business proprietary nature of the information provided, Commerce provided a complete analysis of the extent of the production facilities in the CSIL and TTL Preliminary Analysis Memoranda.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

facilities engaged in manufacturing the product imported into the United States. Commerce has followed a similar approach in other circumvention inquiries where it compared the production facilities in the inquiry country to those in the order country that were used to perform the earlier stages of production that were required to produce the inputs that were assembled and completed in the inquiry country.[306] In *Al Ghurair CIT 2021*, the CIT upheld a similar comparative methodology and noted "that even if {the respondent's} production process and facilities in the UAE appear significant, they are minor as compared to the production process and facilities in China."[307]

Auxin did not contest the conclusion that Commerce reached based on its facility comparison for TTL, but it claimed that Commerce inexplicably excluded certain Chinese solar producers that are affiliated with TTL from its comparison. However, the companies that Auxin seeks to add to the comparison are, which we cannot identify in this memorandum because their names are business proprietary, not relevant to the inquiry period.[308] Therefore, we did not consider any information related to these companies in our analysis of TTL's facilities.

Consequently, we continue to find that the extent of THSM and TTL's production facilities in Thailand, do not support finding their assembly or completion in those facilities to be minor or insignificant.

### The Value of the Processing in Thailand

*CSIL*[309] and *NextEra*[310]

- Commerce based its value analysis on a percentage that it calculated by dividing the value of processing performed by CSIL in Thailand by the value of the inquiry merchandise imported into the United States.
- This analysis is wrongly centered on a quantitative measure, without considering the nature of the production process, even though "Congress has directed {Commerce} to focus more on the nature of the production process and less on the difference in value between the subject merchandise and the parts and components imported into the processing country."[311]
- At verification, Commerce found that THSM in Thailand engaged in "multi-stage," "highly-technical," "technologically sophisticated," "capital intensive," processes, requiring "highly-skilled workers" and "skilled technicians and employees with advanced degrees"—and thus ***not*** "minor or insignificant" processes.[312] Moreover, Commerce

---

[306] *See, e.g.*, *CORE from China (UAE)* IDM at Comment 1 (where Commerce compared the CORE production facilities in the inquiry country to HRS and CRS production facilities in the order country); *see also Pipe and Tube from India (Oman and UAE)* IDM at Comment 6 (where Commerce compared the pipe and tube production facilities in the inquiry countries to the beginning stages of production in the order country).
[307] *See Al Ghurair CIT 2021*, 536 F. Supp. 3d 1371-73.
[308] *See* TTL's ay 9 2023 at 23; *see also* TTL's 4th SQR at 3 and Exhibit 5.
[309] *See* CSIL's April 26, 2023 Case Brief at 21-27.
[310] *See* NextEra's April 26, 2023 Case Brief at 11-15.
[311] *See* CSIL's April 26, 2023 Case Brief at 22 (citing *PET Film from the UAE Preliminary Determination* PDM at 7).
[312] *Id.* at 23 (citing CSIL Verification Report at 18-19).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

previously noted that cell production, which occurs in Thailand, is where the essence of a solar module is realized.

- Thus, Commerce conclusively found that the nature of THSM's production process in Thailand is extensive and significant, showing that, qualitatively, the value added through cell and module production in Thailand is significant. Yet, Commerce inexplicably and inconsistently found that the value of these same "significant" processes constituted a minor portion of the value of the inquiry merchandise.
- In addition, Commerce incorrectly found that the processing value percentage that it calculated supported an affirmative circumvention determination when in other cases it found significantly lower percentages (*e.g.*, 12 to 26 percent) did not support an affirmative circumvention determination.[313]

*Auxin*[314]

- Commerce found processing value percentages as high as one-third of the total value of the merchandise to be a small proportion of that value for purposes of section 781(b)(2)(E) of the Act.[315]
- The processing value percentages of 12 to 26 percent in *Ferrovanadium from Russia Final Determination* are not informative because these are publicly ranged percentages;[316] thus, the actual upper percentage is likely much higher.

**Commerce's Position:** We disagree with the respondents. Section 781(b)(2)(E) of the Act directs Commerce to determine "whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States." We find that in the context of section 781(b)(2)(E) of the Act, the word "value" denotes monetary value. Consequently, section 781(b)(2)(E) of the Act directs Commerce to perform a quantitative, rather than a qualitative, evaluation of the value of third-country processing.

This interpretation is supported by 19 CFR 351.226(i), which provides that "{i}n determining the value of … processing performed … under section 781(b)(2)(E) of the Act, {Commerce} may determine the value of the part or component on the basis of the cost of producing the part or component under section 773(e) of the Act—or, in the case of nonmarket economies, on the basis of section 773(c) of the Act." Costs are measured numerically, as is the value of merchandise. Therefore, section 781(b)(2)(E) of the Act describes a quantitative measurement of the value of third-country processing. This interpretation is reinforced by Congresses' discussion of value

---

[313] *Id.* at 26 (citing *Ferrovanadium from Russia Preliminary Determination*, 77 FR at 6539; Commerce rendered a negative final determination in *Ferrovanadium from Russia Final Determination*).

[314] *See* Auxin's May 9, 2023 Rebuttal Brief at 35-43; Auxin's April 26, 2023 Case Brief at 30-47;

[315] In the *Preamble (Final Rule)*, 62 FR at 27329 Commerce explicitly rejected setting a bright line of 35 percent as determining whether the value of processing implicated circumvention explaining: "to establish a 'safe harbor' or specific guidelines might result in the incorrect classification of substantial production operations as 'insignificant' and 'screwdriver' operations as 'significant." In *CORE from China (Malaysia)* Commerce noted that record evidence demonstrated "the value-added by CORE producers, such as those in the third countries, is approximately 10 percent to 31 percent … {which} support{ed} a finding that the completion process performed in Malaysia represents a small proportion of the merchandise exported to the United States" under section 781(b)(2)(E) of the Act. *See CORE from China (Malaysia) Preliminary*, 85 FR at 8823, unchanged in *CORE from China (Malaysia) Final*.

[316] *See Ferrovanadium from Russia Preliminary Determination*, 77 FR at 6539; unchanged in *Ferrovanadium from Russia Final Determination* IDM at Comment 1.

57

under section 781(b)(1)(D) of the Act (determining whether the value of merchandise produced in the order country is a significant portion of the total value of the merchandise exported to the United States) when Congress noted that the statue did:

> not to establish a rigid numerical standard for determining "significance" nor does the Committee expect Commerce to establish a specific numerical test. The determination of whether the value of the parts or components is a significant portion of the total value of the merchandise should be made on a case-by-case basis, looking at the totality of the circumstances. However, where the proportion of the value is relatively high (*e.g.*, the value of a television tube in relation to a finished television set), the conclusion should be clear.[317]

In addition, Commerce's statement that Congress directed it to focus more on the nature of the production process and less on differences in value, concerned the overall decision of whether third-country processing was minor or insignificant rather than the value calculation described under section 781(b)(2)(E) of the Act. When Commerce stated in *PET Film from the UAE Preliminary Determination*[318] that Congress directed it to focus more on the nature of the production process and less on differences in value, it referenced *Hangers from China (Vietnam)*[319], which referred to *Certain Pasta from Italy (U.S.) Circumvention*[320] and *Hot-Rolled Lead and Bismuth*.[321]

In *Certain Pasta from Italy (U.S.) Circumvention* Commerce stated:

> While some of the statutory factors are inconclusive, the information on the record tends to show that the repackaging operation in the United States *is minor and insignificant*. … Congress directed {Commerce} to focus more on the nature of the production process and less on the difference in value between the subject merchandise and the imported parts or components. *See S. Rep. No. 103-412*, at 81-82 (1994). Thus, we believe that it is appropriate to place more weight on the nature of the production and packaging process (the latter of which merely involves removing pasta from larger bags and placing it in smaller packages) rather than attempt to establish a numerical standard, which would be contrary to the intentions of Congress.[322]

In *Hot-Rolled Lead and Bismuth* Commerce stated:

> The legislative history to section 781(a) {of the Act} establishes that Congress intended {Commerce} *to make determinations regarding circumvention* on a case-by-case basis in recognition that the facts of individual cases and the nature

---

[317] *See* S. Rep. No. 103-412 at 82.
[318] *See PET Film from the UAE Preliminary Determination* PDM at 7.
[319] *See Hangers from China (Vietnam) Preliminary Determination*, 76 FR at 27011-27013, unchanged in *Hangers from China (Vietnam)*, 76 FR at 66895.
[320] *See Pasta from Italy (U.S.) Circumvention Preliminary*, 68 FR at 46575, unchanged in *Pasta from Italy (U.S.) Circumvention*, 68 FR at 54888.
[321] *See Hot-Rolled Lead and Bismuth*, 64 FR at 40347.
[322] *See Pasta from Italy (U.S.) Circumvention Preliminary*, 68 FR at 46575 (emphasis added).

of specific industries vary widely.  In particular, Congress directed {Commerce} to focus more on the nature of the production process and less on the difference in value between the subject merchandise and the imported parts or components. (*See S. Rep. No. 103-412*, 81-82 (1994)).  Thus, we believe that any attempt to establish a numerical standard would be contrary to the intentions of Congress.

The URAA, which became effective on January 1, 1995, redirected the focus of a circumvention inquiry away from a numerical calculation of value-added towards a more qualitative focus on the nature of the production process.  Under the URAA, which provides the current statutory language for section 781 of the Act, the numerical calculation of value-added is just one of five factors {Commerce} is to examine in {its} determination of whether the processing undertaken in the United States is minor or insignificant.[323]

In these cases, Commerce applied Congress's direction to focus more on the nature of the production process and less on value with respect to the overall decision of whether processing is minor or insignificant or the overall determination of whether circumvention is occurring and not its determination under section 781(b)(2)(E) of the Act.

This is consistent with the explanation in *S. Rep. No. 103-412* cited in these cases.  In *S. Rep. No. 103-412*, Congress noted that the provision in section 781(b)(1)(C) of the pre-URAA Act (*i.e.*, that there is a small difference between the value of the order country parts that were assembled in the inquiry country and the value of the finished merchandise imported into the United States) "has not proved effective in curbing the circumvention of antidumping and countervailing duty orders."[324]  Congress then explained that it was amending "sections 781(a) and (b) to shift the *focus of the anticircumvention inquiry* away from a test of the difference in value between the subject merchandise and the imported parts or components toward the nature of the process performed in the United States or a third country"[325] (emphasis added).  Thus, the shift in focus related to the overall circumvention inquiry.

Moreover, the shift away from a difference in value analysis toward a nature of the production process analysis was directed toward section 781(b)(1)(C) of the pre-URAA Act, not section 781(b)(2)(E) of the current version of the Act.  In fact, section 781(b)(2) of the Act, including the numeric value determination under section 781(b)(2)(E) of the Act, were added "to focus the anticircumvention inquiry on the question of whether minor or insignificant assembly or completion is taking place,"[326] which is a consideration of the nature of the third-country processing.  Hence, we disagree with the respondents' claim that Commerce's analysis under section 781(b)(2)(E) of the Act wrongly centered on a quantitative measure, without considering the nature of the production process.

CSIL contends that Commerce incorrectly found that the value of its inquiry country processing, as a percentage of the merchandise value, supported an affirmative circumvention determination,

---

[323] *See Hot-Rolled Lead and Bismuth*, 64 FR 40348 (emphasis added).
[324] *See* S. Rep. No. 103-412, 81 (1994)).
[325] *See* S. Rep. No. 103-412, 81-82 (1994)).
[326] *See* SAA at 894.

when in other cases Commerce found that smaller processing percentages did not support an affirmative circumvention determination. However, Commerce has found processing percentages consistent with CSIL's to be small percentages.[327] Moreover, while CSIL cited the processing percentages of 12 to 26 percent in the *Ferrovanadium from Russia Final Determination* to support its argument, in that case Commerce "acknowledged … that the value of U.S. processing of vanadium pentoxide into ferrovanadium, as calculated by {Commerce}, fell within the range of value-added percentages that {Commerce} has found to be "small" in previous cases …"[328] Thus, we do not find that our assessment of whether the value of CSIL's inquiry country processing is a small proportion of the value of the inquiry merchandise imported into the United States is necessarily inconsistent with some of the "small" percentages found in *Ferrovanadium from Russia Final Determination*. While Commerce ultimately determined in *Ferrovanadium from Russia Final Determination* that the value percentages were not small based on the extensive and substantial processing that occurred, as explained above we find it is appropriate to consider the nature of processing in the overall circumvention decision rather than in assessing the percentage calculated under section 781(b)(2)(E) of the Act.

In the discussion of changes to the Act, the SAA noted that "{t}hese new provisions do not establish rigid numerical standards for determining the significance of the assembly (or completion) activities …"[329] Here, we determined that the limited value percentage that we calculated for CSIL's inquiry country processing is a small proportion of the value of the merchandise imported into the United States.[330] Where the value of the processing performed in the inquiry country is a small proportion of the value of the inquiry merchandise imported into the United States, this factor weighs in favor of finding circumvention.

Finally, CSIL contends that Commerce inexplicably and inconsistently found that its nature of production in the inquiry country was "significant" but that the value of that processing constituted a minor portion of the value of the inquiry merchandise. Our finding is not inconsistent given that we did not include the value of Chinese-produced inputs that were considered in the nature of production analysis in our calculation of the value of that processing.

**Overall Determination of Section 781(b)(1)(C)**

*CSIL*,[331] *NextEra*,[332] *Silfab*,[333] and *TTL*[334]
- Of the five factors for determining whether the process of assembly or completion is minor or insignificant under section 781(b)(1)(C) of the Act, for TTL, Commerce only found that R&D indicated circumvention, and for CSIL, R&D and a small value added in the inquiry country indicated circumvention. Thus, despite the majority of the five

---

[327] *See CORE from China (Malaysia) Preliminary*, 85 FR at 8823, unchanged in *CORE from China (Malaysia) Final*.
[328] *Id.*
[329] *See* SAA at 894.
[330] *See* CSIL's Final Analysis Memorandum where we calculated a ratio similar to the *Preliminary Determination*.
[331] *See* CSIL's April 26, 2023 Case Brief at 4-12.
[332] *See* NextEra's April 26, 2023 Case Brief at 5-14.
[333] *See* Silfab's Tranche 1 Case Brief at 3-4; *see also* Silfab's April 26, 2023 Case Brief at 13-20.
[334] *See* TTL's April 26, 2023 Case Brief at 4-9.

60

factors supporting a negative determination, Commerce determined that both respondents circumvented the *Orders*.

- Commerce's decisions were unlawful.  Congress has required that Commerce consider the totality of the evidence presented regarding processing undertaken in the inquiry countries, and that Commerce must make its determinations "on a case-by-case basis, in recognition that the facts of individual cases and the nature of specific industries are widely variable."[335]  Commerce acknowledges in the *Preliminary Determination* that "{n}o single factor {under section 781(b)(2) of the Act}, by itself, controls Commerce's determination of whether the process of assembly or completion in a third country is minor or insignificant.  Commerce's approach is contrary to the statute, which requires a holistic assessment.[336]

- Commerce's emphasis on R&D is inconsistent across circumvention cases, and in its own words, not informative to its circumvention analysis. In *CWCS from India (Oman and India) Final*, Commerce found that "lack of research and development expenses does not necessarily mean that circumvention exists."[337]  Similarly, in the recent circumvention inquiries of Vietnam in several pipe and tube cases, Commerce determined that "the lack of significant research and development expenses for the production of LWRPT in Vietnam is not informative in determining whether the processing in Vietnam is minor or significant."[338]

- Commerce has repeatedly indicated that the level of R&D is *less* informative in determining whether third-country processing is minor or insignificant than the other statutory factors under section 781(b)(2) of the Act.[339]

- Commerce only gave a cursory, incongruous explanation for the disproportionate importance placed on R&D expenditures:  "{g}iven the uniquely complex nature of solar cell and module production, we give particular importance to the level of THSM and TTL's R&D in Thailand."[340]  Commerce fails to explain why the "uniquely complex" nature of cell and module production elevates the level of R&D above any, much less all, of the other statutory factors under section 781(b)(2) of the Act.

- It is incongruous and fundamentally contradictory for Commerce to find that the nature of the production process is not minor or insignificant, and yet reach a conclusion that the process of assembly or completion in the targeted countries is nonetheless minor or insignificant.  While the nature of production is not the sole factor under 781(b)(1)(c) of the Act determining whether the third country processing is minor or insignificant,

---

[335] *See* CSIL's April 26, 2023 Case Brief at 16 (citing *Thailand* PDM at note 34; *see also*, *e.g.*, *HFC Blends from China* at 20.)

[336] *See* CSIL's April 26, 2023 Case Brief at 17 (citing SAA at 893 ("… no single factor listed in section 781(b)(2) of the Act will be controlling. … the importance of any one of the factors listed under section 781(b)(2) of the Act can vary from case to case depending on the particular circumstances unique to each circumvention inquiry.")).

[337] *See* NextEra's April 26, 2023 Case Brief (citing *Certain Welded Carbon Steel Standard Pipes and Tubes from India* IDM at 14)

[338] *See* TTL's April 26, 2023 Case Brief at 11 (citing *LWR from China (Vietnam) Preliminary* PDM at 20-21).

[339] *See* CSIL's April 26, 2023 Case Brief at 17 (citing *Aluminum Foil from China (Korea and Thailand) Preliminary* PDM at 14)

[340] *See* CSIL's April 26, 2023 Case Brief at 17 (citing *Thailand* PDM at 15).

relying heavily on the nature of the production process in reaching a circumvention determination is consistent with past practice, the statute, and legislative history.[341]

- Commerce appears to have never previously reached an affirmative circumvention determination while also concluding that the nature of the production process in the third country was not minor or insignificant.

- The SAA repeatedly refers to circumventing activity as the establishment of a "screwdriver operation" in the United States or third country, and also notes that it would be "relatively easy" for a foreign exporter to circumvent orders by establishing such screwdriver operations.[342]  The solar cell and module production in the targeted countries is clearly not a simple and small-scale "screwdriver operation" as described in the URAA.

- Commerce's decade-long administration of the *Orders* and in particular, its scope rulings regarding solar cells and panels, indicates that the processing conducted in the inquiry countries is not "minor or insignificant."  In response to proposed scope language submitted by the petitioner in the underlying investigations stating that the scope of the *Orders* includes modules produced in China from cells manufactured in any third-country, Commerce found that modules produced in China from cells produced in a third-country are not covered by the scope of the *Orders*.[343]  When making this determination, Commerce concluded that solar cell production was not minor processing, and did so while taking into account whether the processing of Chinese wafers occurred outside of China

- Relying on findings by the ITC, Commerce described cell production as the "most capital intensive part of the manufacturing process" and "a highly automated, capital intensive, and technologically sophisticated process, requiring skilled technicians and employees with advanced degrees," and that "module production also involves a large number of varied inputs consumed in a complex, multistep production process that requires precision, highly skilled workers, and accurate quality testing equipment at multiple stages.[344]

- Commerce specifically considered the possibility of circumvention in its original scope determination and stated:

> the factors we consider for making country-of-origin determinations inherently reflect the agency's concern that the relief afforded by AD/CVD orders not be eviscerated by moving minor processing outside of the country covered by the order.  Thus, circumvention concerns are reflected in the country-of-origin determination.[345]

- The question of whether cells production is minor processing has been asked and answered.  Commerce refused to grant the petitioner in the underlying investigations such a wide-sweeping remedy stating that if petitioner had concerns regarding "solar

---

[341] *See* NextEra's April 26, 2023 Case Brief (citing *Aluminum Foil from China Circumvention Preliminary Determination (Korea)* PDM at 15).
[342] *Id.* (citing SAA at 893-94).
[343] *Id.* (citing Solar Investigation Scope Clarification Memorandum).
[344] *See* NextEra's April 26, 2023 Case Brief (citing *Thailand* PDM).
[345] *See* TTL's Tranche 1 Case Brief at 4 (citing Solar Investigation Scope Clarification Memorandum).

modules/panels assembled from solar cells produced in a third country," it "has the option of bringing additional petitions to address" such concerns.[346]

- The Circumvention Request mischaracterizes the manufacturing operations required to transform a raw polysilicon wafer into a functional solar cell as "minor and insignificant. Record evidence gathered by Commerce demonstrates that the processing required to create solar cells and modules from a wafer is extensive, complicated, and a high-value generating operation that is not minor.  However, Commerce has incorrectly relied on Auxin's mischaracterization in reaching its *Preliminary Determination* that found circumvention in the targeted countries.

*Auxin*[347]

- The Act, as interpreted by Congress, does not require Commerce to weigh any factor more heavily than another and does not require any particular number of factors be satisfied in order to find assembly operations to be minor or insignificant pursuant to section 781(b)(1)(C) of the Act.  Rather, "the five factors are to be separately taken into consideration, as appropriate, and their totality weighed."[348]
- TTL is incorrect that "Commerce has only found circumvention through minor or insignificant processing when no fewer than four of the five criteria {outlined in section 781(b)(2) of the Act} weighed in favor of finding that the process was minor."[349]  In *HFC Blends from China (India)*, Commerce found the level of investment and the extent of production facilities in India (*i.e.*, the third country) were comparable to the level of investment and the extent of production facilities in China (*i.e.*, the country subject to the order) and thus were not "minor or insignificant."[350]  Nevertheless, Commerce found these two factors were outweighed by the remaining three factors based on "the circumstances of this case" and reached an affirmative finding circumvention.[351]
- In *Al Ghurair*, the CAFC found Commerce had failed to adequately address respondents' arguments concerning the value of processing pursuant to section 781(b)(2)(E) of the Act.  The CAFC continued, however, that insofar as "Commerce's findings of circumvention involved a multi-factor test" and other record evidence supported an affirmative finding of circumvention, Commerce's failure to adequately address value added in the third country was a "harmless error."[352]  In other words, even if Commerce found the value added in the third country was significant pursuant to section 781(b)(2)(E) of the Act, that would not undermine its overall "minor or insignificant" analysis under section 781(b)(2) of the Act.[353]
- Commerce's determination that a minority of the factors outlined in section 781(b)(2) of the Act, when viewed in totality with the other factors, supports a determination that

---

[346] *Id.* at 4 (citing Solar Investigation Scope Clarification Memorandum).
[347] *See* Auxin's Tranche 1 Rebuttal Brief at 28-31; and Auxin's April 26, 2023 Case Brief at 30-47.
[348] *See U.K. Carbon and Graphite* at 1310.
[349] *See* Auxin's May 9, 2023 Rebuttal Brief at 17 (citing TTL's April 26, 2023 Case Brief at 2).
[350] *Id.* at 18 (citing *HFC Blends from China (India) Preliminary* PDM at 18-20, unchanged in *HFC Blends from China (India) Final*).
[351] *Id.* (citing *HFC Blends from China (India) Preliminary* PDM at 18-20, unchanged in *HFC Blends from China (India) Final*).
[352] *Id.* at 18 (citing *Al Ghurair CAFC 2023,*, 65 F.4th at 1351)
[353] *Id.* at 19 (citing *Al Ghurair CAFC 2023*, 65 F.4th at 1351)

CSIL's and TTL's assembly operations in Thailand are minor or insignificant pursuant to sections 781(b)(1)(C) and (b)(2) of the Act is in accordance with law.

- Commerce's determination that the level of R&D is particularly important in this case given the importance of R&D in the solar industry is supported by substantial record evidence.  As the IEA explains:

  > {i}nnovation is key for technological advances across and along clean energy supply chains.  Technological innovation throughout the solar PV supply chain has increased the conversion efficiency of solar cells, reduced material usage and improved energy efficiency per module.  Since 2010, solar PV cells have become nearly 60% more efficient and generation costs have fallen almost 80%.  Without public and private investments in R&D all along the supply chain, solar PV would not be the most affordable electricity generation technology in many parts of the globe.[354]

- Chinese solar producers have engaged in substantial investments in R&D across the solar supply chain to ensure their global dominance.  An example is the Chinese solar conglomerate LONGi stating that by the end of 2020 it "had obtained a total of 1,001 issued patents and invested RMB 2.592 billion in R&D, accounting for 4.75% of its operating revenue."[355]

- Similarly, GCL-Poly has recently noted that it has "filed more than 1,100 invention and utility model patents, including more than 650 granted patents" related to all aspects of polysilicon, ingot, and wafer production.[356]

- The fact that Commerce has found R&D to be relatively unimportant in other circumvention cases does not undermine its finding in this case that R&D is uniquely significant in the solar industry.  As Commerce has previously explained, the "importance of any one of {the section 781(b)(2)} criteria 'can vary from case to case depending on the particular circumstances unique to each circumvention inquiry.'"[357] Accordingly, although "R&D might be a significant factor in some industries, it is not in others … the significance of its presence or absence depends on the industry and product under investigation."[358]

- Silfab's contention that Auxin mischaracterized the solar cell production process, or that Commerce and Auxin ignored section 781(b)(1)(E), is without record support.  Auxin outlined Commerce's longstanding practice of employing a comparative methodology when evaluating whether completion or assembly in a third country is minor or insignificant.  Employing this framework, Auxin demonstrated that the process of completing or assembling solar cells from Chinese-origin wafers, and completing or assembling solar modules from solar cells, was "minor or insignificant" under Commerce practice.  Auxin's analysis is consistent with the DOE and the IEA's own analysis of the solar production process.

---

[354] *Id.* at 20 (citing Auxin's July 29, 2022 Comments at Exhibit 1 (*IEA Report* at 121)).

[355] *Id.* (citing Circumvention Request at PDF page 1612).

[356] *Id.* at 21 (citing Circumvention Request at PDF page 1795).

[357] *Id.* at 21-22 (citing *Diamond Sawblades from China (Thailand)* IDM at Comment 5).

[358] *Id.* at 22 (citing *Hot-Rolled Lead and Bismuth* IDM at Comment 8).

**Commerce's Position:** We disagree with the respondents and continue to find that based on the totality of evidence gathered pursuant to the factors specified under section 781(b)(2) of the Act that THSM and TTL's process of assembly or completion in the inquiry country of the solar modules they ship to the United States is minor.

As an initial matter, we do not find the fact that Commerce has viewed R&D less importantly in other circumvention inquiries than we have viewed it here as undermining our overall finding. Commerce has explained that the "importance of any one of {the section 781(b)(2)} criteria 'can vary from case to case depending on the particular circumstances unique to each circumvention inquiry.'"[359] Accordingly, although "R&D might be a significant factor in some industries, it is not in others … the significance of its presence or absence depends on the industry and product under investigation."[360] Similarly, the Act does not require Commerce to weigh any factor more heavily than another and does not require any particular number of factors be satisfied in order to find assembly operations to be minor or insignificant pursuant to section 781(b)(1)(C) of the Act. Rather, as determined by the CIT, "the five factors are to be separately taken into consideration, as appropriate, and their totality weighed."[361] Thus, there is nothing incongruent with our emphasis on R&D in determining section 781(b)(1)(C) of the Act and the decision-making criteria specified by the Act. While our decision weighed R&D heavily, it also took into consideration the other four factors under section 781(b)(2) of the Act.

The main reason R&D weighs heavily in the overall decision pursuant to section 781(b)(1)(C) of the Act is its preeminent importance in the solar industry. This fact is made evident by the Trina Group investing $150mn in R&D expenses in 2021 alone,[362] while the Canadian Solar Group reported $58mn in R&D expenses.[363] Moreover, these investments are only those listed in the holding companies' financial statements. Investments by the Trina and Canadian Solar Groups in R&D may actually be even higher. LONGi, a leading Chinese solar producer and competitor reported investing over $400mn in R&D and reported incurring R&D costs of nearly 5 percent of its revenue in 2020.[364] Production efficiency in the solar industry is an important measurement of a producer's success, as a solar producer's goal is to be more and more efficient at converting sunlight into energy. The *Bloomberg Report* noted that "{l}arge module makers have been regularly upgrading their production lines to adjust for new cell structures and other technological needs. Factories that lack the most modern equipment can become obsolete quickly in the current competitive market environment."[365]

With regard to individual stages of production, the stages of production less demanding of R&D are those that the respondents have opened overseas. Meanwhile, the production of the wafer, which is the most technically demanding, is undertaken in China. The *Bloomberg Report* stated that "{v}ertical integration, high factory capex and technical hurdles have made the wafer market the most consolidated segment of the PV value chain." and that "{w}afer factories require high

---

[359] *See Diamond Sawblades from China (Thailand)* IDM at Comment 5.
[360] *See Hot-Rolled Lead and Bismuth* IDM at Comment 8.
[361] *See U.K. Carbon and Graphite*, 931 F. Supp. 2d at 1310.
[362] *See* TTL's IQR at Exhibit 9.
[363] *See* CSIL's August 8, 2022 Submission at Exhibit 1-A, page F-5.
[364] *See* Circumvention Request at Exhibit 25 (LONGi Group 2020 Annual Report at 17 and 33).
[365] *Id.* at Exhibit 4.

65

upfront capital expenditure and bear many technical hurdles.[366]  The *Bloomberg Report* also finds that "{c}ell manufacturing is more versatile compared to wafers and polysilicon and has lower technical Hurdles," [367] and that "{b}uilding a new module factory has low technical hurdles compared with wafer and polysilicon." [368]  Thus, not only is R&D of preeminent importance to solar makers, but R&D is most important to wafer production that is exclusively performed by the Chinese affiliates of the respondents and not performed in any inquiry country.  This is important as it mirrors the definition of circumvention where the most important stages of production are performed in the order country while the minor or insignificant production that is more easily relocated is moved overseas in order to avoid AD and CVDs.

Further, as opposed to production facilities, R&D only needs to be done once and can be done at any location.  Thus, as opposed to the production facilities in Thailand, CSIL, and TTL did not have to create new facilities in Thailand in order to incorporate R&D already performed by its affiliates in China.  The preeminent importance of R&D and the fact that it need not be done in the inquiry country is demonstrated by the large disparity noted above between the amount of R&D done by THSM and TTL in Thailand and the amount done by their affiliates in China.[369]  Again, this pattern mirrors the typical pattern of circumvention where everything of importance remains in the order country, while only minor processing is done outside the country.

While four of the five factors in the case of TTL and three of the five factors in the case of THSM do not support circumvention, these factors still are all a function of the activities of TTL and THSM's affiliates in China.  The financial statements of both respondents indicate that their major or ultimate decisions are made in their headquarters located in China.[370]  Further, for both CSIL and TTL we find that nearly all or all of the investment[371] necessary to operate the factories was arranged by and was a function of actions by their affiliates in China.[372]  While

---

[366] *Id.*

[367] *Id.*

[368] *Id.*

[369] Further, CSIL states that it "follows the product and production standards of the Canadian Solar Group."  *See* CSIL's IQR Part 1 at 22.

[370] *See* the Canadian Group's financial statements at CSIL's IQR Part 1 at Exhibit 1-A, which state at 134 that "{m}ost of our management are currently based in China and may remain in China in the future.  Further, this Exhibit states that the Group's audit was done in China.  For TTL, *see* its response to our request to identify all business or operational relationships affecting the development, production, sale and/or distribution of the inquiry merchandise which your company has, or had, with the parent company where TTL stated that "{a}s the parent company of Trina group, TCZ is ultimately responsible for undertaking activities to innovate and introduce new products and services."  *See* TTL's IQR Part 1 at 3.

[371] *See* the Canadian Group's financial statements at CSIL's IQR Part 1 at Exhibit 1-A, which describes all Canadian Solar group investment being having to abide by Chinese financial laws and that "a significant portion of {the Canadian Solar Group's} borrowings come from Chinese banks, {the Canadian Solar Group is} exposed to lending policy changes by the Chinese banks.  CSIL and THSM are ultimately entirely controlled by the Canadian Solar Group in China.  *See* CSIL's IQR Part 1 at Exhibit 1-A.

[372] *See* the Canadian Group's financial statements at CSIL's IQR Part 1 at Exhibit 1-A, which describes all Canadian Solar group investment being having to abide by Chinese financial laws and that "a significant portion of {the Canadian Solar Group's} borrowings come from Chinese banks, {the Canadian Solar Group is} exposed to lending policy changes by the Chinese banks.  CSIL and THSM are ultimately entirely controlled by the Canadian Solar Group in China.  *See* CSIL's IQR Part 1 at Exhibit 1-A.  TTL is ultimately completely owned by the Trina Group and TTL states that its capital investments are contributed by its majority shareholder, TSSD, which is a holding company.  TCZ, the parent company of the Trina Group is located in China.  *See* TTL's IQR Part 1 at 2 and 5.

many of the parts included in the value of processing done in the inquiry countries were sourced locally, as noted above, all or nearly all of the key high tech inputs of wafers and the other six most important inputs were produced in China.[373]  Meanwhile, the sales of solar modules in the United States are made by the Canadian Solar and Trina Groups' U.S. sales affiliates selling solar modules in the United States.[374]  With regard to the nature and extent of production, the country origin of the machinery used by THSM and TTL in the production of solar cells and modules also impacts our overall decision.[375]

In the SAA, Congress described the stereotypical circumvention a screwdriver manufacturer set-up in a third country in which the third-country firm is sent all of the parts that it merely snaps together in an effort to avoid AD and CVDs.[376]  Congress' rewriting of certain sections of the circumvention laws was its effort to prevent this situation from continuing and it is this very scenario that have been realized by the Canadian Solar and Trina Groups' actions with regard to Thailand.  Aside from the operations necessitating a physical presence in Thailand as realized at THSM and TTL, everything is either done in China or is a result of actions done by the Canadian Solar and Trina Groups' headquarters in China.  Nearly all of the technology, financial arrangements, decision making, and all the key inputs can ultimately be traced back to their affiliates in China.  Further, despite moving the solar cell and module factories to China, for CSIL, the majority of processing is still done in China, not Thailand.  Thus, it is not only that the operations of THSM and TTL rely on their Chinese owners for R&D, which is the driver of the solar industry, but even the physical production facilities were created, maintained, and led ultimately by the actions, decisions, financial arrangements, and supply of key inputs provided by their Chinese affiliates.  The extent to which the machinery in the inquiry countries comes from China also impacts our decision.  In consideration of all factors, we find that the preponderance of record information demonstrates that the process of completion by both THSM and TTL is minor or insignificant under section 781(b)(1)(C) of the Act.

With regard to other sections of the Act, no party has commented on our *Preliminary Determination* under sections 781(b)(1)(A) and (B) of the Act that the inquiry merchandise imported into the United States is within the same class or kind of merchandise as the class or kind of merchandise subject to the *Orders* and that this merchandise is being completed and assembled, in part, from parts and components produced in China, the country with respect to which the applicable *Orders* apply.  We continue to find that the conditions under sections 781(b)(1)(A) and (B) of the Act have been met.

Aside from comments that we should not rely on surrogate values for valuing Chinese inputs, which we have rejected for the reasons explained under Comment 7, no party has commented on our *Preliminary Determination* that, pursuant to section 781(b)(1)(D) of the Act, the value of the merchandise produced in China that was used to produce inquiry merchandise is a significant portion of the total value of the merchandise exported from Thailand to the United States for

---

[373] For the exact major inputs THSM and TTL imported from China, *see* the CSIL and TTL Preliminary Analysis Memoranda.
[374] *See* the Canadian Group's financial statements at CSIL's IQR Part 1 at Exhibit 1-A at F-70, identifying Canadian Solar (USA) Inc. as the Group's only U.S. sales entity.
[375] *See* CSIL's 4th SQR at Exhibit S4-1; *see also* TTL's 4th SQR at Exhibit 2.  Both sources reference proprietary information that cannot be disclosed in this memorandum.
[376] *See* the SAA at 893.

CSIL and TTL, and, based on AFA, the non-responsive companies listed in Appendix II of the notice of final determination.

Accordingly, we continue to find that the conditions under section 781(b)(1)(D) of the Act have been met for CSIL and TTL, and the non-responsive companies.  Furthermore, as detailed in Comment 10, we also determine that action is warranted to prevent evasion of the *Orders* pursuant to section 781(b)(1)(E) of the Act.

Concerning the three factors under section 781(b)(3) of the Act (*i.e.*, pattern of trade and sourcing, affiliations, and whether imports of parts and components from China increased), as addressed in Comment 9, Commerce finds that each of these factors supports an affirmative determination of circumvention for CSIL and TTL, and based on AFA, the non-responsive companies listed in Appendix II of the *Federal Register* notice that accompanies this memorandum.

Based on an analysis of the totality of the information on the record of these circumvention inquiries related to CSIL and TTL, we find that CSIL and TTL are circumventing the *Orders* in accordance with section 781(b) of the Act.  Additionally, based on AFA, we find that the non-responsive firms listed Appendix II of the accompanying *Federal Register* notice are circumventing the *Orders* in accordance with section 781(b) of the Act.

Because Commerce was unable to examine all Thai producers of solar cells and modules, Commerce determines that a country-wide determination is most appropriate to prevent further circumvention of the orders by non-examined producers of inquiry merchandise in Thailand.  Therefore, Commerce is applying this affirmative determination of circumvention to all shipments of inquiry merchandise from Thailand on or after April 1, 2022, the date of publication of the *Preliminary Determination*.

**Overall Determinations**

**Comment 9.   Whether the Factors Under 781(b)(3) of the Act Justify an Affirmative Final Determination**

*NextEra*[377]
- Section 781(b)(3) of the Act directs Commerce to take into account three factors in determining whether the merchandise produced in a foreign country is within the scope of an order, but the record does not support an affirmative determination based on these factors.
- None of the factors under section 781(b)(3) are dispositive and should not override a finding that the processing in Thailand is not minor or insignificant.
- Pursuant to section 781(b)(3)(A) of the Act, Commerce analyzed U.S. import statistics and the mandatory respondent's data to find that import volumes from Thailand have increased since the *Orders* were imposed, while imports from China declined.[378]
- Imports from Thailand increased in response to growing U.S. demand.

---

[377] *See* NextEra's April 26, 2023 Case Brief.
[378] *Id.* (citing *Thailand* PDM at 21).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

- The U.S. installed significantly more solar energy capacity in 2021 than it did in 2011. Thus, the patterns of trade reflect a growing domestic market and weighs against finding circumvention.
- Under section 781(b)(3)(C) of the Act, Commerce examined the mandatory respondents' purchases of Chinese-produced inputs from 2008 to 2021 to determine whether shipments of inputs from China to Thailand has increased.[379]
- Cell and module production in Thailand is developed based on the industry's understanding of Commerce's interpretation of the *Orders* regarding the production stage in which the wafer is substantially transformed into a cell and, therefore, subject to the *Orders*.
- An affirmative determination would undermine this understanding. Commerce should therefore not rely on section 781(b)(3) of the Act to find circumvention.
- If Commerce concludes that any of the factors in section 781(b)(3) of the Act weigh in favor of finding circumvention, Commerce should not base an affirmative determination solely on section 781(b)(3) of the Act.
- A negative determination is required, in accordance with the statute and Commerce practice, because processing in Thailand, per NextEra's arguments, is not minor or insignificant, and therefore not all of the mandatory criteria in section 781(b)(1) are met.
- Section 781(b)(1) of the Act lists five criteria that must be met before imports from a third country may be included within an existing order. In contrast, section 781(b)(3) of the Act references three factors that Commerce shall take into account.
- The phrase "take into account" is plainly different from the mandatory language in section 781(b)(1) of the Act, and thus, the section 781(b)(3) factors are clearly not dispositive.
- If processing in the third country is not minor or insignificant, then the factors listed under section 781(b)(3) of the Act are not relevant because not all of the mandatory statutory criteria have been met.
- Commerce has previously emphasized that circumvention determinations are based on the totality of circumstances and the facts of each case.[380]

*Auxin*[381]
- NextEra asserts that Commerce evaluated the factors under section 781(b)(3) of the Act in isolation without taking due consideration of various market conditions. Therefore, Commerce incorrectly found these factors to weigh in favor of finding circumvention.
- In 2021, U.S.-bound solar cell and module shipments from Thailand exceeded U.S.-bound solar cell and module shipments from China. This represents a dramatic shift in the pattern of trade.
- Nonetheless, NextEra asserts that the changes in the pattern of trade simply reflect a growing domestic market. However, Chinese direct shipments have forgone this burgeoning market, and NextEra's assertion reflects a blindness to the deterioration of the U.S. solar industry precipitated by the Chinese government.

---

[379] *Id.* (citing *Thailand* PDM at 23).
[380] *Id.* (citing *Pipe and Tube from India (Oman and UAE)*).
[381] *See* Auxin's May 9, 2023 Rebuttal Brief.

- Accordingly, the extraordinary shifts in the pattern of trade and sourcing patterns strongly support an affirmative determination.
- With respect to section 781(b)(3)(C) of the Act, NextEra found Commerce's finding to be improper because solar cell and module production in Thailand developed based on the shared understanding of the industry from Commerce's interpretation and administration of the *Orders* regarding the stage in the production cycle that renders a product subject to the *Orders*. NextEra has failed to grasp the distinction between a substantial transformation finding and section 781(b) of the Act.
- Additionally, NextEra's admission that parties were searching for export platforms to imbue silicon wafers with a p/n junction admits to circumvention.

**Commerce's Position:** We conclude that the evidence on the record in the Thailand segments regarding section 781(b)(3) of the Act supports Commerce's affirmative circumvention determinations. Therefore, Commerce appropriately issued affirmative determinations of circumvention in Thailand based, in part, on consideration of the factors enumerated in section 781(b)(3) of the Act.

Section 781(b)(3) of the Act provides that, in determining whether to include merchandise assembled or completed in a third country in an AD/CVD order, Commerce shall consider the following additional factors: (A) the pattern of trade, including sourcing patterns; (B) whether the manufacturer or exporter of the merchandise is affiliated with the person who, in the third country, uses the merchandise to complete or assemble the merchandise which is subsequently imported into the United States; and (C) whether or not imports of the merchandise into the third country have increased after the initiation of the AD and/or CVD investigation that resulted in the issuance of an order.

In the *Preliminary Determinations*, Commerce analyzed section 781(b)(3)(A) of the Act by examining the pattern of trade by each mandatory respondent and its Chinese affiliates since the initiation of the underlying investigation.[382] Commerce additionally examined the trade patterns of Chinese shipments of subject merchandise into the U.S. and Thai shipments of subject merchandise into the United States. Commerce concluded that import volumes from Thailand increased since the *Order* was imposed, while imports from China declined, and thus, this pattern weighed in favor of circumvention.[383] NextEra contends that Commerce must not evaluate the patterns of trade within a vacuum and must consider the context of the global market. Notably, U.S. domestic demand has grown significantly since the imposition of the *Order*, as a result of multiple factors, including the Administration's focus on the development of renewable energy. As NextEra stated, deployment of solar energy capacity has grown significantly, and therefore imports from Thailand have become increasingly important to fulfill U.S. demand. Therefore, Commerce must consider the growing U.S. domestic market within its analysis of trade patterns.

The plain language of the Act under section 781(b)(3)(A) of the Act directs Commerce to consider the pattern of trade since the initiation of the investigation of solar cells and modules. The evidence on the record for each mandatory respondent showed extraordinary shifts in the pattern of trade from China to Thailand. U.S.-bound solar cell and module shipments from

---

[382] *See Thailand* PDM at 21.
[383] *See* TTL Preliminary Analysis Memorandum; and CSIL Preliminary Analysis Memorandum.

70

Thailand replaced and exceeded U.S.-bound solar cell and module shipments from China.[384] Additionally, pursuant to section 781(b)(3)(A) of the Act, Commerce evaluated the specific sourcing patterns of the mandatory respondents in Thailand.  Evidence on the record further supported a shift in the pattern of trade from China to Thailand.[385]  Thus, the pattern of trade since the initiation of the investigation shows that this factor weighs in favor of finding circumvention.

Commerce analyzed section 781(b)(3)(C) of the Act by taking into consideration whether the shipments of Chinese inputs that were used to complete or assemble the final product in Thailand increased.[386]  NextEra alleges that Commerce improperly found that this factor weighs in favor of circumvention, and that an affirmative determination would undermine the clear understanding of Commerce's interpretation regarding the stage in the production cycle that renders a product subject to the *Orders*.  The plain language of the Act under section 781(b)(3)(C) instructs Commerce to examine whether imports of Chinese inputs into Thailand used for the production of subject merchandise have increased after the initiation of the underlying investigation.  Evidence on the record clearly shows that imports of Chinese inputs for all companies into Thailand have increased since the year of the initiation of the investigation.  Therefore, this factor weighs in favor of finding circumvention.  Additionally, we agree with domestic parties that there is a clear distinction between a substantial transformation finding and section 781(b) of the Act.  Although substantial transformation and circumvention inquiries may be similar, they are conducted pursuant to different regulatory standards and serve different purposes.[387]  The purpose of a substantial transformation analysis is to determine a product's country of origin, while the purpose of a circumvention analysis is to counteract evasion of AD/CVD orders.  Commerce may find a product that was substantially transformed to still be subject to an AD/CVD order after conducting a circumvention inquiry.  Therefore, given the fact that Chinese inputs into Thailand have increased since the year of the initiation of the *Orders*, we continue to find this factor to weigh in favor of circumvention.

NextEra additionally argues that Commerce cannot base an affirmative determination solely on section 781(b)(3) of the Act, and that a final negative determination is required because the processing in Thailand is not minor or insignificant and, therefore, not all of the mandatory criteria in section 781(b)(1) of the Act have been met.  Contrary to NextEra's arguments, we continue to find the process of assembly in Thailand to be minor or insignificant for all mandatory respondents, and therefore, all mandatory criteria in section 781(b)(1) of the Act have been met.  For additional information, *see* Comment 8.

For Commerce to make an affirmative determination of circumvention, all elements under section 781(b)(1) of the Act must be satisfied, including the minor or insignificant criteria listed in section 781(b)(2) of the Act.  In contrast, section 781(b)(3) of the Act references three factors for Commerce to "take into account," a phrase plainly different from the mandatory language in section 781(b)(1).  These factors are relevant to Commerce's holistic analysis but are not dispositive of whether circumvention is occurring.  Consistent with past practice, Commerce

---

[384] *Id*.
[385] *Id*.
[386] *See Thailand* PDM.
[387] *See Bell Supply CAFC*; *see also* 19 CFR 351.225(j).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

reaches its determination regarding circumvention based on the totality of the evidence for all factors, including those listed under section 781(b)(3).[388]  Commerce agrees with NextEra that section 781(b)(3) does not overturn a negative determination under 781(b)(1) if the process of assembly or completion in the third country is found to be not minor or insignificant under section 781(b)(2).  Here, we have determined the process of assembly or completion in Thailand to be minor or insignificant, and therefore a finding that solar cells and modules produced in Thailand are circumventing the *Orders* is appropriate.

Based on the above analysis, we conclude that Commerce has correctly determined that the factors under section 781(b)(3) of the Act weigh in favor of circumvention and that Commerce appropriately issued an affirmative determination of circumvention in Thailand based on a totality of the factors, including section 781(b)(3) and the determination that the process of assembly or completion in Thailand is minor or insignificant.

**Comment 10. Affirmative Circumvention Determinations Would Not be Appropriate Under Section 781(b)(1)(E) of the Act**

*CSIL*[389]
- Commerce did not provide any discussion regarding the appropriateness of the action, as required by section 781(b)(1)(E) of the Act.
- The CAFC instructed that Commerce must consider each factor enumerated in section 781(b) of the Act.[390]
- Neither the Act nor the SAA provides a specific definition of "appropriate" to be applied in the circumvention context; however, the U.S. Supreme Court has explained that the determination of whether a federal agency's actions are "appropriate" hinges on whether the agency has demonstrated its consideration of "all the relevant factors," and pays "at least some attention to cost."[391]
- The Supreme Court has further indicated that "{n}o regulation is 'appropriate' if it does significantly more harm than good."[392]
- Affirmative final determinations by Commerce in these inquiries to expand the scope of the *Orders* to cover solar cells and/or modules completed in Malaysia, Thailand, Vietnam, and Cambodia using Chinese-origin components would be inappropriate and contradict the definition of "appropriateness" provided by the Supreme Court.[393]
- Commerce has previously confirmed that it is it inappropriate to conduct a circumvention inquiry where merchandise was "expressly and intentionally excluded from the scope of the Orders," as is the case here.[394]

---

[388] *See Pipe and Tube from India (Oman and UAE).*
[389] *See* CSIL's April 26, 2023 Case Brief at 27-31.
[390] *Id.* (citing *Al Ghurair CAFC 2023*, 65 F.4th at 1351).
[391] *Id.* (citing *Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR at 27296, 27327-30 and *Michigan*, 576 U.S. 743, 752).
[392] *Id.* (citing *Michigan*, 576 U.S. 743, 752 (citation omitted)).
[393] *Id.* (citing *Michigan*, 576 U.S. 743, 752 (citation omitted)).
[394] *Id.* (citing *Walk-Behind Lawn Mowers from China Circumvention Rescission*, 88 FR at 13434 (notice of intent to rescind circumvention inquiry on the AD/CVD orders) ("We find that the inquiry merchandise is excluded from the scope of the orders … .  We also find that it is *not appropriate* to conduct a circumvention inquiry on such excluded merchandise." (emphasis added)).

72

- Commerce itself indicated in its original investigation that converting Chinese-origin wafers into solar cells in a third country would not warrant circumvention inquiries.[395]
- Pursuant to *Proclamation 10414*, the President made clear that duties on imports within the scope of these circumvention inquiries are inappropriate due to the current energy emergency instructed Commerce to waive new duties on solar modules from Thailand, Vietnam, Malaysia, and Cambodia for two years.[396]
- Affirmative determinations would run contrary to the goals of the President's directive and to Commerce's regulations,[397] thus, unnecessarily sowing doubt in the very solar supply chain to which the President sought to restore calm and certainty.
- Commerce's approach in the *Preliminary Determination* is contrary to its own recently promulgated circumvention regulations, which state that "the purpose of the proposed modifications is not to penalize companies acting in good faith, but to ensure that circumvention determinations are properly applied to merchandise found to be circumventing an order."[398]
- Commerce should issue negative final determinations because affirmative determinations in these inquiries act to expand the scope of the *Orders* while ignoring and contradicting Commerce's longstanding precedents regarding the nature and significance of certain vital processes in the production of solar cells and modules.

*NextEra*[399]

- Commerce can reach a negative final determination under section 781(b)(1)(E) of the Act which states that Commerce "may" (not "shall" or "must") include products completed in third countries within the scope of an order.
- Including solar cells and modules produced in Cambodia, Malaysia, Thailand, and Vietnam within the scope of the *Orders* is not appropriate since there is no evasion to prevent when the processing that occurs in the third country is so significant.
- AD/CVD proceedings are not exempt from the directive to integrate climate considerations into its policies, strategic planning, and programs.[400]

*Silfab*[401]

- The final determinations must address whether expanding the scope of the *Orders* to encompass cells manufactured in third countries (and the modules produced using those cells) would be appropriate under section 781(b)(1)(E) of the Act.
- Auxin and Commerce have not met the requirements for appropriateness because: (1) no other U.S. producers support Auxin's petitions before Commerce; (2) an unwarranted expansion of the existing *Orders* would cause substantial harm to the U.S. solar industry; and (3) the requested relief would further impede the development of the U.S. solar

---

[395] *Id.* (citing *Orders*, 77 FR at 73018).
[396] *Id.* (citing *Presidential Proclamation 10414*, 87 FR 35067).
[397] *Id.* (citing *2021 Regulations Final Rule* at 86 FR 52300).
[398] *Id.* (citing *2021 Regulations Final Rule* at 86 FR 52300, 52338).
[399] *See* NextEra's April 26, 2023 Case Brief at 20-21.
[400] *Id.* (citing NextEra's May 2, 2022 Comments at Att. 12 (U.S. Department of Commerce, Department Administrative Order 216-22, Addressing the Climate Crisis).
[401] *See* Silfab's March 6, 2023 Case Brief at 4 and Silfab's April 26, 2023 Thailand Case Brief at 5-13.

73

industry, making it impossible to achieve the Biden administration's green energy initiatives.

- U.S. manufacturers have been denied due process in the form of procedural safeguards and eligibility requirements governing AD/CVD relief under U.S. law and Commerce's regulations.  Put simply, Auxin unlawfully made an end-run around the strict procedures and eligibility requirements governing AD/CVD relief under U.S. law, sections 701 and 703 of the Act and 19 CFR 351.203.
- U.S. manufacturers sourced cells from locations outside of China to enable U.S. manufacturing of solar modules in good-faith recognition of existing AD/CVD orders as they had been administered by Commerce and CBP for a decade.
- U.S. manufacturers were never given any notice that such cells could be circumventing the *Orders*.  In fact, as explained above, Commerce's administration of the *Orders* throughout this period consistently confirmed that such merchandise was not subject to the *Orders*.  Accordingly, affirmative final determinations would, without notice, potentially penalize Silfab for its good-faith efforts to comply with U.S. law and grow U.S. module manufacturing.
- Affirmative final determinations would contradict the emergency declared in *Proclamation 10414*.

*Trina*[402]

- Commerce must make a determination that action is appropriate to prevent evasion under section 781(b)(1)(E) of the Act before making an affirmative finding of circumvention.
- After Auxin filed its circumvention allegation, numerous interested parties explained why there is no appropriate reason to implement a circumvention inquiry of the *Orders*.
- Because Commerce has determined that the p/n junction formation determines country-of-origin for purposes of the *Orders*, Commerce has already foreclosed the possibility that p/n junction formation could be minor processing.
- Commerce stated in its original scope determination:  the factors we consider for making country-of-origin determinations inherently reflect the agency's concern that the relief afforded by AD/CVD orders not be eviscerated by moving minor processing outside of the country covered by the order.  Thus, circumvention concerns are reflected in the country-of-origin determination.[403]
- Auxin has no standing because prior to initiation, Commerce received dozens of letters from members of the U.S. solar industry who expressed deep concern for Auxin's circumvention allegation.
- By allowing a small company like Auxin to circumvent standing requirements for AD/CVD petitions, Commerce is inviting future frivolous claims which may result in multi-million-dollar market impacts.[404]

---

[402] *See* TTL's April 26, 2023 Case Brief at 13-20.
[403] *Id.* (citing Solar Investigation Scope Clarification Memorandum at 1).
[404] *Id.* (citing American Clean Power Letter (noting that Auxin's allegation creates a precedent to "misuse. . . trade laws for the benefit of a single company rather than an entire domestic industry.").

*Auxin*[405]

- Commerce appropriately determined that a circumvention inquiry for the *Orders* is appropriate under section 781(b)(1)(E) of the Act.

- The arguments put forth by several interested parties that Commerce's actions are not "appropriate" notwithstanding Commerce's affirmative finding of circumvention are false.

- Commerce followed its practice in determining that action is appropriate to address circumvention pursuant to section 781(b)(1)(E) of the Act in the *Preliminary Determinations*.[406]

- Commerce and the CIT have held as a matter of statutory interpretation that Commerce's evaluation of whether action is appropriate to prevent evasion pursuant to section 781(b)(1)(E) of the Act is tied to consideration of the factors outlined in section 781(b)(3) of the Act.[407]

- Commerce did not address circumvention in the underlying investigation of the *Orders* because its substantial transformation analysis at that time was limited to comparing cell fabrication to module assembly and not comparing cell fabrication to module assembly to prior stages of solar cell production, which is the analysis Commerce is conducting now pursuant to 781(b)(1) of the Act.[408]

- Commerce stated in the *Solar Cells from China Investigation* that "{p}etitioner has the option of bringing additional petitions to address any dumping concerns it has regarding solar modules/panels assembled from solar cells produced in a third country" which does not indicate that Commerce meant that future circumvention inquiries regarding solar cells would not be warranted.[409]

- The CAFC stated in *Bell Supply CAFC* that "if Commerce applies the substantial transformation test and concludes that the imported article has a country of origin different from the country identified in an AD or CVD order, then Commerce can include such merchandise within the scope of an AD or CVD order only if it finds circumvention under" section 781 of the Act.[410]

- Auxin is an interested party as defined by section 771(9)(C) of the Act and was, and is, well within its rights to request that Commerce initiate and conduct these circumvention inquiries.

- Congress rejected a standing requirement for circumvention inquiries when it enacted section 781(b) of the Act, which allows any interested party, including small and medium-size businesses like Auxin, to enforce U.S. trade laws.[411]

- Commerce does not have discretion under the statute to disregard circumventing behavior based on a concern that such a finding would impede other government policy objectives, or any other factor not explicitly provided for in the statute.

---

[405] *See* Auxin's March 17, 2023 Rebuttal Brief at 28-30 and Auxin's May 9, 2023 Rebuttal Brief at 43-64.

[406] *See* Auxin's May 9, 2023 Rebuttal Brief (citing, *e.g.*, the *Thailand* PDM at 23-26).

[407] *Id.* (citing *CORE from China (Vietnam)* IDM at 11; *CORE from China (Vietnam)* IDM; *Tung Mung CIT*, 219 F. Supp. 3d 1333, 1343; and *Peer Bearing Co.*, 36 CIT 1700, 1707; and Auxin's May 5, 2023 Rebuttal Brief (citing *CWCS from India (Oman and India)* Final IDM at Comment 1)).

[408] *Id.* (citing *Solar Cells from China Investigation* IDM at Comment 1).

[409] *Id.* (citing *Solar Cells from China Investigation* IDM at Comment 1).

[410] *Id.* (citing *Bell Supply CAFC*, 888 F.3d 1222, 1230 and *Diamond Sawblades (Thailand)* IDM at Comment 3).

[411] *Id.* (citing 19 CFR 351.226(c)).

75

- Commerce previously rejected arguments that an affirmative final determination is not appropriate and would impose economic costs by stating that comments regarding economic impact address issues outside the purview of the analysis prescribed by section {781(b)} of the Act.[412]

- This circumvention inquiry does not threaten growth of U.S. solar deployment or hinder efforts to address climate change because as noted by the DOE there has been a steady increase in installed PV capacity from 2010-2020 in spite of the *Orders* and temporary safeguard measures.[413]

- The DOE confirmed that rehabilitating U.S. solar manufacturing by effectively enforcing U.S. trade laws and combatting climate change are not mutually exclusive.[414]

- Auxin's analysis of the solar cell production process is consistent with analyses from the DOE and the IEA, and was ultimately vindicated by Commerce's preliminary affirmative findings of circumvention.

- Silfab's argument that these circumvention queries violate its due process are unfounded since Congress enacted the circumvention section of the Act in 1988 in order to prevent evasion and circumvention of AD/CVD orders and did not establish an industry support requirement.

- Silfab's argument that its due process rights have been violated is belied by the fact that it has been allowed to participate in this inquiry from the very start.[415]

- Silfab USA's contention that affirmative final determinations would contradict the emergency declared in *Proclamation 10414* is similarly without merit because although the proclamation effectively eliminates the remedy that Auxin is entitled to by law, nothing in *Proclamation 10414* is inconsistent with affirmative final determinations in these inquiries.

**Commerce Position:**  We disagree with CSIL, NextEra, Silfab, and Trina's assertions that we did not determine the appropriateness of the instant circumvention inquiries pursuant to section 781(b)(1)(E) of the Act.  As an initial matter, we conducted a full analysis pursuant to section 781(b) of the Act in order to determine if the merchandise assembled or completed in a foreign country is within the scope of the *Orders*.[416]  Section 781(b)(1)(E) of the Act authorizes Commerce to include merchandise alleged to be circumventing in the scope of an order if Commerce "determines that action is appropriate … to prevent evasion of such order or finding."  Commerce found that the criteria for a finding circumvention of the *Orders* was met, and further that the factors listed in 781(b)(3) indicated that circumvention of the *Orders* was occurring.  The statute does direct Commerce to consider factors other than whether action under the circumvention statute is appropriate to prevent evasion of the *Orders*.  Here, because we have found that the criteria for finding circumvention were met, and the factors under 781(b)(3) further evinced the existence of circumventing behavior, and because no information on the record suggested that circumvention would cease absent inclusion of inquiry merchandise in the scope of the *Orders*, we find that action is appropriate under 781(b)(1)(E) of the Act.

---

[412] *Id.* (citing *Ferrovanadium from Russia Final Determination* IDM at Comment 4).
[413] *Id.* (citing Auxin's May 16, 2023 Comments at Exhibit 5 (DOE Solar Deep Dive at 2)).
[414] *Id.* (citing Auxin's May 16, 2023 Comments at Exhibit 5 (DOE Solar Deep Dive at iv)).
[415] *See* Auxin's May 5, 2023 Rebuttal Brief (citing *Techsnabexport, Ltd.*, 795 F. Supp. 428 (noting the "essential elements of due process are notice and the opportunity to be heard")).
[416] *See Thailand* PDM at "Summary of Statutory Analysis."

76

With respect to Auxin's standing to request a circumvention inquiry, there is no stipulation in the regulations regarding who can and cannot bring a circumvention inquiry beyond that it be an interested party. Pursuant to 19 CFR 351.226(c), an interested party may submit a circumvention inquiry request as long as it follows the proper procedures and include the requisite product information necessary for Commerce to make an initiation determination. In the instant case, we examined Auxin's circumvention requests and determined that it satisfied the criteria under 19 CFR 351.226(c), thus, giving it standing to proceed.[417]

We also disagree with the arguments raised by CSIL, NextEra, Silfab, and Trina that Commerce precluded future circumvention inquiries on the inquiry merchandise in the language of the investigation. In the investigation, we stated that there was the option for bringing additional petitions regarding assembly of solar cells and modules in a third country,[418] but did not prelude circumvention inquiries, which are requested in response to specific trade pattern and activities that may constitute circumvention as defined in the Act. As noted above, Auxin followed Commerce's requisite procedures for requesting a circumvention inquiry and thus we proceeded accordingly.

Further, we disagree with Silfab's claim that it and other U.S. cell and module producers have been denied due process in the instant inquiry. Silfab claims that because U.S. manufacturers were never given any notice that their cells could be circumventing the *Orders*, its rights to due process were violated. The Act and Commerce's regulations provide for ample notification and comment on Commerce's *Preliminary Determinations* by interested parties. In accordance with the CIT's ruling in *Techsnabexport, Ltd.*, the "essential elements of due process are notice and the opportunity to be heard."[419] As evidenced by the case record of the instant circumvention inquiries Silfab as well as both domestic and foreign solar cell producers have had ample opportunity to file comments, and thus, be heard throughout these inquiries.

Finally, we disagree with CSIL, NextEra, Silfab, and Trina's contention that these circumvention inquiries contradict *Proclamation 10414*. Nothing in the proclamation states that Commerce cannot conduct circumvention inquiries with respect to solar cells and modules. In fact, in response to *Proclamation 10414*, Commerce added Part 362 to its regulations to implement the Proclamation and these regulations, as well as CBP instructions issued by Commerce, specify that no ADs/CVDs will be collected on solar cells and modules entering the United States to which *Proclamation 10414* applies.[420] Thus, Commerce's affirmative circumvention findings cannot be implemented until the provisions of the *Proclamation 10414* expires.

---

[417] *See Initiation Notice*, 87 FR at 19071-72.
[418] *See Solar Cells from China Investigation* IDM at Comment 1.
[419] *See Techsnabexport, Ltd.*, 795 F. Supp at 428.
[420] *See Thailand* PDM at the section, "Certification Process and Country-Wide Affirmative Determination of Circumvention" and *Appendix IV-Certification for "Applicable Entries"*.

**Certification Issues**

**Comment 11. Whether Commerce Should Allow AFA Companies to Certify**

*Auxin*[421]

- Commerce should preclude all non-cooperative parties in this inquiry from participating in any certification regime resulting from an affirmative determination of circumvention based on the recent precedents in *Ferrostaal Metals GmbH* and *CRS from Korea (Vietnam)*.
- The CIT explained that the SAA makes clear that "application of AFA is a tool given to Commerce 'to ensure that {a} party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.'"[422]
- *In Ferrostaal Metals GmbH*, the CIT found that Commerce acted reasonably by applying AFA to the respondent, barring them from participating in the certification regime, and determining that the respondent circumvented the *Orders*.[423]
- The CIT stated that the SAA makes clear that "application of AFA is a tool given to Commerce 'to ensure that {a}party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.'"[424]
- The CIT also noted that in prior circumvention inquiries in which Commerce allowed non-responsive companies to participate in the certification process, there was a lack of responses to issued Q&Vs.[425]
- Commerce's initial Q&V warned recipients that a failure to respond to the questionnaire would result in the use of an inference in selecting from the facts otherwise available, in accordance with section 776(b) of the Act.[426]
- Accordingly, Commerce should follow its longstanding, court-affirmed practice of precluding non-cooperative companies (either by not responding to the Q&V questionnaires or cancelling verification) from participation in any certification regime.

No other interested party commented on this issue.

**Commerce's Position:**  Commerce's decision to bar uncooperative respondents from the certification process is an agency practice affirmed by the CIT, is not impermissibly punitive, and minimizes the impact of AFA findings on parties not found circumventing, while ensuring that Commerce's AFA finding induces cooperation, consistent with Commerce's established practice.  As noted by Auxin, Commerce has the authority to and the discretion to determine the eligibility of parties to participate in the certification regime.[427]

---

[421] *See* Auxin's March 17, 2023 Rebuttal Brief at 23-26.
[422] *Id.* (citing *Ferrostaal Metals*, 518 F. Supp. 3d at 1374-75 (citing SAA at 870).
[423] *Id.*
[424] *Id.* 1357, 1374-75 (citing SAA at 870)).
[425] *Id.* (citing *Ferrostaal Metals GmbH*, 518 F. Supp. 3d 1357, 1375).
[426] *Id.* (citing the Q&V Questionnaire at 1).
[427] *See Cold-Rolled Steel from Korea* IDM at Comment 6.

78

Commerce notified interested parties that it was initiating the circumvention inquiry on a country-wide basis (*i.e.*, not exclusive to the producers mentioned) and would solicit information from certain Cambodian, Malaysian, Thai, and Vietnamese companies concerning their production and shipment of solar cells and modules to the United States.[428] Commerce also stated in the *Initiation Notice* that a company's failure to completely respond to our request for information may result in the application of partial or total facts available which may include adverse inferences.[429] In conducting a country-wide circumvention inquiry, Commerce must evaluate a representative selection of companies to determine whether merchandise has been completed or assembled in the third country, and must take necessary action to prevent evasion.[430] Commerce is not required by the Act or regulations to impose a certification regime in instances where such a regime is inconsistent with preventing evasion and permits uncooperative parties to benefit from their lack of cooperation. Commerce's previous findings that foreign producers' ability to "trace the country of origin of its shipments and identify which shipments to the United States are of Chinese origin on a transaction-specific basis," is crucial to administration of affirmative anti-circumvention findings.[431] Commerce is not obligated to permit a previously uncooperative party to certify if that party has, by its unwillingness to cooperate, prevented Commerce from using that party's information to conduct its analysis, or to assess and verify such party's ability to trace its inputs to particular U.S. sales. Rather, Commerce's establishment of a certification process in which non-cooperative respondents may not participate is consistent with our obligation to administer the law in a manner that prevents evasion of the *Orders*.[432]

As noted by Auxin, the CIT in *Ferrostaal Metals GmbH* sustained Commerce's determination to "bar {non-cooperative respondent} from participating in the certification program and determine that { non-cooperative respondent} was circumventing the orders."[433]

Commerce is authorized under 19 CFR 351.226(m)(1) to take the appropriate remedy to address circumvention, including the application of the determination on a country-wide basis to all products from the same country as the product at issue. Commerce has repeatedly applied certification requirements in other circumvention inquiries which were subject to an affirmative country-wide decision.[434] Therefore, in a case where the affirmative circumvention determination is made entirely on record evidence, uncooperative respondents would be able to benefit from their failure to cooperate (*e.g.*, not filing timely Q&Vs or not participating in verification) merely by the fact that they avoided the inconvenience and expense of participating, including being selected as a mandatory (complete questionnaire) respondent, knowing that their lack of participation might not (or would not) alter Commerce's finding of circumvention. Such non-cooperation could also frustrate Commerce's ability to conduct a circumvention inquiry,

---

[428] *See Initiation Notice*, 87 FR at 19072.

[429] *Id.*.

[430] *See* Thailand RSM at "Selection of Respondents."

[431] *See Butt-Weld Pipe Fittings from China (Malaysia)* IDM at Comment 3; *Hangers from China (Vietnam)* IDM at Comment 4; and *Tissue Paper from China (India) Final Determination* IDM at Comment 2.

[432] *See Butt-Weld Pipe Fittings from China (Malaysia) Preliminary* PDM at 12-13 and 22, unchanged in *Butt-Weld Pipe Fittings from China (Malaysia)*.

[433] *See Ferrostaal Metals GmbH*, 518 F. Supp. 3d at 1375-1376.

[434] *See Butt-Weld Pipe Fittings from China (Malaysia)*; *CRS from China (Vietnam)*; *CORE from China (Vietnam)*; and *CORE from China (UAE)*.

should the largest third-country producers fail to provide Q&V responses. Finally, an uncooperative respondent retains the right to participate in a future review, and thus remedy its uncooperative status and potentially gain the opportunity to participate in a certification regime. For these reasons, Commerce's decision to preclude non-cooperating respondents from the certification regime is legitimately based on the need to induce cooperation and is not punitive.

## Comment 12. Certification Requirements and Corrections

*BYD HK*[435]
- Commerce should simplify its certifications by replacing them with declarations from only importers that the entry(ies) meet the requirements for duty-free treatment based on the *Presidential Proclamation 10404* (*i.e.*, the entry is an "Applicable Entry") or Commerce's determinations in these circumvention inquiries (*i.e.*, either Commerce's negative circumvention determination applies to the entry or the merchandise that was entered into the United States meets the non-Chinese content requirements identified by Commerce).
- CBP already enforces other duty exemptions using simplified certifications and requiring anything more than simple declarations will impede the flow of goods into the United States.
- Commerce should provide importers 60 days to provide simplified declarations for entries that have already been made.

*Jinko*[436]
- To avoid CBP requiring AD/CVD cash deposits on entries with deficient certifications: (1) an importer should be allowed to appeal CBP's decision that a certification is deficient to Commerce and submit a corrected certification, if necessary; (2) an importer should be allowed to submit corrected certifications in the absence of gross negligence or fraudulent intent; and (3) the documentation required to be maintained in connection with the certification should be limited to documents that demonstrate that the entry is an "Applicable Entry" (*i.e.*, the p/n junction in the solar cells was not formed in China) or not an entry of inquiry merchandise (*i.e.*, the solar cells do not contain wafers produced in China).

*Auxin*[437]
- Commerce should continue to require exporters to complete the requisite certifications because: (1) Commerce's preliminary affirmative country-wide circumvention determination applies to all exporters in the inquiry countries; (2) exporters possess certain information necessary for completing the certifications that imports may not have; and (3) BYD HK never explained why requiring certifications from exporters would be burdensome.
- Contrary to BYD HK's claim that "there is no legitimate need or purpose for Commerce to require certifications from exporters or to require the level of factual detail specified in the current certifications," Commerce has specifically stated that the "addition of the

---

[435] *See* BYD HK's March 6, 2023 Case Brief at 2-3.
[436] *See* Jinko's March 6, 2023 Case Brief at 1-5.
[437] *See* Auxin's March 17, 2023 Rebuttal Brief at 26-28.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

certification requirements…strengthens the administration and enforcement of the AD and CVD orders by reducing the possibility that entries may be inaccurately classified by importers."[438]

**Commerce's Position:** We have decided not to revise the certifications as suggested by BYD HK because: (1) requiring exporters to complete the certifications is consistent with Commerce's practice and is necessary; and (2) BYD HK never explicitly identified which parts of the certifications are too burdensome. Commerce has a history of requiring both importers and exporters of goods that are entered into the United States to complete and maintain certifications in certain proceedings or proceeding segments, including as a result of circumvention inquiries.[439] Certifications from exporters are particularly important for implementing the results of this circumvention inquiry because whether merchandise is inquiry merchandise is based on the country where the merchandise was produced and whether certain inputs into that merchandise were produced in China.[440] Neither of these characteristics can be determined through a physical inspection of the merchandise at the border. Moreover, entry documents that are typically available to the importer may not be helpful in identifying where certain inputs in the imported merchandise were produced, as the source of such inputs may not be apparent from invoices, bills of lading, *etc.*, especially where the input passed through multiple parties (producer, exporter, trading company). As Commerce noted in the Preamble to its regulations:

> Given the complex supply chains that may be involved with certain types of subject merchandise (which may involve input producers, intermediate processors, producers, exporters, trading companies, importers, *etc.*), certifications provide additional assurance that the producer, exporter, and/or importer sought adequate information regarding the relevant product in order to accurately certify a particular entry as not subject to an order.[441]

Requiring exporters to complete and maintain certifications provides the added assurance that adequate information was obtained to accurately certify to the facts listed in the certifications. Moreover, simply requiring "declarations" from importers that an entry qualifies as an "Applicable Entry" or meets the non-Chinese content requirements does not provide the same level of assurance that the entry meets those requirements as the certifications that Commerce developed for this circumvention inquiry. Commerce's certifications contain a list of each requirement that must be met to make clear that the importer and exporter have been informed of each requirement by way of the certification and both have specifically certified that each and every requirement has been met.

Furthermore, we disagree that it is inappropriate for Commerce to "require the level of factual detail specified in the current certifications" as argued by BYD HK.[442] "As a general matter,

---

[438] *See* Auxin's March 17, 2023 Rebuttal Brief at 27 (citing *Core from China (Vietnam)* IDM at Comment 4).
[439] *See CORE from China (UAE)*; *see also Aluminum Extrusions from China Minor Alterations Circumvention Final*, 82 FR at 34631-32.
[440] *See Preliminary Determination* at Appendix IV.
[441] *See 2021 Regulations Final Rule*, 87 FR at 52364.
[442] *See* BYD HK's March 6, 2023 Case Brief at 3.

importers are expected to perform their due diligence and exercise reasonable care {when completing entry documents} … . {A} reasonable importer may be expected to know, at a minimum, the identity of certain parties in the transaction chain, understand the imported product, including where it was made, how it was made, and the components of the product (and, in some instances, the source of those components)."[443]  Commerce's certifications do not go beyond these already existing expectations for importers.  Hence, we have not revised the certifications as suggested or waived the certification requirement with respect to exporters.

We now turn to the comments regarding deficient or incorrect certifications and the documentation that must be maintained in connection with the certifications.  If CBP determines that an importer or exporter's certification does not conform to Commerce's requirements, such that the entry is subject to the *Orders*, the importer or exporter can request an administrative review of that entry wherein Commerce will determine the appropriate AD/CVD duty assessment for the entry.  Regarding corrections to certifications, CBP already has provisions in place for importers to correct entry summary information, including certification information, through such means as a post summary correction or a prior disclosure.

With respect to documentation requirements, parties who complete the "Applicable Entries" certification must certify to more than the fact that the solar cells or solar modules were not already subject to the *Orders*; or the AD order on certain crystalline silicon photovoltaic products from Taiwan (certain existing solar orders).  For example, such parties must certify that the solar cells and/or solar modules will be utilized in the United States by no later than 180 days after the earlier of June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* is terminated.

Similarly, parties who complete the "Chinese Component" certification must certify to more than the fact that the solar cells or solar modules do not contain wafers produced in China.  For example, such parties must certify that the solar cells and/or solar modules were not already subject to the *Orders*.

Consequently, it would not be appropriate to limit the documentation requirements as suggested by Jinko.  Commerce noted in the certifications that the certifying party "is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.*, documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, customer specification sheets, production records, invoices, etc.)."[444]  This means that the certifying party must maintain sufficient documentation to support the certification in its entirety.  Therefore, we have not limited the documentation requirement as requested by Jinko.

---

[443] *See 2021 Regulations Final Rule*, 87 FR at 52347-48.
[444] *See Preliminary Determination*, 77 FR at Appendix VI.

**Comment 13. Whether Commerce Can Require Certifications for U.S. Entries of Merchandise Not Covered by the *Orders***

*NE Solar*[445]
- Commerce cannot require exporters of solar cells or solar modules that were not manufactured using Chinese wafers to certify to that fact because such merchandise is not subject to the circumvention inquiry. Commerce cannot change the language of the *Orders* or interpreted that language "in a way contrary to {its} terms.[446]
- Thus, Commerce should revise its certifications to remove references to merchandise that is outside the scope of the circumvention inquiries and that is not subject to the underlying *Orders* (*i.e.*, language in the certification that the imported or exported solar cells and solar modules were not manufactured using wafers produced in China).

No other interested party commented on this issue.

**Commerce's Position:** We disagree with NE Solar's claim that Commerce cannot place certification requirements on interested parties who exported solar cells and/or solar modules to the United States that were produced in the countries under consideration that do not meet the definition of inquiry merchandise. Commerce's regulations at 19 CFR 351.226(m)(1)(iv), provide that "{i}n conducting a circumvention inquiry under this section, the Secretary shall consider, based on the available record evidence, the appropriate remedy to address circumvention and to prevent evasion of the order. Such remedies may include … {t}he implementation of a certification requirement under 19 CFR 351.228." Under 19 CFR 351.228, Commerce may require "an importer or other interested party" to "{m}aintain a certification for entries of merchandise into the customs territory of the United States" and that if such certificate is not maintained or is false, Commerce "may instruct the Customs Service to suspend liquidation of entries of the importer or entries associated with the other interested party and require a cash deposit of estimated duties at the applicable rate …"

Thus, the certification described in 19 CFR 351.228 relates to an entry that was not declared as subject to ADs or CVDs, such as the entries described by NE Solar, since only if the certification was not maintained or was found to be false would such duties be imposed. This interpretation is consistent with Commerce's statement in the Preamble to the regulations that "Commerce uses the certification program, as described in {section} 351.228 of these regulations, to allow parties who have not engaged in the practices which Commerce determined were circumventing an order to certify that they did not participate in such conduct." Therefore, requiring importers and exporters to certify that the imported/exported solar cells or solar modules produced in the countries under consideration were not manufactured using wafers produced in China is entirely consistent with Commerce's regulations and its authority to administer the Act in a manner that prevents evasion of its determinations, including developing certifications that it finds will be effective in preventing such evasion. As the CIT noted, "Commerce has a certain amount of discretion to act in order to 'prevent {} the intentional evasion or circumvention' of the Act … .

---

[445] *See* NE Solar's March 6, 2023 Case Brief at 5-8.
[446] *Id*. at 5-7 (citing *Wheatland*, 161 F.3d at 1370 (quoting *Smith Corona*, 915 F.2d at 686; and *Ericsson*, 60 F.3d at 782).

83

To that end, Commerce may impose measures such as mandatory certification programs where it believes they will be effective in preventing future circumvention of its orders."[447]

Such certifications are particularly important in this circumvention inquiry because inquiry merchandise is not physically distinguishable from non-inquiry merchandise (inquiry and non-inquiry merchandise only differ with respect to the countries where certain materials in the merchandise were produced).  As Commerce noted in the Preamble to its regulations:

> We note that Commerce frequently imposes certifications in instances in which CBP may not be able to ascertain certain identifying details relevant to the product's classification as either subject to, or not subject to, an AD and/or CVD proceeding through physical inspection or the relevant sales documentation accompanying the entry summary, and, thus, could not confirm through these means alone whether a particular entry has been properly designated as {subject to antidumping or countervailing duties}. In such instances, both CBP and Commerce would rely on the certifications as an additional tool to ascertain whether the entry correctly was filed as an entry type not subject to an AD and/or CVD proceeding.[448]

Commerce went on to note in the Preamble that:

> … enforcement of the AD/CVD laws, including taking steps to prevent evasion and circumvention of AD and CVD orders by producers, exporters, and importers, is well within Commerce's authority and is of paramount importance to Commerce.  The addition of a certification requirement, where necessary based on a given case, strengthens the administration and enforcement of the AD and CVD orders by reducing the possibility that entries may be inaccurately filed by importers.  Given the complex supply chains that may be involved … certifications provide additional assurance that the producer, exporter, and/or importer sought adequate information regarding the relevant product in order to accurately certify a particular entry as not subject to an order.[449]

Revising the certification as suggested by NE Solar by removing statements that the imported/exported merchandise was not manufactured using wafers, and/or certain other materials, produced in China would contravene the purpose of the certification at issue which is to "provide additional assurance that the producer, exporter, and/or importer sought adequate information regarding the relevant product in order to accurately certify a particular entry as not subject to an order."[450]

---

[447] *See Appleton Papers Inc.*, 929 F. Supp. 2d at 1337 (citing *Tissue Paper from China (Vietnam) Final Determination* IDM at 9-12); `Solar Cells` *from China Investigation* IDM at 80-81 (finding that a certification regime is necessary and appropriate to prevent evasion of the AD/CVD orders on solar cells); *CORE from China (UAE)*, 85 FR 41957, 41958.

[448] *See Adoption of CFR 351.228*, 86 FR at 52364.

[449] *Id.*

[450] *Id.*

Lastly, Commerce's certifications do not redefine the scope of the *Orders* or inquiry merchandise. Rather, the certifications are tools used to enforce the *Orders* and the circumvention determination in this proceeding so as to prevent evasion of such determinations.

## Comment 14. Whether Exporters and Importers Should be Permitted to Submit Multiple Certifications, as Applicable

*BYD HK*[451] and *CSIL*[452]

- Commerce should clarify that exporters and importers eligible to complete both the Appendix IV "Certification for 'Applicable Entries' Under 19 CFR Part 362 Importer Certification" and Appendix VI "Certification Regarding Chinese Components Importer Certification" certifications may file both certifications.
- Commerce's clarification would provide certainty to importers whose imports comply with the conditions of both certifications should *Presidential Proclamation 10414* and/or Commerce's related September 16, 2022 Final Rule be amended or terminated.[453]
- There is no principled basis for Commerce to preclude parties from filing two certifications and clarifying an importer's ability to submit more than one certification would assist in Commerce's administration of the final determination in these inquiries.
- Commerce should amend its certifications and related appendices to allow importers to submit both the Appendix IV "Certification for 'Applicable Entries' Under 19 CFR Part 362 Importer Certification" and Appendix VI "Certification Regarding Chinese Components Importer Certification" certifications to clarify the certification regime, and in turn, promote its administrability.

No other interested party commented on this issue.

**Commerce's Position:**  We confirm that importers and exporters may complete certifications under ***both*** Appendix IV and Appendix VI of the *Preliminary Determinations*.  Following the release of the *Preliminary Determinations*, Commerce informed interested parties of the certification requirement[454] and established the following types of certifications to administer *Presidential Proclamation 10414* and the findings from the *Preliminary Determinations*:  (1) importer and exporter certifications that specific entries meet the regulatory definition of "Applicable Entries"; (2) importer and exporter certifications that specific entries are not subject to suspension of liquidation or the collection of cash deposits based on the preliminary negative circumvention determinations (in combination with certain of its wafer exporters); and (3) importer and exporter certifications that specific entries of inquiry merchandise are not subject to suspension of liquidation or the collection of cash deposits pursuant to this preliminary country-wide affirmative determination of circumvention because the merchandise was not manufactured using certain components produced in China.[455]  Copies of the certifications and information regarding the certification requirements were provided in the Appendices to the *Preliminary*

---

[451] *See* BYD HK's March 6, 2023 Case Brief at 4-6.

[452] *See* CSIL's March 6, 2023 Case Brief at 3-4.

[453] *See* BYD HK's March 6, 2023 Case Brief (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56868).

[454] *See Preliminary Determinations*, 87 FR at 75225.

[455] *See Thailand* PDM at 23-24.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

*Determination.*[456] Appendix IV of the *Preliminary Determination* related to the certification for "Applicable Entries" under 19 CFR Part 362 whereas Appendix VI relates to the certification regarding Chinese components. We acknowledge that exporters/importers shipping inquiry merchandise from the four countries subject to the circumvention inquiry (*i.e.*, Cambodia, Malaysia, Thailand, and Vietnam) may qualify under the "Applicable Entries" Appendix IV certification related to the *Presidential Proclamation 10414* and the Chinese components Appendix VI certification. Thus, exporters/importers may elect to complete both the Appendix IV and Appendix VI certifications.

**Comment 15. Whether or Not Companies Found Not to be Circumventing Should be Required to Certify and to Identify Their Wafer Suppliers**

*Hanwha*[457]

*Commerce Should Not Request Certifications for Companies Found Not to Be Circumventing the Orders*

- The significance of a negative determination of circumvention is that merchandise exported by a respondent found not to be circumventing the orders is not within the scope of the relevant AD/CVD orders.[458] Yet, contrary to law, Commerce has imposed a certification regime on Hanwha's entries.
- Commerce has the discretion to act to prevent the evasion or circumvention of AD law.[459] Commerce may impose measures such as a certification regime if they believe it will be effective in the prevention of future circumvention.[460]
- Hanwha was found not to be circumventing and, thus, Commerce should not require any certification on exports of solar cells and modules produced by Hanwha because they are not subject merchandise.
- Commerce's stated objective is to craft certification language that targets as closely as possible the merchandise that is circumventing the orders. Imposing a certification requirement on merchandise exported by Hanwha is contrary to this principle.
- Commerce should take reasonable steps to ensure that merchandise from an exporter found not to be circumventing the orders is not subject to suspension of liquidation and ADs/CVDs.[461]
- In prior negative circumvention determinations, Commerce has consistently not adopted any certification requirements.[462] Therefore, companies for which Commerce reaches a negative determination should be exempt from a certification requirement.
- Commerce may implement a certification requirement under 19 CFR 351.228 if Commerce finds the merchandise subject to the inquiry pursuant to 19 CFR

---

[456] *See Preliminary Determinations*, 87 FR at 75227-31.
[457] *See* Hanwha's March 6, 2023 Case Brief at 2-15.
[458] *Id.* (citing 19 CFR 351.226(g)(2)).
[459] *Id.* (citing *Tung Mung CIT*).
[460] *Id.* (citing *Butt-Weld Pipe Fittings from China (Malaysia)*).
[461] *Id.* (citing *Mitsubishi Heavy Industries*).
[462] *Id.* (citing *CORE from China (Guatemala)*; *CORE from China (South Africa)*; *PET Film from the UAE (Bahrain)*; and *Pipe and Tube from India (Oman and UAE)*).

86

351.226(m)(1)(iv).  However, neither the statue nor Commerce's regulations require a certification requirement in the event of a negative circumvention determination.

- If Commerce makes a negative determination, it is required to terminate the proceeding and terminate the suspension of liquidation with a refund of any cash deposit.[463] Therefore, if Commerce makes a negative final circumvention determination, that merchandise must not be included in the *Orders* or subject to duties.

- Because Hanwha is not disclosing its wafer suppliers it is unfairly placed in the same position as the respondents for which Commerce made an affirmative circumvention finding.  This is inconsistent with the statute and Commerce's own regulations, which requires Commerce to terminate the suspension of liquidation in the event of a negative determination in an AD investigation.

*Commerce Has Requested Certifications Where Exporters Reported No Shipments but that Situation is Not Analogous to a Negative Determination*

- Commerce has previously imposed certification requirements on companies found to have no shipments in affirmative circumvention determinations.  Those scenarios are not the same as a negative circumvention determination.[464]

- In these cases, Commerce found the companies to have no shipments, finding that there are no reviewable entries or no reviewable shipments and not investigating a company's books and records to determine if it is circumventing pursuant to section 781(b) of the Act.

- Conversely, a negative circumvention determination is made after Commerce has analyzed a respondent's information.  Hanwha has provided multiple questionnaire responses, thousands of pages of confidential information, and conducted verification of all information needed.

- In *Pipe and Tube from India (Oman and UAE)*, Commerce reached a negative country-wide determination and did not impose any certification requirements.[465]  Similar to this, Hanwha was found not to be circumventing, a certification is not required and requiring one is contrary to law.

*If Commerce Continues to Require Certifications for Companies Found Not to be Circumventing, Commerce Should Modify the Appendix V Certification Requirement and Allow Hanwha to Certify Without Disclosing the Identity of its Wafer Exporters[466]*

- Hanwha objects to the requirement of publicly disclosing the names of its wafer exporters in order to use the certification regime imposed in the *Preliminary Determination*, as it is contrary to Commerce's APO practice and imposes significant harm to Hanwha's business relationships.

- Specifically, 19 CFR 351.105(c)(6) states that Commerce will normally consider the names of particular customers, distributors or suppliers as BPI if so designated by the

---

[463] *Id*. (citing section 731(c)(3) of the Act).
[464] *Id.* (citing *Butt-Weld Pipe Fittings from China (Malaysia)*; and *CORE from China (UAE)*).
[465] *Id.* (citing *Pipe and Tube from India (Oman and UAE)*).
[466] Hanwha refers to the wafer exporters (the companies that ship the wafers from China to Malaysia) as wafer suppliers.  For our analysis these terms are interchangeable.  We note that the Appendix V certification asks for companies to confirm their wafer "exporter."

submitter.  Hanwha has properly requested BPI treatment of the names of its unaffiliated suppliers.

- Requiring Hanwha to disclose the identity of its wafer exporters is therefore inconsistent with the APO, and also seems to violate the spirit of the Trade Secrets Act.
- The identity of wafer exporters/suppliers is extremely sensitive for a variety of commercial reasons, making it virtually impossible for Hanwha to comply.
- None of the five statutory factors under section 781(b)(1)(C) of the Act required an examination of the identity of Hanwha's wafer exporters/suppliers, beyond the fact that the wafers were of Chinese origin.
- Commerce should allow Hanwha to certify that the solar cells and modules are produced in the same general manner as examined in the investigation, without requiring it to trace such exports to a specific wafer supplier.
- The identity of the wafer exporters/suppliers also has no bearing on Commerce's analysis with respect to section 781(b)(1)(D) of the Act.
- In past cases where Commerce has established certification requirements, such as in *CORE from China (UAE)*, respondents were not required to provide the names of their substrate providers.  The respondents were simply required to certify that the substrate was not Chinese.
- The identity of an input supplier has never been part of any certification regime in a circumvention inquiry.
- The proposed certification regime does not take into account that Hanwha and others may qualify new wafer suppliers.  Hanwha seeks confirmation that it will not be barred from using new wafer suppliers for future shipments, should Commerce continue to require the identification of wafer suppliers.
- If Commerce believes a certification regime is necessary, Commerce should modify the certification language and allow a company who received a negative determination to certify that the subject merchandise was produced by that company using a substantially similar production process, without having to publicly disclose the identity of its wafer suppliers.
- Companies found not to be circumventing should be allowed to certify that cells exported to the U.S. are for use in modules produced by affiliated parties in the United States.  Such a certification would be easy to enforce and administer by CBP and would not be detrimental to the U.S. industry in any way as the cells would be dedicated for consumption by an affiliated supplier to produce U.S. modules.
- While Hanwha's inability to use the Appendix V certification could be mitigated by using the Applicable Entries certification, it is inadequate for a company found not to be circumventing.

*Boviet*[467]
- The inclusion of a specific wafer supplier requirement is unnecessary to prevent circumvention, is unrelated to the reasoning underlying Commerce's negative determination, imposes an unnecessary burden on Boviet, and complicates administrability for CBP.

---

[467] *See* Boviet's March 6, 2023 Case Brief at 1-4.

88

- Commerce reached a *Preliminary Determination* that Boviet is not circumventing, based on a number of factors, none of which has any connection to the identity of the Chinese exporter supplying Boviet wafers.
- Boviet's wafer supplier was not a part of Commerce's negative determination for Boviet, and as it is not related to Commerce's determination, Commerce should remove this aspect of the certification requirement.
- The wafer supplier restriction unnecessarily complicates Boviet's compliance with and CBP's administration of Commerce's certification. It hinders Boviet's ability to make normal commercial decisions regarding its supply of wafers.
- Boviet requests that Commerce modify the Appendix V certification to exclude the wafer exporter/supplier requirement for the importer in paragraph F(3) and for the exporter in paragraph D(3), if not remove the certification requirement altogether.

*Auxin*[468]

- Commerce should not weaken its certification regime by carving out certain solar producers, exporters, or importers, making certain requested changes, or delaying its implementation.
- Hanwha argues that Commerce should not impose a certification requirement for companies that received a negative circumvention determination, but because of Commerce's preliminary country-wide affirmative circumvention findings, such a certification regime is necessary to give full effect to Commerce's determination.
- Auxin's proposed certification regime as provided in section II of the rebuttal brief, should make certification easy for companies like Hanwha that have been found to not be circumventing.
- Allowing a producer temporary or permanent exemption from the affirmative ruling and its certification requirements because it is not currently relying on Chinese substrate creates the possibility of future circumvention by that producer.[469]
- With respect to *CORE from China (Guatemala)*, *CORE from China (South Africa)*, *PET film from the UAE (Bahrain)*, and *Pipe and Tube from India (UAE)*, these were negative country-wide circumvention determinations, and therefore, Commerce did not institute certification regimes.
- Where a certification requirement is imposed, it must be imposed on a country-wide basis to avoid evasion of the order and circumvention findings.
- Commerce should alter its certification regime by applying rules proposed by Auxin. Adopting these rules would obviate respondents' arguments regarding the need to publicly identify their wafer suppliers, provide flexibility to respondents in qualifying new wafer suppliers, allow respondents to make commercial decisions, and simplifies the records importers are required to maintain.
- Auxin's proposal is better because it:  (1) avoids the need for respondents to publicly identify their wafer suppliers; (2) provides flexibility to respondents so they are not locked into certain wafer suppliers; (3) allows respondents to determine what is best for their commercial interests when securing Chinese inputs; and (4) simplifies the types of records needed to be maintained by importers.

---

[468] *See* Auxin's March 17, 2023 Rebuttal Brief at 17-21.
[469] *Id.* (citing *CRS from China (Vietnam)*).

**Commerce's Position:**  We continue to find the certification requirements implemented in the *Preliminary Determinations* to be adequate and appropriate.  For the final determinations, we have made slight modifications regarding the wafer exporter language included in the certifications at Appendix V.

Based on record information, Commerce initiated a country-wide circumvention inquiry to determine whether imports of solar cells and modules exported from, and produced in, Cambodia, Malaysia, Thailand, and Vietnam were circumventing the *Orders*.[470]  On December 8, 2022, we preliminarily found that solar cells and modules from Cambodia, Malaysia, Thailand, and Vietnam were circumventing the *Orders* on a country-wide basis.  Under 19 CFR 351.226(m)(1), Commerce is authorized to take the appropriate remedy to address circumvention and prevent evasion of an order, including the application of a determination on a country-wide basis.  Therefore, Commerce applied the affirmative determination of circumvention to all shipments of inquiry merchandise from all four countries on or after April 1, 2022, the date of publication of the *Initiation Notice*.

As stated in the *Preliminary Determinations*, we determined that shipments of inquiry merchandise by Hanwha, in combination with certain wafer exporters, completed in Malaysia using certain parts and components manufactured in China are not circumventing the *Orders*.  In order to administer the country-wide affirmative determination of circumvention, and the company-specific negative determinations of circumvention, Commerce established the certification regime.  The certification regime was implemented to ensure that the merchandise from Hanwha using the specific supply-chain that was found to be not circumventing the *Orders*, is not improperly subject to the *Orders*.

Hanwha argues that companies found not to be circumventing the *Orders* should not be required to certify, as the negative determination of circumvention means that the merchandise exported by the respondent is not within the scope of the relevant order.  In previous negative circumvention determinations, Hanwha notes, Commerce has not adopted any certification requirements.[471]  Additionally, Hanwha contends that in accordance with section 735(c)(2) of the Act, Commerce is required to terminate the proceeding following a negative determination, and to terminate the suspension of liquidation.  The CIT has held that Commerce is expected to take reasonable steps to prevent the suspension of liquidation of non-subject merchandise.  According to Hanwha, based on past precedent where Commerce reached a negative determination, Commerce has indicated that importers and exporters are no longer required to certify their products, lifted the suspension of liquidation, and ordered CBP to refund any cash deposits.[472]

As stated above, Commerce is authorized under 19 CFR 351.226(m)(1) to take the appropriate remedy to address circumvention, including the application of the determination on a country-wide basis to all products from the same country as the product at issue.  Accordingly, Commerce initiated these circumvention inquiries on a country-wide basis and reached an affirmative country-wide determination in its *Preliminary Determinations*.  Therefore, we find the facts of the cases cited by Hanwha not to be analogous to these inquiries.  Commerce did not

---

[470] *See Initiation Notice.*
[471] *See* Hanwha's March 6, 2023 Case Brief (citing *CORE from China (Guatemala)*; *CORE from China (South Africa)*; *Pipe and Tube from India (UAE)*; and *PET Film from the UAE (Bahrain)*).
[472] *See* Hanwha's March 6, 2023 Case Brief (citing *Shelter Forest*).

require certifications in *CORE from China (Guatemala)*, *CORE from China (South Africa)*, and *Pipe and Tube from India (UAE and Oman)* because these were negative country-wide determinations. In *PET Film from the UAE (Bahrain)*, the proceeding was initiated on a specific respondent, not on a country-wide basis. Commerce has repeatedly applied certification requirements in other circumvention inquiries which were subject to an affirmative country-wide decision.[473] Hanwha also asserted that the facts in *Butt-Weld Pipe Fittings from China (Malaysia)* and *CORE from China (UAE)* were not relevant due to the respondents reporting no shipments. However, we find these cases to be relevant as they were circumvention inquiries initiated on a country-wide basis and found to be affirmative. The country-wide affirmative decision was what resulted in the need for certifications for importers and exporters.

Given the affirmative country-wide determinations in the instant inquiries, there is no basis for Commerce to terminate the inquiries, and instead, pursuant to section 781(b)(1)(E) of the Act and 19 CFR 351(m)(1)(iv), Commerce deems a certification regime to be necessary and appropriate administer the determinations and prevent evasion of the *Orders* in the future. The certification regime allows companies found not to be circumventing the *Orders* opportunities to avoid the application of ADs/CVDs. As such, we find the certification regime to be a reasonable step to prevent the suspension of liquidation of non-subject merchandise. Thus, requiring Hanwha to complete certification requirements is not equivalent to treating Hanwha as an affirmative company, but a measure to ensure that Hanwha can certify entries that are not subject to the *Orders* as a consequence of the negative determination regarding Hanwha, while also allowing for the continued administration and enforcement of *Orders*. If Hanwha and other parties are accurately filling out the certifications, they will not be subject to the *Orders*. The facts of this case do not resemble those of *Shelter Forest* as we reached an affirmative country-wide determination in this case. In *Shelter Forest*, Commerce made a negative determination and as a result, indicated that respondents no longer needed to certify, lifted the suspension of liquidation, and ordered CBP to refund any cash deposits.[474] Therefore, we find the facts of *Shelter Forest* to not be relevant.

Hanwha next argues that should Commerce continue to require companies found not to be circumventing, Commerce should modify the Appendix V certification and allow Hanwha to certify without disclosing the identity of its wafer suppliers/exporters. Specifically, Hanwha notes that requiring it to publicly disclose the names of its wafer suppliers/exporters is contrary to APO practice, and pursuant to 19 CFR 351.105(c)(6), a supplier's identity should be treated as BPI. Additionally, per Hanwha, the identity of specific wafer suppliers has no bearing on Commerce's analysis under sections 781(b)(1)(C) and 781(b)(1)(D) of the Act. Boviet further contends that the inclusion of a specific wafer supplier is unnecessary and is unrelated to the reasoning underlying Commerce's determination.

Commerce finds the request to treat the names of wafer exporters/suppliers as BPI within the Appendix V certification to be appropriate and has modified the certification accordingly. Section 351.105(c)(6) of Commerce's regulations states that Commerce will normally consider the names of particular customers, distributors, or suppliers to be BPI, if so designated by the

---

[473] *See Butt-Weld Pipe Fittings from China (Malaysia)*; *CRS from China (Vietnam)*; *CORE from China (Vietnam)*; and *CORE from China (UAE)*.
[474] *See Shelter Forest.*

submitter.  As Hanwha has requested the business proprietary treatment of its unaffiliated wafer suppliers, the regulations state that Commerce will normally treat it as BPI.  Therefore, Commerce has modified the certification under Appendix V to allow the business proprietary treatment of wafer exporters for all respondents found not to be circumventing.  Certifications submitted to CBP as part of an entry package are not made publicly available, and such information will not be publicly disclosed.

With respect to arguments related to the inclusion of specific wafer exporters in the certification, we continue to find it necessary for the names of specific wafer exporters to be required on the certification under Appendix V, with the modification for BPI treatment described above.  In the *Preliminary Determinations*, and as affirmed in this final determination, we performed an analysis based on the particular supply chains of each mandatory respondent.  The *Preliminary Determination* specifically states that we determined that Hanwha's exports of inquiry merchandise produced with wafers exported by the specific parties reported in their questionnaire responses are not subject to the *Orders*.  Therefore, the certification under Appendix V is established to provide companies found not to be circumventing on a company-specific basis to certify that their specific supply chain is not subject to the *Orders*.  As a result, Commerce continues to require respondents found not to be circumventing to include the names of its wafer exporters in the certification.  Our analysis under section 781(b)(2) of the Act is done at an exporter-specific level and the country of origin of the wafer is a critical aspect of our analysis.  Because we are permitting parties to certify shipments as not circumventing only if the shipment utilizes the supply chain examined in this inquiry and we are requiring both the exporter and importer to certify this, the exporter may need to disclose their wafer supplier to their importer.  Should respondents wish to use new wafer suppliers for future shipments, the certifications under Appendix IV and Appendix VI remain available to all companies found not to be circumventing.

Lastly, Auxin commented that Commerce should alter its certification regime by adopting the rules it proposed.  Doing so, according to Auxin, would obviate the need for respondents to publicly identify their wafer suppliers, provide flexibility to respondents in qualifying new wafer suppliers, allow respondents to make commercial decisions, and simplifies the records importers are required to maintain.  Commerce has addressed Auxin's proposal under Comment 19.

Based on the analysis above, Commerce finds the certification regime established at the *Preliminary Determinations* to be appropriate.  With respect to the certification listed under Appendix V, Commerce continues to require the names of specific wafer exporters but will allow respondents to treat them as BPI.

**Comment 16. Whether Commerce Should Reconsider Certification Eligibility in Changed**
          **Circumstances Reviews**

*Vina/LONGi*[475]
- A changed circumstances review is preferable to an administrative review as a proceeding segment in which Commerce could reconsider a company's eligibility to participate in the solar circumvention certification regime.

---

[475] *See* Vina/LONGi's March 6, 2023 Case Brief at 3-6.

92

- The Act and Commerce's regulations indicate that administrative reviews are used to determine final liabilities for ADs/CVDs, not to address matters related to circumvention inquiries.[476]
- It would take too long for a company to gain access to the solar circumvention certification regime through an administrative review and the company would need to participate in multiple administrative reviews.
- For example, under *Presidential Proclamation 10414* and Commerce's implementing regulations (which provide that Commerce will instruct CBP to discontinue suspension of liquidation and the collection of cash deposits on "Applicable Entries" of inquiry merchandise on or before June 6, 2024, (the current Date of Termination of *Presidential Proclamation 10414*)), unless a company incorrectly declared that it had a reviewable suspended entry before June 6, 2024, it will not have any reviewable entries until the twelfth administrative review of the *AD Order* (which covers the period December 1, 2023, through November 30, 2024). The final results of 2023-2024 AD review may not be issued until as late as June 2026. Meanwhile, the company would not be able to use solar circumvention certifications during the POR of the thirteenth administrative review of the *AD Order* (covering the period December 1, 2024, through November 30, 2025) and would need to request that its shipments/entries during the 2024-2025 POR be reviewed. The final results of that review may not be issued until as late as June 2027.
- Moreover, if a company in an inquiry country requested an administrative review and was selected as a mandatory respondent, it would be a waste of resources to conduct a complete analysis of the company's exports/entries when the reason the company requested the review was to establish its eligibility to certify that its solar cells and/or solar modules are not inquiry merchandise subject to review.
- In contrast, in changed circumstances reviews Commerce does not need to issue a questionnaire,[477] or conduct the full analysis performed for mandatory respondents but may focus on the precise reason the company was determined to be ineligible to participate in the solar circumvention certification regime.
- In a changed circumstances review a company could be given the opportunity to establish its eligibility to participate in the solar circumvention certification regime by demonstrating that it is able to trace the components in solar cells or modules to the country in which the wafer and other significant material inputs were produced and thus satisfy the certification requirements.
- Thus, Commerce can address a "change" in its determination that a company was not eligible to participate in the solar circumvention certification regime in a changed circumstances review. Commerce followed this approach in *OCTG from China CCR*.[478]
- Commerce should consider examining certification eligibility in changed circumstances reviews as an alternative to reviewing such eligibility in administrative reviews.

No other interested party commented on this issue.

---

[476] *Id.* (citing section 751(a)(A)-(B) of the Act).
[477] *Id.* at 5 (citing 19 CFR 351.221(c)(3)(iii)).
[478] *Id.* at (citing *OCTG from China CCR*, 87 FR at 15915).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

**Commerce's Position:**  We disagree with Vina/LONGi's position that Commerce should reconsider a company's ineligibility to participate in the solar circumvention certification regime in changed circumstances reviews.  Rather, Commerce will consider requests for eligibility to participate in the solar circumvention certification regime in administrative reviews.

Section 751(b)(1) of the Act provides that "{w}henever {Commerce} receives information concerning, or a request from an interested party for a review of {a final determination, suspension agreement, or continued investigation} which shows changed circumstances sufficient to warrant a review of such determination or agreement, {Commerce} shall conduct a review of the determination or agreement …"  The phrase "changed circumstances" is not defined in the Act, the SAA, or Commerce's regulations and none of those primary and secondary sources contain an explanation of what aspects of a determination may be reconsidered in light of changed circumstances.  While Commerce has broad discretion in determining whether to initiate a changed circumstances review and in deciding the range of matters that can be considered in such a proceeding, its discretion is limited by the statutory requirement that there be "changed circumstances sufficient to warrant a review" of the antidumping order.[479]  In practice, Commerce has conducted changed circumstances reviews to address a wide variety of issues, some of which could also be addressed in the context of an administrative review.[480]  Commerce's practice is to determine, on a case-by-case basis, whether changed circumstances sufficient to warrant a review exist.[481]

Here, Vina/LONGi failed to identify any circumstance that has changed.  Rather, Vina/LONGi argued that "… a changed circumstances review can address a "change" in Commerce's determination that a company was not eligible to participate in its certification program."  However, the circumstance that led Commerce to prohibit importers/exporters from certifying as to the non-Chinese content in inquiry merchandise from certain companies[482] is the fact that those companies did not cooperate in the circumvention inquiry (they either failed to respond to Commerce's quantity and value questionnaire or failed to permit Commerce to verify their questionnaire responses).  The fact that these companies did not cooperate in the inquiry has not changed.  Without any changed circumstances, we find no basis for conducting a changed circumstances review.

In contrast, in *OCTG from China CCR*, the case cited by Vina/LONGi to support its position, there was a change in the facts underlying Commerce's determination.  Specifically, in the underlying circumvention inquiry, Commerce did not implement certifications "because the HLD companies were "unable to track welded OCTG to the country of origin of inputs used in

---

[479] *See* section 751(b)(1) of the Act.
[480] *See, e.g., Aluminum Extrusions from China Preliminary CCR*, 83 FR at 34548 (finding sufficient information to initiate a changed circumstances review to recalculate certain cash deposit rates); *see also Nails from Malaysia CCR Initiation*, 80 FR at 71772 (finding sufficient information and "good cause" to initiate a changed circumstances review to evaluate whether a company was properly utilizing the correct cash deposit rate); and *Pure Magnesium from Canada CCR Initiation*, 57 FR at 41473 (finding sufficient information and "good cause" to initiate a changed circumstances review to evaluate changes to the major subsidy program at issue in the underlying investigation).
[481] *See Tapered Roller Bearings from China*, 67 FR at 10665.
[482] Commerce did not prohibit exporters or importers from certifying that an entry was an "Applicable Entry" under 19 CFR 362.102.

94

the production of welded OCTG …"[483]   In the related changed circumstances review Commerce found that there was a change in circumstances because "the HLD companies are now able to identify and effectively segregate welded OCTG produced by either HLDS (B) in Brunei or HLD Clark in the Philippines using non-Chinese hot-rolled steel from other OCTG produced at their facilities."[484]   We do not have this fact pattern in this circumvention inquiry, and *OCTG from China CCR* did not involve or address companies that failed to cooperate in the earlier circumvention inquiry.

Our approach is consistent with *Plywood from China (Vietnam)* wherein Commerce stated that "we decline to reconsider eligibility for the certification programs established by these circumvention inquiries in the context of a CCR and instead, determine that the appropriate mechanism by which to assess previously ineligible exporters' eligibility for the certification programs for purposes of this proceeding is in the ongoing ARs of the *Orders*."[485]   In that case Commerce explained that in contrast to other cases where companies subsequently claimed that they had changed the methods by which they tracked their raw materials, and Commerce conducted CCRs to verify these new facts, "companies always had the ability to participate or to provide accurate data, and we do not see this as a change in the future."[486]

Vina/LONGi contends that it is preferable for Commerce to consider a company's eligibility to participate in the solar circumvention certification regime in a changed circumstance review, rather than an administrative review for a number of reasons.  Specifically, Vina/LONGi contends that the purpose of an administrative review is to determine final liabilities for ADs and CVDs, not to address matters related to circumvention inquiries.  Moreover, Vina/LONGi maintains that it would take too long and require multiple reviews to gain access to the certification regime, and it could lead to significant and unnecessary work and analysis (*e.g.*, a party simply seeking access to the certification regime may have to file a separate rate application and could be selected as a mandatory respondent).  We have responded to those concerns below.

First, Commerce must determine if entries of solar cells or modules are inquiry merchandise or not, and how to assess duties on merchandise deemed subject to these circumvention inquiries.  Certifications are relevant to that decision because whether or not importers and exporters have met the certification requirements affects whether or not AD/CVDs will be assessed on the entries.  Because the Act directs Commerce to determine final assessment rates in administrative reviews, we find that considering certification eligibility in administrative reviews is consistent with the purpose of that proceeding segment as provided in the Act.

Second, we do not find that our decision to reconsider certification eligibility in an administrative review places importers or exporters of inquiry merchandise from AFA companies in a different position, in terms of timing or requesting multiple reviews, than if they were to import or export subject merchandise from a company that currently has a dumping margin based on AFA.  In both cases, parties would need to wait until the anniversary month of the

---

[483] *See OCTG from China CCR*, 87 FR at 15915.
[484] *Id.*, 87 FR at 15916.
[485] *See Plywood from China (Vietnam) Final* IDM at Comment 13.
[486] *Id*.

95

AD/CVD order to request an administrative review and then would need to wait until the final results of that review were published before, depending on the outcome of the review, entries may no longer be subject to an AFA rate.  Exporters/producers seeking reconsideration with respect to certification eligibility would face a similar timeline before certifications could be used.

Moreover, Commerce did not prohibit importers/exporters from certifying that entries of inquiry merchandise from AFA companies are "Applicable Entries" under 19 CFR 362.102.[487]  Thus, importers and exporters of inquiry merchandise from AFA companies may currently participate in that part of the certification regime and do not need to wait for an administrative review. Furthermore, in the *Preliminary Determination*, which was issued on December 1, 2022, Commerce noted that:

> If it is determined that an importer and/or exporter has not met the certification and/or related documentation requirements for certain entries, Commerce intends to instruct CBP to suspend, pursuant to these preliminary country-wide affirmative determinations of circumvention and the *Orders*, all unliquidated entries for which these requirements were not met and require the importer to post applicable AD and CVD cash deposits equal to the rates noted above.[488]

> Interested parties that wish to have their suspended non-"Applicable Entries," if any, reviewed, and their ineligibility for the certification program re-evaluated, should request an administrative review of the relevant suspended entries during the next anniversary month of these *Orders* (*i.e.*, December 2022 for the *Solar Cells AD Order* and December 2023 for the *Solar Cells CVD Order*).[489]

As indicated above, Vina/LONGi claims that unless a company incorrectly declared that it had a reviewable suspended entry before June 6, 2024, it will not have any reviewable suspended entries until the twelfth administrative review of the *AD Order* (which covers the period December 1, 2023, through November 30, 2024) and could not request an administrative review until December 2024.  Under section 751(a) of the Act, Commerce does not conduct an administrative review of an exporter/producer absent a suspended entry of subject merchandise from that exporter/producer.[490]  However, a U.S. entry of inquiry merchandise made prior to the date of termination of the Proclamation (currently June 6, 2024), that does not meet the "Applicable Entries" certification requirements, could be suspended by CBP.  Specifically, 19 CFR 362.103(b)(iii) provides that "{i}n the event of an affirmative preliminary or final determination of circumvention in the Solar Circumvention Inquiries, the Secretary will direct CBP to suspend liquidation of entries of, and collect cash deposits of estimated duties on, imports of Southeast Asian-Completed Cells and Modules that are not Applicable Entries." Commerce has so directed CBP.[491]  Therefore, an AFA company could have a reviewable

---

[487] *See Preliminary Determinations*, 87 FR at 75221, 75223.  "Applicable Entries" are not subject to suspension of liquidation or the collection of AD or CVDs.
[488] *See Preliminary Determinations*, 87 FR at 75221, 75225.
[489] *Id.*, 87 FR at 75223.
[490] *See Shanghai Sunbeauty Trading Co.*,380 F. Supp. 3d. 1328 (CIT 2019) (affirming Commerce's decision not to conduct a review absent a suspended entry).
[491] *See* CBP Messages Memorandum at msg. no.3041408 at paragraphs 5, 9, and 12b.

suspended entry before the AD AR covering the period December 1, 2023, through November 30, 2024.

Furthermore, as explained above, if such a company's inquiry merchandise was entered into the United States as an "Applicable Entry" before the date of termination of the Proclamation, such an entry will not be subject to ADs or CVDs.  In other words, "Applicable Entries" of Vina/LONGi's inquiry merchandise prior to June 2024 are not treated any differently in a substantive way than if the company had been able to participate in the components portion of the certification program.

Lastly, as noted above, Vina/LONGi expressed concerns that if a party requests an administrative review of an AFA company for Commerce to reconsider certification ineligibility, the AFA company could be selected as a mandatory respondent or need to unnecessarily complete a separate rate application.  In such cases, the requestor should note in the request for an administrative review that it believes that all the imported merchandise from the AFA company would meet the certification requirements and it is seeking a review in order for Commerce to reconsider the exporters/producer's eligibility to certify to that fact.  Commerce could then establish segment-specific procedures in the administrative review for addressing such situations.

In sum, neither the facts in this case, nor Vina/LONGi's arguments, provide a basis for reconsidering certification ineligibility for AFA companies in a changed circumstances review.  As noted in the *Preliminary Determination*, "{i}nterested parties that wish to have their … ineligibility for the certification program re-evaluated, should request an administrative review of the relevant suspended entries during the next anniversary month of these *Orders*."[492]

## Comment 17. Whether Cadmium Telluride Thin Film Solar Products are Covered by Affirmative Final Determinations or Related Certification Requirements

*First Solar Malaysia*[493] and *First Solar Vietnam*[494]
- Commerce did not include CdTe thin film photovoltaic products in its definition of inquiry merchandise.
- Because CdTe thin film photovoltaic products were excluded from the definition of inquiry merchandise and are explicitly excluded from the *Orders* scope language, the circumvention inquiries do not cover CdTe thin film photovoltaic products.
- The ITC intentionally excluded CdTe thin film products from its injury analysis in the underlying affirmative final material injury determinations.[495]
- Given the ITC's intentional exclusion of CdTe products, Commerce cannot lawfully include CdTe thin film products in its circumvention inquiries.[496]

---

[492] *See Preliminary Determinations*, 87 FR at 75221, 75223.
[493] *See* First Solar Malaysia's March 6, 2023 Case Brief at 2-6.
[494] *See* First Solar Vietnam's March 6, 2023 Case Brief at 2-6.
[495] *See* First Solar Malaysia's March 6, 2023 Case Brief at 3 (citing *ITC Solar Final* at Attachment 37-A.).
[496] *Id.* (citing *Wheatland*, 161 F.3d at 1371).

97

- Auxin limited its request for circumvention inquiries to CSPV products and Commerce initiated on that request stating that the class or kind of circumventing merchandise is identical to the CSPV products completed in China that are subject to the *Orders*.[497]
- The certification requirements in the *Preliminary Determination* do not apply to CdTe thin film products.  The three certifications created by Commerce are instead meant to cover CSPV cells or modules.
- The *Preliminary Determination* and its certification requirements do not pertain to CdTe thin film products.  However, given the language of the certifications, it is possible for mistakes to occur, such as a misinterpretation of the term "solar cells and/or solar modules."
- Commerce should take steps to minimize the risk that any affirmative final determination and related certification requirements would be misinterpreted to extend beyond certain CSPV products.
- Should Commerce continue using terms such as "solar cells and modules" or "solar cells and/or solar modules," Commerce should clearly define such terms upon first use to indicate that the terms only pertain to CSPV products.[498]

No other interested party commented on this issue.

**Commerce's Position:**  We confirm that the final affirmative determinations and the related certification requirements apply only to CSPV cells and modules but disagree with First Solar Malaysia and First Solar Vietnam that an affirmative determination of circumvention could be inadvertently applied to non-CSPV products.  As described in the *Preliminary Determinations*, the scope of the *Orders* explicitly exclude "thin film photovoltaic products produced from amorphous silicon (a-Si), cadmium telluride (CdTe), or copper indium gallium selenide."[499] When discussing the merchandise subject to the circumvention inquiry, the *Thailand* PDM and *Federal Register* notice described that "{t}his circumvention inquiry covers, "crystalline silicon photovoltaic cells that meet the physical description of crystalline silicon photovoltaic cells in the scope of the underlying AD/CVD orders, subject to the exclusions therein, whether or not partially or fully assembled into other products, that were produced in {Cambodia, Malaysia, Thailand, and Vietnam} from wafers produced in China."[500]  Therefore, CdTe thin film solar products are not covered by the final affirmative determinations and the related certification requirements.  Given the exclusionary language referenced within the scope of the *Orders*, we find it unnecessary to update the language included in the certifications.

**Comment 18. Clarification and Enforcement of the Utilization Requirement**

To qualify to enter inquiry merchandise under *Presidential Proclamation 10414* without regard to ADs and CVDs inquiry merchandise imported into the United States after November 15, 2022, but on or before the Date of Termination of the proclamation, must be used or installed in the

---

[497] *Id. (*citing Initiation Memorandum at 6).
[498] *See* First Solar Malaysia's March 6, 2023 Case Brief at 6.
[499] *See Thailand* PDM at 5.
[500] *Id.* at 7.

98

United States by no later than 180 days after the Date of Termination of the proclamation (the Utilization Expiration Date).[501]

*Auxin*[502]

- Commerce and CBP cannot administer or enforce the use provision in Part 362 of the regulations because: (1) the Utilization Expiration Date is unknown at the time of importation (the *Presidential Proclamation 10414* can be terminated before the stipulated June 6, 2024, date); (2) the definition of "utilization and utilized" is too vague; and (3) no enforcement mechanism has been provided (CBP possesses limited means to track how inquiry merchandise is used once it is entered into the United States). These deficiencies in the regulation create an enormous loophole through which parties can enter inquiry merchandise without regard to AD and CVDs.[503]

- Commerce could redress these deficiencies by implementing the provisions under 19 CFR 358, which include, among other things, use of importer- or exporter-specific duty waiver requests that contain detailed information related to intended uses of the imported product and other relevant information. 19 CFR 358 also includes an enforcement mechanism to address abuses and violations that could include seizures and other penalties.[504]

- Commerce should not consider the resale of inquiry merchandise to an unaffiliated U.S. customer who commits to use the merchandise within 180 days of the Date of Termination of the *Presidential Proclamation 10414*, as use. Commerce specifically stated in 19 CFR 362.102 that resales do not constitute use for this provision. Additionally, it is not clear how Commerce or CBP could confirm that the purchaser honored its commitment.[505]

*TTL*[506]

- Commerce must provide guidance on how to comply with the use requirement in 19 CFR 362 because the requirement could be interpreted in multiple ways.

- Principally, Commerce must confirm that reselling inquiry merchandise to another party does not automatically mean that the use requirement is not met. Because most importers of solar modules do not use the solar modules but sell them to other parties, this interpretation must be correct because to interpret the use requirement otherwise would mean that the requirement limits the precise activity that *Presidential Proclamation 10414* was intended to permit (it was intended to allow sufficient U.S. imports of solar modules from the inquiry countries).

- Even if U.S. resale is permissible, but insufficient to demonstrate use, under 19 CFR 362, further clarification is required regarding how parties engaged in resales can comply with the use requirement.

---

[501] *See* 19 CFR 362.102.
[502] *See* Auxin's March 6, 2023 Case Brief at 24-26; *see also* Auxin's March 17, 2023 Rebuttal Brief at 31.
[503] *Id.* (citing CBP Messages Memorandum at msg. no. 3041408).
[504] *See* Auxin's March 6, 2023 Case Brief at 25-26 (citing *Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 FR at 63230).
[505] *See* Auxin's March 17, 2023 Rebuttal Brief at 32 (citing *Preliminary Determinations*, 87 FR at 75223).
[506] *See* TTL's March 6, 2023 Case Brief at 8-13.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

- The majority of parties that import solar modules do not install the solar modules that they import, but resell them directly, or indirectly, to other parties in diverse distribution networks that include utility developers, distributors, contractors, subcontractors, and residential and commercial installers.  It is unreasonable, and would be an unprecedented burden, to require the companies, most of which do not have access to entry documents, to maintain records for at least five years that allow them to track the installation dates for specific solar modules and link those dates to specific entries of solar modules.  This is an unnecessary burden and cost, especially considering the limited possibility that distributors and contractors would stockpile solar modules.

- Thus, Commerce must clarify that the use requirement in 19 CFR 362 is met if evidence is maintained that shows:  (1) solar modules sold to utility developers were sold for a specific project; (2) the unaffiliated purchaser committed, either by contract or certification, to install the purchased solar modules within 180 days after the Date of Termination of the *Presidential Proclamation 10414*; or (3) imported solar cells were incorporated in a solar module in the United States within 180 days after the Date of Termination.

*BYD HK*[507]

- Commerce must clarify that the use requirement of 19 CFR 362 is met if the inquiry merchandise is used or installed in the United States within 180 days after the Date of Termination of *Presidential Proclamation 10414*, even if another entity takes ownership of the merchandise and is responsible for its use or installation.

*NextEra*[508]

- Auxin's arguments regarding administration of the use requirement in 19 CFR 362 are unpersuasive.

- Contrary to Auxin's claim, the Utilization Expiration Date is known because it is specified in 19 CFR 362 as 180 days after the Date of Termination of *Presidential Proclamation 10414*.  In the unlikely event that *Presidential Proclamation 10414* is terminated before the currently specified termination date, provisions could be made at the time to address Auxin's concerns.

- While Auxin claims that the definition of "utilization and utilized" is too vague, those terms are clearly defined in 19 CFR 362 as "used or installed in the United States." However, Commerce should clarify that "used" includes solar modules that are dedicated to a particular project or delivered to a project site by the utilization expiration date.

- Although Auxin contends that Commerce did not provide any mechanism for enforcing the provisions of 19 CFR 362, Commerce followed its practice by requiring certifications for entries that purportedly qualify for duty free treatment under *Presidential Proclamation 10414*.  In those certifications, importers and exporters must certify to various facts regarding the relevant entries and acknowledge that they are "aware that U.S. law (including, but not limited to, 18 USC 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S.

---

[507] *See* BYD HK's March 6, 2023 Case Brief at 4.
[508] *See* NextEra's March 17, 2023 Rebuttal Brief at 19-23.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

government."[509]  This passage provides an adequate deterrence against parties submitting fraudulent certifications.

- Part 358 of the regulations contains nothing to improve enforcement of *Presidential Proclamation 10414* and Commerce specifically noted in 19 CFR 362.103(a) that "Part 358 of this chapter shall not apply to {duty free imports under Part 362}."[510]

**Commerce's Position:**  Interested parties have raised concerns and some questions regarding the use requirement in 19 CFR Part 362.  We have addressed those concerns and questions below.

The waiver of ADs and CVDs and estimated duties pursuant to 19 CFR Part 362 only applies to certain Southeast Asian-completed solar cells and modules that are entered into the United States, or withdrawn from warehouse, for consumption before the termination of *Presidential Proclamation 10414*, and, for entries after November 15, 2022, are used in the United States by no later than 180 days after termination of the emergency described in *Presidential Proclamation 10414* (the Utilization Expiration Date).  In the Preamble to 19 CFR Part 362, Commerce also used the word "utilized" when it noted that the duty waiver provided by this part of the regulations applies only to Southeast Asian-Completed solar cells and modules entered into the United States after November 15, 2022, "that are utilized in the United States by the Utilization Expiration Date."  Under 19 CFR 362.102, Commerce defines "utilized and "utilization" as follows:

> Utilization and utilized means the Southeast Asian-Completed Cells and Modules will be used or installed in the United States. Merchandise which remains in inventory or a warehouse in the United States, is resold to another party, is subsequently exported, or is destroyed after importation is not considered utilized for purposes of these provisions.

"Used" means the solar cells or solar modules are in operation or functioning in the United States by the Utilization Expiration Date.  "Installed" means the solar cells or solar modules have been affixed to the structure or in the system in the United States on which, or in which, they will operate by the Utilization Expiration Date, but they are not in operation by that date.  The mere sale of solar modules to a party for a specific project, incorporating solar cells into a solar module in the United States, dedicating solar cells or solar modules to a particular project, or delivering solar cells or solar modules to a project site do not constitute being "used" or "installed."  Additionally, as noted in 19 CFR 362.102, "{m}erchandise which remains in inventory or a warehouse in the United States, is resold to another party, is subsequently exported, or is destroyed after importation is not considered utilized for purposes of these provisions."

The use requirement in 19 CFR Part 362 was added because this part of the regulations was "not intended to benefit those who would stockpile {Southeast Asian}-Completed Cells and Modules for an extended period of time … .  It is not Commerce's goal to have merchandise that enters

---

[509] *See* NextEra's March 17, 2023 Rebuttal Brief at 22 (citing *Preliminary Determinations*, 87 FR at 75228-29).
[510] *Id.* at 20.

101

before the Date of Termination be used in projects long into the future, as the emergency declared by the President exists at this very moment."[511]

The act of reselling solar cells or solar modules to another party who will use or install the merchandise does not, in itself, mean that the use requirement in 19 CFR Part 362 cannot be met. However, in order for an importer who sells the solar cells or solar modules that it imported to accurately certify that the solar cells and/or solar modules will be utilized in the United States by no later than 180 days after the earlier of June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* is terminated, the importer must have knowledge of, and documentation supporting, this fact. TTL has argued that a commitment by a purchaser, either by contract or certification, to install the purchased solar modules within 180 days after the Date of Termination of the *Presidential Proclamation 10414*, should satisfy this documentation requirement. However, the documentation that must be maintained is documentation that supports the actual use or installation of the solar cells or solar module by the Date of Termination and that will allow the party completing the certification to certify to the use or installation by that date. Parties that falsify such certifications will be in violation of U.S. law (including, but not limited to, 18 USC section 1001) that imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government. Given the range of companies that could be involved in the transaction chain between the importer of the solar cells and solar modules and the ultimate end-user of those solar cells and solar modules and the potential complexity of the supply chain, we find that it is not feasible for Commerce to list specific types of supporting documentation.

We disagree with Auxin's claim that the use provision in Part 362 of the regulations cannot be administered because the Date of Termination of *Presidential Proclamation 10414* could change and thus the Utilization Expiration Date is unknown at the time of importation. The Date of Termination is not a constantly changing date but is presently a fixed date, June 6, 2024, that has been publicly announced and, thus, is known to importers. In the Preamble to Part 362 of the regulations, Commerce noted that in setting a suspension of liquidation and collection of cash deposit date upon early termination of the Presidential Proclamation, it would "consider the implementation and direction of the President in terminating the emergency."[512] Similarly, if *Presidential Proclamation 10414* is terminated early, at that time, Commerce will "consider the implementation and direction of the President in terminating the emergency" when determining what additional guidance, if any, should be provided regarding the impact of such an early termination on other provisions and requirements in Part 362 of the regulations.

We also disagree with Auxin's claim that no enforcement mechanism has been provided with respect to the use requirement. U.S. law (including, but not limited to, 18 USC section 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government, including fines and imprisonment for not more than 5 years. Moreover, 19 USC section 1592 provides civil penalties for fraud, gross negligence, and negligence. Thus, there are enforcement mechanisms in place and significant consequences for parties who falsely certify that the use requirement will be met.

---

[511] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56879.
[512] *Id*, 87 FR at 56880.

102

Additionally, Commerce informed certifying parties that they must maintain sufficient documentation supporting the facts to which the party certified for the later of five years after the last entry covered by the certification or three years after the conclusion of any litigation in United States courts regarding such entries.[513]  Commerce also informed certifying parties that they are required to provide CBP and/or Commerce with any documents supporting the certification upon the request of either agency and that the claims made in the certification are subject to verification by CBP and/or Commerce.[514]  In addition, Commerce informed certifying parties that failure to maintain the required certifications and supporting documentation, failure to substantiate the claims made in the certifications, or not allowing CBP and/or Commerce to verify the claims made in the certifications, may result in suspension of liquidation of all unliquidated entries for which the requirements were not met, the importer being required to post antidumping duty and countervailing duty cash deposits on those entries, and the importer being precluded from participating in the certification process.[515]  These certification provisions mirror Commerce's regulations at 19 CFR 351.228, which provide that Commerce may instruct CBP to suspend liquidation of entries and required cash deposits of estimated ADs or CVDs where, among other things, "the certification contained materially false, fictitious or fraudulent statements or representations, or contained material omissions."  Therefore, contrary to Auxin's claim, Commerce clearly explained the requirements that must be fulfilled to ensure compliance with the certification regime, including the end use provision, and the consequences of not meeting those requirements.  Hence, Commerce has instituted enforcement mechanisms with respect to the certifications.

While Auxin contends that CBP possesses limited means to track how inquiry merchandise is used once it is entered into the United States, it is incumbent on importers and exporters to maintain sufficient documentation to substantiate their claims in the certifications, including their claims regarding the use requirement.  Moreover, CBP has experience administering similar certifications, namely end-use certifications, in other inquiries,[516] and experience in this proceeding where importers and exporters must track the source of the solar cells used in solar modules imported into the United States in order to certify that the solar cells were not produced in China.

Finally, we disagree with Auxin that provisions in 19 CFR Part 358 should be applied here.  As an initial matter, according to 19 CFR 362.103(a), "Part 358 of this chapter shall not apply to {the importation of Applicable Entries}."  In addition, as Commerce explained in the Preamble to Part 362 of its regulations, "{t}he purpose of the {Presidential} Proclamation is to increase the supply of United States solar energy for electricity generation purposes … and "to allow for more imports …"[517] Part 358 of the regulations, which covers the importation of supplies used for  emergency relief work free of AD/CVDs, requires that a party mail an advance request, in triplicate, to the Secretary of Commerce in which the party asks for approval to import the

---

[513] See Preliminary Determinations, 87 FR at, e.g., Appendix VI.
[514] Id.
[515] Id.
[516] See Wire Rod from Korea and United Kingdom CCR, 84 FR at 13888:  ("Consequently, we are changing the scope of the orders on wire rod from Korea and the United Kingdom by adding exclusion language related to grade 1078 and higher tire cord quality wire rod and requiring that a certification of end-use be filed with CBP at the time of the filing of the Entry Summary with CBP as provided in the Attachment to this notice.")
[517] See Presidential Proclamation 10414 Final Rule Preamble, 87 FR at 56878.

merchandise free of AD/CVDs, and supplies detailed information about the shipment such as the price, quantity, proposed date of entry, mode used to transport, the destination, and the intended uses of, the imported merchandise and other relevant information, much of which does not relate to the date of use.  Part 358 of the regulations also includes an enforcement mechanism to address abuses and violations of Section 318(a) of the Act that could include seizures and other penalties.[518]  Requirements such as these, including the need for Commerce to specifically approve the importation of solar cells/solar modules free of AD/CVDs for each and every entry, could reduce, rather than increase, the supply of United States solar energy for electricity generation purposes and thus is not in keeping with the purpose of *Presidential Proclamation 10414*.  Moreover, Commerce typically requires CBP to suspend liquidation and collect AD/CVD cash deposits for entries where the certification requirement was not met, rather than seizing the imported merchandise.  Therefore, we have not implemented the requirements of Part 358 of the regulations in this case.

In the *Preliminary Determination*, Commerce stated that a solar module produced in one of the inquiry countries would be subject to its affirmative circumvention determination only if the solar module contains solar cells produced from Chinese-produced wafers and three or more of the following components in the module were produced in China:  (1) silver paste; (2) aluminum frames (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6) junction boxes.  Below we have referred to this prerequisite as the "Wafer-Plus-Three" requirement.

## Comment 19. Whether the "Wafer-Plus-Three" Requirement is Appropriate

In the *Preliminary Determination*, Commerce stated that a solar module produced in one of the inquiry countries would be subject to its affirmative circumvention determination only if the solar module contains solar cells produced from Chinese-produced wafers and three or more of the following components in the module were produced in China:  (1) silver paste; (2) aluminum frames; (3) glass; (4) backsheets; (5) EVA sheets; and (6) junction boxes.  Below we have referred to this prerequisite as the "Wafer-Plus-Three" requirement.

*Auxin*[519]
- Commerce's "Wafer-Plus-Three" requirement is arbitrary, inconsistent with how it has applied the *Orders* in the past, and allows companies to use a high percentage of Chinese components and not be covered by Commerce's affirmative circumvention determination.
- Commerce arbitrarily selected the six components used and the four non-Chinese component rule in its requirement without any explanation.
- Commerce previously determined that if a solar module contains subject solar cells, it is subject to the *Orders*, regardless of the country where the solar module was produced.  Commerce should follow that rule here.  Because Commerce reached an affirmative circumvention determination that solar cells produced in Cambodia, Malaysia, Thailand, or Vietnam from Chinese-produced wafers are covered by the scope of the *Orders*, solar modules produced from those solar cells must be subject to the *Orders* irrespective of Commerce's "Wafer-Plus-Three" requirement.

---

[518] *See* generally 19 CFR 358.103.
[519] *See* Auxin's March 6, 2023 Case Brief at 9-17; *see also* Auxin's March 17, 2023 Rebuttal Brief at 5-6.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

- The "Wafer-Plus-Three" requirement provides an inexpensive path for companies to continue to evade the *Orders* by continuing to heavily rely on Chinese-produced components while sourcing the four least expensive components outside of China.[520]
- Commerce should discard its "Wafer-Plus-Three" requirement and determine that a solar module produced in a third country that contains in-scope solar cells is also in scope. Alternatively, Commerce should determine that only solar modules where at least 50 percent of the value of the solar module comes from components produced outside of China are not subject to Commerce's affirmative circumvention determination.
- A percentage of value test is administrable (companies maintain the records required by CBP) and has been used before (*e.g.*, the United States-Mexico-Canada Agreement).
- Moreover, a percentage of value test benefits exporters/producers because: (1) there is no need for them to use certain wafer suppliers or publicly identify their wafer supplier; (2) it provides them with the flexibility to determine which inputs they will obtain from inside, or outside, of China; and (3) it simplifies the types of records that importers must maintain.
- Moreover, a percentage of value test benefits exporters/producers because: (1) there is no need for them to use certain wafer suppliers or publicly identify their wafer supplier; (2) it provides them with the flexibility to determine which inputs they will obtain from inside, or outside, of China; and (3) it simplifies the types of records that importers must maintain.

*BYD HK*,[521] *CSIL*,[522] *Jinko*,[523] *NextEra*,[524] *Risen*,[525] and *TTL*[526]

- Contrary to Auxin's claim, Commerce did not arbitrarily select the six components that it used in the "Wafer-Plus-Three" requirement. Rather, Commerce selected these components because it knows, based on information in this segment of the proceeding (including Auxin identifying these components as the "most important and significant" factors of production) and its experience in other segments of the proceeding, that these are the most significant components used to produce solar modules.[527]
- By requiring at least four of the six components to be sourced from outside China, Commerce's "Wafer-Plus-Three" requirement ensures that a substantial portion of value of the module is added in the inquiry country.
- Based on the scope of the *Orders*, modules produced in a third-country from solar cells produced in China (subject solar cells) are covered by the *Orders* (*i.e.*, solar modules with subject solar cells are covered by the *Orders*). Meanwhile solar modules not containing subject solar cells are not covered by the *Orders*. Commerce's "Wafer-Plus-Three" requirement is consistent with this principle because Commerce indicated that the solar cells in a solar module that meets the "Wafer-Plus-Three" requirement are not covered by

[520] *Id.* at 15 (citing the *Preliminary Determination* calculations for all four determinations).
[521] *See* BYD HK's March 17, 2023 Rebuttal Brief at 7-13.
[522] *See* CSIL's March 17, 2023 Rebuttal Brief at 10-14.
[523] *See* Jinko's March 17, 2023 Rebuttal Brief at 5-13.
[524] *See* NextEra's March 17, 2023 Rebuttal Brief at 6-11.
[525] *See* Risen's March 17, 2023 Rebuttal Brief at 2-3.
[526] *See* TTL's March 17, 2023 Rebuttal Brief at 6-10.
[527] *See* Risen's March 17, 2023 Rebuttal Brief at 2; *see also* NextEra's March 17, 2023 Rebuttal Brief at 8-9.

105

the circumvention inquiry and the solar module is also not covered by the circumvention inquiry (the solar cells are not in-scope merchandise and the solar module is not in-scope merchandise).

- Auxin has made contradictory arguments.  On the one hand, Auxin requested a circumvention inquiry, which resulted in Commerce ignoring the scope of the *Orders* that requires subject solar modules to contain Chinese produced subject solar cells (subject solar cells).  Subsequent to Commerce's finding that solar cells produced in Southeast Asian countries from Chinese wafers are "subject solar cells," Auxin argues that Commerce must return to the "subject solar cell requirement" in the scope of the *Orders* and find that all modules, irrespective of where they are manufactured and the other components that they contain, are subject merchandise if they contain Southeast Asian produced "subject solar cells."

- Auxin's argument that solar modules containing solar cells with Chinese-produced wafers should be subject to Commerce's affirmative circumvention determination, regardless of the other components that they contain, contradicts its own allegation that companies are circumventing the *Orders* by using various Chinese components to produce solar modules in the inquiry countries.  Moreover, Auxin's argument is inconsistent with Commerce's approach in this inquiry of examining the module production process to determine whether parties selling modules to the United States that were produced in an inquiry county are circumventing the *Orders*, rather than making that determination based on the solar cells in the solar module.[528]

- Auxin's percentage of value test should be rejected because Auxin arbitrarily determined the 50 percent requirement.[529]  There is no precedent, or basis in the Act or Commerce's regulations, for using such a test, which would require Commerce to speculate as to future values of solar module components and use a yet undetermined certification.[530]

- Moreover, Auxin failed to consider that significant swings in market prices could skew the test and dramatic changes in surrogate values may mean that the actual value added in the third country is not properly reflected by the test.[531]

- Auxin's percentage of value test is also contrary to Commerce's practice of conducting a qualitative, rather than a quantitative (*e.g.*, a value added) analysis of third-country processing.[532]

- Auxin's percentage of value test means that even if as much as 49.99 percent of the value of the solar module was added outside of China (such as in an inquiry country), the module would be covered by Commerce's affirmative circumvention determination, thus, indicating that the third-country processing of the module was "minor or insignificant."  This is illogical.[533]

- Furthermore, Auxin failed to adequately support its argument that the "Wafer-Plus-Three" requirement allows a significant proportion of Chinese components to be used if the four least expensive components out of the six components in that requirement are

---

[528] *See* NextEra's March 17, 2023 Rebuttal Brief at 7-8.
[529] *See* NextEra's March 17, 2023 Rebuttal Brief at 10.
[530] *See* BYD HK's March 17, 2023 Rebuttal Brief at 9.
[531] *See* Jinko's March 17, 2023 Rebuttal Brief at 8-10.
[532] *See* BYD HK's March 17, 2023 Rebuttal Brief at 9-10 (citing *Pasta from Italy Circumvention*); *see also* Jinko's March 17, 2023 Rebuttal Brief at 10-12; and CSIL's March 17, 2023 Rebuttal Brief at 12.
[533] *See* BYD HK's March 17, 2023 Rebuttal Brief at 10.

106

sourced from outside of China. Auxin's argument is based on erroneous calculations and incorrect figures.[534] Additionally, expenses, such as conversion costs[535] and G&A expenses, are missing from Auxin's calculations, and the source of certain figures that Auxin used in its calculations is unclear.[536] Auxin's argument also ignores its claim that these six inputs are the "principal" and some of the "most important and significant" factors of production.[537] It is commercially unrealistic to conclude that companies in the inquiry countries would suddenly source all their raw materials from China.[538]

- Because China is an NME country, Commerce uses surrogate values to determine the cost of material inputs from China. Auxin's percentage of value test is not administrable because Commerce/CBP would need to verify the prices of, and surrogate values for, solar module components. CBP is not structured to handle certifications based on value[539] and, because it has no experience selecting and applying surrogate values, it would not be able to verify the accuracy of such value-added based certifications.[540]

- Additionally, no parties, including Commerce and CBP, would know the appropriate surrogate values for solar module components when the solar module was exported to, or imported into, the United States. This information is needed to determine the Chinese and non-Chinese content percentages required for Auxin's test.[541] Alternatively, Commerce would have to use actual costs in China to implement Auxin's percentage of value test, which is contrary to its practice.[542]

- Auxin's claim that its percentage of value test is administrable based on the procedures that CBP uses for the United States-Mexico-Canada Agreement is misplaced. CBP evaluates regional value content under the United States-Mexico-Canada Agreement, but this is not certified on an entry-by-entry basis.[543] Confirming the sources of materials is less burdensome than establishing valuation.[544]

**Commerce's Position:** We disagree with Auxin's contention that, based on Commerce's affirmative circumvention determination, solar modules produced in the inquiry countries, or any country, using solar cells from the inquiry countries made from Chinese-produced wafers are automatically covered by the *Orders*. Auxin based its argument on a mischaracterization and misapplication of Commerce's country-of-origin determination from the investigations underlying these *Orders*. In the underlying investigations, Commerce conducted a substantial transformation analysis and determined "that where solar cell production occurs in a different country from solar module assembly, the country-of-origin of the solar modules/panels is the country in which the solar cell was produced."[545]

---

[534] *Id.* at 11-12 and Exhibit 1 (citing Auxin's March 6, 2023 Case Brief at 13-17).
[535] *See* Risen's March 17, 2023 Rebuttal Brief at 2.
[536] *See* BYD HK's March 17, 2023 Rebuttal Brief at 11-12; *see also* CSIL's March 17, 2023 Rebuttal Brief at 13; and TTL's March 17, 2023 Rebuttal Brief at 8-9.
[537] *See* NextEra's March 17, 2023 Rebuttal Brief at 9-10.
[538] *See* Risen's March 17, 2023 Rebuttal Brief at 2-3.
[539] *See* BYD HK's March 17, 2023 Rebuttal Brief at 9-13; *see also* TTL's March 17, 2023 Rebuttal Brief at 9.
[540] *See* NextEra's March 17, 2023 Rebuttal Brief at 11.
[541] *See* Jinko's March 17, 2023 Rebuttal Brief at 12 and NextEra's March 17, 2023 Rebuttal Brief at 11.
[542] *See* NextEra's March 17, 2023 Rebuttal Brief at 11.
[543] *See* TTL's March 17, 2023 Rebuttal Brief at 9.
[544] *Id.*
[545] *See* Trina's May 2, 2022 Comments at Attachment 8, page 8.

107

The purpose of a substantial transformation analysis is to determine whether merchandise that is further processed outside the order country remains the product of the order country, and thus subject merchandise. The purpose of the analysis conducted under section 781(b) of the Act is to determine whether minor assembly or completion of merchandise from the order country in a third-country was used to circumvent the order. As Commerce noted in the Preamble to its regulations "Commerce's substantial transformation analysis under {19 CFR} 351.225(j) and the test for determining whether a product was completed or assembled in other foreign countries under {19 CFR} 351.226(i) (and section 781(b) of the Act) are two distinct analyses used for different purposes … "[546]

Nowhere in the Act or Commerce's regulations is there a provision to use a substantial transformation analysis to identify circumvention. To determine whether solar modules are covered by this affirmative circumvention determination based on Commerce's country-of-origin rule from the underlying investigations ignores the criterion in section 781(b) of the Act, including determining whether the value of the order country merchandise that is assembled in the third country is a significant portion of, and the value of the third-country processing is a small proportion of, the total value of the solar module. Auxin's approach is inconsistent with how Commerce has analyzed circumvention in other circumvention inquiries (*i.e.,* Commerce applies the circumvention criteria to the merchandise entering the United States, in this case the solar module,, and not a component within the imported product, the solar cell, and determines whether the order country input(s) is a significant share, and the processing in the third country is a minor or insignificant share, of the value of the merchandise entering the United States)[547] and disregards the very nature of the alleged circumvention that Auxin requested that Commerce investigate. Specifically, Auxin requested "that Commerce promptly initiate an anti-circumvention inquiry concerning {solar} cells and modules assembled and completed in Malaysia, Thailand, Vietnam, and Cambodia using Chinese-produced inputs."[548] In contrast to Auxin's approach of focusing on the solar cell, Commerce's "Wafer-Plus-Three" requirement focuses on the Chinese content of the solar module and reflects the nature of the production in the third-country. Furthermore, the "Wafer-Plus-Three" requirement is consistent with section 781(b)(1) of the Act, which requires Commerce's circumvention determination to be made with respect to the "merchandise imported into the United States." Hence, when a solar module is the merchandise that is imported into the United States, Commerce must examine the components of that solar module, not the solar cells alone.

---

[546] *See 2021 Regulations Final Rule*, 86 FR at 52342.
[547] *See e.g., CORE from China (UAE) Preliminary* PDM at 1 and 27-28 (unchanged in *CORE from China (UAE)*) where we determined whether exporters of CORE from the UAE to the United States must pay AD duties based on whether the CORE contains Chinese hot-or cold-rolled steel. The certification requirement in that case was based on a determination that "the value of hot-or cold-rolled steel represents a significant portion of the total value of the {CORE} exported to the United States." *See CORE from China (UAE) Preliminary* PDM at 23. However, the solar cells that Auxin argues we should solely consider when determining whether the solar module containing such solar cells is covered by the circumvention determination, are not entirely made in China (as opposed to the hot-or cold-rolled steel in *CORE from China (UAE)*) and Auxin has not explained to what extent the solar cell should contain Chinese inputs to be considered covered by the *Orders*. Auxin has additionally failed to explain, contrary to Commerce determinations in *CORE from China (UAE)* and other circumvention proceedings, why such solar cell content is a sufficient basis for determining that the solar module should be covered by the *Orders*.
[548] *See* Circumvention Request at 88.

108

In its Circumvention Request, Auxin simply described inquiry merchandise as solar modules assembled and completed in one of the inquiry countries using Chinese-produced inputs.[549] This broad description of inquiry merchandise could have the unintended consequence of including solar modules with miniscule Chinese content (such as a bolt and a screw) as inquiry merchandise. Therefore, Commerce found it necessary to define the relevant Chinese content to consider a solar module as inquiry merchandise.[550] As explained in more detail below, we find that it is reasonable, and consistent with Auxin's Circumvention Request, to use the "Wafer-Plus-Three" requirement to define solar modules as inquiry merchandise where the wafer and at least three of the other primary materials in the solar module were produced in China.

We did not arbitrarily select the seven material inputs used in the "Wafer-Plus-Three" requirement, but based our selection on record evidence, including data provided by the respondents and solar industry surveys in which wafers and the six material inputs used in the "Wafer-Plus-Three" requirement are identified as major solar cell/module inputs.[551] Auxin itself identified the primary materials from the order country that it claims were being assembled and completed in the inquiry countries to circumvent the *Orders*. Specifically, Auxin stated that "reasonably available evidence indicates that the primary direct material inputs used to complete {solar} cells in the subject third countries, *i.e.*, wafers, silane, phosphorus oxychloride (POC13), aluminum and/or silver paste, and the additional components used to assemble the {solar} cells into modules, *i.e.*, solar glass, EVA, backsheet, aluminum frames, and junction boxes, were sourced from China, the country subject to *the Orders*."[552] We did not include silane and phosphorus oxychloride (POC13) in the "Wafer-Plus-Three" requirement because, as opposed to wafers and the six other inputs identified in the "Wafer-Plus-Three" requirement, they were not identified as major inputs in the majority of the solar industry reports/surveys that are on the record and no parties argued that other material inputs should be included in the requirement or that some of the material inputs should be removed from the requirement.

We determine that the "Wafer-Plus-Three" requirement is appropriate on a qualitative basis. The circumvention activity alleged by Auxin involves Chinese-produced wafers being converted into solar cells and solar modules in a third country using additional and substantial Chinese-origin components. Commerce's "Wafer-Plus-Three" requirement directly addresses the situation described by Auxin in its Circumvention Request because it requires producers in the inquiry

---

[549] *Id.*

[550] *See Preliminary Determinations*, 87 FR at 75221, 75222.

[551] *See, e.g.*, the *Bloomberg Report* below Figure 17 (identifying aluminum frames, glass; backsheets, ethylene vinyl acetate sheets, and junction boxes as the most important solar module inputs) and above Figure 12 (identifying silver as the costliest input added at the cell processing stage). The *Bloomberg Report* also emphasizes the importance of wafers and indicates the importance of these aforementioned seven inputs in making solar modules; *see also* the *NREL 2018 Report* at 37 (identifying wafers, metallization pastes (silver), glass, backsheets and junction boxes as the costliest items to produce solar modules) and 33 (identifying the principal solar module input materials as cell stringing and tabbing ribbons, front glass, backsheet, ethylene-vinyl acetate (EVA), encapsulant (2 sheets), AI (aluminum) frame and edge sealant, junction box, junction box potting agent and tape, and coded module sticker label), and the *DOE Solar Deep Dive* at iii ({s}ilicon wafers are processed to make the solar cells that are interconnected and sandwiched between glass and plastic sheets to make c-Si modules"), 36 ("{s}ilver paste is an important component in c-Si solar cells"), and 44 (identifying the aluminum frame, glass, backsheet, encapsulant ("the predominant resins used to make encapsulant are ethylene vinyl acetate (EVA) …" (*see* page 19)), and the junction box as the components of a solar module).

[552] *See* Circumvention Request at 73.

109

countries to either no longer use Chinese wafers, which are the products that are being assembled and completed in the inquiry country, or to source less than half of the other major components that are required to convert the wafers into solar cells/modules from China.  We have determined that this qualitative approach to defining inquiry merchandise is reasonable because it focuses on the number of major components sourced from China.  This approach is also consistent with the concerns described by Auxin that led it to request the circumvention inquiries, namely its claim that "the vast majority — if not all — of the other materials used to convert the Chinese wafers to cells and then assemble the cells into modules in Malaysia, Thailand, Vietnam, and Cambodia are obtained from China."[553]  Under the "Wafer-Plus-Three" requirement, where the majority of the major inputs used to convert the Chinese wafers to cells and then assemble the cells into modules were obtained from (produced in) China, the module is inquiry merchandise and will be subject to Commerce's affirmative circumvention determination.

Further, Auxin itself noted that where:

> the primary direct material inputs used to complete {solar} cells in the subject third countries, *i.e.*, wafers, silane, phosphorus oxychloride (POCI3), aluminum and/or silver paste, and the additional components used to assemble the {solar} cells into modules, *i.e.*, solar glass, EVA, backsheet, aluminum frames, and junction boxes, were sourced from China … a qualitative analysis itself would be sufficient to conclude that the value of processing in {the inquiry countries}" would represent "a small proportion of the value of the merchandise imported to the United States.[554]

Thus, by limiting the amount of Chinese content in the solar module, the "Wafer-Plus-Three" requirement addresses, on a qualitative basis, Auxin's concern and increases the non-Chinese portion of the value of the merchandise.

We also determine that the "Wafer-Plus-Three" requirement is appropriate on a quantitative basis.  Under the "Wafer-Plus-Three" requirement, a solar module is not inquiry merchandise if it has no Chinese-produced wafers, or where four of its six major inputs, other than the wafer, were not produced in China.  Based on record evidence regarding the value of wafers and conversion costs in a solar module,[555] and the statement in the *Bloomberg Report* that "Southeast Asian nations account for just 27% of the value of a typical {solar} module exported to the U.S."[556] we find that the "Wafer-Plus-Three" requirement would not result in a small value of inputs from outside of China as contended by Auxin.[557]

Moreover, we find there are flaws with the analysis that Auxin provided to support its claim that the "Wafer-Plus-Three" requirement would continue to allow a solar module to contain a

---

[553] *Id.* at 30.
[554] *Id.* at 73.
[555] *See* our summary of the data in the *DOE Solar Deep Dive*, *IEA Report*, and Bloomberg Report, as well as our calculations based on these reports showing the costs of the wafers and other six inputs in the Solar Survey Analysis Memorandum.
[556] *See* the *Bloomberg Report* at the narrative below Figure 22. that "Southeast Asian nations account for just 27% of the value of a typical PV module exported to the U.S."
[557] *See* Auxin's March 6, 2023 Case Brief at 15 and Solar Survey Analysis Memorandum.

significant proportion of Chinese inputs and not be subject to Commerce's affirmative circumvention determination.  Specifically, Auxin provided a table of per-unit costs for the inputs identified in the "Wafer-Plus-Three" requirement showing that a solar module could contain Chinese components that represent a high percentage of the total per-unit direct material cost of a solar module and yet, under the "Wafer-Plus-Three" requirement, the solar module would not be considered inquiry merchandise.[558]  Besides the questions raised by certain respondents regarding the source of Auxin's per-unit costs, we find that Auxin failed to account for other material costs and conversion costs incurred in the inquiry countries in its analysis.  Further, if one accounts for these additional material and conversion costs, even relying on Auxin's per-unit costs, non-Chinese inputs would comprise much more than the "small" percentage of total value claimed by Auxin.[559]

Thus, we find that Auxin's analysis does not provide the proper measure of the extent to which companies in an inquiry country are using Chinese-produced inputs to convert wafers into solar modules.  In contrast, by defining solar modules subject to the inquiry as solar modules where the wafer and at least three of the other major inputs were produced in China, Commerce has addressed Auxin's concern that "major Chinese companies have set up minor assembly operations in Southeast Asia — using their existing dedicated supply base in China for almost the entirety of the bill of materials — to circumvent the Orders …"[560]  Additionally, the "Wafer-Plus-Three" requirement is consistent with Congressional direction away from a rigid numerical approach.[561]  This approach is also consistent with how Commerce has identified inquiry merchandise in other circumvention inquiries, namely based on whether certain content in the merchandise came from the order country.[562]

We also find that Auxin's percentage of value test is not administrable.  Because the *Orders* apply to China, an NME country, Chinese-produced components are valued based on surrogate values.[563]  However, Auxin never explained how Commerce's NME methodology would be used in its proposed percentage of value test.  For example, Auxin never explained, under its proposal, whether surrogate values would be used to determine total value and, if so, how importers and exporters would properly select any surrogate values used.  Commerce normally selects surrogate values in a proceeding segment after considering record evidence and comments provided by interested parties.[564]  However, Auxin never explained how Commerce would evaluate any surrogate values used in the percentage of value test, or the type proceeding in which Commerce would conduct such an evaluation.  Furthermore, it is not feasible for Commerce to evaluate and examine potentially numerous surrogate value calculations that could change from entry to entry.

---

[558] *Id.*
[559] *Id.*
[560] *See* Circumvention Request at 32.
[561] *See* SAA at 893-94.
[562] *See, e.g.*, *CORE from China (UAE) Preliminary* PDM at 1, 23, and 27-28, unchanged in *CORE from China (UAE)*.
[563] *See* section 773(c) of the Act.
[564] *See Thailand* PDM at 4-5 and 8-9.

Auxin claimed that "{g}iven the records kept and maintained by the foreign producers, these data can be supplied to CBP to validate the value-added calculation."[565]  However, applying Commerce's NME methodology to the percentage of value test would require the use of surrogate values.  CBP is not charged with evaluating surrogate value selections, and it cannot be expected to validate a value-added test based on surrogate values.  Additionally, we find it would not be feasible for exporters and importers that are unfamiliar with Commerce's NME methodology to select the appropriate surrogate values to determine the percentage of a solar module's total value represented by Chinese components.  Thus, we find that it is unclear how Auxin's proposed percentage of value test would be implemented in light of Commerce's NME methodology.

Lastly, Auxin maintains that its proposed percentage of value test benefits exporters/producers because there is no need for them to publicly identify their wafer supplier and simplifies the types of records that importers must maintain.  Neither claim is valid.  Exporters do not need to publicly identify their wafer supplier(s) under Commerce's "Certification Regarding Chinese Components."[566]  Thus, in this regard, Auxin's proposed percentage of value test, in which exporters would not need to publicly identify their wafer supplier(s), does not provide any benefit to exporters that is not already in place.  Further, it is unclear how Auxin's proposed percentage of value test would simplify record keeping when solar modules can have hundreds of inputs and exporters/producers would need to maintain records to determine whether each input was produced in China or outside of China and to calculate the value of the non-Chinese and/or Chinese inputs in the solar module.  Moreover, under Auxin's proposed approach, a number of records, such as surrogate value information, that are generally not kept in the ordinary course of business would need to be maintained.  In contrast, when using the "Certification Regarding Chinese Components" parties need to maintain records to determine where only the seven inputs listed in Commerce's "Wafer-Plus-Three" requirement were produced.

**Other Issues**

**Comment 20. Whether Commerce Properly Placed *Ex Parte* Memoranda on the Record That Concerned the Circumvention Inquiries**

*Auxin*[567]
- Commerce unlawfully omitted communication related to the issuance of *Proclamation 10414* and Commerce's final rule implementing aspects of that proclamation.[568]
- Commerce's omission resulted in an incomplete administrative record for the circumvention inquiries.

No other interested party commented on this issue.

---

[565] *See* Auxin's March 6, 2023 Case Brief at 16.
[566] *See Preliminary Determinations*, 87 FR at Appendix VI.
[567] *See* Auxin's April 26, 2023 Case Brief at 79.
[568] *See* Auxin's April 26, 2023 Case Brief (citing *Presidential Proclamation 10414*, 87 FR at 35067; and *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56868).

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

**Commerce's Position:** We disagree. By statute, Commerce shall maintain a record of any *ex parte* meeting between interested parties or other persons providing factual information in connection with a segment of an AD/CVD proceeding and the person charged with making the determination if information relating to that AD/CVD proceeding was presented or discussed at such meeting.[569] Throughout the course of the circumvention inquiries, Commerce consistently placed summaries of *ex parte* contacts concerning the circumvention inquiries on the administrative record.[570] Commerce was not required to memorialize for the record communications on matters distinct from the AD/CVD inquiries at hand, including Presidential *Proclamation 10414* or the rulemaking resulting from that Proclamation.[571]

**Comment 21. Whether Commerce's Determination to Apply *Presidential Proclamation 10414* Retroactively is Contrary to Law**

*Auxin*[572]

- Commerce unlawfully retroactively applied regulations developed pursuant to the declaration of emergency announced in *Presidential Proclamation 10414*. Specifically, Commerce waived application of affirmative circumvention findings to all entries of inquiry merchandise after initiation of these inquiries on April 1, 2022, but before the Presidential Proclamation was issued on June 6, 2022.[573]
- The retroactive application of *Presidential Proclamation 10414* is: "(a) *ultra vires* because Commerce possesses no independent legal authority to issue an emergency declaration; (b) is contrary to the explicit wording of *Presidential Proclamation 10404*; (c) is unlawful under the statutory authority under which the proclamation was issued, and (d) is otherwise inconsistent with Commerce's circumvention regulations, which require Commerce to issue suspension of liquidation and cash deposit instructions to CBP in the event of an affirmative finding of circumvention."[574]
- Commerce should "follow its regulations and request that CBP suspend liquidation and collect cash deposits on all entries after April 1, 2022, until June 6, 2022."[575]
- In the *Preliminary Determinations,* Commerce stated that entries prior to the Date of Termination that have met the certification requirements will not be subject to suspension

---

[569] *See* section 777(a)(3) of the Act ("{AD/CVD} proceedings are investigatory rather than adjudicatory in nature, and {the ex parte} provision is intended to ensure that all parties to the preceeding {*sic*} are more fully aware of the presentation of factual information to the administering authority or the ITC"); and S. Rep. No. 96-249, at 99-100 (1979); *F Lli De Cecco,* 980 F. Supp 485.
[570] *See, e.g*., Memoranda, "Meeting with Counsel for Auxin," dated November 14, 2022, and NE Solar January 29, 2023 *Ex Parte* Memorandum.
[571] *See Baker Hostetler*, 473 F.3d 312 (conversations focused on matters other than AD/CVD proceedings do not fall under the section 777(a)(3) of the Act *ex parte* provision).
[572] *See* Auxin's March 6, 2023 Case Brief at 17-24.
[573] *Id.* at 17-18 and n. 41. "In making this argument and stating that June 6, 2022, is the operable date for lifting of suspension and collection of cash deposits, Auxin is not suggesting in any way that *Presidential Proclamation 10414* and/or Commerce's implementing regulations are lawful. Indeed, Auxin has explained in detail in previous submissions on this record and in response to Commerce's request for comments why *Presidential Proclamation 10414* and Commerce's regulations were devoid of any factual underpinnings to support the purported emergency and that Commerce superseded existing regulations to implement the proclamation."
[574] *Id.* (citing 19 CFR 351.226(l)(2)(ii) and (iii).
[575] *Id.*

113

of liquidation, or the cash deposit requirements described above.[576]  Commerce justified this departure from its practice and regulations by citing 19 CFR Part 362.

- Commerce specifically stated that pursuant to 19 CFR 362.103(b)(1)(i), "Commerce will direct U.S. Customs and Border Protection (CBP) to discontinue the suspension of liquidation and collection of cash deposits that were ordered based on Commerce's initiation of these circumvention inquiries.  In addition, pursuant to 19 CFR 362.103(b)(1)(ii) and (iii), Commerce will not direct CBP to suspend liquidation, and require cash deposits, of estimated ADs and CVDs based on these affirmative preliminary determinations of circumvention on, any 'Applicable Entries.'"[577]

- Commerce confirmed that "suspension of liquidation procedures would only apply to 'imports of Southeast Asian-Completed solar cells and modules that are not 'Applicable Entries' that were entered, or withdrawn from warehouse, for consumption on or after April 1, 2022."[578]

- First, Commerce possesses no legal authority to declare a national emergency and does not cite any such authority in its *Preliminary Determination*.  Commerce explicitly expanding the scope of *Presidential Proclamation 10414* by applying it to entries of inquiry merchandise that entered the United States prior to the identification of the emergency while lacking such legal authority renders the decision *ultra vires*.[579]

- Second, Commerce's retroactive actions are not consistent with the authority relied upon for adoption of Part 362 of its regulations:  *Presidential Proclamation 10414*.  The Proclamation does not authorize retroactive effect of the national emergency declared on June 6, 2022.[580]

- *Presidential Proclamation 10414* specifically states that any actions taken by Commerce to permit duty-free entries of solar cells and modules from Cambodia, Malaysia, Thailand, and Vietnam last "until 24 months *after* the date of this proclamation or until the emergency declared herein has terminated, whichever occurs first."[581]

- *Presidential Proclamation 10414* does not authorize any actions for entries before the June 6, 2022, date.  Thus, *Presidential Proclamation 10414* does not authorize Commerce to take any action affecting entries before June 6, 2022.

- Third, section 318(a) of the Act, the statutory authority under which *Presidential Proclamation 10414* was issued, does not allow action before the declaration of an emergency, and only authorizes action "*during* the continuance of" an emergency "declare{d}" by presidential proclamation.[582]  No emergency was declared prior to June 6, 2022.

- The *Preliminary Determination* is inconsistent with the statute and regulations as Commerce's circumvention regulations state that following an affirmative preliminary determination:  (1) the Secretary will direct the Customs service to continue the suspension of liquidation and apply the applicable cash deposit rate; and (2) direct the Customs service to begin the suspension of liquidation and require a cash deposit of

---

[576] *Id.* (citing *Preliminary Determinations*, 87 FR at 75224).
[577] *Id.* (citing *Preliminary Determinations*, 87 FR at 75223).
[578] *Id.* (citing *Clarification of Product Coverage Memorandum* at 2).
[579] *Id.* (citing *Cf. Stark v. Wickard*, 321 U.S at 288; *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. at 1679).
[580] *Id.* (citing *Presidential Proclamation 10414*, 87 FR at 35067-69).
[581] *Id.* (citing *Presidential Proclamation 10414*, 87 FR at 35068).
[582] *Id.* (citing section 318(a) of the Act).

114

estimated duties, at the applicable rate, for each unliquidated entry on or after the date of publication of the notice of initiation of the inquiry.[583]

- In the *Initiation Notice,* Commerce notified all interested parties of the initiation of circumvention inquiries, including a description of the products subject to the inquiries and an explanation of the reasons for Commerce's decision to initiate such inquiries.[584]

- With respect to suspension of liquidation, Commerce explained that it would follow 19 CFR 351.226(l)(1), notifying CBP of its initiation and direct CBP to continue suspension of liquidation and apply the cash deposit rate that would be applicable if the products were determined to be covered by the scope of *the Orders.* Commerce also mentioned that it would follow the suspension of liquidation rules under 19 CFR 351.226(l)(2)-(4) should it issue preliminary or final circumvention determinations.[585]

- Thus, Commerce provided all interested parties with notice of initiation, the reasons for initiation, and Commerce's intention to suspend liquidation for merchandise that entered after the date of initiation, April 1, 2022, consistent with Commerce's regulations. As such, suspension of liquidation retroactive to the date of initiation was appropriate and lawful.[586]

- Commerce's failure to suspend liquidation and collect cash deposits from April 1, 2022, through June 6, 2022, is unlawful for many reasons and should be reversed in the final determination.

*NextEra,*[587] *BYD HK,*[588] *CSIL,*[589] *TTL,*[590] *Silfab,*[591] and *Risen*[592]

- Auxin's argument that Commerce "unlawfully retroactively applied" its regulations in 19 CFR Part 362 has no place in these circumvention inquiries, which are meant to examine whether circumvention has taken place under the relevant statute and regulations, and not to assess whether Commerce's regulations are proper.

- Commerce has no basis to disregard the 19 CFR Part 362 regulations that exempt entries between April 1, 2022, and June 6, 2022 (and certain entries made after June 6, 2022) from any suspension of liquidation, cash deposit requirements, or duty assessment resulting from these inquiries, without engaging in a new notice-and-comment procedure separate from this circumvention inquiry.

- Although Auxin urges Commerce to suspend liquidation and collect cash deposits on merchandise entered between April 1, 2022 and June 6, 2022, it is unlawful for Commerce to do so as "Commerce, like other agencies, must follow its own regulations."[593]

---

[583] *Id.* (citing 19 CFR 351.226(1)(2)(i)-(ii)).
[584] *Id.* (citing *Initiation Notice*, 87 FR at 19072).
[585] *Id.*
[586] *Id.* (citing *Aluminum (Taishan) Co.*, 983 F.3d 487).
[587] *See* Next Era's March 17, 2023 Case Brief at 11-18.
[588] *See* BYD HK's March 17, 2023 Rebuttal Brief at 13-18.
[589] *See* CSIL's March 17, 2023 Rebuttal Brief at 14-20.
[590] *See* TTL's March 17, 2023 Rebuttal Brief at 10-11.
[591] *See* Silfab's March 17, 2023 Rebuttal Brief at 8-13.
[592] *See* Risen's March 17, 2023 Rebuttal Brief  at 3-4.
[593] *See* NextEra's March 17, 2023 Rebuttal Brief (citing *See Torrington*, 82 F.3d at 1049; *see also, e.g., Fort Stewart*, 495 U.S. at 654 ("It is a familiar rule of administrative law that an agency must abide by its own regulations."); and *Saddler*, 68 F.3d at 1358 (finding that agency "must abide by its own regulation")).

115

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved
Appx10673

- Pursuant to 19 CFR Part 362, entries between April 1, 2022, and June 6, 2022, are exempt from any suspension of liquidation, cash deposit requirements, or duty assessment resulting from this circumvention inquiry. Specifically, 19 CFR 362.103 exempts "Applicable Entries" from those obligations. 19 CFR 362.102 defines "Applicable Entries" as "entries of Southeast Asian-Completed Cells and Modules that are entered into the United States, or withdrawn from warehouse, for consumption before the Date of Termination."[594]

- Commerce's regulations apply to all entries made prior to the "Date of Termination," and there is no basis to limit application of the exemptions to entries made after June 6, 2022. Moreover, the *Presidential Proclamation 10414 Final Rule Preamble* confirms that the 19 CFR Part 362 regulations are intended to apply to entries made between April 1, 2022, and June 6, 2022.[595]

- Given that "agency regulations are to be interpreted in a similar manner to statutes, which includes a consideration of the text, history, and purpose of a regulation, 19 CFR Part 362 clearly requires Commerce to exempt entries between April 1, 2022, and June 6, 2022, from any suspension of liquidation, cash deposits, or final duties resulting from these inquiries."[596]

- Commerce "promulgated the Part 362 regulations through notice-and-comment rulemaking.[597] The APA requires notice-and-comment procedures to be followed not only when rules are formulated, but also when they are amended or repealed."[598]

- Commerce cannot amend and implement regulations without a new informal rulemaking process under the APA.[599]

- The Supreme Court has explained that the APA requires agencies to "use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance."[600]

- Commerce may not repeal or amend the portions of 19 CFR Part 362 exempting entries between April 1, 2022, and June 6, 2022, from duties as part of its final determination in this circumvention inquiry. Instead, Commerce would be required to publish a notice of proposed rulemaking informing the public that it is considering a change to 19 CFR Part 362 of its regulations, allow an opportunity for comment, and then publish a final rule responding to such comments.[601] There is no basis for Commerce to depart from 19 CFR Part 362 in the final determination until Commerce does so.

---

[594] *Id.* "Date of Termination" in turn is defined as "June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* has been terminated, whichever occurs first." *See also* 19 CFR 362.102.

[595] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877).

[596] *Id.* (citing *Kisor*, 139 S. Ct. at 2423-24).

[597] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble;* and *Presidential Proclamation 10414 Proposed Rule*).

[598] *See* BYD HK's March 17, 2023 Rebuttal Brief (citing 5 USC 551(5); and 5 USC 553).

[599] *Id.* (citing *Alaska*, 177 F.3d at 1033-34, 1036: In clarifying this requirement, the Supreme Court has interpreted the APA to require the same procedures when an agency amends or repeals a rule as to when the agency issued that rule)).

[600] *Id.* (citing *Perez,* 575 U.S. at 101; *see also Ass'n of Priv. Sector*, 681 F.3d at 462-63 (finding that agency violates the APA when it does not give notice of proposed rule and opportunity to affected parties to comment); *Invenergy*, 422 F. Supp. 3d at 1285 ("The court concludes that the Exclusion constituted agency rulemaking. Repealing the rule, therefore, also requires rulemaking subject to APA notice and comment.")).

[601] *Id.* (citing 5 USC 553).

- Although Auxin claims that Commerce has no legal authority to declare a national emergency and expanded the scope of *Presidential Proclamation 10414* or acted inconsistently with *Presidential Proclamation 10414* by extending the duty waiver to entries made between April 1, 2022, and June 6, 2022, Commerce did not declare a national emergency. Instead, it was the President that made the declaration in *Presidential Proclamation 10414*, as allowed by section 318(a) of the Act.

- Commerce addressed the arguments regarding the consistency of 19 CFR Part 362 with *Presidential Proclamation 10414* when it promulgated the regulation. Commerce is "taking action now (*i.e.*, during the period of the emergency) to extend the period before it directs CBP to suspend liquidation and collect cash deposits and to waive any AD/CVD estimated duties and duties for these unliquidated goods."[602]

- Commerce's Part 362 regulations are prospective in application because "Commerce's regulation stated prior to the imposition of duties that there would be no such duties, and because Commerce was extending the deadline for actions that it had not yet taken."[603]

- Commerce also explained that the authorization to waive duties under *Presidential Proclamation 10414* "until 24 months after the date of this proclamation or until the emergency declared herein has terminated" specified only the end date for duty-free treatment, without specifying a start date or limiting application of the waiver to entries made after the *Presidential Proclamation 10414*.[604]

- Commerce recognized that providing duty-free treatment to entries made prior to June 6, 2022, furthers the emergency relief goals reflected in *Presidential Proclamation 10414* (specifically, the market uncertainty caused by the initiation of these circumvention inquiries).[605]

- Subjecting entries made prior to June 6, 2022, to AD/CVD cash deposit rates that were unknown at the time of entry and to assessment rates that would not be determined until many months or even years in the future would have increased, not decreased, the market uncertainty the *Presidential Proclamation 10414* and Commerce's Part 362 were seeking to address.[606] Such an application would limit the capital available to complete solar projects and otherwise build capacity.[607]

- Auxin's arguments regarding the scope of authority provided in section 318(a) of the Act are also meritless as Auxin reads far too much into the following statutory language: the President "may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act."[608] At most this provision of the statute prevents extension of deadlines after the emergency subsided.

- The provision noted by Auxin does not prohibit the application of the statute to entries that remain unliquidated at the time of the emergency declaration and Commerce's extension of deadlines for ordering cash deposits and assessment of duties occurred after the emergency was declared.

---

[602] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877).
[603] *Id.*
[604] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877 and 56878).
[605] *See* NextEra's March 17, 2023 Rebuttal Brief (citing *Presidential Proclamation 10414 Proposed Rule*, 87 FR at 39430; *see also Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56872, 56875-77).
[606] *Id.* (citing *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56875-78).
[607] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56878).
[608] *Id.* (citing Auxin March 17, 2023 Case Brief at 20).

117

- Section 318(a) of the Act contains two separate grammatical clauses stating what the President may authorize the Secretary to do: (1) the President "may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act"; and (2) the President "may authorize the Secretary of the Treasury to permit, under such regulations as the Secretary of the Treasury may prescribe, the importation free of duty of food, clothing, and medical, surgical, and other supplies for use in emergency relief work." The use of the word "authorize" a second time in a separate clause indicates that the authority in the second clause is distinct from the first.

- The language "during the continuance of such emergency" qualifies only the authority in the first clause (the authority to extend deadlines), not the second (the separate authority to waive duties). Therefore, the authority to permit the duty-free importation of supplies for emergency relief work is less constrained than the authority to extend deadlines under the Act.[609]

- Commerce explained in the *Presidential Proclamation 10414 Final Rule Preamble* that applying the waiver to entries that remained unliquidated at the time of the President's Proclamation harmonizes the authority provided under section 318(a) of the Act with the retrospective AD/CVD system, which is also part of the Act.

- Even if Commerce did not have authority under section 318(a) to waive duties on entries made prior to *Presidential Proclamation 10414*, Commerce possesses separate authority to exempt such entries from ADs/CVDs.

- Commerce invoked its authority to issue regulations pertaining to section 781 of the Act when it promulgated 19 CFR Part 362 of its regulations.[610] Section 781 of the Act states that Commerce "may include within the scope" merchandise completed or assembled in other foreign countries if certain criteria are met.[611] Thus, even if the criteria for an affirmative circumvention determination are found, section 781 provides Commerce with the discretion to determine whether to include merchandise within the scope of an AD/CVD order.

- Section 781 of the Act is silent on when an order will be applied after Commerce determines to extend the order to cover merchandise completed or assembled in other foreign countries. Commerce exercised its gap-filling authority regarding the administration of section 781 of the Act by issuing 19 CFR 351.226. However, nothing in the statute mandates the particular procedures that Commerce adopted in 19 CFR 351.226 and that Auxin would like Commerce to apply.

- Commerce is free to adopt additional regulations through notice-and-comment rule making that supersede the provisions in 19 CFR 351.226 in order to address the policy issues raised by this case. Commerce recognized this in the *Presidential Proclamation Final Rule 10414 Preamble.*[612]

- It was reasonable for Commerce to exempt merchandise entered prior to June 6, 2022, from duties when that merchandise was outside of the scope of the *Orders* as a matter of

---

[609] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877-78).
[610] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877-78; and *Presidential Proclamation 10414 Proposed Rule*, 87 FR at 39429).
[611] *Id.* (citing 19 CFR 351.226(b)(1)).
[612] *Id.* (citing *Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56876-78).

law at the time of entry and the nature of the cell and/or module production process occurring in Southeast Asia is significant.

- Auxin does not cite any language from the AD/CVD statute or section 318(a) requiring Commerce to apply ADs/CVDs to pre-*Presidential Proclamation 10414* entries. Additionally, Auxin does not cite any authority that would require Commerce to suspend liquidation, apply cash deposit, and duty assessment provisions in 19 CFR 351.226(1) instead of the exception to those rules found in Part 362.

- 19 CFR Part 362 regulations were adopted following notice-and-comment rulemaking to address the situation presented in these circumvention inquiries and should prevail over general provisions in 19 CFR 351.226(1).[613]  Moreover, the 19 CFR Part 362 regulations make it clear that they are intended to be employed as an exception to any otherwise applicable rules found within 19 CFR 351.226 through the language "notwithstanding {section} 351.226(l) of this chapter."

- Given that 19 CFR Part 362 is explicitly identified as an exception to 19 CFR 351.226(l), Auxin's argument that Commerce was required to follow 19 CFR 351.226(l) is incorrect.

- *Presidential Proclamation 10414, Presidential Proclamation 10414 Final Rule Preamble*, Commerce's affirmative circumvention determinations, and the accompanying instructions issued to CBP by Commerce, clearly state that merchandise entered for consumption between April 1, 2022, and June 6, 2022, are not subject to AD/CVD liability.[614]

- Auxin's argument that Commerce unlawfully retroactively applied regulations promulgated pursuant to the declaration of emergency announced in *Presidential Proclamation 10414* is not made in the proper forum.  Commerce is bound by law to follow the requirements of *Presidential Proclamation 10414* and 19 CFR Part 362 of its regulations.

- This policy, combined with the meaning of 19 CFR Part 362, means that Commerce cannot retroactively impose duties on imports designated as "Applicable Entries" in the final determinations, especially given the general presumption against retroactive applications of law.[615]

- Amending or repealing 19 CFR Part 362 in the context of these circumvention inquiries would create unfair surprise and deprive parties of a meaningful opportunity to comment on a significant change in Commerce's regulations.[616]

- Commerce should continue to exempt entries made between April 1, 2022, and June 6, 2022, from any suspension of liquidation, cash deposit requirements, or duty assessment resulting from these circumvention inquiries.

**Commerce's Position:**  Commerce disagrees with Auxin that the regulations promulgated under *Presidential Proclamation 10414* are unlawfully retroactive.  Auxin makes four primary claims

---

[613] *Id.* (citing *Romani*, 523 U.S. at 532 (later, more specific statute governs); *Fourco Glass Co.*, 353 U.S. at 228 ("However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment.")).

[614] *See* BYD HK's March 17, 2023 Rebuttal Brief (citing CBP MSGs Memorandum at Message No. 3047409).

[615] *Id.* (citing *Bowen*, 488 U.S. at 208*; and I.N.S.*, 533 U.S. at 316.

[616] *Id. (*citing *Kisor*, 139 S Ct. at 2418-2419); *see also* CSIL's March 17, 2023 Rebuttal Brief (citing *Skidmore,* , 323 U.S. at 140 (1944)*; and Cathedral Candle*, 400 F.3d at 1366).

119

that the regulations are unlawful, none of which we find to be persuasive or sufficient to change our reasoning with respect to this circumvention inquiry.

First, Auxin claims that Commerce possesses no legal authority to declare a national emergency, yet "explicitly expanded the scope" of *Presidential Proclamation 10414 ultra vires* by applying it to inquiry merchandise that entered the United States "prior to the identification of the emergency."[617]  However, as Auxin notes, Commerce has already addressed the legality of its authority to issue the regulations under *Presidential Proclamation 10414 Final Rule Preamble*, itself.[618]  That rule, which was issued pursuant to lawful notice and comment process, confirms that "Commerce is taking action now (*i.e.*, during the period of the emergency) to extend the period before it directs CBP to suspend liquidation and collect cash deposits and to waive any AD/CVD estimated duties and duties for these unliquidated goods."[619]  "In other words, the final rule stated, ahead of any imposition of such duties, that there will be no such duties."[620]  Such a statement is not expanding the scope of the emergency retroactively; rather, "such a decision is prospective in its application"[621] because it concerns the establishment of duties that have not yet been determined but may be determined during the course of the emergency.

Second, Auxin argues that the retroactive application of *Presidential Proclamation 10414* is contrary to the explicit wording of the proclamation itself, because it only authorizes Commerce to take actions to permit duty-free entries of solar cells "until 24 months after the date of this proclamation."[622]  Auxin argues that because the *Presidential Proclamation 10414* only authorizes Commerce to take action *after* the date of *Presidential Proclamation 10414*, Commerce is precluded from taking action with respect to entries prior to June 6, 2022.[623]  Commerce addressed this argument in the notice and comment period, as discussed in the *Presidential Proclamation 10414 Final Rule Preamble*.[624]  While the *Presidential Proclamation 10414* does declare an end date to the time period of duty-free treatment, it did not specify a start date, nor did it limit the application of the waiver to only entries made after *Presidential Proclamation 10414*.[625]  Additionally, the goods that entered the country prior to *Presidential Proclamation 10414* remain unliquidated, and have yet to have a final decision with respect to applicable duties.  By taking action with respect to those goods, in accordance with the regulations promulgated in *Presidential Proclamation 10414 Final Rule*, Commerce is not acting retroactively:  before any duties were determined to be applicable to these entries, the regulations stated that there would be no duties imposed on these entries.[626]  We also agree with the respondents that the actions taken by Commerce in enacting this rule to provide duty-free treatment to entries prior to June 6, 2022, furthers the relief goals for the national emergency declared in *Presidential Proclamation 10414*, and subjecting entries made prior to June 6, 2022,

---

[617] *See* Auxin's March 6, 2023 Case Brief at 17-18.
[618] *Id.*
[619] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877.
[620] *Id.*, 87 FR at 56877-78.
[621] *Id.*, 87 FR at 56877.
[622] *See* Auxin's March 6, 2023 Case Brief (quoting *Presidential Proclamation 10414*, 87 FR at 35068).
[623] *Id.* at 20.
[624] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877.
[625] *Id.*, 87 FR at 56877-78.
[626] *Id.*, 87 FR at 56877.

Filed By: Paola Aleman Ordaz, Filed Date: 8/18/23 9:44 AM, Submission Status: Approved

to duties would increase uncertainty in the market for solar cells and run contrary to the intent of *Presidential Proclamation 10414*.[627]

Third, Auxin argues that the *Presidential Proclamation 10414 Final Rule* is inconsistent with *Presidential Proclamation 10414* and the authority under which it was issued (*i.e.*, section 318(a) of the Act), which provides for action to be taken "during" an emergency.  Auxin states that there was no emergency declared prior to June 6, 2022; therefore, the Act does not allow Commerce act before that date.[628]  We disagree with this interpretation.  Section 318(a) of the Act states "{w}henever the President shall by proclamation declare an emergency to exist … he may authorize the Secretary of the Treasury to extend during the continuance of such emergency the time herein prescribed for the performance of any act, and may authorize the Secretary of the Treasury to permit, under such regulations as the Secretary of the Treasury may prescribe, the importation free of duty of food, clothing, and medical, surgical, and other supplies for use in emergency relief work."[629]  This provision contains two distinct clauses:  (1) authorizing the Secretary to "extend during the continuance of such emergency the time … for the performance of any act," and (2) authorizing the Secretary to "permit … the importation free of duty of food, clothing, and medical, surgical, and other supplies."[630]  We agree with respondents' argument that the grammatical construction of the statute, in particular using the word "authorize" in each of the two clauses, indicates that the authority in the second clause is independent from the authority in the first.  Accordingly, the President may authorize individually each of these two actions, or both, and the actions are not necessarily required to be implemented in unison or otherwise qualify each other.  In any event, Auxin's interpretation of the phrase "during the continuance of such emergency" is misleading.  Because these two clauses are independent, the phrase "during the continuance of such emergency" applies only to the first clause and does not limit the second clause concerning the waiver of duties.  Additionally, while it is true that the entries in question entered the country prior to June 6, 2022, Commerce's *taking action* with respect to setting a definitive amount of duties for those entries (which were unliquidated at the time of the rule, with no final amount of duties set) is not retroactive in nature as it is occurring during the continuance of the emergency as declared by the President.[631]

We also disagree with Auxin's reading of section 318 of the Act as prohibiting the retrospective application of duties (or lack thereof) to unliquidated merchandise because the general operation of the AD/CVD system in the United States is a retrospective one.  The "final liability for duties is determined after the merchandise is imported," and under this system entries are suspended and cash deposits are collected in order to wait for the final ascertainment of duties at a later time.[632]  That is the same situation of "retrospective" application of duties that Auxin is concerned about here; that merchandise entered the country and remains unliquidated while awaiting the final amount of duties owed.  To argue that section 318 of the Act prohibits this type

---

[627] *Id.*, 87 FR at 56875-78.
[628] *See* Auxin's March 6, 2023 Case Brief at 20.
[629] *See* section 318(a) of the Act.
[630] *Id.*
[631] *See Presidential Proclamation 10414 Final Rule Preamble*, 87 FR at 56877.
[632] *Id.* at 56877 (citing 19 CFR 351.212(a); and sections 703(d), 705(c), 706, 733(d), 735(c), and 736 of the Act).

121

of action is to ignore the fact that the passage by Congress of these provisions underpinning the AD/CVD system in the same Act supports reading them in harmony.[633]

Fourth, Auxin argues that the regulations promulgated under the *Presidential Proclamation 10414* are inconsistent with Commerce's circumvention regulations, which require Commerce to issue suspension of liquidation and cash deposit instructions to CBP in the event of an affirmative finding of circumvention.[634]  Auxin also states that this language was also included in Commerce's *Initiation Notice* and *Preliminary Determination*, which supposedly means that any failure to suspend liquidation and collect cash deposits from April 1, 2022, to June 6, 2022 is unlawful and should be reversed in the final determination.[635]  We disagree that Commerce must continue to follow the liquidation and cash deposit rules provided for in 19 CFR 351.226 in this specific case.  The 19 CFR Part 362 regulations carve out an exception to otherwise applicable rules (*i.e.*, those found in 19 CFR 351.226).[636]  Specifically, the 19 CFR Part 362 regulations state that "notwithstanding 351.226(l) … the Secretary shall instruct CBP to discontinue the suspension of liquidation of entries and collection of cash deposits for any Southeast-Asian-Completed Cells and Modules that were suspended pursuant to {section}351.226(l) of this chapter."[637]  If Commerce were to follow the liquidation and cash deposit rules provided for in 19 CFR 341.226, it would be acting contrary to the explicit language of the 19 CFR Part 362 regulations.  Furthermore, in situations in which a regulation is adopted following a notice and comment process and is more specific than an existing regulation, the more specific regulation prevails.[638]  Therefore, if a conflict arises between 19 CFR 362 and 19 CFR 351.226, the stipulations of 19 CFR 362 prevail.

## Comment 22. Whether Third-Country Exporters Without an AD Rate Should Receive the Separate Rate

*NextEra*[639]

- If Commerce reaches a country-wide affirmative circumvention determination, it should permit third-country exporters that neither have their own AD cash deposit rate, nor use a wafer exporter in China with its own AD cash deposit rate, to deposit ADs based on the separate rate determined in the China AD solar cells proceeding, rather than deposit ADs at the cash deposit rate of the China-wide entity.

---

[633] *Id.*, 87 FR at 56877 (citing *FDA v. Brown & Williamson*, 529 U.S. at 132-33 ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme … .  A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme … and fit, if possible, all parts into an harmonious whole."))

[634] *See* Auxin's March 6, 2023 Case Brief at 18 (citing 19 CFR 351.226(l)(2)(ii) and (iii)).

[635] *Id.* at 20-21.

[636] *See* 19 CFR 362.103(b)(1).

[637] *See* 19 CFR 362.103(b)(1)(i).

[638] *See Romani*, 523 U.S. at 532 (discussing the statutory canon that a later, more specific statute governs in the case of conflict); *Fourco Glass Co.*, 353 U.S. at 228 (holding that the general language of a statute "will not be held to apply to a matter specifically dealt with in another part of the same enactment."); *see also Roberto*, 440 F.3d at 1350 ("{t}he rules of statutory construction apply when interpreting an agency regulation.").

[639] *See* NextEra's March 6, 2023 Case Brief at 4-8.

- In *CORE from China (Vietnam)*, Commerce applied the AD cash deposit rate of Chinese companies granted a separate rate in the China AD investigation to imports of CORE produced in Vietnam using Chinese substrate." [640]

- Commerce cannot assume that companies in a third-country are part of the China-wide entity like it does for companies in China that cannot demonstrate their independence from the Chinese government.  Moreover, Commerce should not apply its NME methodology to companies in Cambodia, Malaysia, or Thailand, which are independent market economy countries.

- Commerce clearly explained in the *AD Order* that the China-wide AD rate is based on AFA.  The purpose of the statutory AFA provision is to encourage respondents' cooperation and ensure that they do not obtain a more favorable result by failing to cooperate than if they had cooperated.[641]  The third-country exporters fully cooperated with Commerce's requests for information in the circumvention inquires, and thus, there is no reason to apply an AFA rate, *i.e.*, the China-wide rate, to these exporters.

- Secretary Raimondo testified before Congress that a tariff rate in the range of 200 percent is "excessive" and "exceedingly unlikely."[642]  The China-wide AD cash deposit rate is 238.95 percent.  To avoid uncertainty and limit the damage to solar deployment in the United States, Commerce should permit third-country companies without their own AD rate, or without a Chinese wafer exporter with its own AD rate, to deposit ADs at the cash deposit rate of companies granted a separate rate in the China AD solar cells proceeding.

- Alternatively, Commerce should establish a procedure for companies to obtain separate rate status either by submitting separate rate applications in this inquiry, submitting separate rate applications in the ongoing AD administrative review in this proceeding, even if the exporter is not under review, or requesting a changed circumstances review to establish separate rate status on an expedited basis.

*Auxin*[643]

- Consistent with its long-standing practice, Commerce should continue to assign exporters without an individual AD rate or without a separate AD rate, the China-wide AD rate.[644]

- Commerce applied that practice in *CRS from China (Vietnam)*,[645] and contrary to NextEra's claim, in *CORE from China (Vietnam)*.[646]

- The purpose of a circumvention inquiry is to determine whether circumvention of an order has occurred, not conduct a separate rates analysis.  If Commerce reaches an affirmative circumvention determination, then it will order the suspension of liquidation of entries of inquiry merchandise and the collection of AD/CVD cash deposits pending conduct of an administrative review where Commerce will, among other things, determine the appropriate cash deposit rates and conduct separate rate analyses.[647]

---

[640] *Id.* (citing *CORE from China (Vietnam)* IDM at Comment 3).

[641] *Id.*  (citing SAA at 200; and *Changzhou Wujin Fine Chem*, 701 F.3d at 1378).

[642] *Id.* (citing NextEra's May 19, 2022 Comments at Attachment 3).

[643] *See* Auxin's March 17, 2023 Rebuttal Brief at 13-16.

[644] *Id.* (citing *Preliminary Determinations*, 87 FR at 75224; Policy Bulletin 05.1).

[645] *Id.* (citing *CRS from China (Vietnam)*, 83 FR at 23892).

[646] *Id.* (citing *CORE from China AD Investigation*, 81 FR at 35318).

[647] *Id.* (citing *Tissue Paper from China (Vietnam) Final Determination* IDM at Comment 5; and *Hangers from China (Vietnam)* IDM at Comment 5).

**Commerce's Position:**  We disagree with NextEra.  Pursuant to Commerce's affirmative country-wide circumvention determinations, duties under the *Orders* will apply to U.S. entries of inquiry merchandise from Cambodia, Malaysia, Thailand, and Vietnam unless at least one of the certification requirements is met.  Because the applicable *Orders* are on China, in this circumvention inquiry Commerce followed the methodology that it employs in AD proceedings involving China to determine the appropriate AD cash deposit rate for U.S. entries of inquiry merchandise.  Commerce considers China to be an NME country.[648]  In proceedings involving NME countries, Commerce maintains a rebuttable presumption that all exporters are subject to government control and thus, should be assigned a single antidumping duty deposit rate. It is Commerce's policy to assign all exporters of subject merchandise this single rate unless an exporter can demonstrate that it is sufficiently independent so as to be entitled to a separate rate.[649]  Therefore, as we explained in the *Preliminary Determinations*, entries from Cambodia, Malaysia, Thailand, and Vietnam will be assessed at the China-wide entity rate unless either:  (1) the relevant cell or module exporter from Cambodia, Malaysia, Thailand, or Vietnam has its own company-specific AD and/or CVD rate under the *Orders* or; (2) if it does not, the Chinese company that exported the wafers to that third-country cell/module exporter has its own company-specific AD and/or CVD rate under the *Orders*.[650]

Although NextEra asserts that Commerce cannot assume that companies in a third-country are part of the China-wide entity, Commerce's position in AD proceedings involving China is clear - " 'the {China}-wide rate applies to all entries of subject merchandise' unless Commerce has determined a firm is eligible for a separate rate … .  If a third-country exporter of subject merchandise wishes to have its own rate, it is incumbent upon that exporter to request a review."[651]

While exporters that are wholly-foreign owned do not need to demonstrate *de jure* and *de facto* independence from government control to receive a separate rate, they must nonetheless demonstrate that they are wholly owned by entities located in market-economy countries and that their ultimate owners are located in market-economy countries to receive a separate rate.[652]  Such entities must demonstrate this by completing the relevant portions of Commerce's separate rate application.[653]  As the CIT explained, while "… Commerce recognizes that companies organized outside of China are *per se* independent from the control of the {Chinese} government" it is only "{o}nce a party demonstrates that it is foreign owned, {that} Commerce accords that company a

---

[648] *See Aluminum Foil* PDM at the section, "China's Status as a Non-Market Economy."

[649] *See Sparklers from China*, 56 FR at 20588; *see also Silicon Carbide from China*, 59 FR at 22585;, and 19 CFR 351.107(d).

[650] *See Preliminary Determinations*, 87 FR at 75224.

[651] *See Xanthan Gum from China 2016-2017* IDM at Comment 1.

[652] *See Chlorinated Isocyanurates from China 2019-2020 Preliminary Results* PDM ("{t}o establish whether a company is sufficiently independent to be eligible for a separate, company-specific rate, Commerce analyzes each exporting entity in an NME country under the test established in *Sparklers* as amplified in *Silicon Carbide*, and further refined by *Diamond Sawblades*.  However, if Commerce determines that a company is wholly foreign-owned or located in a market economy (ME) country, then a separate-rate analysis is not necessary to determine whether it is independent from government control."), unchanged in *Chlorinated Isocyanurates from China 2019-2020 Final Results*.

[653] *See* https://enforcement.trade.gov/nme/nme-sep-rate.html.

124

rate separate from the {China}-wide rate."[654]  Thus, Commerce's practice in NME cases is to require exporters inside and outside the NME country to demonstrate that they are not part of the NME-wide entity in order to obtain separate rate status.

There is no basis in this circumvention inquiry to grant separate rate status to companies that currently do not have a separate rate, or whose wafer suppliers do not have a separate rate. Commerce does not conduct a separate rates analysis in circumvention inquiries and did not do so here.  The purpose of the circumvention statute is to give Commerce the authority, and the criteria to follow, to administer "AD and {CVD} orders in such a way as to prevent circumvention and diversion of U.S. law."[655]  Therefore, Commerce focused its analysis in the circumvention inquiry on applying the relevant methodology in section 781 of the Act to determine whether circumvention was occurring and did not conduct a separate rates analysis. Commerce conducts separate rates analyses in administrative reviews.[656]  Commerce conducts administrative reviews to determine "the amount of any antidumping duty,"[657] and a separate rates analysis is integral to this.  Separately, Commerce conducts circumvention inquiries to establish whether certain goods must be subject to an order,[658] not to establish the duty rates for those goods.  Further, Commerce's application of the China-wide entity AD rate to exporters that do not have their own separate rate, or whose wafer suppliers do not have a separate rate, in this circumvention inquiry is consistent with its practice in other circumvention inquiries involving China including, contrary to NextEra's claim, *CORE from China (Vietnam)* in which Commerce stated that it "will instruct CBP to require AD cash deposits equal to the rate established for the China-wide entity (199.43 percent) …"[659]

We disagree with NextEra's claim that Commerce reached a determination based on adverse facts available with respect to certain cooperative third-country exporters that do not have a separate rate by requiring cash deposits equal to the China-wide rate on U.S. entries of their inquiry merchandise.  Commerce made determinations based on adverse facts available only with respect to uncooperative companies.  As adverse facts available, Commerce determined that the uncooperative companies "exported inquiry merchandise and that U.S. entries of that merchandise are circumventing the *Orders*."[660]  Additionally, Commerce prohibited importers and exporters from using certain certifications with respect to U.S. entries of inquiry merchandise from the uncooperative companies.[661]  Commerce did not require a cash deposit equal to the China-wide rate on U.S. entries of inquiry merchandise from any company as part of

---

[654] *See Decca Hospitality Furnishings*, 391 F.Supp.2d at 1300.

[655] *See Senate Report 100-71* at 101; *see also Tissue Paper from China (Vietnam) Final Determination* at Comment 1 ("The overall purpose of an anti-circumvention inquiry is to prevent the evasion of an AD order").

[656] *See Tissue Paper from China (Vietnam) Final Determination* IDM at Comment 5 ("{c}ontrary to MFVN's suggestion, in conducting this inquiry, {Commerce} has not determined a cash deposit rate, conducted a separate rate analysis, or calculated an individual margin of dumping for MFVN, which is done during an administrative review.").

[657] *See* section 751(a)(1)(B) of the Act.

[658] *See* section 781(b) of the Act; *see also Bell Supply CAFC.*

[659] *See CORE from China (Vietnam)*, 83 FR at 23896; *see also CORE from China AD Investigation*, 81 FR at 35318; *Tissue Paper from China (India) Final Determination* IDM at 15; *Aluminum Extrusions from China (Vietnam),* 84 FR at 39806; *Butt-Weld Pipe Fittings from China (Malaysia),* 84 FR at 29165; and *SDGE from China (UK)* IDM at Comment 5.

[660] *See Preliminary Determinations*, 87 FR at 75221, 75223.

[661] *Id.*

125

an adverse facts available determination. Rather, Commerce required that importers deposit ADs equal to the China-wide rate on entries of inquiry merchandise from cooperative third-country exporters only where the third-country exporters or their Chinese wafer supplier(s) do not have a separate rate. In fact, a company that is barred from certifying that its exports contain no Chinese wafers or module components may still receive a company-specific rate if it already has such a rate under the *Orders* or if its Chinese wafer exporter has its own rate under the *Orders*.[662]

Both the CIT and the CAFC recognized that even if Commerce based the China-wide entity's dumping margin on adverse facts available, that "does not change its applicability to an NME entity that cooperated, but ultimately failed to qualify for a separate rate."[663] For example, in *Advanced Technology*, the CIT stated:

> Commerce did not apply adverse facts available to {respondent}, Commerce rather found that {respondent} had not rebutted the presumption of state control and assigned it the {China}-wide rate. These are two distinct legal concepts: a separate AFA rate applies to a respondent who has received a separate rate but has otherwise failed to cooperate to the best of its ability whereas the {China}-wide rate applies to a respondent who has not received a separate rate. [664]

Consequently, we will continue to instruct CBP to require a cash deposit equal to the China-wide rate on U.S. entries of inquiry merchandise from any company that neither has its own AD cash deposit rate, nor uses a wafer exporter in China with its own AD cash deposit rate.

## VIII. RECOMMENDATION

Based on our analysis of the comments received and our findings at verification, we recommend adopting the above positions. We recommend finding, based on the analysis and findings detailed above and in the *Preliminary Determination*, that imports of solar cells and modules, completed in Thailand using certain parts and components manufactured in China, are circumventing the *Orders*, except for shipments complying with the certification requirements described in the *Federal Register* notice.

---

[662] *See Preliminary Determinations*, 87 FR at 75224; *see also* the section, "Entries on or After Termination of the Proclamation" in the *Federal Register* notice accompanying this memorandum.
[663] *See Walk-Behind Lawn Mowers from China* IDM at Comment 9 (citing *Diamond Sawblades Coalition*, 866 F.3d at 1313).
[664] *Id.* at Comment 9 (citing *Advanced Technology*, 938 F. Supp. 2d at 1351 (citing *Watanabe Group,* 34 CIT 1545, Slip Op. 10-139 at 9, n. 8)).

If this recommendation is accepted, we will publish the final determination in these inquiries in the *Federal Register*.

☒                              ☐
_____          _____
Agree                        Disagree

                                 8/17/2023

X    *Lisa W. Wang*
_____

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

127

**Appendix I - Acronyms/Abbreviations**

| Acronym/Abbreviation | Complete Name |
|---|---|
| $ | United States Dollars |
| ACCESS | Antidumping and Countervailing Duty Centralized Electronic Service System |
| AD | Antidumping Duty |
| AFA | Adverse Facts Available |
| APA | Administrative Procedure Act |
| APO | Administrative Protective Order |
| AR | Administrative Review |
| Auxin | Auxin Solar Inc. |
| bn | Billion |
| Boviet | Boviet Solar Technology Co., Ltd. |
| BPI | Business Proprietary Information |
| BYD HK | BYD (H.K.) Co., Ltd. |
| Shangluo BYD | BYD (Shangluo) Industrial Co., Ltd. |
| CAFC | U.S. Court of Appeals for the Federal Circuit |
| Cambodia | Kingdom of Cambodia |
| Canadian Solar or the Canadian Solar Group | Canadian Solar International Limited; Canadian Solar Manufacturing (Changshu) Inc.; Canadian Solar Manufacturing (Luoyang) Inc.; CSI Cells Co., Ltd.; CSI Solar Co., Ltd.; CSI Manufacturing (Fu Ning) Co., Ltd.; Canadian Solar Manufacturing (Thailand) Co., Ltd.; and Canadian Solar Manufacturing Vietnam Co., Ltd. |
| CBP | U.S. Customs and Border Protection |
| CCR | Changed Circumstances Review |
| CdTe | Cadmium Telluride |
| CEA | Clean Energy Associates, LLC |
| China | The People's Republic of China |
| CIT | U.S. Court of International Trade |
| COM | Cost of manufacturing |
| Commerce | The U.S. Department of Commerce |
| CORE | Certain Corrosion-Resistant Steel Products |
| CRS | Certain Cold-Rolled Steel Flat Products |
| CSIL | Canadian Solar International Limited |
| CSIL | Canadian Solar International Limited. Also, any reference to the author of case briefs and rebuttals submitted by CSIL and any member of the Canadian Solar Group. |

| | |
|---|---|
| CSPV | Crystalline Silicon Photovoltaic |
| CVD | Countervailing Duty |
| Date of Termination | Date of termination of Presidential Proclamation 10414 |
| DOE | United States Department of Energy |
| EPCG | Export Promotion Capital Goods |
| ET | Eastern Time |
| EVA | Ethylene Vinyl Acetate |
| FA | Facts Available |
| First Solar Malaysia | First Solar Malaysia Sdn. Bhd. |
| First Solar Vietnam | First Solar Vietnam Manufacturing Co., Ltd. |
| FY | Fiscal Year |
| GW | Gigawatt |
| G&A | General and Administrative Expenses |
| Hanwha | Hanwha Q Cells Malaysia Sdn. Bdh. |
| HFC | Hydrofluorocarbon |
| HRS | Hot Rolled Steel |
| HTS | Harmonized Tariff Schedule |
| IDM | Issues and Decision Memorandum |
| IEA | International Energy Agency |
| Inquiry Countries | Cambodia, Malaysia, Thailand and Vietnam |
| ITC | U.S. International Trade Commission |
| Jinko | Jinko Solar Technology Sdn. Bhd./ Jinko Solar (Malaysia) Sdn. Bhd. |
| Le Shan Jinko | Jinko Solar (Le Shan) Co., Ltd |
| KHR | Cambodian Riel |
| LONGi | LONGi (H.K) Trading Limited in the Vietnam segment, and LONGi (Kuching) Sdn. Bhd. and LONGi Technology (Kuching) Sdn. Bhd. in the Malaysia segment |
| LWRPT | Light-Walled Rectangular Pipe and Tube |
| Maxeon | Maxeon Solar Technologies, Ltd. |
| mn | Million |
| MW | Megawatts |
| MYR | Malaysian Ringgit |
| NE Solar | New East Solar Energy (Cambodia) Co., Ltd. |
| NextEra | NextEra Energy Constructors, LLC |
| Ningbo Kyanite | Ningbo Kyanite International Trade Co., Ltd |
| NME | non-market economy |

| OCTG | Oil Country Tubular Goods |
|---|---|
| p/n | Positive/Negative |
| PDM | Preliminary Decision Memorandum |
| PERC | Passivated Emitter and Rear Contact |
| PET Film | Polyethylene Terephthalate Film, Sheet, and Strip |
| PLI | Product-Linked Incentive |
| POR | Period of Review |
| Q&V | Quantity and Value |
| R&D | Research and Development |
| Red Sun | Red Sun Energy Long An Company Limited |
| Risen | Risen Solar Technology Sdn. Bhd |
| RMB | Renminbi |
| Silfab | Silfab Solar WA Inc. |
| solar cells and modules | certain crystalline silicon photovoltaic cells, whether or not assembled into modules |
| Sonali | Sonali Energees USA LLC |
| Tata Power | Tata Power Solar System Limited |
| TBH | Thai Bhat |
| Thailand | Kingdom of Thailand |
| the Act | Tariff Act of 1930, as amended |
| The LONGi Group | LONGi (Kuching) Sdn. Bhd., LONGi Technology (Kuching) Sdn. Bhd. , LONGi (H.K.) Trading Limited, LONGi Solar Technology (H.K.) Limited, LONGi Solar Technology (U.S.) Inc. |
| THSM | Canadian Solar Manufacturing (Thailand) Co., Ltd. |
| Trina or the Trina Group | Trina Solar (Vietnam) Science & Technology Co., Ltd, Trina Solar Energy Development Company Limited, and Trina Solar Co., Ltd. in Vietnam segment and Trina Solar Science & Technology (Thailand) Ltd. in Thailand segment |
| TTL | Trina Solar Science & Technology (Thailand) Ltd. |
| TTL | Trina Solar Science & Technology (Thailand) Ltd. Also, any reference to the author of case briefs and rebuttals submitted by TTL and any member of the Trina Group. |
| TSSD | Trina Solar (Singapore) Science & Technology Pte. Ltd. |

| | |
|---|---|
| TCZ | Trina Solar Co., Ltd. |
| URAA | Uruguay Round Agreements Act |
| Vietnam | Socialist Republic of Vietnam |
| Vina | Vina Solar Technology Company Limited |
| Vina Cell | Vina Cell Technology Company Limited |
| VND | Vietnamese Dong |
| VSUN | Vietnam Sunergy Joint Stock Company |
| Websol Energy | Websol Energy System Limited |

**Appendix II - Court and Case Citation Table**
**This Section is Sorted by Short Citation**

| Short Citation | Administrative Case Determinations |
|---|---|
| *2003 Policy Bulletin* | *Proposed Policies Regarding the Conduct of Changed Circumstance Reviews of the Countervailing Duty Order on Softwood Lumber from Canada (C 122 839)*, 68 FR 37456 (June 24, 2003) |
| *2021 Regulations Final Rule* | *Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 FR 52300 (September 20, 2021) |
| *Activated Carbon from China* | *Certain Activated Carbon from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review; 2016-2017,* 83 FR 53214 (October 22, 2018), and accompanying IDM |
| *Orders* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 FR 73018 (December 7, 2012); *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Countervailing Duty Order*, 77 FR 73017 (December 7, 2012) |
| *AD Order* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 77 FR 73018 (December 7, 2012) |
| *Adoption of CFR 351.228* | *Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 FR 52300 (September 20, 2021) |
| *Advanced Technology* | *Advanced Technology & Materials Co. v. United States*, 938 F. Supp. 2d 1342, 1351 (CIT 2013) (citing Watanabe Group v. United States, 34 CIT 1545 (CIT 2010), Slip Op. 10-139 |
| *Ajmal Steel* | *Ajmal Steel Tubes & Pipes Indus. LLC v. United States,* Slip Op. 22-121 (CIT October 28, 2022) |
| *AK Steel Corp.* | *AK Steel Corp. v. United States*, 192 F.3d 1367 (Fed. Cir. 1999) |
| *Al Ghurair CAFC 2023* | *Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351 (Fed. Cir. 2023) |
| *Al Ghurair CIT 2021* | *Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357 (CIT 2021) |

| | |
|---|---|
| *Alaska* | *Alaska Pro. Hunters Ass'n v. FAA*, 177 F.3d 1030, 1033-34, 1036 (D.C. Cir. 1999) |
| *Albemarle Corp.* | *Albemarle Corp. & Subsidiaries v. United States*, 821 F.3d 1345 (Fed. Cir. 2016) |
| *Allegheny v. U.S.* | *Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368 (Fed. Cir. 2003) |
| *Aluminum (Taishan) Co.* | *Aluminum (Taishan) Co. v. United States,* 983 F.3d 487 (Fed. Cir. 2020) |
| *Aluminum Extrusions from China* | *Aluminum Extrusions from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 76 FR 18524 (April 4, 2011) |
| *Aluminum Extrusions from China (Vietnam)* | *Aluminum Extrusions from the People's Republic of China:  Final Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders, and Partial Rescission*, 84 FR 39805 (August 12, 2019) |
| *Aluminum Extrusions from China Minor Alterations Circumvention Final* | *Aluminum Extrusions from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders and Rescission of Minor Alterations Anti-Circumvention Inquiry*, 82 FR 34630 (July 26, 2017), and accompanying IDM |
| *Aluminum Extrusions from China Preliminary CCR* | *Aluminum Extrusions from the People's Republic of China:  Initiation and Preliminary Results of Expedited Changed Circumstances Review*, 83 FR 34548 (July 20, 2018) |
| *Aluminum Foil from China* | *Certain Aluminum Foil from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 83 FR 9282 (March 5, 2018) |
| *Aluminum Foil from China (Korea and Thailand)* | *Antidumping and Countervailing Duty Orders on Certain Aluminum Foil from the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention With Respect to the Republic of Korea and the Kingdom of Thailand,* 88 FR 17177 (March 22, 2023) |
| *Aluminum Foil from China (Korea and Thailand) Preliminary* | *Antidumping and Countervailing Duty Orders on Certain Aluminum Foil from the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention With Respect to the Republic of Korea and the Kingdom of Thailand*, 88 FR 17177 (March 22, 2023), and accompanying PDM |
| *Aluminum Foil from Oman* | *Certain Aluminum Foil from the Sultanate of Oman: Final Affirmative Countervailing Duty Determination*, 86 FR 52888 (September 23, 2021) |

| | |
|---|---|
| *Aluminum Foil PDM* | *Antidumping Duty Investigation of Certain Aluminum Foil from the People's Republic of China: Affirmative Preliminary Determination of Sales at Less-Than-Fair Value and Postponement of Final Determination*, 82 FR 50858, 50861 (November 2, 2017), and accompanying PDM (citing Memorandum, "China's Status as a Non-Market Economy," dated October 26, 2017) |
| *Aluminum Sheet from Bahrain* | *Common Alloy Aluminum Sheet from Bahrain: Final Affirmative Countervailing Duty Determination*, 86 FR 13333 (March 8, 2021) |
| *Amanda Foods CIT* | *Amanda Foods (Vietnam) Ltd. v. United States*, 647 F. Supp. 2d at 1381 |
| *Antidumping and Countervailing Duties FR* | *Antidumping Duties; Countervailing Duties*, 61 FR 7308 (February 27, 1996) |
| *Antidumping Duties; Countervailing Duties; Final Rule* | *Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27296, 27340 (May 19, 1997) |
| *API v. U.S.* | *API v. United States EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995) |
| *Appelton Papers Inc.* | *Appelton Papers Inc. v. United States*, 37 CIT 1034 Slip Op.13-87 (July 2013) |
| *Archer Daniels* | *Archer Daniels Midland Co. v. United States*, 968 F. Supp. 2d 1269, 1279 (CIT 2014) |
| *Ass'n of Priv. Sector* | *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 462-63 (D.C. Cir. 2012) |
| *Ausimont* | *Ausimont United States v. United States*, 882 F. Supp. 1087, 1098 (CIT 1995) |
| *B.F. Goodrich v. U.S.* | *B.F. Goodrich Co. v. United States*, 794 F. Supp. 1148 (CIT 1992) |
| *Baker Hostetler* | *Baker Hostetler v. United States*, 473 F.3d 312 (D.C. Cir. 2006) |
| *Ball Bearings from Thailand* | *Final Affirmative Countervailing Duty Determination and Partial Countervailing Duty Order: Ball Bearings and Parts Thereof from Thailand; Final Negative Countervailing Duty Determinations: Antifriction Bearings (Other Than Ball or Tapered Roller Bearings) and Parts Thereof from Thailand*, 54 FR 19130 (May 3, 1989) |
| *Beijing Tianhai* | *Beijing Tianhai Industry Co. v. United States*, 52 F. Supp. 3d 1351 (CIT 2015) |
| *Bell Supply CAFC* | *Bell Supply Co., LLC v. United States*, 888 F.3d 1222 (Fed. Cir. 2018) |

| | |
|---|---|
| *Bethlehem Steel v. U.S.* | *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (CIT 2001) |
| *Bloomberg Report* | BloombergNEF, Solar PV Trade and Manufacturing: A Deep Dive (2021) |
| *BMW of N. Am. LLC* | *BMW of N. Am. LLC v. United States*, 926 F.3d 1291 (Fed. Cir. 2019) |
| *Bomont Indus.* | *Bomont Indus. v. United States*, 733 F. Supp. 1507 (CIT 1990) |
| *Borusan v. American Cast Iron Pipe* | *Borusan Mannesmann Boru Sanayi v. American Cast Iron Pipe Co.*, Ct. No. 20-2014 2021 U.S. App. (Fed. Cir. 2021) |
| *Borusan  2015* | *Borusan Mannesmann Boru Sanayi v Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (CIT 2015) |
| *Borusan  2017* | *Borusan Mannesmann Boru Sanayi v Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1327-30, *aff'd* 857 F.3d 1353 (Fed. Cir. 2017) |
| *Bowen* | *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) |
| *Brass Sheet and Strip from Canada* | *Brass Sheet and Strip from Canada:  Final Affirmative Determination of Circumvention of Antidumping Duty Order,* 58 FR 33610 (June 18, 1993), and accompanying IDM |
| *Building Sys. De Mex.* | *Building Sys. De Mex., S.A. de C.V. v. United States*, 567 F. Supp. 3d 1306, 1316 (CIT 2022) |
| *Butt-Weld Pipe Fittings from China (Malaysia)* | *Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China:  Final Affirmative Determination of Circumvention of the Antidumping Duty Order*, 84 FR 29164 (June 21, 2019) |
| *Butt-Weld Pipe Fittings from China (Thailand)* | *See Certain Carbon Steel Butt-Weld Pipe Fittings from the People's Republic of China; Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 59 FR 15155 (March 31, 1994) |
| *Canada – Feed-In Tariff Program* | *Canada – Measures Relating to the Feed-In Tariff Program, (WT/DS426/AB/R)*, adopted May 6, 2013 |
| *Canadian Solar CAFC* | *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 919 (Fed. Cir. 2019) |
| *Carbon and Alloy Steel Wire Rod from Italy* | *Countervailing Duty Investigation of Carbon and Alloy Steel Wire Rod from Italy:  Final Affirmative Determination*, 83 FR 13242 (March 28, 2018) |
| *Carbon Steel Flanges from Italy* | *Finished Carbon Steel Flanges from Italy:  Final Determination of Sales at Less Than Fair Value*,  82 FR 29481 (June 29, 2017), and accompanying IDM |

| | |
|---|---|
| *Carlisle Tire & Rubber v. U.S.* | *Carlisle Tire & Rubber Co. v. United States*, 564 F. Supp. 834 (CIT 1983) |
| *Cathedral Candle* | *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1366 (Fed. Cir. 2005) |
| *Celik Halat* | *Celik Halat ve Tel Sanayi A.S. v. United States*, 557 F. Supp. 3d 1348 (CIT 2022) |
| *Ceramica Regiomontana* | *Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961, 966 (CIT 1986) |
| *Certain Pasta from Italy AR11* | *Certain Pasta from Italy: Final Results of the Eleventh (2006) Countervailing Duty Administrative Review*, 74 FR 5922 (February 3, 2009) |
| *Certain Pasta from Italy AR7* | *Certain Pasta from Italy: Final Results of the Seventh Countervailing Duty Administrative Review*, 69 FR 70657 (December 7, 2004) |
| *Certain Steel Products from Korea* | *Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations: Certain Steel Products from Korea*, 58 FR 37338 (July 9, 1993) |
| *Certain Wheat from Canada* | *Final Affirmative Countervailing Duty Determinations: Certain Durum Wheat and Hard Red Spring Wheat from Canada*, 68 FR 52747 (September 5, 2003) |
| *Cf. Stark v. Wickard* | *Cf. Stark v. Wickard,* 321 U.S. 288 (1944) |
| *CFS from China* | *Coated Free Sheet Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 72 FR 60645 (October 25, 2007) |
| *Changzhou Trina Solar Energy v. U.S. (2016)* | *Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334 (CIT 2016) *aff'd* 264 F. Supp. 3d 1325, 1334 (CIT 2017) |
| *Changzhou Trina Solar Energy v. U.S. (2018)* | *Changzhou Trina Solar Energy Co. Ltd. v. United States*, 352 F. Supp. 3d 1316 (CIT 2018) |
| *Changzhou Trina Solar Energy v. U.S. (2020)* | *Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287 (CIT 2020) |
| *Changzhou Wujin Fine Chem* | *Changzhou Wujin Fine Chem. Factory Co. v. United States,* 701 F.3d 1367 (Fed. Cir. 2012) |
| *Chevron* | *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) |
| *Chlorinated Isocyanurates from China* | *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Countervailing Duty Administrative Review, and Partial Rescission of Countervailing Duty Administrative Review*, 82 FR 27466 (June 15, 2017) |

| | |
|---|---|
| *Chlorinated Isocyanurates from China 2019-2020 Final Results* | *Chlorinated Isocyanurates from the People's Republic of China: Final Determination of No Shipments; 2019–2020 Administrative Review*, 86 FR 36253 (July 9, 2021) |
| *Chlorinated Isocyanurates from China 2019-2020 Preliminary Results* | *Chlorinated Isocyanurates from the People's Republic of China: Preliminary Determination of No Shipments; 2019-2020*, 86 FR 13291 (March 8, 2021) |
| *Cinsa* | *Cinsa, S.A. de C.V. v. United States*, 966 F. Supp. 1230 (CIT 1997) |
| *Circular Welded Carbon-Quality Steel Pipe from China (Vietnam) Preliminary* | *Circular Welded Carbon Quality Steel Pipe from the People's Republic of China: Preliminary Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 88 FR 21975 (April 12, 2023) |
| *Circular Welded Carbon-Quality Steel Pipe from Oman* | *Circular Welded Carbon-Quality Steel Pipe from the Sultanate of Oman: Final Affirmative Countervailing Duty Determination*, 77 FR 64473 (October 22, 2012) |
| *CITIC Trading Company, Ltd. Remand* | *Final Results of Redetermination Pursuant to Court Remand, CITIC Trading Company, Ltd. v. United States of America and ABC Coke, et al: Final Results Pursuant to Remand*, Court No. 01-00901, Slip Op. 03-23 (CIT March 4, 2003), dated June 17, 2003, available at https://access.trade.gov/resources/remands/03-23.pdf |
| *Citric Acid from China* | *Citric Acid and Certain Citrate Salts from the People's Republic of China: Final Results of Countervailing Duty Administrative Review*, 77 FR 72323 (December 5, 2012) |
| *COALITION I* | *Comm. Overseeing Action for Lumber Int'l Trade Investigations v. United States*, 483 F. Supp. 3d 1253 (CIT 2020) |
| *COALITION II* | *Comm. Overseeing Action for Lumber Int'l Trade Investigations v. United States*, 535 F. Supp. 3d 1336 (CIT 2021) |
| *Coated Paper from China* | *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 75 FR 59212 (September 27, 2010) |
| *Cold Rolled Steel from China (Vietnam) Preliminary* | *Certain Cold-Rolled Steel Flat Products from the People's Republic of China: Affirmative Preliminary Determination of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 82 FR 58178 (December 11, 2017) |

| | |
|---|---|
| CORE from China (Guatemala) | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Negative Final Determination of Circumvention Involving Guatemala,* 85 FR 41954 (July 13, 2020) |
| CORE from China (Guatemala) Preliminary | *Negative Preliminary Determination of Circumvention Involving Guatemala:  Certain Corrosion-Resistant Steel Products from the People's Republic of China*, 85 FR 8840 (February 18, 2020) |
| CORE from China (Malaysia) Final | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Final Determination of Circumvention Involving Malaysia,* 86 FR 30263 (June 7, 2021) |
| CORE from China (Malaysia) Preliminary | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention Involving Malaysia,* 85 FR 8823 (February 18, 2020) |
| CORE from China (South Africa) | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Negative Final Determination of Circumvention Involving South Africa*, 86 FR 30253 (June 7, 2021), and accompanying IDM |
| CORE from China (South Africa) Preliminary | *Negative Preliminary Determination of Circumvention Involving South Africa:  Certain Corrosion-Resistant Steel Products from the People's Republic of China*, 85 FR 8844 (February 18, 2020) |
| CORE from China (UAE) | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Final Determination of Circumvention Involving the United Arab Emirates*, 85 FR 41957 (July 13, 2020) |
| CORE from China (UAE) Preliminary | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention Involving the United Arab Emirates*, 85 FR 8841 (February 18, 2020) |
| CORE from China (Vietnam) | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 83 FR 23895 (May 23, 2018) |

| | |
|---|---|
| *CORE from China AD Investigation* | *Certain Corrosion-Resistant Steel Products from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value, and Final Affirmative Critical Circumstances Determination, in Part*, 81 FR 35316 (June 2, 2016) |
| *CORE from Korea (Vietnam)* | *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Affirmative Final Determinations of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 84 FR 7034 (December 26, 2019) |
| *CORE from Taiwan (Malaysia)* | *Certain Corrosion-Resistant Steel Products from Taiwan:  Affirmative Final Determination of Circumvention Involving Malaysia*, 86 FR 30257 (June 7, 2021) |
| *CORE from Taiwan Final* | *Certain Corrosion-Resistant Steel Products from Taiwan:  Affirmative Final Determination of Circumvention Inquiry on the Antidumping Duty Order*, 84 FR 70937 (December 26, 2019) |
| *CORE from Taiwan Preliminary Determination* | *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Affirmative Preliminary Determination of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 84 FR 32875 (July 10, 2019) |
| *CRS from Brazil* | *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from Brazil:  Final Affirmative Determination,* 81 FR 49940 (July 29, 2016), and accompanying IDM |
| *CRS from China (Vietnam)* | *Certain Cold-Rolled Steel Flat Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 83 FR 23891 (May 23, 2018) |
| *CRS from Korea (Vietnam)* | *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Affirmative Final Determinations of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 84 FR 70948 (December 26, 2019) |
| *CRS from Korea (Vietnam) Preliminary* | *Certain Cold-Rolled Steel Flat Products from the Republic of Korea:  Affirmative Preliminary Determination of Anti-Circumvention Inquiries on the Antidumping Duty and Countervailing Duty Orders*, 84 FR 32875 (July 10, 2019) |

| | |
|---|---|
| *CVD Order* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Countervailing Duty Order*, 77 FR 73017 (December 7, 2012) |
| *CVP 23 from China* | *Carbazole Violet Pigment 23 from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 75 FR 36630 (June 28, 2010) |
| *CWCS from India (Oman and India) Final* | *Certain Welded Carbon Steel Standard Pipes and Tubes from India:  Final Negative Determinations of Circumvention of the Antidumping Duty Order*, 88 FR 12917 (March 1, 2023) |
| *CWCS from India (Oman and India) Preliminary* | *Preliminary Negative Determinations of Circumvention of the Antidumping Order:  Certain Welded Carbon Steel Standard Pipes and Tubes from India*, 87 FR 52507 (August 26, 2022) |
| *DAK Americas* | *DAK Americas LLC v. United States*, 517 F. Supp. 3d 1349, 1360 (CIT 2021) |
| *Decca Hospitality Furnishings* | *Decca Hospitality Furnishings, LLC, et al. v. United States*, 391 F. Supp. 2d 1298 (August 2005) |
| *Diamond Sawblades (Thailand)* | *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Final Determination of AntiCircumvention Inquiry*, 84 FR 33920 (July 16, 2019) |
| *Diamond Sawblades (Thailand) Preliminary* | *Diamond Sawblades and Parts Thereof from the People's Republic of China:  Preliminary Affirmative Determination of Circumvention*, 83 FR 57425 (November 15, 2018) |
| *Diamond Sawblades Coalition* | *Diamond Sawblades Manufacturers Coalition v. United States*, 866 F.3d 1304, 1313 (Fed. Cir. 2017) |
| *Diamond Sawblades Coalition CIT* | *Diamond Sawblades Manufacturers Coalition v. United States*, 816 F. Supp. 2d 1342 (CIT January 2012) |
| *Dillinger France* | *Dillinger France S.A. v. United States,* 981 F.3d 1318, 1322 (Fed. Cir. 2020) |
| *Dongtai Peak* | *Dongtai Peak Honey Indus. v. United States,* 777 F.3d 1343 (Fed. Cir. 2015) |
| *Encino Motorcars* | *Encino Motorcars, LLC v. Navarro*, 570 U.S. 211 (2016) |
| *Ericsson* | *Ericsson GE Mobile Commc'ns, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995) |
| *Essar Steel* | *Essar Steel Ltd. v. United States,* 678 F.3d 1268 (Fed. Cir. 2012) |

| | |
|---|---|
| *F Lli De Cecco* | *F. Lli De Cecco Di Filippo Fara San Martino S.P.A. v. United States*, 980 F. Supp 485 (CIT 1997) |
| *F Lli De Cecco Fed. Cir.* | *F. Lli De Cecco Di Filippo Fara San Martino S.P.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) |
| *FDA v. Brown & Williamson* | *FDA v. Brown & Williamson Tobacco*, 529 U.S. 120 (2000) |
| *PSF from Korea* | *Fine Denier Polyester Staple Fiber from the Republic of Korea:  Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24743 (May 30, 2018) |
| *PSF from Taiwan* | *Fine Denier Polyester Staple Fiber from Taiwan: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24745 (May 30, 2018) |
| *Federal–Mogul Corp.* | Federal–Mogul Corp. v. United States, 63 F.3d 1572, 1575 (Fed. Cir. 1995) |
| *Ferrostaal Metals GmbH* | *Ferrostaal Metals GmbH v. United States*, 518 F. Supp. 3d 1357 (CIT 2021) |
| *Ferrovanadium from China Final Determination* | *Notice of Final Determination of Sales at Less Than Fair Value:  Ferrovanadium from the People's Republic of China*, 67 FR 71137 (November 29, 2002) |
| *Ferrovanadium from China Preliminary Determination* | *Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination:  Ferrovanadium from the People's Republic of China*, 67 FR 45088 (July 8, 2002) |
| *Ferrovanadium from Russia Final Determination* | *Ferrovanadium and Nitrided Vanadium from the Russian Federation:  Negative Final Determination of Circumvention of the Antidumping Duty Order*, 77 FR 46712 (August 6, 2012) |
| *Ferrovanadium from Russia Preliminary Determination* | *Preliminary Negative Determination and Extension of Time Limit for Final Determination of Circumvention of the Antidumping Duty Order on Ferrovanadium and Nitrided Vanadium from the Russian Federation*, 77 FR 6537 (February 8, 2012) |
| *Fish Fillets from Vietnam* | *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and New Shipper; 2010-2011*, 78 FR 17350 (March 21, 2013), and accompanying IDM |

| | |
|---|---|
| *Fish Fillets from Vietnam (Cambodia)* | *Circumvention and Scope Inquiries on the Antidumping Duty Order on Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Partial Affirmative Final Determination of Circumvention of the Antidumping Duty Order, Partial Final Termination of Circumvention Inquiry and Final Rescission of Scope Inquiry*, 71 FR 38608 (July 7, 2006) |
| *Fort Stewart* | *Fort Stewart Schs. v. Fed. Labor Relations Auth.*, 495 U.S. 641, 654 (1990) |
| *Fource Glass Co.* | *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222 (1957) |
| *Gallant Ocean (Thai.) Co.* | *Gallant Ocean (Thai.) Co., v. United States*, 602 F.3d 1319 (Fed. Cir. 2010) |
| *Glycine from China (India)* | *Glycine from the People's Republic of China: Final Partial Affirmative Determination of Circumvention of the Antidumping Duty Order*, 77 Fed. Reg. 73,426 (December 10, 2012) |
| *Glycine from India CVD* | *Glycine from India: Final Results of Countervailing Duty Administrative Review; 2020,* 87 FR 76611 (December 15, 2022) |
| *Granular PTFE Resin from Italy* | *Polytetrafluoroethylene Resin from Italy: Final Affirmative Determination of Circumvention of Antidumping Duty Order*, 58 FR 26100 (April 30, 1993) |
| *Graphite Electrodes from China (U.K.) Prelim* | *Small Diameter Graphic Electrodes from the People's Republic of China: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order and Extension of Final Determination*, 77 FR 33405, 33413 (June 6, 2012) |
| *Grobest* | *Grobest & I-Mei Industries (Vietnam) Co., Ltd. v. United States*, 815 F. Supp. 2d 1342 (CIT 2012) |
| *Hangers from China (Vietnam)* | *Steel Wire Garment Hangers from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order,* 76 FR 66895 (October 28, 2011), and accompanying IDM |
| *Hangers from China (Vietnam) Preliminary Determination* | *Steel Wire Garment Hangers from the People's Republic of China: Affirmative Preliminary Determination of Circumvention of the Antidumping Order and Extension of Final Determination*, 76 FR 27007 (May 10, 2011) |

| | |
|---|---|
| *Hardwood Plywood from China* | *Certain Hardwood Plywood Products from the People's Republic of China: Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders*, 88 FR 46470 (July 20, 2023) |
| *HFCs from China (India)* | *Hydrofluorocarbon Blends from the People's Republic of China: Final Negative Scope Ruling on Gujarat Fluorochemicals Ltd.'s R-401A Blend; Affirmative Final Determination of Circumvention of the Antidumping Duty Order by Indian Blends Containing Chinese Components*, 85 FR 61930 (October 1, 2020) |
| *HFCs from China (India) Preliminary* | *Hydrofluorocarbon Blends from the People's Republic of China: Preliminary Scope Ruling on Gujarat Fluorochemicals Ltd.'s R-410A Blend; Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order for Indian Blends Containing Chinese Components*, 85 FR 20244 (April 10, 2020) |
| *Hot-Rolled Lead and Bismuth* | *Hot-Rolled Lead and Bismuth Carbon Steel Products from Germany and the United Kingdom; Negative Final Determinations of Circumvention of Antidumping and Countervailing Duty Orders*, 64 FR 40336 (July 26, 1999) |
| *Hot-Rolled Steel from Korea AD* | *Certain Hot-Rolled Steel Flat Products from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 32720 (July 9, 2019) |
| *Huvis* | *Huvis Corp. v. United States*, 570 F.3d 1347, 1356 (Fed. Cir. 2009) |
| *Hyundai Electricity CAFC* | *Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078 (Fed. Cir. 2021) |
| *Hyundai Electricity CIT* | *Hyundai Electric & Energy Systems Co., Ltd v. United States*, 477 F. Supp.3d 1324, 132 (CIT 2020) |
| *I.N.S.* | *I.N.S. v. Enrico St. Cyr*, 533 U.S. 289, 316 (2001) |
| *Initiation Notice Dated February 2, 2023* | *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 FR 7060, 71062 (February 2, 2023) |
| *Inmax SDN* | *Inmax SDN v. United States*, 277 F. Supp. 3d 1367 (CIT 2017) |
| *Invenergy* | Invenergy Renewables LLC v. United States, 422 F. Supp. 3d 1255, 1285 (CIT 2019) |
| *Jiasheng* | *Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States*, 28 F. Supp. 1317 (CIT 2014) |
| *Kisor* | *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) |

| | |
|---|---|
| *KYD, Inc.* | *KYD, Inc. v. United States*, 607 F.3d 760, 767-68 (Fed. Cir. 2010) |
| *Lined Paper Products from India* | *Certain Lined Paper Products from India: Notice of Final Results of the First Antidumping Duty Administrative Review*, 74 FR 17149 (April 14, 2009) |
| *LWR from China (Vietnam) Preliminary* | *Light-Walled Rectangular Pipe and Tube from the People's Republic of China: Preliminary Affirmative Determination of Circumvention of the Antidumping Duty and Countervailing Duty Orders*, 88 FR 21985 (April 12, 2023) |
| *LWR from Taiwan (Vietnam) Preliminary* | *Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan: Preliminary Affirmative Determination of Circumvention of the Antidumping Duty Order*, 88 FR 21980 (April 12, 2023) |
| *Macao CIT* | *Macao Commer. & Indus. Spring Mattress Mfr. v. United States,* 437 F. Supp. 3d 1324 (CIT 2020) |
| *Max Fortune Indus. Co.* | *Max Fortune Indus. Co. v. United States*, Slip Op. 13-52 (CIT 2013), 37 CIT 549, 560-62 (CIT 2013) |
| *Merck Sharp & Dohme Corp. v. Albrecht* | *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019) |
| *Michigan* | *Michigan v. EPA*, 576 U.S. 743, 752 (2015) |
| *Mid Continent* | *Mid Continent Steel & Wire, Inc. v. United States*, Slip Op. 2023-45 (CIT 2023) |
| *Mitsubishi Elec. Corp.* | *Mitsubishi Elec. Corp. v. United States,* 700 F. Supp. 538, 555 (CIT 1988), *aff'd* 898 F. 2d 1577 (Fed. Cir. 1990) |
| *Mitsubishi Heavy Industries* | *Mitsubishi Heavy Industries v. United States,* 986 F. Supp. 1428 (CIT 1997) |
| *Mukund CIT* | *Mukand, Ltd. v. United States*, 37 CIT 443, 452 (CIT 2013) |
| *Mukund Fed. Cir.* | *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1308 (Fed. Cir. 2014) |
| *Nails from Malaysia CCR Initiation* | *Certain Steel Nails from Malaysia: Initiation of Antidumping Duty Changed Circumstances Review*, 80 FR 71772 (November 17, 2015) |
| *Nails from Oman* | *Final Results of Antidumping Duty Administrative Review; 2021: Certain Steel Nails from the Sultanate of Oman*, 87 FR 78639 (December 22, 2022) |
| *Nippon Steel* | *Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) |

| | |
|---|---|
| *OCTG from China (Brunei and Philippines)* | *Oil Country Tubular Goods from the People's Republic of China:  Final Affirmative Determinations of Circumvention,* 86 FR 67443 (November 26, 2021) |
| *OCTG from China (Brunei and Philippines) Preliminary* | *Oil Country Tubular Goods from the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention,* 86 FR 43627 (August 10, 2021) |
| *OCTG from China CCR* | *Oil Country Tubular Goods from the People's Republic of China:  Final Results of Antidumping and Countervailing Duty Changed Circumstances Reviews,* 87 FR 15915 (March 21, 2022) |
| *Off-the-Road Tires from China* | *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances,* 73 FR 40485 (July 15, 2008), and accompanying IDM |
| *Oman Fasteners* | *Oman Fasteners LLC v. United States,* Slip Op. 23-17 (February 22, 2023) |
| *Omnibus Trade & Competitiveness Act* | Conference Report to the 1988 Omnibus Trade & Competitiveness Act, H.R. Rep. No. 100-576, (1988), at 590, reprinted in 1988 U.S.C.C.A.N. 1547, 1623-24 |
| Omnibus Trade Act, Report of the Senate Finance Committee | Omnibus Trade Act, Report of the Senate Finance Committee, S. Rep. No. 71, 100th Cong., 1st Sess. 100 (1987) |
| *Paper from Brazil SII* | *Certain Uncoated Paper from Brazil:  Preliminary Results of the Antidumping Duty Administrative Review and Preliminary Successor-in-Interest Determination; 2019-2020,* 86 FR 30000 (June 4, 2021), unchanged in *Certain Uncoated Paper from Brazil:  Final Results of Antidumping Duty Administrative Review; 2019-2020,* 86 FR 55820 (October 7, 2021) |
| *Pasta from Italy (U.S.) Circumvention* | *Certain Pasta from Italy:  Affirmative Final Determinations of Circumvention of Antidumping and Countervailing Duty Orders,* 68 FR 54888 (September 19, 2003) |
| *Pasta from Italy (U.S.) Circumvention Preliminary* | *Certain Pasta from Italy:  Affirmative Preliminary Determinations of Circumvention of Antidumping and Countervailing Duty Orders,* 68 FR 46571 (August 6, 2003) |
| *Pasta from Italy Circumvention Final* | *Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order,* 63 FR 54672 (October 13, 1998) |

| | |
|---|---|
| *Pasta from Italy Circumvention Preliminary* | *Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 63 FR 18364 (April 15, 1998) |
| *Peer Bearing Co.* | *Peer Bearing Co. v. United States*, 36 CIT 1700 (2012) |
| *Perez* | *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) or *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015) |
| *Pesquera Mares* | Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1380 (Fed. Cir. 2001) |
| *PET Film from India* | *Polyethylene Terephthalate Film, Sheet, and Strip from India:  Preliminary Results of Countervailing Duty Administrative Review, and Rescission, in Part; 2020,* 87 FR 48453 (August 9, 2022), and accompanying PDM |
| *PET Film from India Final* | *Polyethylene Terephthalate Film, Sheet, and Strip (PET Film) from India:  Final Results of Countervailing Duty Administrative Review; 2020,* 87 FR 76024 (December 12, 2022), and accompanying IDM |
| *PET Film from the UAE Preliminary Determination* | *Preliminary Negative Determination of Circumvention of the Antidumping Order on Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates*, 80 FR 26229 (May 7, 2015) |
| *PET Film from the UAE (Bahrain)* | *Polyethylene Terephthalate Film, Sheet, and Strip from the United Arab Emirates:  Negative Final Determination of Circumvention of the Antidumping Duty Order*, 80 FR 47463 (August 7, 2015) |
| *Pipe and Tube from India (Oman and UAE)* | *Certain Welded Carbon Steel Standard Pipes and Tubes from India:  Final Negative Determinations of Circumvention of the Antidumping Order*, 88 FR 12917 (March 1, 2023) |
| *Pipe and Tube from India (Oman and UAE) Preliminary* | *Certain Welded Carbon Steel Standard Pipes and Tubes from India:  Preliminary Negative Determinations of Circumvention of the Antidumping Order*, 87 FR 52507 (August 26, 2022) |
| *Plywood from China (Vietnam) Final* | *Certain Hardwood Plywood Products from the People's Republic of China:  Final Scope Determination and Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders,* 88 FR 46740 (July 20, 2023), and accompanying IDM |

| | |
|---|---|
| *Plywood from China (Vietnam) Preliminary* | *Certain Hardwood Plywood Products from the People's Republic of China:  Preliminary Scope Determination and Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders,* 87 FR 45753 (July 29, 2022), and accompanying PDM |
| Policy Bulletin 05.1 | Enforcement and Compliance's Policy Bulletin No. 05.1, regarding, "Separate-Rates Practice and Application of Combination Rates in Investigations involving Non-Market Economy Countries," (April 5, 2005), available on Commerce's website at https://www.trade.gov/policy-bulletin-051 |
| Policy Bulletin 94.1 | Enforcement and Compliance's Policy Bulletin No. 94.1, regarding, "Cost of Production - Standards for Initiation of Inquiry," (March 25, 1994), available on Commerce's website at https://www.trade.gov/policy-bulletin-941 |
| *Polyvinyl Alcohol from China Final Determination* | *Notice of Final Determination of Sales at Less Than Fair Value:  Polyvinyl Alcohol from the People's Republic of China,* 68 FR 47538 (August 11, 2003) |
| *Polyvinyl Alcohol from China Preliminary Determination* | *Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination:  Polyvinyl Alcohol from the People's Republic of China,* 68 FR 13674 (March 20, 2003) |
| *Preamble (Final Rule)* | *Antidumping Duties; Countervailing Duties,* 62 FR 27296 (May 19, 1997) |
| *Preserved Mushrooms from China* | *Certain Preserved Mushrooms from the People's Republic of China:  Final Results and Final Partial Rescission of the Sixth Administrative Review,* 71 FR 40477 (July 17, 2006) |
| *Presidential Proclamation 10414* | *Proclamation No. 10414, Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia,* 87 FR 35067 (June 9, 2022) |
| *Presidential Proclamation 10414 Final Rule Preamble* | *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414,* 87 FR 56868 (September 16, 2022) |
| *Presidential Proclamation 10414 Proposed Rule* | *Procedures Covering Suspension of Liquidation, Duties and Estimated Duties in Accord With Presidential Proclamation 10414:  Proposed Rule,* 87 FR 39426 (July 1, 2022) |

| | |
|---|---|
| *PrimeSource Bldg. Prods.* | *PrimeSource Bldg. Prods. v. United States*, 497 F. Supp. 3d 1333 (CIT 2021) (citing U.S. Const. art I, § 8, cl. 1 & cl. 3) |
| *Procedures for Importation of Supplies for Use in Emergency Relief Work* | *Procedures for Importation of Supplies for Use in Emergency Relief Work*, 71 FR 63230 (October 30, 2006) |
| *Pure Magnesium from Canada CCR Initiation* | *Initiation of Changed Circumstances Countervailing Duty Administrative Reviews; Pure Magnesium and Alloy Magnesium from Canada*, 57 FR 41473 (September 10, 1992) |
| *QSPs from China CCRs* | *Certain Quartz Surface Products from the People's Republic of China:  Initiation of Antidumping and Countervailing Duty Changed Circumstances Reviews; Global Stone,* 88 FR 41377 (June 26, 2023); and *Certain Quartz Surface Products from the People's Republic of China:  Initiation of Antidumping and Countervailing Duty Changed Circumstances Reviews; AM Stone,* 88 FR 41386 (June 26, 2023) |
| *Retail Carrier Bags from Taiwan Final Determination* | *Polyethylene Retail Carrier Bags from Taiwan: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 79 FR 61056 (October 9, 2014)) |
| *Retail Carrier Bags from Taiwan Preliminary Determination* | *Polyethylene Retail Carrier Bags from Taiwan: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 79 FR 31302 (June 2, 2014) |
| *Roberto* | *Roberto v. Dep't of Navy*, 440 F.3d 1341 (Fed. Cir. 2006) |
| *Romani* | *United States v. Est. of Romani*, 523 U.S. 517 (1998) |
| S. Rep. No. 103-412 | Joint Report of the Committee on Finance, Committee on Agriculture Nutrition and Forestry, Committee on Governmental Affairs of the United States Senatre to Accompany S. 2467, Uruguay Round Agreements Act |
| SAA | Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, Vol. I (1994) |
| *Saddler* | *Saddler v. Dep't of the Army*, 68 F.3d 1357, 1358 (Fed. Cir. 1995) |
| *Save Domestic Oil* | *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283 (Fed. Cir. 2004) |
| *SDGE from China* | *Small Diameter Graphite Electrodes from the People's Republic of China:  Final Results of the First Administrative Review of the Antidumping Duty Order and Final Rescission of the Administrative Review, in Part*, 76 FR 56397 (September 13, 2011) |

| | |
|---|---|
| SDGE from China (UK) | *Small Diameter Graphite Electrodes from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 77 FR 47596 (August 9, 2012) |
| Senate Report 100-71 | *U.S. Senate, Committee on Finance, Omnibus Trade Act of 1987*, S. Rep. No. 100-71, at 101 (1987) |
| Shakeproof Tool Works, Inc. | *Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*, 268 F.3d 1376 (Fed. Cir. 2001) |
| Shanghai Sunbeauty Trading Co. | *Shanghai Sunbeauty Trading Co. v. United States*, 380 F. Supp. 3d. 1328 (CIT 2019) |
| Shelter Forest CIT | *Shelter Forest Int'l Acquisition, Inc. v. United States*, Slip Op. 2021-90 (CIT 2021) |
| Shenzhen Xinboda | *Shenzhen Xinboda Industrial Co., Ltd. v. United States*, 494 F. Supp. 3d 1347 (CIT 2021) |
| Shrimp from China | *Certain Frozen Warmwater Shrimp from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018-2019,* 85 FR 83891 (December 23, 2020), and accompanying IDM |
| Silicon Carbide from China | *Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide from the People's Republic of China*, 59 FR 22585 (May 2, 1994), |
| Silicon Metal from Brazil | *Silicon Metal from Brazil: Final Affirmative Countervailing Duty Determination,* 83 FR 9838 (March 8, 2018), and accompanying IDM |
| SKF CIT | *SKF USA Inc. v. United States*, 675 F. Supp. 2d 1264 (CIT 2009) |
| Skidmore | *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) |
| Smith Corona | *Smith Corona Corp. v. United States*, 915 F.2d 683, 686 (Fed. Cir. 1990)) |
| Softwood Lumber from Canada | *Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017), and accompanying IDM |
| Solar Cells from China 2017-2018 AR | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018,* 85 FR 62275 (October 2, 2020), and accompanying IDM |
| Solar Cells from China Investigation | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Determination of Sales at Less Than* |

| | |
|---|---|
| | *Fair Value, and Affirmative Final Determination of Critical Circumstances, in Part*, 77 FR 63791 (October 17, 2012) |
| Solar Products from China | *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China:  Final Determination of Sales at less Than Fair Value*, 79 FR 76970 (December 23, 2014) |
| Solaria Scope Ruling | Memorandum, "The Solaria Corporation Scope Ruling," dated April 8, 2021 (placed on the record in NextEra's Letter, "Pre-Preliminary Determination Comments," dated October 20, 2022, at Attachment 22 |
| Sonali Scope Application | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Sonali Scope Application," dated January 25, 2023 |
| Sonali Scope Inquiry | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Sonali Scope Inquiry," dated January 20, 2023 |
| Soybean Meal from India AD | *Final Affirmative Determination of Sales at Less than Fair Value:  Organic Soybean Meal from India*, 87 FR 16458 (March 23, 2022) |
| Soybean Meal from India CVD | *Final Affirmative Countervailing Duty Determination of Sales at Less than Fair Value:  Organic Soybean Meal from India*, 87 FR 16453 (March 23, 2022) |
| Sparklers from China | *Notice of Final Determination of Sales at Less Than Fair Value:  Sparklers from the People's Republic of China*, 56 FR 20588 (May 6, 1991) |
| SSF from India SII | *Stainless Steel Flanges from India:  Preliminary Results of Antidumping Duty Administrative Review, Preliminary Successor-in-Interest Determination, and Partial Rescission; 2019-2020,* 86 FR 60792 (November 4, 2021), unchanged in *Stainless Steel Flanges from India:  Final Results of Antidumping Duty Administrative Review; 2019–2020,* 87 FR 27568 (May 9, 2022) |
| SSSS from China (Vietnam) | *Stainless Steel Sheet and Strip from the People's Republic of China:  Final Scop Ruling and Final Affirmative Determination of Circumvention for Exports from the Socialist Republic of Vietnam*, 88 FR 18521 (March 29, 2023) |
| SSSS from China (Vietnam) Preliminary | *Stainless Steel Sheet and Strip from the People's Republic of China:  Scope Ruling and Preliminary Affirmative Determination of Circumvention for Exports from the Socialist Republic of Vietnam*, 87 FR 56626 (September 15, 2022) |

| | |
|---|---|
| *Steel Flanges from India* | *Finished Carbon Steel Flanges from India: Preliminary Results of Countervailing Duty Administrative Review; 2019*, 86 FR 500032 (September 7, 2021), and accompanying PDM |
| *Steel Flanges from India Final* | *Finished Carbon Steel Flanges from India: Final Results of Countervailing Duty Administrative Review; 2019*, 86 FR 67909 (November 30, 2021), and accompanying IDM |
| *Steel Flanges from Spain AD* | *Finished Carbon Steel Flanges from Spain: Final Results of Antidumping Duty Administrative Review; 2017–2018*, 85 FR 7919 (February 12, 2020) |
| *Steel Threaded Rod from Thailand Final* | *Steel Threaded Rod from Thailand: Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 79 FR 14476 (March 14, 2014) |
| *Steel Threaded Rod from Thailand Preliminary* | *Steel Threaded Rod from Thailand: Preliminary Determination of Sales at Less Than Fair Value and Affirmative Preliminary Determination of Critical Circumstances*, 78 FR 79670 (December 31, 2013) |
| *Steel Tubing from Taiwan Preliminary Results (Taiwan)* | *Light-Walled Welded Rectangular Carbon Steel Tubing from Taiwan*, 88 FR 21980 (April 12, 2023) |
| *Tapered Roller Bearings from China* | *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 74 FR 3987 (January 22, 2009) |
| *Tapered Roller Bearings from China* | *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of New Shipper Reviews*, 67 FR 10665 (March 8, 2002) |
| *Techsnabexport, Ltd.* | *Techsnabexport, Ltd. v. United States*, 795 F.Supp. 428 (CIT 1992) |
| *Timken Co.* | *Timken Co. v. United States*, 968 F. Supp. 2d 1279 (2014), *aff'd* 589 F. App'x 995 (Fed. Cir. 2015) |
| *Tissue Paper from China (India) Final Determination* | *Certain Tissue Paper Products from the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 83 FR 40101 (July 3, 2013) |
| *Tissue Paper from China (India) Preliminary Determination* | *Certain Tissue Paper Products from the People's Republic of China: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 78 FR 14514 (March 6, 2013), and accompanying IDM |
| *Tissue Paper from China (Thailand) Final Determination* | *Certain Tissue Paper Products from the People's Republic of China: Affirmative Final Determination of* |

| | |
|---|---|
| | *Circumvention of the Antidumping Duty Order*, 74 FR 29172 (June 19, 2009) |
| *Tissue Paper from China (Vietnam) Final Determination* | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 73 FR 57591 (October 3, 2008) |
| *Tissue Paper from China (Vietnam) Preliminary Determination* | *Certain Tissue Paper Products from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order and Extension of Final Determination*, 73 FR 21580 (April 22, 2008) |
| *Torrington* | U.S. Senate, Committee on Finance, Omnibus Trade Act of 1987, S. Rep. No. 100-71, at 101 (1987) |
| *TPP from China (Thailand)* | *Affirmative Final Determinations of Circumvention of the Antidumping Order:  Certain Tissue Paper Products from the People's Republic of China*, 73 FR 57591 (October 3, 2008) |
| *Tung Mung CIT* | *Tung Mung Dev. Co. v. United States*, 219 F. Supp. 3d 1333, 1343 (CIT 2002) |
| *U.K. Carbon and Graphite* | *U.K. Carbon and Graphite Co., Ltd. v United States*, 931 F. Supp. 2d 1322 (CIT 2013) |
| *Uncoated Paper from China Final Determination* | *Certain Uncoated Paper from Brazil, the People's Republic of China, and Indonesia:  Affirmative Final Determinations of Circumvention of the Antidumping Duty Orders and Countervailing Duty Orders for Certain Uncoated Paper Rolls*, 86 FR 71025 (December 14, 2021) |
| *Uncoated Paper from China Preliminary Determination* | *Certain Uncoated Paper from the People's Republic of China:  Affirmative Preliminary Determinations of Circumvention of the Antidumping and Countervailing Duty Orders for Uncoated Paper Rolls*, 85 FR 72624 (November 13, 2020) |
| *Uncovered Innerspring Units from China (Malaysia) Final Determination* | *Uncovered Innerspring Units from the People's Republic of China:  Affirmative Final Determination of Circumvention of the Antidumping Duty Order*, 80 FR 74758 (November 30, 2015) |
| *Uncovered Innerspring Units from China (Malaysia) Preliminary Determination* | *Uncovered Innerspring Units from the People's Republic of China:  Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order*, 80 FR 64392, 64393 (October 23, 2015) |
| *USITC Solar 2021 Determination* | *Crystalline Silicon Photovoltaic Cells and Modules from China*, Inv. No. TA-201-75 (Extension), USITC Pub. 5266 (December 2021) |

| | |
|---|---|
| *USITC Solar Investigation Final* | *Crystalline Silicon Photovoltaic Cells and Modules from China*, Inv. No. TA-481 and 731-TA-1190 (Final), USITC Pub. 4360 (November 2012) |
| *Uyghur Forced Labor Prevention Act:  U.S. Customs and Border Protection Operational Guidance for Importers* | *Uyghur Forced Labor Prevention Act:  U.S. Customs and Border Protection Operational Guidance for Importers June 13, 2022*, CBP Publication No. 1793-0522 |
| *Vietnam Finewood* | *Vietnam Finewood Company Limited, et.al v. United States*, 466 F. Supp. 3d 1273 (CIT 2023) |
| *Walk-Behind Lawn Mowers from China* | *Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value*, 86 FR 27384 (May 20, 2021) |
| *Walk-Behind Lawn Mowers from China Circumvention Rescission* | *Certain Walk-Behind Lawn Mowers and Parts Thereof from the People's Republic of China:  Notice of Intent to Rescind Circumvention Inquiry on the Antidumping and Countervailing Duty Orders*, 88 FR 13434 (March 3, 2023) |
| *Walgreen Co.* | *Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010) |
| *Wantanabe Group* | *Watanabe Group v. United States*, 34 CIT 1545, Slip Op. 10-139 (CIT 2010) |
| *Wheatland* | *Wheatland Tube Co. v. United States* 161 F.3d 1365, 1371 (Fed. Cir. 1998) |
| *Wire Rod from Korea and United Kingdom CCR* | *Carbon and Alloy Steel Wire Rod from the Republic of Korea and the United Kingdom:  Notice of Final Results of Antidumping Duty Changed Circumstances Review*, 84 FR 13888 (April 8, 2019) |
| *Xanthan Gum from China 2016-2017* | *Xanthan Gum from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Partial Discontinuation of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 65142 (December 19, 2018) |
| *Yangtai CIT* | *Yantai Oriental Juice Co. v. United States*, Slip Op. 03-33 (CIT March 21, 2003) |
| *Yangzhou CAFC* | *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) |
| *Youngstown Sheet & Tube Co.* | *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) |

**Appendix III -Documents on Record**
**This Section is Sorted by Short Citation**

| Short Citation | Document Title and Date |
|---|---|
| *Appendix IV-Certification for "Applicable Entries"* | *Preliminary Determination at Appendix IV; Certification for "Applicable Entries"* |
| *Appendix V-Certification for Non-Circumventing Companies* | *Preliminary Determination at Appendix IV; Certification for Entries of Inquiry Merchandise from Companies Preliminarily Found Not to Be Circumventing* |
| *Appendix VI-Certification Regarding Chinese Components* | *Preliminary Determination at Appendix IV; Certification Regarding Chinese Component* |
| Auxin November 9, 2022 *Ex Parte* Memorandum | Memorandum, "Meeting with Counsel for Auxin," dated November 14, 2022 |
| Auxin's April 26, 2023  Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2)—Thailand," dated April 26, 2023 |
| Auxin's April 26, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2)—Thailand," dated April 26, 2023 |
| Auxin's August 3, 2022 SV Rebuttal Comments | Auxin's Letter, "Rebuttal Surrogate Value Comments and Information," dated August 3, 2022 |
| Auxin's March 24, 2023 Case Brief | Auxin's Letter,  "Auxin's Case Brief (Tranche 2)," dated March 24, 2023 |
| Auxin's April 19, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche2)—Vietnam," dated April 19, 2023 |
| Auxin's April 24, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2) - Malaysia," dated April 24, 2023 |
| Auxin's April 27, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Case Brief (Tranche2)—Thailand," dated April 27, 2023 |
| Auxin's April 28, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2)—Vietnam," dated April 28, 2023 |
| Auxin's April 3, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2)," dated April 3, 2023 |
| Auxin's Hearing Request | Auxin's Letter, "Auxin Solar, Inc.'s Request for Public Hearing," dated December 29, 2022 |
| Auxin's Investment and R&D Information | Auxin's Letter, "Submission of Investment and Research and Development Information," dated July 29, 2022 |
| *Auxin's ITC Posthearing Brief* | *Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products): Posthearing Brief on Behalf of Auxin Solar Inc.*, Inv. No. TA-201-75 (Safeguard Extension) (November 2021) |
| *Auxin's ITC Prehearing Brief* | *Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products): Prehearing Brief on Behalf of Auxin Solar Inc.*, Inv. No. TA-201-75 (Safeguard Extension) (October 2021) |

| | |
|---|---|
| Auxin's July 27, 2022 SV Comments | Auxin's Letter, "Submission of Surrogate Value Information for Vietnamese Factors of Production," dated July 27, 2022 |
| Auxin's July 29, 2022 Comments | Auxin's Letter, "Submission of Investment and Research and Development Information," dated July 29, 2022 |
| Auxin's March 17, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 1)," dated March 17, 2023 |
| Auxin's March 24, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 2)," dated March 24, 2023 |
| Auxin's March 6, 2023 Case Brief | Auxin's Letter, "Auxin's Case Brief (Tranche 1)," dated March 6, 2023 |
| Auxin's March 7, 2022 Submission | Auxin's Letter, "Response to NextEra's Request to Reject Anti-Circumvention Ruling Requests," March 7, 2022 |
| Auxin's May 16, 2022 Comments | Auxin's Letter, "Auxin's Response to Rebuttal Comments and Factual Information," dated May 16, 2022 |
| Auxin's May 5, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2) - Malaysia," dated May 5, 2023 |
| Auxin's May 9, 2023 Rebuttal Brief | Auxin's Letter, "Auxin's Rebuttal Brief (Tranche 2)," dated May 9, 2023 |
| Auxin's October 20, 2023 Pre-Preliminary Comments | Auxin's Letter, "Pre-Preliminary Comments Concerning Jinko Solar Technology Sdn. Bhd. and Hanwha Q Cells Malaysia Sdn. Bhd.," dated October 20, 2022 |
| *Bloomberg Report* | BloombergNEF, *Solar PV Trade and Manufacturing:  A Deep Dive* (2021) |
| Boviet 1st SQR | Boviet's Letter, "Boviet First Supplemental Questionnaire Response," dated August 11, 2022 |
| Boviet 2nd SQR | Boviet's Letter, "Boviet Second Supplemental Questionnaire Response," dated August 12, 2022 |
| Boviet 3rd SQR | Boviet's Letter, "Boviet Third Supplemental Questionnaire Response," dated October 7, 2022 |
| Boviet 4th SQR | Boviet's Letter, "Boviet Fourth Supplemental Questionnaire Response," dated November 2, 2022 |
| Boviet Final Analysis Memorandum | Memorandum, "Final Analysis Memorandum for Boviet Solar Technology Co., Ltd.," dated concurrently with this memorandum |
| Boviet Preliminary Analysis Memorandum | Memorandum, "Preliminary Analysis Memorandum for Boviet Solar Technology Co., Ltd.," dated December 1, 2022 |
| Boviet's May 5, 2023 Rebuttal Brief | Boviet's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Second Tranche Rebuttal Brief," dated May 5, 2023 |

| | |
|---|---|
| Boviet's April 28, 2023 Rebuttal Brief | Boviet's Letter, "Boviet Rebuttal Brief re Tranche II," dated April 28, 2023 |
| Boviet's August 3, 2022 SV Rebuttal Comments | Boviet's Letter, "Boviet Rebuttal Surrogate Value Information," dated August 3, 2022 |
| Boviet's IQR Part I | Boviet's Letter, "Boviet Initial Circumvention Inquiry Questionnaire Response," dated June 3, 2022 |
| Boviet's IQR Part II | Boviet's Letter, "Boviet Circumvention Inquiry Questionnaire Response – Part II," dated June 23, 2022 |
| Boviet's July 27, 2020 SV Comments | Boviet's Letter, "Boviet Surrogate Value Information," dated July 27, 2022 |
| Boviet's March 17, 2023 Rebuttal Brief | Boviet's Letter, "Boviet's Letter in Lieu of Rebuttal Brief re Tranche 1," dated March 17, 2023 |
| Boviet's March 6, 2023 Case Brief | Boviet's Letter, "Boviet Case Brief re Tranche 1," dated March 6, 2023 |
| BYD HK Final Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Cambodia: Final Analysis Memorandum for BYD (H.K.) Co., Ltd.," dated concurrently with this memorandum |
| BYD HK Hearing Request | BYD HK's Letter, "Request for Hearing," dated January 6, 2023 |
| BYD HK Initial QR Part I | BYD HK's Letter, "Response to Initial Questionnaire," dated June 7, 2022 |
| BYD HK Initial QR Part II | BYD HK's Letter, "Response to Second Circumvention Inquiry Questionnaire," dated June 23, 2022 |
| BYD HK 1st SQR | BYD HK's Letter, "Response to First Supplemental Questionnaire," dated August 9, 2022 |
| BYD HK 2nd SQR | BYD HK's Letter, "Response to Second Supplemental Questionnaire," dated August 19, 2022 |
| BYD HK 3rd SQR | BYD HK's Letter, "Response to Third Supplemental Questionnaire," dated October 12, 2022 |
| BYD HK Verification Exhibits | BYD HK's Letter, "Verification Exhibits of BYD (HK) Co., Ltd.," dated February 16, 2023 |
| BYD HK's Verification Report | Memorandum, "Verification of the Questionnaire Responses of BYD (H.K.) Co., Ltd. in the Circumvention Inquiry of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China - with Respect to Cambodia," dated March 15, 2023 |
| BYD HK Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Cambodia: Preliminary Analysis Memorandum for BYD (H.K.) Co., Ltd.," dated December 1, 2022 |
| BYD HK's April 3, 2023 Rebuttal Brief | BYD HK's Letter, "Second Tranche Rebuttal Brief of BYD HK," dated April 3, 2023 |

| | |
|---|---|
| BYD HK's March 17, 2023 Rebuttal Brief | BYD HK's Letter, "First Tranche Rebuttal Brief of BYD," dated March 17, 2023 |
| BYD HK's March 24, 2023 Case Brief | BYD HK's Letter, "Second Tranche Case Brief," dated March 24, 2023 |
| BYD HK's March 6, 2023 Case Brief | BYD HK's Letter, "First Tranche" Letter in Lieu of Case Brief of BYD," dated March 6, 2023 |
| *Cambodia* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Cambodia," dated December 1, 2022 |
| Cambodia RSM | Memorandum, "Circumvention Inquiry with Respect to Cambodia:  Respondent Selection," dated May 12, 2022 |
| CBP Data Release Memorandum | Memorandum," Release of Customs and Border Protection Entry Data," dated March 29, 2022 |
| CBP Messages Memorandum | Memorandum, "Placement of Customs and Border Protection (CBP) Messages on Record of Proceedings," dated February 17, 2023 |
| *CEA Report* | Clean Energy Associates, *Crystalline Silicon PV - Sector Background* (2022) |
| Circumvention Questionnaires | Circumvention Inquiry Questionnaire," dated May 13 and 16, 2022 |
| Circumvention Request | Auxin's Letter, "Auxin Solar's Request for an Anti-Circumvention Ruling to Section 781(b) of the Tariff Act of 1930, As Amended," dated February 8, 2022 |
| Clarification of Product Coverage Memorandum | Memorandum, "Clarification of Product Coverage," dated December 19, 2022 |
| May 2, 2022 Memorandum | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China:  Comments on Potential Certification Requirements," dated May 19, 2022 Circumvention Inquiries With Respect to Cambodia, Malaysia,  Thailand, and Vietnam – Potential Certification Requirements," dated May 2, 2022 |
| Commerce's December 1, 2022 Rejection Letter | Commerce's Letter, "Rejection Letter of Red Sun's Q&V Questionnaire Response," dated December 1, 2022 |
| CSIL Final Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand:  Final Analysis Memorandum for Canadian Solar International Limited," dated concurrently with this memorandum |
| CSIL's 1st SQR | CSIL's Letter, "Response to First Supplemental Questionnaire," dated August 8, 2022 |
| CSIL's 2nd SQR | CSIL's Letter, "Response to Second Supplemental Questionnaire," dated August 12, 2022 |
| CSIL's 3rd SQR | CSIL's Letter, "Response to Third Supplemental Questionnaire," dated October 7, 2022 |

| | |
|---|---|
| CSIL's 4th SQR | CSIL's Letter, "Response to Fourth Supplemental Questionnaire," dated November 2, 2022 |
| CSIL's April 19, 2023 Case Brief | CSIL's Letter, "Second Tranche Case Brief of Canadian Solar International Limited," dated April 19, 2023 |
| CSIL's April 26, 2023 Rebuttal Brief | CSIL's Letter, "Second Tranche Case Brief of Canadian Solar International Limited," dated April 26, 2023 |
| CSIL's April 27, 2023 Case Brief | CSIL's Letter, "Second Tranche Case Brief of Canadian Solar International Limited," dated April 27, 2023 |
| CSIL's Hearing Request | CSIL's Letter, "Request for Hearing," dated January 6, 2023 |
| CSIL's IQR Part I | CSIL's Letter, "Response to Circumvention Inquiry Questionnaire," dated June 3, 2022 |
| CSIL's IQR Part II | CSIL's Letter, "Response to Second Circumvention Inquiry Questionnaire," dated June 23, 2022 |
| CSIL's March 17, 2023 Rebuttal Brief | CSIL's Letter, "First Tranche Rebuttal Brief," dated March 17, 2023 |
| CSIL's March 6, 2023 Case Brief | CSIL's Letter, "First Tranche Case Brief," dated March 6, 2023 |
| CSIL's May 9, 2023 Rebuttal Brief | CSIL's Letter, "Second Tranche Rebuttal Case Brief of Canadian Solar International Limited," dated May 9, 2023 |
| CSIL's October 20, 2022 Pre-Preliminary Comments | CSIL's Letter, "Comments in Advance of the Preliminary Determination," dated October 20, 2022 |
| CSIL Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand: Preliminary Analysis Memorandum for Canadian Solar International Limited," dated December 1, 2022 |
| CSIL's Verification Exhibits | CSIL's Letter, "Verification Exhibits," dated February 22, 2023 |
| CSIL's Verification Report | Memorandum, "Verification of the Information Reported by Canadian Solar International Limited," dated April 19, 2023 |
| *Denis De Ceuster Report* | Denis De Ceuster and DDC Solar LLC, *Crystalline Silicon Photovoltaic Supply Chain: from Polysilicon to Solar Panel* (2022) |
| DHS Order Re: Forced Labor in Xinjiang | The Department of Homeland Security Issues Withhold Release Order on Silica-Based Products Made by Forced Labor in Xinjiang," U.S CUSTOMS AND BORDER PROTECTION (June 24, 2021), available at https://www.cbp.gov/newsroom/national-media-release/departmenthomeland- security-issues-withhold-release-order-silica |

| | |
|---|---|
| *DOE Solar Deep Dive* | *U.S. Department of Energy Response to Executive Order 14017 "America's Supply Chains," Solar Photovoltaics: Supply Chain Deep Dive Assessment* (February 24, 2022) included in the memorandum, "Meeting with the Department of Energy," dated June 3, 2022 |
| ET Solar Scope Ruling | Memorandum, "Final Scope Ruling on the Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China: ET Solar Inc.," dated June 15, 2021 |
| Factor Valuation Memorandum | Memorandum, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China - Circumvention Inquiries with Respect to Cambodia, Malaysia and Thailand: Factor Valuation Memorandum," dated December 1, 2022 |
| First Solar Malaysia's April 24, 2023 Case Brief | First Solar Malaysia's Letter, "Letter in Lieu of Case Brief for Second Tranche of Issues," dated April 24, 2023 |
| First Solar Malaysia's Hearing Request | First Solar Malaysia's Letter, "Request to Participate at Hearing," dated January 6, 2023 |
| First Solar Malaysia's March 17, 2023 Rebuttal Brief | First Solar Malaysia's Letter, "Letter in Lieu of Rebuttal Brief for First Tranche of Issues," dated March 17, 2023 |
| First Solar Malaysia's March 6, 2023 Case Brief | First Solar Malaysia's Letter, "Case Brief for First Tranche of Issues," dated March 6, 2023 |
| First Solar Malaysia's May 5, 2023 Case Brief | First Solar Malaysia's Letter, "Letter in Lieu of Rebuttal Brief for Second Tranche of Issues," dated May 5, 2023 |
| First Solar Vietnam's April 28, 2023 Rebuttal Brief | First Solar Vietnam's Letter, "Letter in Lieu of Rebuttal Brief for Second Tranche of Issues," dated April 28, 2023 |
| First Solar Vietnam's March 17, 2023 Rebuttal Brief | First Solar Vietnam's Letter, "Letter in Lieu of Rebuttal Brief for First Tranche of Issues," dated March 17, 2023 |
| First Solar Vietnam's March 6, 2023 Case Brief | First Solar Vietnam's Letter, "Case Brief for First Tranche of Issues," dated March 6, 2023 |
| First Solar's April 28, 2023 Rebuttal Brief | First Solar Vietnam's Letter, "Letter in Lieu of Rebuttal Brief of Second Tranche of Issues," dated April 28, 2023 |
| First Tranche Briefing Schedule | Memorandum, "Announcement of Briefing Schedule for First Tranche of Case and Rebuttal Briefs," dated February 22, 2023 |
| *FTI Report* | FTI Consulting, Inc., *The Photovoltaic Value Chain In Southeast Asia:  Response to BloombergNEF's Solar PV Trade and Manufacturing:  Deep Dive* (2021) |

| | |
|---|---|
| Hanwha Final Analysis Memorandum | Memorandum, "Hanwha Q CELLS Malaysia Sdn. Bhd. (Hanwha) – Final Analysis Memorandum," dated concurrently with this memorandum |
| Hanwha IQR Part I | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Response to Circumvention Inquiry Questionnaire (Part I)," dated June 3, 2022 |
| Hanwha IQR Part II | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Response to Circumvention Inquiry Questionnaire (Part II)," dated June 23, 2022 |
| Hanwha's 1st SQR | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s First Supplemental Questionnaire Response," dated August 9, 2022 |
| Hanwha's 2nd SQR | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Second Supplemental Questionnaire Response," dated August 19, 2022 |
| Hanwha's 3rd SQR | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Fourth Supplemental Questionnaire Response," dated October 11, 2022 |
| Hanwha Preliminary Analysis Memorandum | Memorandum, "Hanwha Q CELLS Malaysia Sdn. Bhd. (Hanwha) – Preliminary Analysis Memorandum," dated December 1, 2022 |
| Hanwha's April 24, 2023 Case Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Case Brief Regarding Comments on Certification Issues (Second Tranche)," dated April 24, 2023 |
| Hanwha's December 14, 2022 Certification Comments | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd's Comments on Proposed Certification Process," dated December 14, 2022 |
| Hanwha's Hearing Request | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Hearing Request," dated January 6, 2023 |
| Hanwha's March 17, 2023 Rebuttal Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Rebuttal Brief Regarding Comments on Certification Issues (First Tranche)," dated March 17, 2023 |
| Hanwha's March 6, 2023 Case Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Case Brief Regarding Comments on Certification Issues (First Tranche)," dated March 6, 2023 |
| Hanwha's May 5, 2023 Rebuttal Brief | Hanwha's Letter, "Hanwha Q CELLS Malaysia Sdn. Bhd.'s Rebuttal Brief (Second Tranche)," dated May 5, 2023 |
| Hearing Transcript | Hearing Transcript, "Solar Cells from China Circumvention Inquiries covering Cambodia, Malaysia, Thailand and Vietnam," dated July 25, 2023 |
| IEA Report | International Energy Agency, *Solar PV Global Supply Chains* (2022) |

| | |
|---|---|
| Initiation Memorandum | Memorandum, "Initiation of Circumvention Inquiries," dated March 25, 2022 |
| *Initiation Notice* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Initiation of Circumvention Inquiry on the Antidumping Duty and Countervailing Duty Orders*, 87 FR 19071 (April 1, 2022) |
| ITC Notification Letter | Commerce's Letter, "Notification of Affirmative Preliminary Determinations of Circumvention," dated May 30, 2023 |
| *ITC Solar Final* | *Crystalline Silicon Photovoltaic Cells and Modules from China,* Inv. No. 701-TA-481 and 731-TA-1190 (Final), USITC Pub. 4360 (November 2012) |
| *ITC Solar Monitoring* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Partially or Fully Assembled into Other Products: Monitoring Developments in the Domestic Industry,* Inv. No. TA-201-75 (Monitoring), USITC Pub. 5021 (February 2020) |
| *ITC Solar Safeguard Proceeding 2017* | *Crystalline Silicon Photovoltaic Cells (Whether or Not Partially or Fully Assembled into Other Products),* Inv. No. TA-201-75 (Safeguard), USITC Pub. 4739 (November 2017) |
| *ITC Solar Safeguard Proceeding 2019* | *Crystalline Silicon Photovoltaic Cells and Modules from China,* Inv. No. 701-TA-481 and 731-TA-1190 (Review), USITC Pub. 4874 (March 2019) |
| JA Solar, LONGi, VINA and VSUN's March 17, 2023 Rebuttal Brief | VSUN's Letter, "Letter in Lieu of Rebuttal Brief," dated March 17, 2023 |
| JA Solar's Hearing Request | JA Solar's Letter, "JA Solar's Request for Hearing," dated January 6, 2023 |
| JA Solar's May 2, 2022 Comments | JA Solar's Letter, "JA Solar Comments and Rebuttal Factual Information on Anti-Circumvention Inquiry Request," dated May 2, 2022 |
| Jinko Final Analysis Memorandum | Memorandum, "Jinko Solar Technology Sdn. Bhd. and Jinko Solar (Malaysia) Sdn. Bhd. – Final Analysis Memorandum," dated concurrently with this memorandum |
| Jinko IQR Part I | Jinko's Letter, "Jinko Initial Questionnaire Part I Questionnaire Response," dated June 6, 2022 |
| Jinko IQR Part II | Jinko's Letter, "Jinko Initial Questionnaire Part II Questionnaire Response," dated June 23, 2022 |
| Jinko's 1st SQR | Jinko's Letter, "Jinko First Supplemental Questionnaire Response," dated August 8, 2022 |

| | |
|---|---|
| Jinko's 2nd SQR | Jinko's Letter, "Jinko Second Supplemental Questionnaire Response," dated August 19, 2022 |
| Jinko's 3rd SQR | Jinko's Letter, "Jinko Third Supplemental Questionnaire Response," dated October 11, 2022 |
| Jinko's 4th SQR | Jinko's Letter, "Jinko Fourth Supplemental Questionnaire Response," dated November 2, 2022 |
| Jinko Preliminary Analysis Memorandum | Memorandum, "Jinko Solar Technology Sdn. Bhd. and Jinko Solar (Malaysia) Sdn. Bhd. – Preliminary Analysis Memorandum," dated December 1, 2022 |
| Jinko Verification Report | Memorandum, "Verification of the Questionnaire Responses of Jinko," dated April 12, 2023 |
| Jinko's April 24, 2023 Case Brief | Jinko's Letter, "Jinko Second Tranche Case Brief," dated April 24, 2023 |
| Jinko's Hearing Request | Jinko's Letter, "Jinko Request to Participate at Hearing," dated January 6, 2023 |
| Jinko's March 17, 2023 Rebuttal Brief | Jinko's Letter, "Jinko First Tranche Rebuttal," dated March 17, 2023 |
| Jinko's March 6, 2023 Case Brief | Jinko's Letter, "Jinko First Tranche Letter Concerning Certification Requirements," dated March 6, 2023 |
| Jinko's May 5, 2023 Rebuttal Brief | Jinko's Letter, "Jinko Second Tranche Rebuttal Brief," dated May 5, 2023 |
| *Malaysia* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to Malaysia," dated December 1, 2022 |
| Malaysia RSM | Memorandum, "Circumvention Inquiries With Respect to Malaysia:  Respondent Selection," dated May 12, 2022 |
| Maxeon's Hearing Request | Maxeon's Letter, "Request to Appear at Public Hearing," dated January 2, 2023 |
| Maxeon's March 17, 2023 Rebuttal Brief | Maxeon's Letter, "Maxeon's Rebuttal Brief," dated March 17, 2023 |
| Maxeon's March 6, 2023 Case Brief | Maxeon's Letter, "Maxeon's Case Brief," dated March 6, 2023 |
| NE Solar IQR Part I | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Initial Questionnaire Response," dated June 3, 2022 |
| NE Solar IQR Part II | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China;-Circumvention Inquiry Initial Questionnaire Response," dated June 23, 2022 |

| | |
|---|---|
| NE Solar Hearing Request | NE Solar's Letter, "New East Solar Energy's Request to Participate in Hearing," dated January 6, 2023 |
| NE Solar January 29, 2023 *Ex Parte* Memorandum | Memorandum, "Meeting with Counsel for New East Solar," dated January 29, 2023 |
| NE Solar Preliminary Analysis Memorandum | Memorandum, "Preliminary Analysis Memorandum for New East Solar (Cambodia) Co., Ltd.," dated December 1, 2022 |
| NE Solar's August 17, 2022 SQR | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Surrogate Value Questionnaire Response," dated August 17, 2022 |
| NE Solar's November 4, 2022 SQR | NE Solar's Letter, " Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Questionnaire Response," dated November 4, 2022 |
| NE Solar's October 11, 2022 SQR | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Questionnaire III Response," dated October 11, 2022 |
| NE Solar's August 8, 2022 SQR | NE Solar's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China; Circumvention Inquiry Supplemental Questionnaire I Response," dated August 8, 2022 |
| NE Solar's March 6, 2023 Case Brief | NE Solar's Letter, "New East Solar Energy's Case Brief," dated March 6, 2023 |
| Next Era's March 17, 2023 Rebuttal Brief | Next Era's Letter, "First Tranche Rebuttal Brief," dated March 17, 2023 |
| Next Era's March 6, 2023 Case Brief | Next Era's Letter, "Tranche 1 Case Brief," dated March 6, 2023 |
| NextEra's April 28, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated April 28, 2023 |
| NextEra's April 3, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated April 3, 2023 |
| NextEra's May 19, 2022 Comments | NextEra's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China: Comments on Potential Certification Requirements," dated May 19, 2022 |
| NextEra's May 9, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated May 9, 2023 |

| | |
|---|---|
| NextEra's April 19, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated April 19, 2023 |
| NextEra's April 24, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated April 24, 2023 |
| NextEra's April 26, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated April 26, 2023 |
| NextEra's April 28, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated April 28, 2023 |
| NextEra's Hearing Request | NextEra's Letter, "Request to Appear at Hearing," dated January 6, 2023 |
| NextEra's March 24, 2023 Case Brief | NextEra's Letter, "Second Tranche Case Brief," dated March 24, 2023 |
| NextEra's May 2, 2022 Comments | NextEra's letter, "NextEra Comments on Auxin's Circumvention Ruling Request," dated May 2, 2022 |
| NextEra's May 2, 2022 Submission | NextEra's Letter, "NextEra Comments on Auxin's Circumvention Ruling Request," dated May 2, 2022 |
| NextEra's May 5, 2023 Rebuttal Brief | NextEra's Letter, "Second Tranche Rebuttal Brief," dated May 5, 2023 |
| *NREL 2018 Report* | National Renewable Energy Laboratory,  *Crystalline Silicon Photovoltaic Module Manufacturing Costs and Sustainable Pricing* (February 2020) at Attachment 24 of NextEra's 5.2.22 Submission |
| *NREL Report* | National Renewable Energy Laboratory, *Crystalline Silicon Photovoltaic Module Manufacturing Costs and Sustainable Pricing* (2020) |
| *Preliminary Determinations* | *Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China:  Preliminary Affirmative Determinations of Circumvention With Respect to  Cambodia, Malaysia, Thailand, and Vietnam*, 87 FR 75221 (December 8, 2022) |
| Preliminary Determination Corrections | Memorandum, "Preliminary Determinations Corrections," dated January 24, 2023 |
| Q&V Questionnaire | Quantity and Value Questionnaire for Circumvention Inquiries With Respect to Cambodia, Malaysia, Thailand, and Vietnam, dated March 30, 2022 |
| Q&V Questionnaire Deadline Extension | Memorandum, "Extension of the Deadline to Respond to the Quantity and Value Questionnaire," dated April 20, 2022 |
| Red Sun's April 19, 2023 Case Brief | Red Sun's Letter, "Red Sun's Second Tranche Case Brief," dated April 19, 2023 |

| | |
|---|---|
| Red Sun's January 6, 2023 Request Letter | Red Sun's Letter, "Request to Supplement Rejection Memo and Place Correspondence with Red Sun on the Record," dated January 6, 2023 |
| Request for Comments on Surrogate Countries | Memorandum, "Request for Economic Development, Surrogate Country Comments and Information," dated May 13, 2022 |
| Risen's March 17, 2023 Rebuttal Brief | Risen's Letter, "Risen Solar Rebuttal Brief – Tranche 1," dated March 17, 2023 |
| Risen's March 6, 2023 Case Brief | Risen's Letter, "Risen Solar Case Brief – Tranche 1," dated March 6, 2023 |
| Risen's May 5, 2023 Rebuttal Brief | Risen's Letter, "Risen Solar Rebuttal brief - Tranche II," dated May 5, 2023 |
| Second Tranche Briefing Schedule for Cambodia | Memorandum, "Announcement of Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for Cambodia," dated March 15, 2023 |
| Second Tranche Briefing Schedule for Malaysia | Memorandum, "Announcement of Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for Malaysia," dated April 12, 2023 |
| Second Tranche Briefing Schedule for Thailand | Memorandum, "Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for the Circumvention Inquiry Covering the Kingdom of Thailand (Thailand)," dated April 19, 2023 |
| Second Tranche Briefing Schedule for Vietnam | Memorandum, "Briefing Schedule for Second Tranche of Case and Rebuttal Briefs for the Circumvention Inquiry Covering the Socialist Republic of Vietnam (Vietnam)," dated April 12, 2023 |
| Silfab's April 19, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc.," dated April 19, 2023 |
| Silfab's April 24, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc., "dated April 24, 2023 |
| Silfab's April 26, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc.," dated April 26, 2023 |
| Silfab's Hearing Request | Memorandum, "Request for Hearing," dated January 6, 2023 |
| Silfab's March 17, 2023 Rebuttal Brief | Silfab's Letter, "Letter in Lieu of First Tranche Rebuttal Brief of Silfab Solar WA Inc.," dated March 17, 2023 |
| Silfab's March 24, 2023 Case Brief | Silfab's Letter, "Second Tranche Case Brief of Silfab Solar WA Inc.," dated March 24, 2023 |
| Silfab's March 6, 2023 Case Brief | Silfab's Letter, "First Tranche Letter in Lieu of Case Brief of Silfab Solar WA Inc.," dated March 6, 2023 |

| | |
|---|---|
| Silfab's May 2, 2022 Comments | Silfab's Letter, "Comments and Factual Information to Rebut, Clarify and Correct Factual Information Contained in Auxin's Request for a Circumvention Ruling, dated May 2, 2022 |
| *Solar CCR Excluding Certain Off-Grid Solar Products* | *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Changed Circumstances Reviews, and Revocation of Antidumping and Countervailing Duty Orders, in Part*, 86 FR 71616, 71617 (December 17, 2021) (excluding certain off-grid CSPV) |
| Solar Surveys Analysis Memorandum | Memorandum, "Analysis Memorandum Regarding Solar Industry Surveys," dated concurrent with this memorandum. |
| Solar Investigation Scope Clarification Memorandum | Memorandum, "Scope Clarification: Antidumping and Countervailing Duty Investigations of Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China, A-570-979, C-570-980," dated March 19, 2012. |
| Solaria Scope Ruling | Memorandum, "Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells from the People's Republic of China, and Certain Crystalline Silicon Photovoltaic Product from Taiwan: The Solar Corporation Scope Ruling," dated April 8, 2021 |
| SunSpark Scope Ruling | Memorandum, "SunSpark Technology Inc. Scope Ruling," dated October 23, 2020 |
| *Thailand* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Thailand," dated December 1, 2022 |
| Thailand RSM | Memoranda, "Circumvention Inquiry With Respect to Thailand: Respondent Selection," dated May 12, 2022 |
| Third Supplemental Questionnaire | Commerce's Letter, "Third Supplemental Questionnaire," dated September 23, 2022 |
| Trina's April 19, 2023 Case Brief | Trina's Letter, "Trina's Second Tranche Case Brief," dated April 19, 2023 |
| Trina's March 17, 2023 Rebuttal Brief | Trina's Letter, "Trina's First Tranche Rebuttal Brief," dated March 17, 2023 |
| Trina's March 6, 2023 Case Brief | Trina's Letter, "First Tranche Case Brief of Trina," dated March 6, 2023 |
| Trina's May 2, 2022 Comments | Trina's Letter, "Trina's Comments on Auxin's Circumvention Inquiry Request and Factual Information Submission to Rebut, Clarify, or Correct Facial Information Contained in Auxin's Request," dated May 2, 2022 |

| | |
|---|---|
| TTL Final Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand:  Final Analysis Memorandum for Trina Solar Science & Technology (Thailand) Ltd.," dated concurrently with this memorandum |
| TTL IQR Part II | TTL's Letter, "May 16, 2022 Anti-Circumvention Inquiry Initial Questionnaire Response," dated June 23, 2022 |
| TTL Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Thailand:  Preliminary Analysis Memorandum for Trina Solar Science & Technology (Thailand) Ltd.," dated December 1, 2022 |
| TTL's May 9, 2023 Rebuttal Brief | TTL's Letter, "TTL's Second Tranche Rebuttal Brief," dated May 9, 2023 |
| TTL's 1st SQR | TTL's Letter, "First Supplemental Questionnaire," dated August 8, 2022 |
| TTL's 2nd SQR | TTL's Letter, "Second Supplemental Questionnaire," dated August 9, 2022 |
| TTL's 3rd SQR | TTL's Letter, "Third Supplemental Questionnaire," dated October 7, 2022 |
| TTL's 4th SQR | TTL's Letter, "Fourth Supplemental Questionnaire," dated November 2, 2022 |
| TTL's April 26, 2023 Case Brief | TTL's Letter, "TTL's Second Tranche Case Brief," dated April 26, 2023 |
| TTL's April 27, 2023 Rebuttal Brief | TTL's Letter, "Trina's First Tranche Rebuttal Brief," dated April 27, 2023 |
| TTL's Hearing Request | Memorandum, "Request for Public Hearing," dated January 6, 2023 |
| TTL's IQR Part I | TTL's Letter, "May 13, 2022 Anti-Circumvention Inquiry Initial Questionnaire Response," dated June 3, 2022 |
| TTL's May 19, 2022 Comments | TTL's Letter, "Trina's Comments on Potential Certification Requirements," dated May 19, 2022, Thailand. |
| TTL's Verification Report | Memorandum, "Verification of the Information Reported by Trina Solar Science & Technology (Thailand) Co. Ltd.," dated April 19, 2023 |
| Uyghur Forced Labor Prevention Act | Uyghur Forced Labor Prevention Act," U.S CUSTOMS AND BORDER PROTECTION, available at https://www.cbp.gov/trade/forced-labor/UFLPA |
| *Vietnam* PDM | Memorandum, "Preliminary Decision Memorandum for the Circumvention Inquiry With Respect to the Socialist Republic of Vietnam," dated December 1, 2022 |
| Vietnam Preliminary SV Memo | Commerce's Letter, "Crystalline Silicon Photovoltaic Cells, Whether or Not, Assembled Into Modules, from the People's Republic of China - Circumvention |

| | |
|---|---|
| | Inquiries with Respect to the Socialist Republic of Vietnam: Factor Valuation Memorandum," dated December 1, 2022 |
| Vietnam RSM | Memoranda, "Circumvention Inquiry With Respect to the Socialist Republic of Vietnam: Respondent Selection," dated May 12, 2022 |
| Vina Cell's Q&V Questionnaire | Commerce's Letter, "Vina Cell re: Quantity and Value Questionnaire for Circumvention Inquiries with Respect to Cambodia, Malaysia, Thailand, and Vietnam," dated March 30, 2022 |
| Vina Cell's Q&V Response | Vina Cell's Letter, "Quantity and Value Questionnaire," dated April 21, 2022 |
| Vina Preliminary Analysis Memorandum | Memorandum, "Circumvention Inquiry with Respect to Vietnam: Preliminary Analysis Memorandum for Vina Solar Technology Company Limited," dated December 1, 2022 |
| Vina/LONGi's March 6, 2023 Case Brief | Vina/LONGi's Letter, "Case Brief on General Issues," dated March 6, 2023 |
| Vina's 1st SQR | Vina's Letter, "Vina Solar's Response to the Department's First Supplemental Questionnaire," dated August 10, 2022 |
| Vina's April 19, 2023 Case Brief | Vina's Letter, "Letter in Lieu of Case Brief on Additional Issues," dated April 19, 2023 |
| Vina's April 28, 2023 Rebuttal Brief | Vina's Letter, "Rebuttal Case Brief (Tranche 2) - Vietnam," dated April 28, 2023 |
| Vina's Initial Questionnaire | Commerce's Letter, "Vina Circumvention Inquiry Questionnaire," dated May 16, 2022 |
| Vina's IQR Part I | Vina's Letter, "Vina Solar's Response to Part 1 of the Department's Questionnaire," dated June 7, 2022 |
| Vina's IQR Part II | Vina's Letter, "Vina Solar's Response to Part 2 of the Department's Questionnaire," dated June 23, 2022 |
| Vina's Q&V Questionnaire | Commerce's Letter, "Vina Solar re: Quantity and Value Questionnaire for Circumvention Inquiries with Respect to Cambodia, Malaysia, Thailand, and Vietnam," dated March 30, 2022 |
| Vina's Q&V Response | Vina's Letter, "Quantity and Value Questionnaire," dated April 21, 2022 |
| Vina's Verification Agenda | Commerce's Letter, "Verification of Vina Solar Technology Company Limited's Questionnaire Responses," dated February 2, 2023 |
| Vina's Verification Memorandum | Memorandum, "Verification of Vina Solar Technology Company Limited," dated April 12, 2023 |
| Vina's Verification Questionnaire | Commerce's Letter, "Verification Preparedness Questionnaire," dated October 12, 2022 |

| VSUN's March 6, 2023 Case Brief | VSUN's Letter, "VSUN's Letter in Lieu of Case Brief," dated March 6, 2023 |

Forum to the maximum extent permitted by law and consistent with the need for balanced industry representation. Where possible, the Department of Commerce will also consider the ethnic, racial, and gender diversity of the United States.

U.S. Section members will receive no compensation for their participation in Forum-related activities. Individual members will be responsible for all travel and related expenses associated with their participation, including attendance at Forum and Section meetings. At the meetings, the U.S. and Indian Sections will be expected to offer recommendations to the U.S. and Indian governments. Only appointed members may participate in official Forum meetings; substitutes and alternates may not participate. U.S. Section members will serve until December 31, 2024. Members serve at the discretion of the Secretary.

This notice supersedes the notices announcing membership opportunities for appointment, or reappointment, to the U.S. Section of the Forum published in the **Federal Register** on February 18, 2022 (87 FR 9318) and March 23, 2022 (87 FR 16455).

To be considered for membership in the U.S. Section, please submit the following information as instructed in the **ADDRESSES** and **DATE** captions above: Name and title of the applicant; the applicant company's name, place of incorporation, main headquarters address, and principal place of business address (if different); size of the company; size of company's export trade, investment, and nature of operations or interest in India; and a brief statement describing the candidate's qualifications that should be considered, including information about the candidate's ability to initiate and be responsible for activities in which the Forum will be active. The application should also include sufficient information to demonstrate the applicant's company is U.S.-owned or controlled, which may include, for example, an affirmation from the company that a majority of its voting stock is owned by U.S. citizens or other U.S. entities, an affirmation that a majority of its board of directors are U.S. citizens, or other indicia of U.S. ownership or control. Candidates who applied under a previous notice will need to submit a new application if they want to be considered. All candidates will be notified once selections have been made.

Dated: August 17, 2023.

**Valerie Dees,**

*Director of the Office of South Asia.*

[FR Doc. 2023–18076 Filed 8–22–23; 8:45 am]

**BILLING CODE 3510–HE–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–570–979, C–570–980]

**Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, From the People's Republic of China: Final Scope Determination and Final Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam**

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) determines that, except as noted below, imports of certain crystalline silicon photovoltaic cells, whether or not assembled into modules (solar cells and modules), that have been completed in the Kingdom of Cambodia (Cambodia), Malaysia, the Kingdom of Thailand (Thailand), or the Socialist Republic of Vietnam (Vietnam), using parts and components produced in the People's Republic of China (China), as specified below, that are then subsequently exported from Cambodia, Malaysia, Thailand, or Vietnam to the United States are circumventing the antidumping duty (AD) and countervailing duty (CVD) orders on solar cells and modules from China.

**DATES:** Applicable August 23, 2023.

**FOR FURTHER INFORMATION CONTACT:** Jose Rivera, Peter Shaw, or Toni Page (Cambodia and Malaysia) and Jeff Pedersen or Paola Aleman Ordaz (Thailand and Vietnam), Offices VII and IV, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–0842, (202) 482–1398, (202) 482–0697, (202) 482–2769, and (202) 482–4031, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On December 8, 2022, Commerce published the preliminary

determinations [1] of the circumvention inquiries of the AD and CVD orders on solar cells and modules from China. The circumvention inquiries concern solar cells and modules which were completed in Cambodia, Malaysia, Thailand, or Vietnam using parts and components manufactured in China. [2] We invited parties to comment on the *Preliminary Determinations*.

On December 23, 2022, Sonali Energees USA LLC (Sonali) filed a Scope Ruling Application in which it requested that Commerce determine that the solar modules that it imports into the United States from Cambodia are outside the scope of the *Orders*. [3] On January 20, 2023, Commerce notified all interested parties that it would address Sonali's scope ruling request in the circumvention inquiry covering Cambodia. [4]

A summary of events that occurred since Commerce published the *Preliminary Determinations,* as well as a full discussion of the issues raised by parties for these final determinations, may be found in the Issues and Decision Memoranda. [5] Commerce conducted the

---

[1] *See Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Preliminary Affirmative Determinations of Circumvention With Respect to Cambodia, Malaysia, Thailand, and Vietnam,* 87 FR 75221 (December 8, 2022) (*Preliminary Determinations*), and accompanying Preliminary Decision Memoranda (PDM).

[2] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order,* 77 FR 73018 (December 7, 2012) (*AD Order*); *see also Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Countervailing Duty Order,* 77 FR 73017 (December 7, 2012) (*CVD Order*) (collectively, *Orders*).

[3] *See* Sonali's Letter, "Sonali Energees USA LLC's Scope Ruling Application for Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Request for Scope Ruling on Certain Solar Modules and Cells Manufactured in Cambodia," dated December 23, 2022.

[4] *See* Memorandum, "Sonali Scope Inquiry," dated January 20, 2023.

[5] *See* Memoranda, "Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Issues and Decision Memorandum for the Circumvention Inquiry With Respect to the Kingdom of Cambodia" (Cambodia IDM); "Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Issues and Decision Memorandum for the Circumvention Inquiry With Respect to Malaysia;" "Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Issues and Decision Memorandum for the Circumvention Inquiry With Respect to the

Continued

scope inquiry in accordance with 19 CFR 351.225(c) and (h) and these circumvention inquiries in accordance with section 781(b) of the Tariff Act of 1930, as amended (the Act) and 19 CFR 351.226.

## Scope of the Orders

The products subject to the *Orders* are solar cells and modules. For a full description of the scope of the *Orders, see* the Issues and Decision Memoranda.[6]

## Scope Ruling

The scope ruling covers certain solar modules that have been completed in Cambodia, using wafers from China, that are subsequently exported from Cambodia to the United States.

## Merchandise Subject to the Circumvention Inquiries

The circumvention inquiries cover certain solar cells and modules that have been completed in Cambodia, Malaysia, Thailand, or Vietnam, using parts and components from China, as specified below, that are subsequently exported from Cambodia, Malaysia, Thailand, or Vietnam to the United States (inquiry merchandise).

Specifically, these circumvention inquiries cover: (A) crystalline silicon photovoltaic cells that meet the physical description of crystalline silicon photovoltaic cells in the scope of the underlying *Orders,* subject to the exclusions therein, whether or not partially or fully assembled into other products, that were produced in Cambodia, Malaysia, Thailand, or Vietnam, from wafers produced in China; and (B) modules, laminates, and panels consisting of crystalline silicon photovoltaic cells, subject to the exclusions for certain panels in the scope of the underlying orders, whether or not partially or fully assembled into other products, that were produced in Cambodia, Malaysia, Thailand, or Vietnam from wafers produced in China and where more than two of the following components in the module/laminate/panel were produced in China: (1) silver paste; (2) aluminum frames; (3) glass; (4) backsheets; (5) ethylene vinyl acetate sheets; and (6) junction boxes.

If modules, laminates, and panels consisting of crystalline silicon photovoltaic cells do not meet both of the conditions in item (B) above, then these circumvention inquiries do not cover the modules, laminates, and panels, or the crystalline silicon photovoltaic cells within the modules, laminates, and panels, even if those crystalline silicon photovoltaic cells were produced in Cambodia, Malaysia, Thailand, or Vietnam from wafers produced in China. Wafers produced outside of China with polysilicon sourced from China are not considered to be wafers produced in China for purposes of these circumvention inquiries.

## Methodology

Commerce made the final scope determination in accordance with 19 CFR 351.225. Commerce made these final circumvention findings in accordance with section 781(b) of the Act and 19 CFR 351.226.

## Analysis of Comments Received

All issues raised in the case and rebuttal briefs submitted by parties in these inquiries are addressed in the Issues and Decision Memoranda. Commerce did not receive any comments on Sonali's Scope Ruling Application. A list of topics included in the Issues and Decision Memoranda are included as Appendix I to this notice. The Issues and Decision Memoranda are public documents and are on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov.* In addition, complete versions of the Issues and Decision Memoranda can be accessed directly at *https://access.trade.gov/ public/FRNoticesListLayout.aspx.*

## Final Scope Ruling

As detailed in the Cambodia IDM, we find that the merchandise described in Sonali's Scope Ruling Application is not covered by the scope of the *Orders.* However, Sonali's merchandise is subject to Commerce's determination in the circumvention inquiry involving Cambodia.

## Final Determinations of Circumvention

As detailed in the Issues and Decision Memoranda for Cambodia, Malaysia, and Vietnam, and in the *Preliminary Determination* for Thailand, with the exception of certain U.S. importers from the exporters identified in Appendix III to this notice, we determine that U.S. imports of inquiry merchandise are

circumventing the *Orders* on a country-wide basis. As a result, we determine that this merchandise is covered by the *Orders.*

We determine, pursuant to section 781(b) of the Act and 19 CFR 351.225(g), that solar cells/solar modules exported from, and produced in, Malaysia, or Vietnam by the entities listed for each of those countries in Appendix III to this notice, using wafers produced in China that were exported by specific companies are not circumventing the *Orders.*

After considering comments from interested parties, we determine to not apply adverse facts available to Vietnam Sunergy Joint Stock Company.[7]

*See* the "Suspension of Liquidation and Cash Deposit Requirements" section below for details regarding suspension of liquidation and cash deposit requirements. *See* the "Certification" and "Certification Requirements" section below for details regarding the use of certifications.

## Use of Adverse Facts Available

In the *Preliminary Determinations,* we relied on the facts available under section 776(a) of the Act, including facts available with adverse inferences under section 776(b) of the Act, where appropriate. In particular, we requested information from certain companies in each of the examined countries, including the quantity and value (Q&V) of their exports during the inquiry period for purposes of respondent selection. In the Q&V questionnaire, Commerce explained that, if the company to which Commerce issued the questionnaire fails to respond to the questionnaire, or fails to provide the requested information, Commerce may find that the company failed to cooperate by not acting to the best of its ability to comply with the request for information, and may use an inference that is adverse to the company's interests in selecting from the facts otherwise available. Certain companies to which Commerce issued the Q&V questionnaire in the Malaysia, Thailand, and Vietnam inquiries received, but failed to timely respond to, the Q&V questionnaire.[8]

Additionally, New East Solar Energy (Cambodia) Co., Ltd.[9] and Vina Solar Technology Co., Ltd.[10] refused to participate in verification.

---

Kingdom of Thailand''; and ''Antidumping and Countervailing Duty Orders on Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Issues and Decision Memorandum for the Circumvention Inquiry With Respect to the Socialist Republic of Vietnam'' (Vietnam IDM); all dated concurrently with, and hereby adopted by, this notice (collectively, Issues and Decision Memoranda).

[6] *Id.*

[7] *See* Vietnam IDM at Comment 8.

[8] *See* Appendix II for a list of companies that failed to respond to Commerce's request for Q&V information.

[9] *See* Cambodia IDM at Comment 9.

[10] *See* Memorandum, ''Verification of Vina Solar Technology Company Limited,'' dated April 12, 2023.

Therefore, we find that necessary information is not available on the record and that the companies that failed to timely respond to the Q&V questionnaire withheld requested information, failed to provide requested information by the deadline or in the form and manner requested, significantly impeded these inquiries, and that the companies that refused to be verified significantly impeded these inquiries and provided information that could not be verified, within the meaning of sections 776(a)(2)(A)–(D) of the Act. Moreover, we find that these companies failed to cooperate to the best of their ability to provide the requested information, within the meaning of section 776(b) of the Act, because they either did not provide a timely response to Commerce's Q&V questionnaire or did not allow their submitted information to be verified. Consequently, we have used adverse inferences with respect to these companies in selecting from among the facts otherwise available on the record, pursuant to sections 776(a) and (b) of the Act.

Based on the adverse facts available used, we determine that the companies listed in Appendix II to this notice exported inquiry merchandise and that U.S. entries of that merchandise are circumventing the *Orders.* As noted above, we are no longer applying adverse facts available to Vietnam Sunergy Joint Stock Company and this company has been removed from the list in Appendix II.[11] Additionally, with the exception of the ''Applicable Entries'' certification, which is described in the ''Certifications'' section below, we are precluding the companies listed in Appendix II to this notice from participating in the certification programs that we are establishing for exports of solar cells and modules from Cambodia, Malaysia, Thailand, and Vietnam.

U.S. entries of inquiry merchandise made on or after April 1, 2022, that are ineligible for certification based on the failure of the companies listed in Appendix II to cooperate, or for other reasons, shall remain subject to suspension of liquidation until final assessment instructions on those entries are issued, whether by automatic liquidation instructions, or by instructions pursuant to the final results of an administrative review. After considering comments from interested parties, we determined that interested parties that wish to have their suspended non-''Applicable Entries,'' if any, reviewed, and/or their ineligibility

for the certification program re-evaluated, should request an administrative review of the relevant suspended entries during the next anniversary month of these *Orders* (*i.e.,* December 2023).[12] The requestor should note in the request for an administrative review that: (1) it believes that all the imported merchandise from the company identified in Appendix II would meet the certification requirements in Appendix VI of this **Federal Register** notice; and (2) that the requestor is seeking a review in order for Commerce to reconsider the exporter/producer's eligibility to certify to that fact.

## Suspension of Liquidation and Cash Deposit Requirements

On June 6, 2022, the President of the United States signed *Presidential Proclamation 10414,* ''Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia.''[13] In *Presidential Proclamation 10414,* the President directed the Secretary of Commerce (the Secretary) to:

consider taking appropriate action under section 1318(a) of title 19, United States Code, to permit, until 24 months after the date of this proclamation or until the emergency declared herein has terminated, whichever occurs first, under such regulations and under such conditions as the Secretary may prescribe, the importation, free of the collection of duties and estimated duties, if applicable, under sections 1671, 1673, 1675, and 1677j of title 19, United States Code, {(sections 701, 731, 751 and 781 of the Act)} of certain solar cells and modules exported from the Kingdom of Cambodia, Malaysia, the Kingdom of Thailand, and the Socialist Republic of Vietnam, and that are not already subject to an antidumping or countervailing duty order as of the date of this proclamation . . .

On September 12, 2022, Commerce added Part 362 to its regulations to implement *Presidential Proclamation 10414.* Pursuant to 19 CFR 362.103(b)(1)(i), Commerce will direct U.S. Customs and Border Protection (CBP) to discontinue the suspension of liquidation and collection of cash deposits that were ordered based on Commerce's initiation of these circumvention inquiries. In addition, pursuant to 19 CFR 362.103(b)(1)(ii) and

(iii), Commerce will not direct CBP to suspend liquidation, and require cash deposits, of estimated ADs and CVDs based on these affirmative determinations of circumvention on, any ''Applicable Entries.'' However, Commerce will direct CBP to suspend liquidation, and collect cash deposits, of estimated ADs and CVDs based on these affirmative determinations of circumvention on, imports of ''Southeast Asian-Completed cells and modules'' that are not ''Applicable Entries.''

Pursuant to 19 CFR 362.102, 'Southeast Asian-Completed Cells and Modules'' are:

crystalline silicon photovoltaic cells, whether or not assembled into modules (solar cells and modules), which are completed in the Kingdom of Cambodia, Malaysia, the Kingdom of Thailand, or the Socialist Republic of Vietnam using parts and components manufactured in the People's Republic of China, and subsequently exported from Cambodia, Malaysia, Thailand, or Vietnam to the United States. These are cells and modules subject to the Solar Circumvention Inquiries. Southeast Asian-Completed Cells and Modules does not mean solar cells and modules that, on June 6, 2022, the date Proclamation 10414 was signed, were already subject to Certain Solar Orders.[14]

''Applicable Entries means the entries of Southeast Asian-Completed Cells and Modules that are entered into the United States, or withdrawn from warehouse, for consumption before the Date of Termination and, for entries that enter after November 15, 2022, are used in the United States by the Utilization Expiration Date.''[15] The ''Date of Termination'' is ''June 6, 2024, or the date the emergency described in *Presidential Proclamation 10414* has been terminated, whichever occurs first.''[16] The ''Utilization Expiration Date'' is ''the date 180 days after the Date of Termination.''[17] ''Utilization and utilized means the Southeast Asian-Completed Cells and Modules will be used or installed in the United States. Merchandise which remains in inventory or a warehouse in the United States, is resold to another party, is subsequently exported, or is destroyed after importation is not considered utilized for purposes of'' the provisions in Part 362 of the regulations.[18]

---

[11] *See* Vietnam IDM at Comment 8.

[12] *See* Issues and Decisions Memoranda at the Comment entitled ''Whether Commerce Should Reconsider Certification Eligibility in Changed Circumstances Reviews.''

[13] *See* Proclamation No. 10414, *Declaration of Emergency and Authorization for Temporary Extensions of Time and Duty-Free Importation of Solar Cells and Modules from Southeast Asia,* 87 FR 35067 (June 9, 2022) (*Proclamation 10414*).

[14] ''Certain Solar Orders'' refers to the following orders: (1) *Solar Cells AD Order;* (2) *Solar Cells CVD Order;* and (3) *Certain Crystalline Silicon Photovoltaic Products from Taiwan: Antidumping Duty Order,* 80 FR 8596 (February 18, 2015).

[15] *See* 19 CFR 362.102.

[16] *Id.*

[17] *Id.*

[18] *Id.*

Therefore, based on these affirmative determinations of circumvention, Commerce will direct CBP to continue to suspend liquidation of, and collect cash deposits of the applicable estimated ADs and CVDs on, U.S. imports of Southeast Asian-completed solar cells and solar modules that are not ''Applicable Entries'' that were entered, or withdrawn from warehouse, for consumption on or after April 1, 2022, the date of publication of initiation of these circumvention inquiries in the **Federal Register**,[19] but prior to the Date of Termination of *Presidential Proclamation 10414.* Specifically, with the exception of the entries for which the importer and exporter have met the requirements of the relevant certifications described in the ''Certified Entries'' section of this notice below, Commerce will direct CBP to implement the following cash deposit requirements for U.S. entries of ''Southeast Asian-completed cells and modules'' that are not ''Applicable Entries'': (1) for exporters of the solar cells or solar modules that have a company-specific cash deposit rate under the *AD Order* and/or *CVD Order,* the cash deposit rate will be the company-specific AD and/or CVD cash deposit rate established for that company in the most recently-completed segment of the solar cells proceedings; (2) for exporters of the solar cells or solar modules that do not have a company-specific cash deposit rate under the *AD Order* and/or *CVD Order,* the cash deposit rate will be the company-specific cash deposit rate established under the *AD Order* and/or *CVD Order* for the company in China that exported the wafers to the producer/exporter in the relevant third country (*i.e.,* Cambodia, Malaysia, Thailand, or Vietnam) that were incorporated in the imported solar cells or solar modules; and (3) if neither the exporter of the solar cells or solar modules nor the exporter of the wafers described in item (2) above has a company-specific cash deposit rate, the AD cash deposit rate will be the China-wide rate (238.95 percent), and the CVD cash deposit rate will be the all-others rate (15.24 percent). Commerce has established the following third-country case numbers in the Automated Commercial Environment (ACE) for such entries: Cambodia—A–555–902–000/C–555–903–000; Malaysia—A–557–988–000/C–557–989–000; Thailand—A–

549–988–000/C–549–989–000; and Vietnam—A–552–988–000/C–552–989–000. If the exporter of the wafers described in the cash deposit requirements above has its own company-specific cash deposit rate under the *Orders,* the importer, producer, or exporter of inquiry merchandise containing those wafers may file a request in ACCESS on the record of the applicable proceeding segment that Commerce establish a case number in ACE for the *Orders* for the applicable third-country that is specific to the Chinese wafer exporter. CBP may also submit such a request to Commerce through the ACE AD/CVD Portal Inquiry System.

**Entries on or After Termination of Presidential Proclamation 10414**

Upon termination of the *Presidential Proclamation 10414,* Commerce will issue instructions to CBP that are described in 19 CFR 362.103(b)(2). Further, consistent with 19 CFR 362.103(b)(3), after the *Preliminary Determinations,* Commerce issued instructions to CBP pursuant to 19 CFR 362.103(b)(3).[20]

**Certified Entries**

Entries prior to the Date of Termination for which the importer and exporter have met the certification requirements described below and in Appendix IV, V, or VI to this notice, and entries on or after the Date for Termination for which the importer and exporter have met the certification requirements described below and in Appendix V or VI to this notice, will not be subject to suspension of liquidation, or the cash deposit requirements described above. Failure to comply with the applicable requisite certification requirements may result in the merchandise being subject to ADs and CVDs.

**Certifications**

In order to administer these country-wide affirmative determinations of circumvention, and the company-specific negative determinations of circumvention, and to implement *Presidential Proclamation 10414,* Commerce has established the following types of certifications: (1) importer and exporter certifications that specific entries meet the regulatory definition of ''Applicable Entries'' (*see* Appendix IV to this notice); (2) importer and exporter certifications that specific entries are not subject to suspension of liquidation or the collection of cash deposits based

on the negative circumvention determinations with respect to the exporters listed in Appendix III to this notice in combination with certain wafer exporters (*see* Appendix V to this notice); and (3) importer and exporter certifications that specific entries of solar cells or solar modules from Cambodia, Malaysia, Thailand, or Vietnam are not subject to suspension of liquidation or the collection of cash deposits pursuant to these country-wide affirmative determinations of circumvention because the merchandise meets the component content requirements described in the certification (*see* Appendix VI to this notice). The non-cooperative companies listed in Appendix II are not eligible to use the certification described in items (2) or (3) above for the relevant inquiry country.[21]

Importers and exporters that claim that: (1) an entry of ''Southeast Asian-completed cells and modules'' is an ''Applicable Entry''; (2) an entry of solar cells or solar modules is not subject to suspension of liquidation or the collection of cash deposits based on the negative circumvention determination with respect to one of the companies listed in Appendix III; or (3) the entry of solar cells or solar modules is not subject to suspension of liquidation or the collection of cash deposits based on the inputs used to manufacture such merchandise, must complete the applicable certification and meet the certification and documentation requirements described below, as well as the requirements identified in the applicable certification.

**Certification Requirements**

Importers are required to complete and maintain the applicable importer certification, and maintain a copy of the applicable exporter certification, and retain all supporting documentation for both certifications. For entries of inquiry merchandise more than 14 days after the date of publication of the notice of Commerce's *Preliminary Determinations* of circumvention in the **Federal Register**, the applicable importer certification must be completed and signed by the time the entry summary is filed for the relevant entry. For entries

---

[19] *See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Initiation of Circumvention Inquiry on the Antidumping Duty and Countervailing Duty Orders,* 87 FR 19071 (April 1, 2022).

[20] *See Preliminary Determinations,* 87 FR at 75224.

[21] *See Preliminary Determinations* PDM at the section titled ''Use of Facts Available with an Adverse Inference''; and, *e.g., Anti-circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy: Affirmative Preliminary Determination of Circumvention of the Antidumping Duty Order,* 63 FR 18364, 18366 (April 15, 1998), unchanged in *Anti-Circumvention Inquiry of the Antidumping Duty Order on Certain Pasta from Italy: Affirmative Final Determination of Circumvention of the Antidumping Duty Order,* 63 FR 54672, 54675–76 (October 13, 1998).

of inquiry merchandise during the period April 1, 2022, (the date of initiation of these circumvention inquiries) through the 14th day after the date of publication of the notice of Commerce's *Preliminary Determinations* of circumvention in the **Federal Register**, where the entry has not been liquidated (and entries for which liquidation has not become final), the applicable importer certification should have been completed and signed by no later than 45 days after the date of publication of the notice of Commerce's *Preliminary Determinations* of circumvention in the **Federal Register**. For entries of inquiry merchandise during the period April 1, 2022, through the 14th day after the date of publication of the notice of Commerce's *Preliminary Determinations* of circumvention in the **Federal Register**, importers have the option to complete a blanket certification covering multiple entries, individual certifications for each entry, or a combination thereof.

The importer, or the importer's agent, must submit both the importer's certification and the exporter's certification to CBP as part of the entry process by uploading them into the document imaging system (DIS) in ACE. Where the importer uses a broker to facilitate the entry process, it should obtain the entry summary number from the broker. Agents of the importer, such as brokers, however, are not permitted to certify on behalf of the importer.

Exporters are required to complete and maintain the applicable exporter certification and provide the importer with a copy of that certification and all supporting documentation (*e.g.,* invoice, purchase order, production records, *etc.*). For shipments of inquiry merchandise more than 14 days after the date of publication of the notice of Commerce's *Preliminary Determinations* of circumvention in the **Federal Register**, the applicable exporter certification must be completed and signed, and a copy of the certification provided to the importer, on, or prior to, the date of shipment. For entries during the period April 1, 2022, (the date of initiation of these circumvention inquiries) through the 14th day after the date of publication of the notice of Commerce's *Preliminary Determinations* of circumvention in the **Federal Register**, the applicable exporter certification should have been completed and signed, and a copy of the certification provided to the importer, by no later than 45 days after the date of publication of the notice of Commerce's *Preliminary Determinations* of circumvention in the **Federal Register**. For shipments of inquiry

merchandise during the period April 1, 2022, through the 14th day after the date of publication of the notice of Commerce's *Preliminary Determinations* of circumvention in the **Federal Register**, exporters have the option to complete a blanket certification covering multiple entries, individual certifications for each entry, or a combination thereof.

The exporter certification should be completed by the party selling the solar cells or solar modules to the United States that were manufactured in Cambodia, Malaysia, Thailand, or Vietnam.

Additionally, the claims made in the certifications and any supporting documentation are subject to verification by Commerce and/or CBP. Importers and exporters are required to maintain the certifications and supporting documentation for the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

For unliquidated entries (and entries for which liquidation has not become final) of solar cells and solar modules that were declared as non-AD/CVD type entries (*e.g.,* type 01) and were entered, or withdrawn from warehouse, for consumption in the United States during the period April 1, 2022, (the date of initiation of these circumvention inquiries) through the date of publication of the *Preliminary Determinations* in the **Federal Register**, for which none of the above certifications may be made, importers must file a Post Summary Correction with CBP, in accordance with CBP's regulations, regarding conversion of such entries from non-AD/CVD type entries to AD/CVD type entries (*e.g.,* type 01 to type 03). Importers should report those AD/CVD type entries using the following third-country case numbers: Cambodia—A–555–902–000/C–555–903–000; Malaysia—A–557–988–000/C–557–989–000; Thailand—A–549–988–000/C–549–989–000; and Vietnam—A–552–988–000/C–552–989–000. Other third-country case numbers may be established following the process described above. The importer should pay cash deposits on those entries consistent with the regulations governing post summary corrections that require payment of additional duties.

If it is determined that an importer and/or exporter has not met the certification and/or related documentation requirements for certain entries, Commerce intends to instruct

CBP to suspend, pursuant to these country-wide affirmative determinations of circumvention and the *Orders*,[22] all unliquidated entries for which these requirements were not met and require the importer to post applicable AD and CVD cash deposits equal to the rates noted above.

**Administrative Protective Order**

This notice will serve as the only reminder to all parties subject to an administrative protective order (APO) of their responsibility concerning the destruction of proprietary information disclosed under an APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and the terms of an APO is a sanctionable violation.

**Notification to Interested Parties**

These determinations are issued and published in accordance with section 781(b) of the Act and 19 CFR 351.226(g)(2).

Dated: August 17, 2023.

**Lisa W. Wang,**
*Assistant Secretary for Enforcement and Compliance.*

## APPENDICES

| Appendix No. | Appendix name |
|---|---|
| I ................... | List of Topics Discussed in the Issues and Decision Memoranda |
| II ................... | List of Companies to Which Commerce Applied AFA |
| III ................... | List of Companies Found Not To Be Circumventing |
| IV ................... | Certification for "Applicable Entries" |
| V ................... | Certification for Entries of Inquiry Merchandise From Companies Found Not To Be Circumventing |
| VI ................... | Certification Regarding Chinese Components |

**Appendix I**

**List of Topics Discussed in the Issues and Decision Memoranda**

**Cambodia**

I. Summary
II. Background
III. Merchandise Subject to the Scope Inquiry
IV. Scope of the *Orders*
V. Regulatory Framework for Scope Inquiry
VI. Interested Party Scope Comments
VII. Scope Determination
VIII. Scope of the Circumvention Inquiry
IX. Period of the Circumvention Inquiry

---

[22] *See Orders.*

X. Changes Since the *Preliminary Determination*
XI. Discussion of the Issues
Comment 1. Whether Solar Cells With a p/ n Junction Formed Outside of China Should Be Subject to the Circumvention Inquiries
Comment 2. Whether a Wafer Should Be Considered a Chinese Input Where Either the Wafer or the Polysilicon in the Wafer was Produced Outside of China
Comment 3. Whether Commerce Should Analyze Investment Data on a Per-Unit Basis
Comment 4. Whether to Depart from the Section 781(b)(2) ''Minor or Insignificant'' Methodology Applied in the *Preliminary Determinations*
Comment 5. Whether the Nature of Third-Country Processing Indicates the Processing is Minor or Insignificant Under Section 781(b)(2)(C) of the Act
Comment 6. How to Value U.S. Imports of Solar Cells and Modules for Purposes of Section 781(b)(2)(E) of the Act
Comment 7. Whether Material Costs Should be Included in the Value of Third-Country Processing
Comment 8. Whether Commerce Should Rely on Surrogates To Value Chinese Inputs Consumed in the Inquiry Country
Comment 9. Whether Commerce Should Apply AFA to NE Solar
Comment 10. Whether NE Solar's Production Process Data Support a Negative Final Determination
Comment 11. Whether To Include BYD HK's Tollers in Determining Whether the Process of Assembly or Completion is Minor or Insignificant
Comment 12. Whether BYD HK's Process of Assembly in Cambodia is Minor or Insignificant Under Section 781(b)(1)(C) of the Act
Comment 13. Whether the Factors Under 781(b)(3) of the Act Justify an Affirmative Final Determination
Comment 14. Whether Commerce's Country-Wide Affirmative Circumvention Determination was Appropriate
Comment 15. Affirmative Circumvention Determinations Would not be Appropriate Under Section 781(b)(1)(E) of the Act
Comment 16. Whether Commerce Should Allow AFA Companies To Certify
Comment 17. Certification Requirements and Corrections
Comment 18. Whether Commerce Can Require Certifications for U.S. Entries of Merchandise Not Covered by the *Orders*
Comment 19. Whether Exporters and Importers Should be Permitted To Submit Multiple Certifications, as Applicable
Comment 20. Whether or Not Companies Found Not To Be Circumventing Should Be Required To Certify and To Identify Their Wafer Suppliers
Comment 21. Whether Commerce Should Reconsider Certification Eligibility in Changed Circumstances Reviews
Comment 22. Whether Cadmium Telluride Thin Film Solar Products are Covered by Affirmative Final Determinations or Related Certification Requirements

Comment 23. Clarification and Enforcement of the Utilization Requirement
Comment 24. Whether the ''Wafer-Plus-Three'' Requirement is Appropriate
Comment 25. Whether Commerce Properly Placed *Ex Parte* Memoranda on the Record That Concerned the Circumvention Inquiries
Comment 26. Whether Commerce's Determination to Apply *Presidential Proclamation 10414* Retroactively is Contrary to Law
Comment 27. Whether Third-Country Exporters Without an AD Rate Should Receive the Separate Rate
XII. Recommendation

**Malaysia**

I. Summary
II. Background
III. Scope of the *Orders*
IV. Scope of the Circumvention Inquiry
V. Period of the Circumvention Inquiry
VI. Changes Since the *Preliminary Determination*
VII. Discussion of the Issues
Comment 1. Whether Solar Cells With a p/ n Junction Formed Outside of China Should Be Subject to Circumvention Inquiries
Comment 2. Whether a Wafer Should Be Considered a Chinese Input Where Either the Wafer or the Polysilicon in the Wafer was Produced Outside of China.
Comment 3. Whether Commerce Should Analyze Investment Data on a Per-Unit Basis
Comment 4. Whether To Depart From the Section 781(b)(2) ''Minor or Insignificant'' Methodology Applied in the Preliminary Determinations
Comment 5. Whether the Nature of Third-Country Processing Indicates the Processing is Minor or Insignificant Under Section 781(b)(2)(C) of the Act
Comment 6. Whether Material Costs Should be Included in the Value of Third-Country Processing
Comment 7. Whether Commerce Should Correct Certain Ministerial Errors and Minor Verification Corrections
Comment 8. Whether Jinko's Cell and Module Manufacturing is Minor or Insignificant Under Section 781(b)(1)(C) of the Act
Comment 9. Whether Hanwha's Cell and Module Manufacturing is Minor or Insignificant under Section 781(b)(1)(C) of the Act
Comment 10. Whether Hanwha's Shipments of Chinese Inputs Weighs in Favor of Circumvention Under Section 781(b)(3)(C) of the Act
Comment 11. Whether Commerce's Country-Wide Affirmative Circumvention Determination Was Appropriate
Comment 12. Affirmative Circumvention Determinations Would Not Be Appropriate Under Section 781(b)(1)(E) of the Act
Comment 13. Whether Commerce Should Allow AFA Companies To Certify
Comment 14. Certification Requirements and Corrections

Comment 15. Whether Commerce Can Require Certifications for U.S. Entries of Merchandise Not Covered by the Orders
Comment 16. Whether Exporters and Importers Should be Permitted To Submit Multiple Certifications, as Applicable
Comment 17. Whether or Not Companies Found Not To Be Circumventing Should be Required To Certify and To Identify Their Wafer Suppliers
Comment 18. Whether Commerce Should Reconsider Certification Eligibility in Changed Circumstances Reviews
Comment 19. Whether Cadmium Telluride Thin Film Solar Products are Covered by Affirmative Final Determinations or Related Certification Requirements
Comment 20. Clarification and Enforcement of the Utilization Requirement
Comment 21. Whether the ''Wafer-Plus-Three'' Requirement is Appropriate
Comment 22. Whether Commerce Properly Placed Ex Parte Memoranda on the Record That Concerned the Circumvention Inquiries
Comment 23. Whether Commerce's Determination to Apply *Presidential Proclamation 10414* Retroactively is Contrary to Law
Comment 24. Whether Third-Country Exporters Without an AD Rate Should Receive the Separate Rate
VIII. Recommendation

**Thailand**

I. Summary
II. Background
III. Scope of the *Orders*
IV. Scope of the Circumvention Inquiry
V. Period of the Circumvention Inquiry
VI. Changes Since the *Preliminary Determination*
VII. Discussion of the Issues
Comment 1. Whether Solar Cells With a p/ n Junction Formed Outside of China Should Be Subject to Circumvention Inquiries
Comment 2. Whether a Wafer Should Be Considered a Chinese Input Where Either the Wafer or the Polysilicon in the Wafer was Produced Outside of China.
Comment 3. Whether Commerce Should Analyze Investment Data on a Per-Unit Basis
Comment 4. Whether To Depart from the Section 781(b)(2) ''Minor or Insignificant'' Methodology Applied in the Preliminary Determinations
Comment 5. How to Value U.S. Imports of Solar Cells and Modules for Purposes of Section 781(b)(2)(E) of the Act
Comment 6. Whether Material Costs Should Be Included in the Value of Third-Country Processing
Comment 7. Whether Commerce Should Rely on Surrogates To Value Chinese Inputs Consumed in the Inquiry Country
Comment 8. Whether Third Country Processing was Minor-General
Comment 9. Whether the Factors Under 781(b)(3) of the Act Justify an Affirmative Final Determination
Comment 10. Affirmative Circumvention Determinations Would Not Be

Appropriate Under Section 781(b)(1)(E) of the Act

Comment 11. Whether Commerce Should Allow AFA Companies To Certify

Comment 12. Certification Requirements and Corrections

Comment 13. Whether Commerce Can Require Certifications for U.S. Entries of Merchandise Not Covered by the *Orders*

Comment 14. Whether Exporters and Importers Should Be Permitted To Submit Multiple Certifications, as Applicable

Comment 15. Whether or Not Companies Found Not To Be Circumventing Should be Required to Certify and to Identify Their Wafer Suppliers

Comment 16. Whether Commerce Should Reconsider Certification Eligibility in Changed Circumstances Reviews

Comment 17. Whether Cadmium Telluride Thin Film Solar Products are Covered by Affirmative Final Determinations or Related Certification Requirements

Comment 18. Clarification and Enforcement of the Utilization Requirement

Comment 19. Whether the "Wafer-Plus-Three" Requirement is Appropriate

Comment 20. Whether Commerce Properly Placed Ex Parte Memoranda on the Record That Concerned the Circumvention Proceedings

Comment 21. Whether Commerce's Determination To *Apply Presidential Proclamation 10414* Retroactively is Contrary to Law

Comment 22. Whether Third-Country Exporters Without an AD Rate Should Receive the Separate Rate

VIII. Recommendation

## Vietnam

I. Summary

II. Background

III. Scope of the *Orders*

IV. Scope of the Circumvention Inquiry

V. Period of the Circumvention Inquiry

VI. Changes Since the *Preliminary Determination*

VII. Discussion of the Issues

Comment 1. Whether Solar Cells With a p/n junction Formed Outside of China Should Be Subject to Circumvention Inquiries

Comment 2. Whether a Wafer Should Be Considered a Chinese Input Where Either the Wafer or the Polysilicon in the Wafer was Produced Outside of China.

Comment 3. Whether Commerce Should Analyze Investment Data on a Per-Unit Basis

Comment 4. Whether To Depart From the Section 781(b)(2) "Minor or Insignificant" Methodology Applied in the Preliminary Determinations

Comment 5. How To Value U.S. Imports of Solar Cells and Modules for Purposes of Section 781(b)(2)(E) of the Act

Comment 6. Whether Material Costs Should Be Included in the Value of Third-Country Processing

Comment 7. Whether Third Country Processing was Minor-General

Comment 8. Whether VSUN Is Eligible to Participate in the Certification Program

Comment 9. Whether Commerce's Rejection of Red Sun Q&V Submission was Proper

Comment 10. Whether Commerce Should Base Surrogate Financial Ratios on Websol Energy's Financial Statements

Comment 11. Whether Commerce's Country-Wide Affirmative Circumvention Determination Appropriate

Comment 12. Affirmative Circumvention Determinations Would not Be Appropriate Under Section 781(b)(1)(E) of the Act

Comment 13. Whether Commerce Should Allow AFA Companies to Certify

Comment 14. Whether Commerce Should Allow Vina's Affiliates to Certify

Comment 15. Certification Requirements and Corrections

Comment 16. Whether Commerce Can Require Certifications for U.S. Entries of Merchandise Not Covered by the *Orders*

Comment 17. Whether Exporters and Importers Should be Permitted to Submit Multiple Certifications, as Applicable

Comment 18. Whether or Not Companies Found Not to Be Circumventing Should be Required to Certify and to Identify Their Wafer Suppliers

Comment 19. Whether Commerce Should Reconsider Certification Eligibility in Changed Circumstances Reviews

Comment 20. Whether Cadmium Telluride Thin Film Solar Products are Covered by Affirmative Final Determinations or Related Certification Requirements

Comment 21. Clarification and Enforcement of the Utilization Requirement

Comment 22. Whether the "Wafer-Plus-Three" Requirement is Appropriate

Comment 23. Whether Commerce Properly Placed Ex Parte Memoranda on the Record That Concerned the Circumvention Proceedings

Comment 24. Whether Commerce's Determination To Apply *Presidential Proclamation 10414* Retroactively is Contrary to Law

Comment 25. Whether Third-Country Exporters Without an AD Rate Should Receive the Separate Rate

VIII. Recommendation

## Appendix II—List of Companies to Which Commerce Applied AFA

### Cambodia

1. New East Solar Energy (Cambodia) Co., Ltd.

### Malaysia

1. AMC Cincaria Sdn Bhd
2. Flextronic Shah Alam Sdn. Bhd.
3. Funing Precision Component Co., Ltd.
4. Samsung Sds Malaysia Sdn. Bhd.
5. Vina Solar Technology Co., Ltd.

### Thailand

1. Celestica (Thailand) Limited
2. Green Solar Thailand Co., Ltd.
3. Lightup Creation CO., Ltd.
4. Thai Master Frame Co., Ltd.
5. Three Arrows (Thailand) Co., Ltd.
6. Yuan Feng New Energy
7. Solar PPM.

8. Sunshine Electrical Energy Co., Ltd.

### Vietnam

1. Cong Ty Co Phan Cong Nghe Nang (Global Energy)
2. GCL System Integration Technology
3. Green Wing Solar Technology Co., Ltd.
4. HT Solar Vietnam Limited Company
5. Irex Energy Joint Stock Company
6. S-Solar Viet Nam Company Limited
7. Venergy Solar Industry Company
8. Red Sun Energy Co., Ltd.
9. Vina Solar Technology Co., Ltd.

## Appendix III—List of Companies Found Not To Be Circumventing

### Malaysia

1. Hanwha Q CELLS Malaysia Sdn. Bhd.
2. Jinko Solar Technology Sdn. Bhd./Jinko Solar (Malaysia) Sdn. Bhd.

### Vietnam

1. Boviet Solar Technology Co., Ltd.

## Appendix IV

### Certification for "Applicable Entries" Under 19 CFR Part 362 Importer Certification

I hereby certify that:

(A) My name is {IMPORTING COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF IMPORTING COMPANY}, located at {ADDRESS OF IMPORTING COMPANY}.

(B) I have direct personal knowledge of the facts regarding importation of the solar cells and solar modules produced in {SELECT ONE OF THE FOLLOWING COUNTRIES: KINGDOM OF CAMBODIA, MALAYSIA, THE KINGDOM OF THAILAND, OR THE SOCIALIST REPUBLIC OF VIETNAM } that were entered into the Customs territory of the United States under the entry summary number(s) identified below which are covered by this certification. "Direct personal knowledge" refers to the facts the certifying party is expected to have in its own records. For example, the importer should have direct personal knowledge of the exporter and/or seller's identity and location.

(C) If the importer is acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

The solar cells and/or solar modules covered by this certification were imported by {NAME OF IMPORTING COMPANY} on behalf of {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER}.

If the importer is not acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

{NAME OF IMPORTING COMPANY} is not acting on behalf of the first U.S. customer.

(D) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM THE MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(E) I have personal knowledge of the facts regarding the production and exportation of the solar cells and modules identified below. "Personal knowledge" includes facts obtained from another party, (*e.g.*,

correspondence received by the importer (or exporter) from the producer of the imported products regarding production).

(F) The imported solar cells and/or solar modules covered by this certification:

1. Were produced in {SELECT ONE OF THE FOLLOWING COUNTRIES: KINGDOM OF CAMBODIA, MALAYSIA, THE KINGDOM OF THAILAND, OR THE SOCIALIST REPUBLIC OF VIETNAM} using parts and components manufactured in the People's Republic of China;

2. Were exported to the United States from {SELECT ONE OF THE FOLLOWING COUNTRIES: KINGDOM OF CAMBODIA, MALAYSIA, THE KINGDOM OF THAILAND, OR THE SOCIALIST REPUBLIC OF VIETNAM} without further assembly in another country;

3. Absent the affirmative determination of circumvention, are not covered by the antidumping duty or countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China;

4. Are not covered by the antidumping duty order on certain crystalline silicon photovoltaic products from Taiwan;

5. Were entered into the United States, or were withdrawn from warehouse, for consumption before 06/06/2024, or before the date the emergency described in *Presidential Proclamation 10414* is terminated, whichever occurs first; and

6. If entered, or withdrawn from warehouse, after November 15, 2022, the solar cells and/or solar modules will be utilized in the United States by no later than 180 days after the earlier of 06/06/2024, or the date the emergency described in *Presidential Proclamation 10414* is terminated. Utilized means the solar cells or solar modules will be used or installed in the United States. Solar cells or solar modules which remain in inventory or in a warehouse in the United States, are resold to another party, are subsequently exported, or are destroyed after importation are not considered utilized.

(G) This certification applies to the following entries (repeat this block as many times as necessary):

Entry Summary #:
Applicable Line Item # of the Entry
 Summary:
Foreign Seller:
Foreign Seller's Address:
Foreign Seller's Invoice #:
Applicable Line Item # on the Foreign
 Seller's Invoice:
Producer:
Producer's Address:

(H) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.,* documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, production records, invoices, *etc.*) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(I) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of the exporter's certification (attesting to information regarding the production and/or exportation of the imported merchandise identified above), and any supporting documentation provided to the importer by the exporter, until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(J) I understand that {NAME OF IMPORTING COMPANY} is required to provide U.S. Customs and Border Protection (CBP) and/or the U.S. Department of Commerce (Commerce) with the importer certification, and any supporting documentation, and a copy of the exporter's certification, and any supporting documentation provided to the importer by the exporter, upon the request of either agency.

(K) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(L) I understand that failure to maintain the required certifications and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all entries to which this certification applies are not "Applicable Entries." I understand that such a finding may result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping duty and countervailing duty cash deposits determined by Commerce; and

(iii) the importer no longer being allowed to participate in the certification process.

(M) I understand that agents of the importer, such as brokers, are not permitted to make this certification.

(N) This certification was completed and signed on, or prior to, the date of the entry summary if the entry date is more than 14 days after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**. If the entry date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**, this certification was completed and signed by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(O) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.

Signature
_____
{NAME OF COMPANY OFFICIAL}
{TITLE OF COMPANY OFFICIAL}
Date
_____

**Exporter Certification**

The party that made the sale to the United States should fill out the exporter certification.

I hereby certify that:

(A) My name is {COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF FOREIGN COMPANY THAT MADE THE SALE TO THE UNITED STATES}, located at {ADDRESS OF FOREIGN COMPANY THAT MADE THE SALE TO THE UNITED STATES};

(B) I have direct personal knowledge of the facts regarding the production and exportation of the solar cells and solar modules for which sales are identified below. "Direct personal knowledge" refers to facts the certifying party is expected to have in its own records. For example, an exporter should have direct personal knowledge of the producer's identity and location.

(C) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(D) The solar cells and/or solar modules covered by this certification:

1. Were produced in {SELECT ONE OF THE FOLLOWING COUNTRIES: KINGDOM OF CAMBODIA, MALAYSIA, THE KINGDOM OF THAILAND, OR THE SOCIALIST REPUBLIC OF VIETNAM} using parts and components manufactured in the People's Republic of China;

2. Were exported to the United States from {SELECT ONE OF THE FOLLOWING COUNTRIES: KINGDOM OF CAMBODIA, MALAYSIA, THE KINGDOM OF THAILAND, OR THE SOCIALIST REPUBLIC OF VIETNAM} without further assembly in another country;

3. Absent the affirmative determination of circumvention, are not covered by the antidumping duty or countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China; and

4. Are not covered by the antidumping duty order on certain crystalline silicon photovoltaic products from Taiwan.

(E) This certification applies to the following sales to {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER} (repeat this block as many times as necessary):

# of the Foreign Seller's Invoice to the U.S. Customer:
Applicable Line Item # of the Foreign Seller's Invoice to the U.S. Customer:
Producer Name:
Producer's Address:
Invoice # of the Producer's Invoice to the Foreign Seller (if the foreign seller and the producer are the same party, report "NA" here):

(F) I understand that {NAME OF FOREIGN COMPANY THAT MADE THE SALE TO THE UNITED STATES} is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.,* documents maintained in

Filed By: Katrina Dyer, Filed Date: 8/23/23 11:51 AM, Submission Status: Approved

Barcode:4419744-03 A-570-979 CIRC - Anti Circumvention Inquiry - from Thailand 2022

the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, customer specification sheets, production records, invoices, *etc.*) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(G) I understand that {NAME OF FOREIGN COMPANY THAT MADE THE SALE TO THE UNITED STATES} is required to provide the U.S. importer with a copy of this certification and is required to provide U.S. Customs and Border Protection (CBP) and/or the U.S. Department of Commerce (Commerce) with a copy of this certification, and any supporting documents, upon the request of either agency.

(H) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(I) I understand that failure to maintain the required certification and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all sales to which this certification applies are sales of merchandise that was not entered into the United States in ''Applicable Entries.'' I understand that such a finding may result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping and countervailing duty cash deposits determined by Commerce; and

(iii) the seller/exporter no longer being allowed to participate in the certification process.

(J) I understand that agents of the seller/exporter, such as freight forwarding companies or brokers, are not permitted to make this certification.

(K) This certification was completed and signed, and a copy of the certification was provided to the importer, on, or prior to, the date of shipment if the shipment date is more than 14 days after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**. If the shipment date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**, this certification was completed and signed, and a copy of the certification was provided to the importer, by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(L) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.

Signature ________________________
{NAME OF COMPANY OFFICIAL}
{TITLE OF COMPANY OFFICIAL}
Date ________________________

## Appendix V

### Certification for Entries of Inquiry Merchandise From Companies Found Not To Be Circumventing

*Company Name:* Boviet Solar Technology Co., Ltd.

### Importer Certification

I hereby certify that:

(A) My name is {IMPORTING COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF IMPORTING COMPANY}, located at {ADDRESS OF IMPORTING COMPANY}.

(B) I have direct personal knowledge of the facts regarding importation of the solar cells and solar modules produced in Vietnam that were entered into the Customs territory of the United States under the entry summary number(s) identified below which are covered by this certification. ''Direct personal knowledge'' refers to the facts the certifying party is expected to have in its own records. For example, the importer should have direct personal knowledge of the exporter and/or seller's identity and location.

(C) If the importer is acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

The solar cells and/or solar modules covered by this certification were imported by {NAME OF IMPORTING COMPANY} on behalf of {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER}.

If the importer is not acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

{NAME OF IMPORTING COMPANY} is not acting on behalf of the first U.S. customer.

(D) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM THE MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(E) I have personal knowledge of the facts regarding the production and exportation of the solar cells and modules identified below. ''Personal knowledge'' includes facts obtained from another party, (*e.g.,* correspondence received by the importer (or exporter) from the producer of the imported products regarding production).

(F) The solar cells and/or solar modules covered by this certification were:

1. Sold to the United States by Boviet Solar Technology Co., Ltd.
2. Exported to the United States by Boviet Solar Technology Co., Ltd.
3. Produced in Vietnam by Boviet Solar Technology Co., Ltd., using wafers manufactured in the People's Republic of China that were exported to Vietnam by Ningbo Kyanite International Trade Co., Ltd.

(G) The U.S. Department of Commerce (Commerce) found that solar cells and/or solar modules produced by Boviet Solar Technology Co., Ltd., using wafers manufactured in China that were exported by the wafer supplier listed in item F above, and exported by Boviet Solar Technology Co., Ltd. are not circumventing the antidumping duty and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.

(H) This certification applies to the following entries (repeat this block as many times as necessary):

Entry Summary #:
Applicable Line Item # of the Entry Summary:
Foreign Seller's Invoice #:
Applicable Line Item # on the Foreign Seller's Invoice:

(I) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.,* documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, production records, invoices, *etc.*) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(J) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of the exporter's certification (attesting to information regarding the production and/or exportation of the imported merchandise identified above), and any supporting documentation provided to the importer by the exporter, until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(K) I understand that {NAME OF IMPORTING COMPANY} is required to provide U.S. Customs and Border Protection (CBP) and/or Commerce with the importer certification, and any supporting documentation, and a copy of the exporter's certification, and any supporting documentation provided to the importer by the exporter, upon the request of either agency.

(L) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(M) I understand that failure to maintain the required certifications and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all entries to which this certification applies are entries of merchandise that is covered by the scope of the antidumping and countervailing duty orders on solar cells and solar modules from China. I understand that such a finding will result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping duty and countervailing duty cash deposits determined by Commerce; and

(iii) the importer no longer being allowed to participate in the certification process.

Filed By: Katrina Dyer, Filed Date: 8/23/23 11:51 AM, Submission Status: Approved

(N) I understand that agents of the importer, such as brokers, are not permitted to make this certification.

(O) This certification was completed and signed on, or prior to, the date of the entry summary if the entry date is more than 14 days after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**. If the entry date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**, this certification was completed and signed by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(P) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.

Signature

NAME OF COMPANY OFFICIAL
TITLE OF COMPANY OFFICIAL
Date

## Exporter Certification

### Certification for Entries of Inquiry Merchandise From Companies Found Not To Be Circumventing

*Company Name:* Boviet Solar Technology Co., Ltd.

The party that made the sale to the United States should fill out the exporter certification.

I hereby certify that:

(A) My name is {COMPANY OFFICIAL'S NAME} and I am an official of Boviet Solar Technology Co., Ltd., located at B5, B6, Song Khe Industrial Zone, Noi Hoang District Bac Giang Province, Vietnam;

(B) I have direct personal knowledge of the facts regarding the production and exportation of the solar cells and solar modules for which sales are identified below. "Direct personal knowledge" refers to facts the certifying party is expected to have in its own records. For example, an exporter should have direct personal knowledge of the producer's identity and location.

(C) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(D) The solar cells and/or solar modules covered by this certification were:

1. Sold to the United States by Boviet Solar Technology Co., Ltd.

2. Exported to the United States by Boviet Solar Technology Co., Ltd.

3. Produced in Vietnam by Boviet Solar Technology Co., Ltd. using wafers manufactured in the People's Republic of China (China) that were exported to Vietnam by Ningbo Kyanite International Trade Co., Ltd.

(E) The U.S. Department of Commerce (Commerce) found that solar cells and/or solar modules produced by Boviet Solar Technology Co., Ltd., using wafers manufactured in China that were exported by the wafer supplier listed in item D above, and exported by Boviet Solar Technology Co., Ltd. are not circumventing the antidumping duty and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.

(F) This certification applies to the following sales to {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER} {repeat this block as many times as necessary}:

# of the Foreign Seller's Invoice to the U.S. Customer: Applicable Line Item # of the Foreign Seller's Invoice to the U.S. Customer:

(G) I understand that Boviet Solar Technology Co., Ltd. is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.,* documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, customer specification sheets, production records, invoices, *etc.*) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(H) I understand that Boviet Solar Technology Co., Ltd. is required to provide the U.S. importer with a copy of this certification and is required to provide U.S. Customs and Border Protection (CBP) and/or Commerce with a copy of this certification, and any supporting documents, upon the request of either agency.

(I) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(J) I understand that failure to maintain the required certification and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all sales to which this certification applies are sales of merchandise that is covered by the scope of the antidumping and countervailing duty orders on solar cells and solar modules from China. I understand that such a finding will result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping and countervailing duty cash deposits determined by Commerce; and

(iii) the seller/exporter no longer being allowed to participate in the certification process.

(K) I understand that agents of the exporter, such as freight forwarding companies or brokers, are not permitted to make this certification.

(L) This certification was completed and signed, and a copy of the certification was provided to the importer, on, or prior to, the date of shipment if the shipment date is more than 14 days after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**. If the shipment date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**, this certification was completed and signed, and a copy of the certification was provided to the importer, by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(M) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.

Signature

{NAME OF COMPANY OFFICIAL}
{TITLE OF COMPANY OFFICIAL}
Date

### Certification for Entries of Inquiry Merchandise From Companies Found Not To Be Circumventing

*Company Name:* Hanwha Q CELLS Malaysia Sdn. Bhd.

**Importer Certification**

I hereby certify that:

(A) My name is {IMPORTING COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF IMPORTING COMPANY}, located at {ADDRESS OF IMPORTING COMPANY}.

(B) I have direct personal knowledge of the facts regarding importation of the solar cells and solar modules produced in Malaysia that were entered into the Customs territory of the United States under the entry summary number(s) identified below which are covered by this certification. "Direct personal knowledge" refers to the facts the certifying party is expected to have in its own records. For example, the importer should have direct personal knowledge of the exporter and/or seller's identity and location.

(C) If the importer is acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

The solar cells and/or solar modules covered by this certification were imported by {NAME OF IMPORTING COMPANY} on behalf of {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER}.

If the importer is not acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

{NAME OF IMPORTING COMPANY} is not acting on behalf of the first U.S. customer.

(D) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM THE MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(E) I have personal knowledge of the facts regarding the production and exportation of the solar cells and modules identified below. "Personal knowledge" includes facts obtained from another party, (*e.g.,* correspondence received by the importer (or exporter) from the producer of the imported products regarding production).

(F) The solar cells and/or solar modules covered by this certification were:

1. Sold to the United States by Hanwha Q CELLS Malaysia Sdn. Bhd.

2. Exported to the United States by Hanwha Q CELLS Malaysia Sdn. Bhd.

3. Produced in Malaysia by Hanwha Q CELLS Malaysia Sdn. Bhd., using wafers manufactured in the People's Republic of China that were exported to Malaysia by: {CHECK THE RELEVANT WAFER EXPORTERS BELOW} {we have afforded business proprietary information (BPI) treatment to the names of the wafer exporters; for a table of the names of the wafer exporters, which must be included as part of this paragraph in the certificate submitted to CBP—please refer to the proprietary version of this certification on ACCESS).

(G) The U.S. Department of Commerce (Commerce) found that solar cells and/or solar modules produced by Hanwha Q CELLS Malaysia Sdn. Bhd., using wafers manufactured in China that were exported by the wafer supplier(s) listed in item F above, and exported by Hanwha Q CELLS Malaysia Sdn. Bhd. are not circumventing the antidumping duty and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.

(H) This certification applies to the following entries (repeat this block as many times as necessary):

Entry Summary #:
Applicable Line Item # of the Entry Summary:
Foreign Seller's Invoice #:
Applicable Line Item # on the Foreign Seller's Invoice:

(I) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.*, documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, production records, invoices, *etc.*) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(J) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of the exporter's certification (attesting to information regarding the production and/or exportation of the imported merchandise identified above), and any supporting documentation provided to the importer by the exporter, until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(K) I understand that {NAME OF IMPORTING COMPANY} is required to provide U.S. Customs and Border Protection (CBP) and/or Commerce with the importer certification, and any supporting documentation, and a copy of the exporter's certification, and any supporting documentation provided to the importer by the exporter, upon the request of either agency.

(L) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(M) I understand that failure to maintain the required certifications and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all entries to which this certification applies are entries of merchandise that is covered by the scope of the antidumping and countervailing duty orders on solar cells and solar modules from China. I understand that such a finding will result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping duty and countervailing duty cash deposits determined by Commerce; and

(iii) the importer no longer being allowed to participate in the certification process.

(N) I understand that agents of the importer, such as brokers, are not permitted to make this certification.

(O) This certification was completed and signed on, or prior to, the date of the entry summary if the entry date is more than 14 days after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**. If the entry date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**, this certification was completed and signed by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(P) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.

Signature _____
{NAME OF COMPANY OFFICIAL}
{TITLE OF COMPANY OFFICIAL}
Date _____

**Exporter Certification**

**Certification for Entries of Inquiry Merchandise From Companies Found Not To Be Circumventing**

*Company Name:* Hanwha Q CELLS Malaysia Sdn. Bhd.

The party that made the sale to the United States should fill out the exporter certification.

I hereby certify that:

(A) My name is {COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF COMPANY}, located at {ADDRESS OF COMPANY}.

(B) I have direct personal knowledge of the facts regarding the production and exportation of the solar cells and solar modules for which sales are identified below. "Direct personal knowledge" refers to facts the certifying party is expected to have in its own records. For example, an exporter

should have direct personal knowledge of the producer's identity and location.

(C) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(D) The solar cells and/or solar modules covered by this certification were:

1. Sold to the United States by Hanwha Q CELLS Malaysia Sdn. Bhd.

2. Exported to the United States by Hanwha Q CELLS Malaysia Sdn. Bhd.

3. Produced in Malaysia by Hanwha Q CELLS Malaysia Sdn. Bhd. using wafers manufactured in the People's Republic of China (China) that were exported to Malaysia by: {CHECK THE RELEVANT WAFER EXPORTERS BELOW} {we have afforded business proprietary information (BPI) treatment to the names of the wafer exporters; for a table of the names of the wafer exporters, which must be included as part of this paragraph in the certificate submitted to CBP—please refer to the proprietary version of this certification on ACCESS).

(E) The U.S. Department of Commerce (Commerce) found that solar cells and/or solar modules produced by Hanwha Q CELLS Malaysia Sdn. Bhd., using wafers manufactured in China that were exported by the wafer supplier(s) listed in item D above, and exported by Hanwha Q CELLS Malaysia Sdn. Bhd. are not circumventing the antidumping duty and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.

(F) This certification applies to the following sales to {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER} {repeat this block as many times as necessary):

# of the Foreign Seller's Invoice to the U.S. Customer:
Applicable Line Item # of the Foreign Seller's Invoice to the U.S. Customer:

(G) I understand that Hanwha Q CELLS Malaysia Sdn. Bhd. is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.*, documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, customer specification sheets, production records, invoices, *etc.*) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(H) I understand that Hanwha Q CELLS Malaysia Sdn. Bhd. is required to provide the U.S. importer with a copy of this certification and is required to provide U.S. Customs and Border Protection (CBP) and/or Commerce with a copy of this certification, and any supporting documents, upon the request of either agency.

(I) I understand that the claims made herein, and the substantiating

documentation, are subject to verification by CBP and/or Commerce.

(J) I understand that failure to maintain the required certification and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all sales to which this certification applies are sales of merchandise that is covered by the scope of the antidumping and countervailing duty orders on solar cells and solar modules from China. I understand that such a finding will result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping and countervailing duty cash deposits determined by Commerce; and

(iii) the seller/exporter no longer being allowed to participate in the certification process.

(K) I understand that agents of the exporter, such as freight forwarding companies or brokers, are not permitted to make this certification.

(L) This certification was completed and signed, and a copy of the certification was provided to the importer, on, or prior to, the date of shipment if the shipment date is more than 14 days after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**. If the shipment date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**, this certification was completed and signed, and a copy of the certification was provided to the importer, by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(M) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.
Signature
{NAME OF COMPANY OFFICIAL}
{TITLE OF COMPANY OFFICIAL}
Date

**Certification for Entries of Inquiry Merchandise From Companies Found Not To Be Circumventing**

*Company Name:* Jinko Solar Technology Sdn. Bhd.; and Jinko Solar (Malaysia) Sdn. Bhd.

**Importer Certification**

I hereby certify that:

(A) My name is {IMPORTING COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF IMPORTING COMPANY}, located at {ADDRESS OF IMPORTING COMPANY}.

(B) I have direct personal knowledge of the facts regarding importation of the solar cells and solar modules produced in Malaysia that were entered into the Customs territory of the United States under the entry summary

number(s) identified below which are covered by this certification. ''Direct personal knowledge'' refers to the facts the certifying party is expected to have in its own records. For example, the importer should have direct personal knowledge of the exporter and/or seller's identity and location.

(C) If the importer is acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

The solar cells and/or solar modules covered by this certification were imported by {NAME OF IMPORTING COMPANY} on behalf of {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER}.

If the importer is not acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

{NAME OF IMPORTING COMPANY} is not acting on behalf of the first U.S. customer.

(D) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM THE MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(E) I have personal knowledge of the facts regarding the production and exportation of the solar cells and modules identified below. ''Personal knowledge'' includes facts obtained from another party, (*e.g.,* correspondence received by the importer (or exporter) from the producer of the imported products regarding production).

(F) The solar cells and/or solar modules covered by this certification were:

1. Sold to the United States by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd.

2. Exported to the United States by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd.

3. Produced in Malaysia by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd.}, using wafers manufactured in the People's Republic of China that were exported to Malaysia by: {CHECK THE RELEVANT WAFER EXPORTERS BELOW}

Jinko Solar Co., Ltd.
Jinko Solar Import and Export Co., Ltd.
Jinko Solar (Chuzhou) Co., Ltd.
Jinko Solar (Shangrao) Co., Ltd.
Yuhuan Jinko Solar Co., Ltd.
JINKOSOLAR MIDDLE EAST DMCC.

(G) The U.S. Department of Commerce (Commerce) found that solar cells and/or solar modules produced by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd., using wafers manufactured in China that were exported by the wafer supplier(s) identified in item F above, and exported by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd. are not circumventing the antidumping duty and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.

(H) This certification applies to the following entries (repeat this block as many times as necessary):

Entry Summary #:
Applicable Line Item # of the Entry Summary:
Foreign Seller's Invoice #:
Applicable Line Item # on the Foreign Seller's Invoice:

(I) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.,* documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, production records, invoices, *etc.*) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(J) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of the exporter's certification (attesting to information regarding the production and/or exportation of the imported merchandise identified above), and any supporting documentation provided to the importer by the exporter, until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(K) I understand that {NAME OF IMPORTING COMPANY} is required to provide U.S. Customs and Border Protection (CBP) and/or Commerce with the importer certification, and any supporting documentation, and a copy of the exporter's certification, and any supporting documentation provided to the importer by the exporter, upon the request of either agency.

(L) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(M) I understand that failure to maintain the required certifications and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all entries to which this certification applies are entries of merchandise that is covered by the scope of the antidumping and countervailing duty orders on solar cells and solar modules from China. I understand that such a finding will result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping duty and countervailing duty cash deposits determined by Commerce; and

(iii) the importer no longer being allowed to participate in the certification process.

(N) I understand that agents of the importer, such as brokers, are not permitted to make this certification.

(O) This certification was completed and signed on, or prior to, the date of the entry summary if the entry date is more than 14 days after the date of publication of the

notice of Commerce's preliminary determination of circumvention in the **Federal Register**. If the entry date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**, this certification was completed and signed by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(P) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.
Signature _____
{NAME OF COMPANY OFFICIAL}
{TITLE OF COMPANY OFFICIAL}
Date _____

### Exporter Certification

**Certification for Entries of Inquiry Merchandise From Companies Found Not To Be Circumventing**

*Company Name:* Jinko Solar Technology Sdn. Bhd.; and Jinko Solar (Malaysia) Sdn. Bhd.

The party that made the sale to the United States should fill out the exporter certification.

I hereby certify that:

(A) My name is {COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF COMPANY}, located at {ADDRESS OF COMPANY}.

(B) I have direct personal knowledge of the facts regarding the production and exportation of the solar cells and solar modules for which sales are identified below. "Direct personal knowledge" refers to facts the certifying party is expected to have in its own records. For example, an exporter should have direct personal knowledge of the producer's identity and location.

(C) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(D) The solar cells and/or solar modules covered by this certification were:

1. Sold to the United States by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd.

2. Exported to the United States by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd.

3. Produced in Malaysia by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd. using wafers manufactured in the People's Republic of China (China) that were exported to Malaysia by: {CHECK THE RELEVANT WAFER EXPORTERS BELOW}

Jinko Solar Co., Ltd.
Jinko Solar Import and Export Co., Ltd.
Jinko Solar (Chuzhou) Co., Ltd.
Jinko Solar (Shangrao) Co., Ltd.
Yuhuan Jinko Solar Co., Ltd.
JINKOSOLAR MIDDLE EAST DMCC.

(E) The U.S. Department of Commerce (Commerce) found that solar cells and/or solar modules produced by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd., using wafers manufactured in China that were exported by the wafer supplier(s) identified in item D above, and exported by Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd. are not circumventing the antidumping duty and countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China.

(F) This certification applies to the following sales to {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER} (repeat this block as many times as necessary):
# of the Foreign Seller's Invoice to the U.S. Customer:
Applicable Line Item # of the Foreign Seller's Invoice to the U.S. Customer:

(G) I understand that Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd. are required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.*, documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, customer specification sheets, production records, invoices, *etc.*) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(H) I understand that Jinko Solar Technology Sdn. Bhd. or Jinko Solar (Malaysia) Sdn. Bhd. are required to provide the U.S. importer with a copy of this certification and is required to provide U.S. Customs and Border Protection (CBP) and/or Commerce with a copy of this certification, and any supporting documents, upon the request of either agency.

(I) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(J) I understand that failure to maintain the required certification and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all sales to which this certification applies are sales of merchandise that is covered by the scope of the antidumping and countervailing duty orders on solar cells and solar modules from China. I understand that such a finding will result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping and countervailing duty cash deposits determined by Commerce; and

(iii) the seller/exporter no longer being allowed to participate in the certification process.

(K) I understand that agents of the exporter, such as freight forwarding companies or brokers, are not permitted to make this certification.

(L) This certification was completed and signed, and a copy of the certification was provided to the importer, on, or prior to, the date of shipment if the shipment date is more than 14 days after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**. If the shipment date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register** this certification was completed and signed, and a copy of the certification was provided to the importer, by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(M) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.
Signature _____
{NAME OF COMPANY OFFICIAL}
{TITLE OF COMPANY OFFICIAL}
Date _____

### Appendix VI

**Certification Regarding Chinese Components**

**Importer Certification**

I hereby certify that:

(A) My name is {IMPORTING COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF IMPORTING COMPANY}, located at {ADDRESS OF IMPORTING COMPANY}.

(B) I have direct personal knowledge of the facts regarding importation of the solar cells and solar modules produced in {COUNTRY} that were entered into the Customs territory of the United States under the entry summary number(s) identified below which are covered by this certification. "Direct personal knowledge" refers to the facts the certifying party is expected to have in its own records. For example, the importer should have direct personal knowledge of the exporter and/or seller's identity and location.

(C) If the importer is acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

The solar cells and/or solar modules covered by this certification were imported by {NAME OF IMPORTING COMPANY} on behalf of {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER}.

If the importer is not acting on behalf of the first U.S. customer, include the following sentence as paragraph C of this certification:

{NAME OF IMPORTING COMPANY} is not acting on behalf of the first U.S. customer.

(D) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM THE MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(E) I have personal knowledge of the facts regarding the production and exportation of the solar cells and modules identified below.

''Personal knowledge'' includes facts obtained from another party, (e.g., correspondence received by the importer (or exporter) from the producer of the imported products regarding production).

(F) If the imported products covered by this certification are solar cells that are not in solar modules or products that contain solar cells that are not in a solar module, then the importer certifies that the solar cells produced in {COUNTRY} that are covered by this certification were not manufactured using wafers produced in China, regardless of whether sourced directly from a Chinese producer or from a downstream supplier.

(G) If the imported products covered by this certification are solar modules or products that contain solar modules, then the importer certifies that the solar modules produced in {COUNTRY} that are covered by this certification were not manufactured using wafers produced in China, regardless of whether sourced directly from a Chinese producer or from a downstream supplier, *or* the solar modules produced in {COUNTRY} that are covered by this certification were manufactured using wafers produced in China but *no more than two* of the following inputs that were used to manufacture the solar modules were produced in China, regardless of whether sourced directly from a Chinese producer or from a Chinese downstream supplier:

a. Silver Paste
b. Aluminum Frames
c. Glass
d. Backsheets
e. Ethylene-Vinyl Acetate
f. Junction Boxes

(H) The solar cells and/or solar modules covered by this certification: (a) absent the affirmative determination of circumvention, are not covered by the antidumping duty or countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China; and (b) are not covered by the antidumping duty order on certain crystalline silicon photovoltaic products from Taiwan.

(I) This certification applies to the following entries (repeat this block as many times as necessary):

Entry Summary #:
Applicable Line Item # of the Entry Summary:
Foreign Seller:
Foreign Seller's Address:
Foreign Seller's Invoice #:
Applicable Line Item # on the Foreign Seller's Invoice:
Producer:
Producer's Address:

(J) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of this certification and sufficient documentation supporting this certification (i.e., documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, production records, invoices, etc.) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years

after the conclusion of any litigation in United States courts regarding such entries.

(K) I understand that {NAME OF IMPORTING COMPANY} is required to maintain a copy of the exporter's certification (attesting to information regarding the production and/or exportation of the imported merchandise identified above), and any supporting documentation provided to the importer by the exporter, until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(L) I understand that {NAME OF IMPORTING COMPANY} is required to provide U.S. Customs and Border Protection (CBP) and/or the U.S. Department of Commerce (Commerce) with the importer certification, and any supporting documentation, and a copy of the exporter's certification, and any supporting documentation provided to the importer by the exporter, upon the request of either agency.

(M) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(N) I understand that failure to maintain the required certifications and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all entries to which this certification applies are entries of merchandise that is covered by the scope of the antidumping and countervailing duty orders on solar cells and solar modules from China. I understand that such a finding will result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping duty and countervailing duty cash deposits determined by Commerce; and

(iii) the importer no longer being allowed to participate in the certification process.

(O) I understand that agents of the importer, such as brokers, are not permitted to make this certification.

(P) This certification was completed and signed on, or prior to, the date of the entry summary if the entry date is more than 14 days after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**. If the entry date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**, this certification was completed and signed by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(Q) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.
Signature _____

{NAME OF COMPANY OFFICIAL}
{TITLE OF COMPANY OFFICIAL}
Date _____

**Exporter Certification**

The party that made the sale to the United States should fill out the exporter certification.

I hereby certify that:

(A) My name is {COMPANY OFFICIAL'S NAME} and I am an official of {NAME OF FOREIGN COMPANY THAT MADE THE SALE TO THE UNITED STATES}, located at {ADDRESS OF FOREIGN COMPANY THAT MADE THE SALE TO THE UNITED STATES};

(B) I have direct personal knowledge of the facts regarding the production and exportation of the solar cells and solar modules for which sales are identified below. ''Direct personal knowledge'' refers to facts the certifying party is expected to have in its own records. For example, an exporter should have direct personal knowledge of the producer's identity and location.

(C) The solar cells and/or solar modules covered by this certification were shipped to {NAME OF PARTY IN THE UNITED STATES TO WHOM MERCHANDISE WAS FIRST SHIPPED}, located at {U.S. ADDRESS TO WHICH MERCHANDISE WAS SHIPPED}.

(D) If the exported products covered by this certification are solar cells that are not in solar modules or products that contains solar cells that are not in a solar module, then the seller certifies that the solar cells produced in {COUNTRY} that are covered by this certification were not manufactured using wafers produced in China, regardless of whether sourced directly from a Chinese producer or from a downstream supplier.

(E) If the exported products covered by this certification are solar modules or products that contain solar modules, then the seller certifies that the solar modules produced in {COUNTRY} that are covered by this certification were not manufactured using wafers produced in China, regardless of whether sourced directly from a Chinese producer or from a downstream supplier, or the solar modules produced in {COUNTRY} that are covered by this certification were manufactured using wafers produced in China but *no more than two* of the following inputs that were used to manufacture the solar modules were produced in China, regardless of whether sourced directly from a Chinese producer or from a Chinese downstream supplier:

a. Silver Paste
b. Aluminum Frames
c. Glass
d. Backsheets
e. Ethylene-Vinyl Acetate
f. Junction Boxes

(F) The solar cells and/or solar modules covered by this certification: (a) absent the affirmative determination of circumvention, are not covered by the antidumping duty or countervailing duty orders on crystalline silicon photovoltaic cells, whether or not assembled into modules, from the People's Republic of China; and (b) are not covered by the antidumping duty order on certain crystalline silicon photovoltaic products from Taiwan.

(G) This certification applies to the following sales to {NAME OF U.S. CUSTOMER}, located at {ADDRESS OF U.S. CUSTOMER} (repeat this block as many times as necessary):

# of the Foreign Seller's Invoice to the U.S. Customer:

Applicable Line Item # of the Foreign Seller's Invoice to the U.S. Customer:

Producer Name:

Producer's Address:

Invoice # of the Producer's Invoice to the Foreign Seller (if the foreign seller and the producer are the same party, report "NA" here):

(H) I understand that {NAME OF FOREIGN COMPANY THAT MADE THE SALE TO THE UNITED STATES} is required to maintain a copy of this certification and sufficient documentation supporting this certification (*i.e.,* documents maintained in the normal course of business, or documents obtained by the certifying party, for example, product specification sheets, customer specification sheets, production records, invoices, *etc.*) until the later of: (1) the date that is five years after the latest entry date of the entries covered by the certification; or (2) the date that is three years after the conclusion of any litigation in United States courts regarding such entries.

(I) I understand that {NAME OF FOREIGN COMPANY THAT MADE THE SALE TO THE UNITED STATES} is required to provide the U.S. importer with a copy of this certification and is required to provide U.S. Customs and Border Protection (CBP) and/or the U.S. Department of Commerce (Commerce) with a copy of this certification, and any supporting documents, upon the request of either agency.

(J) I understand that the claims made herein, and the substantiating documentation, are subject to verification by CBP and/or Commerce.

(K) I understand that failure to maintain the required certification and supporting documentation, or failure to substantiate the claims made herein, or not allowing CBP and/or Commerce to verify the claims made herein, may result in a *de facto* determination that all sales to which this certification applies are sales of merchandise that is covered by the scope of the antidumping and countervailing duty orders on solar cells and solar modules from China. I understand that such a finding will result in:

(i) suspension of liquidation of all unliquidated entries (and entries for which liquidation has not become final) for which these requirements were not met;

(ii) the importer being required to post the antidumping and countervailing duty cash deposits determined by Commerce; and

(iii) the seller/exporter no longer being allowed to participate in the certification process.

(L) I understand that agents of the seller/exporter, such as freight forwarding companies or brokers, are not permitted to make this certification.

(M) This certification was completed and signed, and a copy of the certification was provided to the importer, on, or prior to, the date of shipment if the shipment date is more than 14 days after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**. If the shipment date is on or before the 14th day after the date of publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**, this certification was completed and signed and a copy of the certification was provided to the importer, by no later than 45 days after publication of the notice of Commerce's preliminary determination of circumvention in the **Federal Register**.

(N) I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make materially false statements to the U.S. government.

Signature

{NAME OF COMPANY OFFICIAL}
{TITLE OF COMPANY OFFICIAL}

Date

[FR Doc. 2023–18161 Filed 8–22–23; 8:45 am]

**BILLING CODE 3510–DS–P**

# DEPARTMENT OF COMMERCE

## International Trade Administration

**[A–893–002, A–487–001, A–546–001, A–533–919, A–475–845, A–803–001, A–201–859, A–565–804, A–455–807, A–856–002, A–469–826, A–583–873]**

## Mattresses From Bosnia and Herzegovina, Bulgaria, Burma, India, Italy, Kosovo, Mexico, the Philippines, Poland, Slovenia, Spain, and Taiwan: Initiation of Less-Than-Fair-Value Investigations

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Applicable August 17, 2023.

**FOR FURTHER INFORMATION CONTACT:** Amaris Wade (Bosnia and Herzegovina), TJ Worthington (Bulgaria), Paul Gill (Burma), Steven Seifert (India), Caroline Carroll (Italy), Sean Carey (Kosovo), Benjamin Blythe (Mexico), Emily Halle (the Philippines), Dakota Potts (Poland), Benjamin A. Luberda (Slovenia), Matthew Palmer (Spain), and Paul Gill (Taiwan), AD/CVD Operations, Offices II, III, IV, V, VII, and IX, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–6334, (202) 482–4567, (202) 482–5673, (202) 482–3350, (202) 482–4948, (202) 482–3964, (202) 482–3457, (202) 482–0176, (202) 482–0223, (202) 482–2185, (202) 482–1678, and (202) 482–5673, respectively.

**SUPPLEMENTARY INFORMATION:**

## The Petitions

On July 28, 2023, the U.S. Department of Commerce (Commerce) received antidumping duty (AD) petitions concerning imports of mattresses from Bosnia and Herzegovina, Bulgaria, Burma, India, Italy, Kosovo, Mexico, the Philippines, Poland, Slovenia, Spain, and Taiwan, filed in proper form on behalf of the petitioners,[1] U.S. producers of mattresses and certified unions that represent workers engaged in the domestic production of mattresses.[2] These AD petitions were accompanied by a countervailing duty (CVD) petition concerning imports of mattresses from Indonesia.[3]

On August 1, 8, and 9, 2023, Commerce requested supplemental information pertaining to certain aspects of the Petitions.[4] Additionally, on August 7, 9, and 10, 2023, the petitioners filed timely responses to these requests for additional information.[5]

[1] Brooklyn Bedding; Carpenter Co.; Corsicana Mattress Company; Future Foam Inc.; FXI, Inc.; Kolcraft Enterprises Inc.; Leggett & Platt, Incorporated; Serta Simmons Bedding Inc.; Southerland, Inc.; Tempur Sealy International; the International Brotherhood of Teamsters; and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (collectively, the petitioners).

[2] *See* Petitioners' Letter, "Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, India, Indonesia, Italy, Kosovo, Mexico, Philippines, Poland, Slovenia, Spain and Taiwan: Antidumping and Countervailing Duty Petitions," dated July 28, 2023 (Petitions).

[3] *Id.*

[4] *See* Commerce's Letters, "Petitions for the Imposition of Antidumping Duties on Imports of Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, India, Italy, Kosovo, Mexico, the Philippines, Slovenia, Spain, and Taiwan and Countervailing Duties on Imports from Indonesia: Supplemental Questions," dated August 1, 2023 (General Issues Supplemental); Country-Specific Supplemental Questionnaires: Bosnia Supplemental; Bulgaria Supplemental; Burma Supplemental; India Supplemental; Italy Supplemental; Kosovo Supplemental; Mexico Supplemental; the Philippines Supplemental; Slovenia Supplemental; Spain Supplemental; and Taiwan Supplemental, dated August 1, 2023; "Petitions for the Imposition of Antidumping Duties on Imports of Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, India, Italy, Kosovo, Mexico, the Philippines, Slovenia, Spain, and Taiwan and Countervailing Duties on Imports from Indonesia: Supplemental Questions," dated August 8, 2023 (Second General Issues Supplemental); *see also* Memoranda, "Phone Call with Counsel to the Petitioners," dated August 9, 2023.

[5] *See* Petitioners' Letters, "Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, India, Italy, Kosovo, Mexico, Philippines, Slovenia, Spain, and Taiwan: Responses to Petition Supplemental Questionnaires," dated August 7, 2023, at Volume I (First General Issues Supplement) and Volume II (Country-Specific AD Supplements); "Mattresses from Bosnia and Herzegovina, Bulgaria, Burma, India, Italy, Kosovo, Mexico, Philippines, Slovenia,

Continued

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 2025-1940, 2025-1941

**Short Case Caption:** Trina Solar Science & Technology (Thailand) Ltd. v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 12,986 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 10/15/2025

Signature: /s/ Nicholas R. Sparks

Name: Nicholas R. Sparks

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2025-1940, 2025-1941

**Short Case Caption:** Trina Solar Science & Technology (Thailand) Ltd. v. US

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains ___23___ number of unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☑ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 10/15/2025

Signature: /s/ Nicholas R. Sparks

Name: Nicholas R. Sparks

Save for Filing